UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| GARDEN CITY EMPLOYEES'<br>RETIREMENT SYSTEM, Individually and on<br>Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ANIXTER INTERNATIONAL INC., et al.,<br><br>Defendants. | No. 1:09-cv-05641<br><br>Judge Robert M. Dow, Jr.<br><br><u>CLASS ACTION</u> |

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS

## TABLE OF AUTHORITIES

**Page**

NATURE OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE .............................................................................9

PARTIES ...............................................................................................................9

BACKGROUND TO THE CLASS PERIOD .......................................................12

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL
    OMISSIONS DURING THE CLASS PERIOD.............................................15

ADDITIONAL ALLEGATIONS OF SCIENTER.................................................42

LOSS CAUSATION/ECONOMIC LOSS .............................................................51

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
    DOCTRINE .................................................................................................53

CLASS ACTION ALLEGATIONS .......................................................................54

NO SAFE HARBOR .............................................................................................56

COUNT I ...............................................................................................................56

    Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
        Thereunder Against All Defendants .................................................56

COUNT II ..............................................................................................................57

    Violation of Section 20(a) of the Exchange Act Against the Individual Defendants........57

PRAYER FOR RELIEF ........................................................................................57

JURY TRIAL DEMAND ......................................................................................58

**NATURE OF THE ACTION**

1.        This is a federal class action on behalf of purchasers of the common stock of Anixter International Inc. ("Anixter" or the "Company") between January 29, 2008 and October 20, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.        Defendant Anixter describes itself as a "leading global distributor of communication products, electrical and electronic wire & cable, fasteners and other small parts."  The Company is a global supplier of communications products used to connect voice, video, data and security systems. It provides electrical and electronic wire and cable, fasteners, and other small components to build, repair and maintain a variety of systems and equipment.

3.        Anixter operates through three main business lines: (i) Enterprise Cabling and Security Solutions; (ii) Electric Wire and Cable; and (iii) Operating End Markets ("OEM") Supply. Enterprise Cabling and Security Solutions, Anixter's largest business line, accounted for over 50% of the Company's total revenue in 2007 and 2008; Electric Wire and Cable accounted for nearly 30% of total revenue in 2007 and 2008; and OEM supply accounted for nearly 20% of total revenue in 2007 and 2008.  Anixter also operates internationally, with 22% of its total business (56% of its OEM supply business) coming from Europe and 8% from Asian Pacific and Latin America in 2007.

4.        By the end of 2007, acquisition opportunities – the mechanism through which Anixter had historically grown its business – had dried up.  Therefore, during 2008, defendants informed investors that they expected Anixter to continue to achieve revenue growth organically, and forecasted a growth rate of 8-12% for 2008.  Defendants continued to represent that the Company would be able to achieve the stated growth rates, despite the economic downturn and simultaneous credit market contraction that had begun to emerge in 2007.

5.     On January 29, 2008, the start of the Class Period, Anixter issued a press release announcing its financial results for 4Q07 and fiscal year 2007.  Despite decreasing sales growth in Europe, defendant Grubbs assured investors that the Company continued to have "***strong growth . . . in the security and OEM markets***" and a "***solid backlog and healthy pipeline of potential new projects and customers***."  In addition, Grubbs assured investors that Anixter would continue to achieve "***solid earnings and growth***" in 2008 despite deteriorating market conditions:

> ***While 2008 begins with a well publicized, less certain overall economic environment than 2007, recent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year***.

6.     In addition, defendants insisted that the Company's market demand "***remained robust***" and was "***healthy across all markets***."  Defendants also reassured investors that despite a sales decrease in Europe, "***business activity levels in Europe remain strong***" and confirmed their expectation of 9% to 11% organic growth in Europe (within their previous Company-wide 8% to 12% guidance).

7.     In response to defendants' positive assurances, shares of Anixter stock rose $10.55 per share, or approximately 18%, in just one day, to close at $68.85 per share. ***That same day***, as the stock price shot up in response to defendants' positive reassurances, defendant Grubbs ***sold 14,000 shares*** of his personally held Anixter stock for $67.00 per share, reaping proceeds of $938,000. Shortly thereafter, on February 15, 2008 (while the stock price was still largely inflated), defendant Letham ***sold 3,668 shares*** of his personally held Anixter stock at prices between $66.91 and $68.29 – much higher than the $58.30 investors paid before defendants' January 29, 2008 statements – reaping proceeds of $248,199.

8.     At the same time, defendants knew that the deteriorating credit markets and global economic conditions were negatively impacting Anixter's business.  By 2008, corporate spending, particularly for information technology ("IT") projects, was decreasing in North America and

Europe.  As a result, Anixter was experiencing a slowdown in sales in its enterprise cabling business, which depended largely on IT projects for sales growth.  Defendants were aware of this negative trend through monthly reports showing the sales and profits of Anixter's cabling business by geography.

9.     The declining economic conditions were also impacting Anixter's OEM supply business, the majority of which was based in Europe.  Anixter's OEM supply business consisted largely of sales to OEMs in the European industrial and automotive industries.  But by 2008, these industries were slowing dramatically as a result of the economic downturn.  In fact, in January 2008, Moody's Global Corporate Finance predicted that demand in the major Western European markets for European automotive OEMs would "stagnat[e]" in 2008, due, in part, to slowing GDP growth and softening housing markets.  Defendants knew that slowing demand in the OEM industry meant less sales for OEM suppliers such as Anixter.  In addition, the declining sales in Anixter's OEM supply business was compressing its gross margins, as OEM supply sales typically have higher margins than other products.

10.     Despite the negative effects of the deteriorating market conditions on Anixter's gross margins and organic sales growth, defendants continued to falsely reassure investors throughout the Class Period that the Company remained unaffected by these conditions.

11.     On April 22, 2008, defendants announced Anixter's financial results for 1Q08.  For the quarter, Anixter reported a decrease in organic sales growth to only 7% (down from 9% in 4Q07) and gross margins of only 23.7%.  Despite the disappointing results, defendant Grubbs assured investors that the first quarter's "divergent growth rates" were nothing more than an "unfavorable impact from holidays," and that Anixter would "*sustain overall growth despite certain economic concerns*."  Given the uncertain credit markets, however, analysts questioned defendants on these disappointing results and any potential negative effects going forward.  But defendants reassured the

analysts that it was "***more of a seasonal pattern impact . . . [t]han it is anything about the credit market issue***," and that conditions were actually "***improv[ing]***" for Anixter.  This was the opposite of what defendants had previously told investors in Anixter's 2007 Annual Report, namely that "[t]he operating results of the Company are ***not*** significantly affected by seasonal fluctuations . . . ."

12.     Defendants also reassured investors that while Anixter had seen some "reduced spending . . . due in part to softer corporate spending," this was limited to "specific project plans of individual customers" and did ***not*** "represent[] a broader trend."  Moreover, they assured investors that Anixter "***continue[d] to generate very healthy growth***," that "***backlogs remain[ed] healthy***," and that "***bookings [had] trended up in the past several weeks***."

13.     Defendants knew these statements were false and misleading.  At the same time defendants were telling investors that Anixter would "sustain overall growth despite certain economic concerns," defendants knew, and later admitted, that the Company's sales growth was being "***negatively impacted by macro economic trends***."  Throughout 2008, corporate spending continued to decline as a result of the deteriorating global economies, thereby negatively affecting the majority of Anixter's business.  Even if related to "specific project plans of individual customers" as defendants suggested, slower corporate spending, particularly for IT projects, was having a severe effect on Anixter's business – something defendants failed to disclose to investors.  Indeed, defendants later admitted (after the Class Period) that "***[w]hen the market slows***, the chunk of the market that we do particularly well in ends up being a little bit smaller and so ***we see an effect from that pretty quickly in our business***" – the opposite of what defendants told investors on April 22, 2008, namely that Anixter was ***not*** being affected by the economic downturn.

14.     Additionally, defendants knew that Anixter's European business (its second largest reporting group) was slowing dramatically.  By 1Q08, organic growth for Europe had fallen to a paltry ***2%***.  As the industrial and automotive OEM industries continued to slow, Anixter's European

OEM supply business, which constituted the majority of its European sales, continued to decline, further compressing Anixter's margins. In addition, and contrary to defendants' reassurances that these gross margin pressures "*[we]re being mitigated through pricing actions*," defendants knew, and failed to disclose, that Anixter was involved in a significant pricing dispute with Jaguar-Land Rover ("JLR"), a major European OEM customer. According to Anixter insiders, JLR exerted considerable pressure on Anixter to lower prices and pay rebates based on JLR's purchases, and this pressure increased with the sale of JLR to Tata Motors in March 2008. Moreover, it was well known throughout Anixter's United Kingdom ("UK") operations (the Company's largest European market) that Anixter and JLR were involved in a pricing dispute throughout 2008 and that Anixter was very likely going to have to pay JLR the disputed amount. Ultimately, defendants admitted on October 20, 2008 that Anixter was involved in this "pricing dispute" and was forced to pay $3 million to JLR during the Class Period, materially affecting Anixter's financial results. Notably, in the midst of this dispute, defendant Eck visited Anixter's UK operations almost immediately after assuming his role as Chief Executive Officer ("CEO") in July 2008.

15.     On July 22, 2008, defendants announced Anixter's financial results for 2Q08. For the quarter, Anixter reported a decrease in organic sales growth to only 4% and gross margins of 23.8%. Despite the continuing decline in Anixter's organic sales growth and overall decline in economic conditions, defendants reiterated their guidance of 8% to 12% organic growth for 2008 and continued to reassure investors that any softening in sales for the quarter was limited to specific customers and was *not* the result of "*broad-based negative trends*."

16.     Despite having told investors in April that Anixter's gross margin pressures were just a "*short term anomaly*" that had *already improved* in 2Q08, defendants again reported margin pressures as a result of a decline in OEM supply business. Nonetheless, defendant Eck continued to convince investors that Anixter was "*experienc[ing] very strong growth in Europe*," and that

despite "continuing concerns about weakness in our economy," the Company was "*seeing good growth across all [its] businesses and around the world*." In addition, with regard to defendants' prior claim that gross margin pressures were "being mitigated through pricing actions," defendant Eck told investors that Anixter had in fact "*succeeded in negotiating price increases with [its] customers*."

17.     At the same time, defendants knew that Anixter's organic sales growth, particularly in its European OEM supply business, was being severely impacted by the economic downturn. According to Anixter insiders, it was clear by June 2008 that Anixter's OEM supply business in the UK, which constituted the majority of the Company's European sales, was slowing dramatically as a result of the global economic crisis and was unlikely to improve as the global recession continued to gather momentum. In addition, Anixter began pushing out delivery dates for OEM products previously ordered, and cancelling orders entirely to avoid taking delivery of new inventory. By cancelling and delaying orders, Anixter avoided having inventory on its books that it would not be able to sell due to the significant decline in business it was experiencing.

18.     Moreover, the decline in Anixter's OEM supply business continued to compress its gross margins. Indeed, defendants later admitted on October 20, 2008 that the decline in gross margins was due, in part, to "slower sales in [Anixter's] higher gross margin OEM supply business."

19.     In addition, Anixter had not "succeeded in negotiating price increases with [its] customers," as defendants led investors to believe. Anixter continued to have a significant pricing dispute with OEM customer JLR as well as Lucent, a major customer in Anixter's Integrated Supply ("AIS") division, a division of its OEM supply business. The Company was involved in an ongoing and escalating tension over pricing with Lucent during the Class Period which resulted in significantly decreased sales to Lucent and, ultimately, the loss of Lucent's business completely in 2009.

20.     At the same time defendants were telling investors that Anixter was "experience[ing] very strong growth in Europe" and would "sustain overall growth despite certain economic concerns," defendants and other Company insiders unloaded tens of thousands of shares of their personally held Anixter stock.  During the Class Period, defendants and other Company insiders sold *over 60,000 shares* of Anixter stock for gross proceeds *in excess of $3.9 million*.

21.     Then, on October 21, 2008, defendants announced Anixter's results for 3Q08.  For the quarter, Anixter reported organic sales growth of only 2% total, *negative* 2% for Europe, and gross margins of 23.4%.  Defendants admitted for the first time that the Company was being "*negatively impacted by macro economic trends*" and had "*experienced a noticeable slowing in growth*," including "reduced manufacturing volumes at certain customers *due to economic softness*."  Moreover, defendants disclosed that "given deterioration in the credit markets and the economy as a whole, corporate spending has slowed or declined for discretionary items, including certain information technology projects," thereby negatively affecting Anixter's enterprise cabling business.

22.     In addition, defendants admitted that Anixter was experiencing "*softening sales in [its] higher gross margin OEM supply business*," which was compressing its gross margins.  Defendants further disclosed that Anixter had been involved in a "customer pricing dispute," referring to JLR, *the resolution of which reduced gross profit by $3 million (or 20 basis points of gross margin)*.

23.     As a result of defendants' October 21, 2008 disclosures, the price of Anixter common stock fell $18.76, or approximately 40% over the next five trading days, to close at $29.06 on October 27, 2008, as shown in the following chart of Anixter's stock price:



Anixter's shareholders suffered damages as a result of defendants' Class Period misrepresentations and omissions.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

27.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

28.     By Court Order dated November 17, 2009, Indiana Laborers Pension Fund (the "Fund") was appointed the Lead Plaintiff in this action.  The Fund purchased Anixter common stock during the Class Period as detailed in the Certification filed with the Court on November 10, 2009 in support of the Fund's motion to be appointed Lead Plaintiff.  As a result of defendants' conduct detailed herein, the Fund suffered damages in connection with its purchases of Anixter securities.

29.     Plaintiff Garden City Employees' Retirement System purchased the common stock of Anixter during the Class Period as detailed in the Certification filed with the Court on September 11, 2009 in support of the original complaint.  As a result of defendants' conduct detailed herein, Garden

City Employees' Retirement System suffered damages in connection with its purchases of Anixter securities.

30.     Defendant Anixter is incorporated in Delaware and maintains its headquarters at 2301 Patriot Boulevard, Glenview, IL 60026-8020.   The Company, together with its subsidiaries, distributes communications products, specialty wire and cable products, fasteners, and small parts.

31.     (a)     Defendant Robert J. Eck ("Eck") is President and CEO of Anixter.  Prior to that, he was the Company's Executive Vice President and Chief Operating Officer.

(b)     Defendant Dennis J. Letham ("Letham") is, and was at all relevant times, Executive Vice President of Finance and Chief Financial Officer ("CFO") of Anixter.

(c)     Defendant Robert Grubbs ("Grubbs") was President and CEO of Anixter from February 1998 until his resignation in June 2008.

(d)     Defendants Eck, Letham and Grubbs are referred to herein as the "Individual Defendants."  They are liable for the false and misleading statements and omissions, set forth at ¶¶46-52, 55-56, 61-67, 74-81, 83, 85.

32.     The Individual Defendants were Anixter's President and CEO, and CFO.  All of these executives, by virtue of their high-level positions with Anixter, directly participated in the management of Anixter, were directly involved in the day-to-day operations of Anixter at the highest levels and were privy to confidential proprietary information concerning Anixter and its business, operations, products, growth, financial statements and financial condition and were aware of, or deliberately disregarded, that the false and misleading statements made by and regarding the Company were still alive in the market and causing the Company's stock to trade at inflated prices. Because of their managerial positions with Anixter, each had access to the adverse undisclosed information about Anixter's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during

the Class Period materially false and misleading.  Each of the defendants held themselves out to the public as spokespeople of the Company, informed about the business results and conditions of Anixter which they reported to investors, and over which they monitored as part of their responsibility in managing the affairs of Anixter.

33.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Anixter's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Anixter's common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Anixter's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Anixter's business, operations and management and the intrinsic value of Anixter common stock; (ii) enabled the Individual Defendants and other Company insiders to sell 60,481 shares of their personally-held Anixter common stock for gross proceeds in excess of $3.9 million; and (iii) caused plaintiff and members of the Class to purchase Anixter common stock at artificially inflated prices.

## BACKGROUND TO THE CLASS PERIOD

35.     Anixter was founded in 1957 by brothers Alan and Bill Anixter and went public on the American Stock Exchange in 1967.  In 1987, Itel, a holding company owned by Samual Zell, bought Anixter and subsequently renamed it Anixter International.  Mr. Zell continues to own approximately 14% of Anixter's outstanding common stock and remains the Chairman of Anixter's Board of Directors.

36.     Anixter operates through three main lines of business.  The Company's Enterprise Cabling and Security Solutions business group makes up the largest component of the Company's total revenue, approximately 54% in 2007 and 52% in 2008.  This group focuses on the supply of cabling, connectivity, wireless devices, cameras, recorders, power and other items and IT projects for enterprise networks, factory automation, security networks and data centers.

37.     Electric Wire and Cable is Anixter's second largest business group, accounting for approximately 28% of the Company's total revenue in 2007 and 29% in 2008.  This group provides electrical and electronic wire and cable to the contractor, integrator, architectural and engineering, utilities, broadcast and industrial markets.  Specific products in this group include power cable, flexible cable, coaxial cable, armored cable, building wire, fiber optic cable, mining cable, control cable, accessories and portable cord.

38.     OEM supply is Anixter's third largest business group.  OEM supply represented approximately 18% of the Company's total revenue in 2007 and 19% in 2008.  This group delivers "C" class components, such as fasteners, nuts and bolts, directly to the production line of its OEM customers, which include aerospace, industrial and automotive companies.  This group also provides its customers with supply chain services including direct-line feed and vendor-managed inventory, subassembly, kitting, stores management, aftermarket spares and logistics, and employs an in-house

team of 300 IT professionals to tailor these solutions to each customer's specific needs.   The majority of Anixter's OEM supply business (56%) is based in Europe.

39.      In addition to its multiple lines of business, Anixter operates in multiple regions.   In 2007, the Company generated approximately 70% of its total sales from North America (U.S. and Canada), 22% from Europe and 8% from its emerging markets (Asia Pacific and Latin America). The percentages of revenue by business line and region for 2007 are set forth in the following chart:

**Percentages of 2007 Revenue**

| Line of Business | North America (U.S. and Canada) | Europe | Emerging Markets | Total Company |
|---|---|---|---|---|
| Enterprise Cabling & Security Solutions | 71% | 15% | 14% | 54% |
| Electronic Wire & Cable | 86% | 13% | 1% | 28% |
| OEM Supply | 44% | 56% | 0% | 18% |
| Total by Region | 70% | 22% | 8% | 100% |

40.      Historically, Anixter has grown its sales base through both strategic acquisitions and organic sales growth.   By the end of 2007, however, acquisition opportunities were scarce as a result of the global economic decline.   Defendants admitted on January 29, 2008 that "[p]robably the biggest thing that is noticeable in the last few months has been a reduction in the number of [acquisition] opportunities or the number of things that seem to be in the markets" due to a "lack of credit to support deals."   Defendants compared it to selling a house in a down market:   "[I]t is probably no different than if you have a non-compulsory decision to sell your house.   Are you going to put it on your market right now? [Analyst response: No.]."

41.      As a result, the majority of Anixter's sales growth in 2007 was achieved organically, and defendants were relying on organic growth to drive sales growth in 2008.   Defendants admitted as much in Anixter's 2007 Annual Report, stating that "[f]uture growth will continue to be primarily driven organically."

- 13 -

42.     As early as mid-2007, defendants began telling investors that, despite declining economic conditions, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008.  The market, however, was concerned about Anixter's ability to achieve this level of organic growth.  By late 2007, the U.S. and global economies were declining and the credit markets were contracting.  Indeed, defendants themselves admitted in October 2007 that there was a "significant amount of economic uncertainty . . . particularly in the U.S. related to the credit markets."  But despite defendants' strong growth guidance in the face of this "economic uncertainty," investors were unsure about the effects of the economic slowdown and tighter credit markets on Anixter's business, particularly given the weakness in the residential sector and the potential impact on the non-residential and industrial markets in which Anixter operated.  According to a September 12, 2007 The Buckingham Research Group report, investors remained cautious about Anixter's prospects because of the "current credit market contraction."

43.     Defendants knew that these concerns were justified.  By the end of 2007, Anixter's sales and profits were under pressure due to slower global demand, including lower capital, non-residential construction and technology spending.  Moreover, Anixter's organic growth rate, which defendants were relying on to drive 2008 sales growth, had declined significantly throughout 2007, falling from 22% to 19% in 1Q07, 17% in 2Q07, and 9% in 3Q07 and 4Q07.

44.     In an attempt to allay investors' concerns (and prevent a corresponding stock price decline), in November 2007, defendants began aggressively repurchasing the Company's stock.  As intended, analysts responded favorably to the Company's repurchases in an uncertain market.  On November 28, 2007, The Buckingham Research Group reported that "*[w]e are encouraged by Anixter management's aggressive share repurchases in response to persistent weakness in AXE shares.  Despite increasing economic uncertainty, in particular surrounding the outlook for non-*

*residential construction, we continue to expect organic revenue growth for Anixter to solidly outpace end market conditions*."

45.     The share repurchases alone, however, were not enough.  Defendants knew that they needed to convince the market (albeit falsely) that Anixter was not being affected by the credit market contraction or declining global economies in order to pump up the price of the Company's stock and, ultimately, unload tens of thousands of shares of their personally held stock at the inflated prices.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

46.     The Class Period begins on January 29, 2008.  On that day, Anixter issued a press release announcing its financial results for the fourth quarter and fiscal year 2007, the period ended December 28, 2007.  For the quarter, the Company reported earnings per share ("EPS") of $1.69 and year-over-year organic sales growth of 9%.  Commenting on the results, defendant Grubbs stated, in pertinent part, as follows:

> "We are very pleased with the strong financial results in the quarter and the year. Our success in expanding our product and supply chain offering, along with an intense focus on broadening and diversifying our global customer base, drove record sales, operating margins and net income in 2007.  *We enter 2008 confident in our ability to continue executing on our growth strategies including further expanding our customer base as well as growing with our existing customers*."

47.     Despite reporting a decrease in sales growth in Europe, defendant Grubbs assured investors that the Company had "***strong growth***" in its OEM markets and a "***solid backlog*** and ***healthy pipeline*** of potential new projects and customers":

> "Sales growth in the quarter was again fairly broad based.  The breadth and diversity of the end markets we serve, along with our unique ability to provide global support to those customers, continues to drive new customer acquisition and expand our role with existing customers.  *At the same time, we have continued to experience strong growth from our strategic initiatives in the security and OEM markets*. . . ."

- 15 -

"... During the quarter we also continued to experience very solid new order flow in North America. *We enter 2008 with a solid backlog of orders and a healthy pipeline of potential new projects* . . . ."

"... Taking out exchange rate differences and sales from acquisitions, overall sales in Europe were flat as compared to unusually strong sales results in the year ago quarter. We continue to be encouraged by our growing presence in Europe and, similar to North America, *we enter 2008 with a solid backlog and healthy pipeline of potential new projects and customers*."

48.     Defendant Grubbs also reassured investors that this "solid sales and earnings growth"

would continue throughout 2008 despite overall deteriorating market conditions:

"The record sales and earnings performance in 2007 was the result of many of the same underlying trends that generated record performances over the past couple of years, especially as relates to expansion of our customer base. *While 2008 begins with a well publicized, less certain overall economic environment than 2007, recent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year*. As we look to the start of a new year, we remain focused on building on our strategic initiatives of growing our security and OEM supply businesses, initiating an industrial automation network sales effort, adding to our supply chain services offering, enlarging the geographic presence of our electrical wire & cable business, and expanding our product offering. *We believe that if we continue to successfully execute our strategic initiatives to grow our product and service offerings and expand our customer base, we can drive solid sales and earnings growth in 2008*."

49.     Following the press release, defendants held an earnings conference call with analysts

and investors to discuss the Company's earnings and operations.   During the conference call,

defendant Letham continued to reassure investors that Anixter's business "*remained robust*" and

*unaffected by the declining economic environment*:

[T]his was an interesting quarter in terms of the disconnect between the broader markets negative economic news and the fact that our business performed so strongly in the period. *This disconnect continues into 2008 as early indications of our 2008 business activity continue to support a continuation of recent solid trends for our business despite the economic uncertainties in other parts of the economy*.

\*     \*     \*

*Overall in market demand remain [sic] healthy across all markets*. Larger project demand generally *remained robust* and we continue to have good success with our strategic initiatives. . . .

- 16 -

*. . . Day to day demand from both new and existing customers also remain strong.*

50.     While defendants admitted that "year on year sales in Europe were flat," defendants blamed the decrease in sales growth on a challenging year-over-year comparison due to "unusually strong sales" from the prior year's fourth quarter, rather than on current economic factors negatively affecting the Company.  Defendant Letham continued to reassure investors that "***business activity levels in Europe remain[ed] strong***" and that the Company would "***add to growth in Europe in the coming quarters***":

> Excluding acquisitions and foreign exchange effects, year on year sales in Europe were flat compared to the unusually strong sales reported in the year ago fourth quarter. . . .
>
> As a result, we were presented with a challenging year on year comparison in Europe.  ***Our business activity levels in Europe remain strong*** although they are not experienced in the same exceptional rates of acceleration that they were in the second half of 2006.  As a result, the return to more traditional holiday related sales trends at the end of 2007 has produced the less favorable year on year comparison.  ***We remain optimistic, however, that an increasing base of global account projects, continued progress in expanding geographic scope of our electrical wiring and cable business and the growth of our mid eastern market presence will all add to growth in Europe in the coming quarters***.

51.     With regard to Anixter's 2008 outlook, defendant Grubbs added that defendants "ha[d]n't seen any changes in these trends" for 2008, and that "*[a]ctivity levels are still good*."

> So I think the breadth of our products and the breadth of our customers as well as our industries we served as well as the geographic coverage we provide, continued to fuel good growth and profitability.  ***As we go into 2008 we really haven't seen any changes in these trends.  Activity levels are still good as it relates to product, customer, services, new customer opportunities***.

52.     During the January 29, 2008 earnings conference call, analysts questioned defendants on Anixter's decrease in European sales growth, given the tough economic conditions.  Defendants dismissed analysts concerns and reiterated their forecast of 9% to 11% organic growth:

> [ANALYST:] . . . A little bit of noise in Europe from the fourth quarter last year and I was looking back at previous growth here and I think its been running right around high single-digits, low double-digits.  ***When you step back and look at the***

***underlying growth, do you see that level of growth in that let's say nine to 11%
range continuing ahead here in Europe*** and then Asia Pacific, Latin America[?]  A
little slower growth, we have seen some strong quarters in the past and I guess it
jumps around but you see the same kind of, I guess, underlying growth and at least
over the next several quarters in the emerging countries as you have been seeing over
the last year[?]

DENNIS LETHAM:  You know, as I said in the call, ***we have not seen anything
really as we go into the next year changing.  So, to answer your questions about
Europe, we are still comfortable driving the kind of growth we have driven.***  We
just had a, you know, - last year fourth quarter there was some stuff losing to the
third quarter and bunch of project fixing up (indiscernible).  Now, I think you will
see continuing in the emerging markets, you see very, very strong growth and you
know, you have a little tick down, slow tick down percentage wise because the
numbers get bigger.  Yes, probably.  ***But you're going to still see well, well above, I
believe, the overall growth rate coming out of those emerging markets***.

53.     Defendants positive reassurances had their intended effect.   In response to

defendants' statements, shares of Anixter stock rose ***$10.55 per share***, or approximately ***18% in one

day***, to close at $68.85 per share, on heavy trading volume.  That same day, as the stock price shot up

in response to defendants' statements, defendant Grubbs unloaded ***14,000 shares*** of his personally

held Anixter stock, for $67.00 per share, reaping proceeds of $938,000.  Shortly thereafter, on

February 15, 2008 (while the stock was still significantly inflated), defendant Letham sold ***3,668

shares*** of his personally held Anixter stock at prices between $66.91 and $68.29 – much higher than

the $58.30 price investors received before defendants' January 29, 2008 statements – reaping

proceeds of $248,199.

54.     Analysts responded positively to defendants' January 29, 2008 reassurances.  For

example, on January 29, 2008, William Blair & Company reported that:  "Anixter's business outlook

was also encouraging.  The company said recent activity levels suggest that its end-markets remain

strong.  Anixter also stated that it is entering 2008 with a solid backlog and healthy pipeline of

potential new projects and customers."  Similarly, on January 29, 2008, Next Generation Equity

Research, LLC reported that:  "Management maintained a bullish outlook for 2008 despite the

weakening macroeconomic environment largely due to continued strength in their key end-markets and growth overseas."

55.    On February 21, 2008, defendants signed and filed with the SEC Anixter's 2007 Form 10-K, in which defendants reiterated their positive but false reassurances to investors of "strong growth insecurity and OEM supply sales."  In the Form 10-K, defendants stated:

> The factors driving the Company's strong organic growth [in 2007] were consistent with those the Company has seen during the past couple of years.  The Company experienced sold growth in larger project business, as it relates to data center builds in the enterprise cabling market and particularly within the energy/natural resources customers in the electrical and electronic wire and cable market. ***The Company also continues to experience strong growth in security and OEM supply sales***.

56.    Anixter's 2007 Form 10-K also included the following certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendants Grubbs and Letham:

> (2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> (3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> \*       \*       \*

> (2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

57.    Defendants' January and February 2008 positive statements, assurances and forecasts were false and misleading when made and failed to disclose material information concerning Anixter's business.  At the same time defendants were reassuring investors that market demand "***remained robust***" and was "***healthy across all markets***," defendants knew, as described in ¶¶58-60, 106-107, 109, 113, that the deteriorating credit markets and global economic conditions were

negatively impacting Anixter's business, such that defendants' guidance of 8% to 12% organic growth for 2008 had no reasonable basis.

58.     By 2008, corporate spending, particularly for IT projects, was declining in North America and Europe.  As a result, Anixter was experiencing a slowdown in sales in its enterprise cabling business, which depended largely on IT projects for sales growth.  Indeed, defendant Eck later admitted after the Class Period that "***IT projects spending . . . that drives [Anixter's] structure cabling business tends to slow down, very obviously slows down, in difficult times***."

59.     The declining economic conditions were also impacting Anixter's OEM supply business, the majority of which was based in Europe.  Anixter's European market constituted the second largest reporting group for Anixter in 2008 – 21% of total revenue.  OEM supply sales constituted the majority of those sales and were a significant part of the Company's overall business. Anixter's OEM supply business consisted largely of sales to OEMs in the industrial and automotive industries.  But by 2008, these industries were slowing dramatically as a result of the economic downturn.  In particular, the European automotive industry (along with the U.S. automotive industry) had begun slowing dramatically as a result of the global economic crisis.  Indeed, in January 2008, Moody's Global Corporate Finance predicted that demand in the major Western European markets for European automotive OEMs would "stagnat[e]" in 2008, due, in part, to slowing GDP growth and softening housing markets.  Defendants knew that slowing demand in the OEM industry meant fewer sales for OEM suppliers such as Anixter, and as described in ¶¶106-107, 109, 113, saw that impact on Anixter's business.

60.     In addition, the decline in Anixter's OEM supply business was also negatively impacting the Company's operating margins, as OEM supply sales traditionally produced the Company's highest operating margins.  Defendants later admitted on October 20, 2008 that the

Company was experiencing a decline in gross margins during the Class Period due, in part, to "**slower sales in [Anixter's] higher gross margin OEM supply business**."

61.     On April 22, 2008, Anixter issued a press release announcing its financial results for 1Q08, the period ended March 28, 2008.  For the quarter, the Company reported EPS of $1.45 and year-over-year organic sales growth of only **7%**.  Defendant Grubbs, however, reassured investors that the first quarter's "divergent growth rates" were nothing more than an "unfavorable impact from holidays," and that Anixter would "**sustain overall growth despite certain economic concerns**":

> "We are very pleased to report double digit increases in sales, operating profits and earnings per diluted share over the prior year quarter.  The multiple end markets we serve, the diversity of industries in which our customers operate and the broad geographies over which our business is conducted **have given us the ability to sustain overall growth despite certain economic concerns**.  We believe the diversity and depth of our business will continue to work to our shareholders' benefit **regardless of broader economic conditions**."

62.     Defendant Eck repeated these reassurances, telling the market that any effect from the declining economic environment on Anixter was limited to specific customers and did not represent a "broader trend" for the Company's businesses:

> "While there were a number of customer-specific situations where spending was reduced in response to slower economic conditions, **we do not believe this represents a broader trend**.  Overall, we are encouraged by the fact that our backlog grew slightly during the first quarter and activity levels show the prospect for continued year-on-year sales growth.  It should be noted that in 2007 we experienced unusually strong 14 percent consecutive quarter growth between the first and second quarter that was more than twice historical seasonal patterns and leaves us with a difficult year-on-year comparison for the upcoming second quarter.  **Nonetheless, we expect to report not only consecutive quarter sales growth in the second quarter, but also year-on-year sales growth over the very strong second quarter of 2007**."

> "We remain focused on building on our strategic initiatives including growing our security and OEM supply businesses, initiating an industrial automation network sales effort, adding to our supply chain services offering, enlarging the geographic presence of our electrical wire & cable business, and expanding our product offering. Short-term macro-economic conditions may slow our organic sales growth from the rates of the past couple of years, which when combined with the investment in these initiatives may limit near-term earnings growth.  **We believe, however, that continued focus, investment and successful execution on these**

- 21 -

*strategies will drive full-year and longer-term growth and profitability of the business*."

63.     Defendants also admitted that Anixter was experiencing gross margin pressures in its global electrical wire & cable business and European OEM supply business.  Defendant Eck, however, reassured investors that the factors pressuring gross margins "*[we]re being mitigated through pricing actions*" and that operating margins would continue to increase during the year.  At no time did defendants attribute the gross margin pressures to economic factors negatively affecting the Company:

> "After more than two years in which sales growth was consistently broad based over the various customer end markets and geographies we serve, the first quarter of 2008 exhibited more divergent growth rates.  Also, as compared to the year ago first quarter, the first quarter of 2008 reflects an unfavorable impact from holidays due to the timing of the New Year and Easter.  *Importantly, we continued to make significant progress on our major initiatives during the quarter, including growing in new markets*."

*     *     *

> "While sales were up 11 percent, organic growth was 7 percent.  *As compared to the first quarter of last year, gross margins experienced some pressure in the electrical wire & cable market on a global basis and in the OEM supply market in Europe*.  At the same time, we have continued to invest in people to drive our initiatives of expanding our security business, the global reach of the electrical wire & cable business and our initial efforts in the factory automation market.  *Some of the factors pressuring gross margins in the first quarter are being mitigated through pricing actions.  When combined with seasonal pick-ups in sales volumes, which should improve operating leverage, we anticipate higher operating margins during the year*."

> ". . . *In Europe, operating margins in the most recent quarter were 4.1 percent as compared to 4.6 percent in the year ago quarter.  This decline in operating margins is largely within the OEM supply business.  The lower OEM supply operating margins reflect a combination of lower gross margins*, costs associated with the closing of one facility, increased costs associated with preparations for business IT system conversions starting in 2009 and costs for development of expanded Asian product sourcing capabilities."

64.     Following the press release, defendants held an earnings conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call,

- 22 -

defendants continued to represent to investors that Anixter's organic sales growth rates were *unaffected by the economic downturn*.  At the same time, defendants admitted that the Company was continuing to experience gross margin pressures in its electrical and wire business line and European OEM business line.  Defendants reassured investors, however, that they had *improved* these situations "*over the past several weeks*" and that the gross margin pressures would "*abate in the coming months*."  Defendant Letham stated:

> Over the past two or three quarters, our shareholders and the analysts who followed us have asked a lot of questions regarding the slowing economy and the extent to which it directly impacts our performance.  In response to those questions, we have pointed to the diversity and depth of the end markets we serve, the various vertical markets in which our customers operate.  *The geographic diversity of our business model and various company driven initiatives as factors mitigating some of the effects of a slowing economy*.

> Details of our first quarter results highlight how the diversity of our business and the success of our growth initiatives *did in fact mitigate the effects of the current economic slowdown* to a sufficient degree to once again allow us to report double digit growth in sales, operating income and diluted earnings per share as well as improved operating margins versus the year ago quarter.

> *   *   *

> After adjusting for acquisitions and exchange rate differences, we still achieved a *healthy 7% organic sales growth* as compared to the year-ago first quarter.  Adjusted for holidays, the organic growth was 8% which is in line with the lower end of our 8% to 12% organic growth target range.

> *   *   *

> *The decline in gross margins was based in two areas.  The electrical wire and cable business in North America and the OEM supply business in Europe*.  In the electrical wire and cable business in North America, as I noted earlier, we encountered pricing issues in some of the products that are more commodity-like where certain manufacturers who had excess production capacity were taking pricing actions inconsistent with the underlying commodity price trends.  In the European OEM supply business, lower gross margins reflect timing issues with the pass-through of rising commodity prices.  *On the positive side, we've experienced recent improvements in both of these situations over the last several weeks and as a result, we believe that this gross margin pressure, seen in the first quarter will abate in the coming months*.

- 23 -

65.     For his part, defendant Eck admitted that Anixter was seeing "softer corporate spending," but he assured investors that this related to only a few "specific project plans of individual customers," and that Anixter's sales "***continue to generate very healthy growth***," despite the broader economic uncertainty:

> I really want to start by saying that we're pleased with our results for the first quarter in an environment that included economic uncertainty and significant disruption in the credit markets. . . .
>
> In North America and Europe the enterprise growth was affected by a challenging comparison to very strong project volume in the first quarter of 2007. Last year, we saw more project spending from financial retail and technology customers than we have experienced this year. ***Their reduced spending is due in part to softer corporate spending but more significantly relates to specific project plans of individual customers. However, the day to day sales activity along with new customer growth was helping for the quarter and bookings trended up in the past several weeks***.
>
> *     *     *
>
> Turning to the OEM supply business, we saw positive trends in the first quarter in both Europe and North America. Growth came from both new customer contracts as well as adding more products to existing customer programs. ***While some customers have reduced their production schedules, this was offset by growth with other customers and added products***. . . . There continue to be opportunities to expand the OEM supply business through adding more customers in existing geographic areas as well as expanding our coverage to other countries or regions of the world where we're not yet present. . . .
>
> ***In closing, while there continues to be concern about the condition of the U.S. economy, we're seeing growth in our daily booking rates across all of the businesses and geographies***. Even with the slower economic growth, we experienced in the first quarter, we were able to make investments in our growth initiatives, maintain good operating expense control and gain operating leverage in the business. ***Our backlogs remain healthy*** and as customers focus on total cost and working capital reductions, our supply chain services will continue to gain traction. We think that as our customers look for ways to become more efficient, the combination of our global geographic presence, supply chain services and high quality product offering will enable us to continue to gain market share. We expect that the second quarter will show a continuation of the trend of sequential quarterly growth as well as growth over 2007.

66.     When specifically questioned by analysts about Anixter's pricing and margin issues in the first quarter, defendants assured the analysts that it was just a "***short term anomaly***" that was "***very quickly fixing itself***":

> [ANALYST:] . . . I think one of the key concerns that people are having today is that the potential that Anixter is being squeezed between OEMs and customers and I just wanted to clarify on your discussion about price increases.  Are you saying that the situation is that the OEMs are not passing through pricing, therefore, you're not passing through pricing?  Or is it more that the OEMs are passing through pricing but you're not able to[?]
>
> BOB ECK:     No.  I think, David, the answer is that because there was some over capacity based on the slowdown in manufacturing of building wire which is a market that we do not generally participate in, that excess capacity was then directed toward other products and the factories.  The result was that there was greater supply of those products so the manufacturers weren't pushing through the commodity costs but likewise, there was more volume in the market generally of those products that we participate in so that created a little bit of a margin squeeze for us.  ***But as Dennis and I both noted, what we're seeing already in the trends in the second quarter is that we've really pushed through that issue and we're seeing margins up already***.
>
>          . . . I think part of this is if you look at the first quarter, like we said, you lost a couple of days at the beginning of the quarter. . . .  You had the building wire market because the housing starts are down.  So, the manufacturers were in a position where they didn't raise prices as quickly as they normally do.  And there was excess capacity.  ***What we've seen happen toward the end of last quarter and the beginning of this quarter is pricing increases coming through, demand picking back up and you're kind of back into a normal cycle that happens with commodities***.  ***We didn't see that in January and February.  Short term anomaly quite frankly.  Very quickly fixing itself***.

67.     When questioned about the decline in daily bookings in enterprise products given the deteriorating credit markets, defendants similarly dismissed analysts concerns, telling analysts that the decline was "more of a seasonal pattern impact" than a "credit market issue" and that business conditions were actually ***improving***:

> [ANALYST:] Wanted to drill down a little bit on the comments you made about daily bookings picking up in the enterprise and – in the enterprise products.  And I think that – I guess they were certainly down during the first quarter.  Is that a bit of a repeat of sort of summer credit crises when you had a glitch in bookings then it came back?  Does it feel like that?  What was the trend on the daily bookings during the quarter?  If you could put some color on that.

DENNIS LETHAM:  *I think what we're seeing, Ted, is more of a seasonal pattern impact here.  Than it is anything about the credit market issue*.  The pickup we're seeing in booking activity reflects what we would consider to be kind of normal, sequential, month to month quarter one to quarter two type of activity unfolding that *gives us reason to be optimistic about the pattern for the next quarter or two as opposed to assuming that there's some broader economic issue that is driving against the growth numbers*.

[ANALYST:] Would I be correct in thinking that the – the daily bookings or the enterprise space did deteriorate sharply, maybe more so than normal during the first quarter[?]

BOB ECK:     You know what. Ted? I wouldn't say that.  I think what we saw was a leveling out in our booking level in the first quarter.  We didn't see the type of growth that we normally might have expected and now I think as Dennis says, *we're back seeing more of the sequential growth pattern that we would expect from Q1 to Q2*.

*       *       *

[ANALYST:] . . . In the comments on the quarter, you talked about divergence between customers and product lines and then sort of in your wrap-up, you're talking about all geographies and all product lines showing better bookings.  Is there a difference here between the conditions in the quarter and the conditions now looking forward?  Or is that – is there some inconsistency there?  I guess I wanted to have that reconciled.

BOB ECK:     *I think what we're really trying to say is there [is] an improvement in conditions.  That's exactly [what] we're saying*.

68.     For the same reasons outlined in ¶¶57-60, defendants April 22, 2008 statements were materially false and misleading when made and failed to disclose material information concerning Anixter's business.  At the same time defendants were telling investors that Anixter would "sustain overall growth despite certain economic concerns," defendants knew, and later admitted, that the Company's organic sales growth was being "*negatively impacted by macro economic trends*." Throughout 2008, corporate spending continued to decline as a result of the deteriorating global economies, thereby negatively affecting the majority of Anixter's business.  Even if related to "specific project plans of individual customers," as defendants claimed, slower corporate and IT spending was having a severe effect on Anixter's business, as described in ¶¶107, 109-111.  Indeed,

- 26 -

defendants later admitted that "*[w]hen the market slows . . . we see an effect from that pretty quickly in our business*" – the opposite of what defendants told investors on April 22, 2008, namely that Anixter was *not* being affected by the economic downturn.

69.     Additionally, defendants knew that Anixter's European business (its second largest reporting group) was slowing dramatically.  By 1Q08, organic growth for Europe had fallen to a paltry *2%*.  As the industrial and automotive OEM industries continued to slow, Anixter's European OEM supply business, which constituted the majority of its European sales, continued to decline, further compressing Anixter's margins.  According to a former Credit Manager for Anixter's European markets ("CW1"), Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008.  CW1 was a former Credit Manager for Anixter's European market and worked at the Company's UK operations and, thus, was in a position to have such knowledge.

70.     In addition, and contrary to defendants' reassurances that Anixter's gross margin pressures "*[we]re being mitigated through pricing actions*," defendants knew, and failed to disclose, that Anixter was involved in a significant pricing dispute with major European OEM customer JLR.  According to a former Programme Buyer for Anixter's UK operations ("CW2"), JLR continuously exerted considerable pressure on Anixter to lower prices and improve services, and routinely threatened to cancel its business relationship with Anixter in favor of another supplier.  Once a year, Anixter paid JLR a rebate based on the amount of product that JLR purchased from Anixter.  Additionally, every year JLR benefitted from lower prices from Anixter as a result of exerting significant pressure, even though Anixter had to pay a higher rebate amount.  At the same time, JLR wanted to maintain extremely lean inventories, but wanted products from Anixter immediately.  One way Anixter tried to compensate for JLR's pricing pressure during the Class Period was to no longer procure its own materials from European suppliers, instead sourcing lower

cost materials from Asian suppliers.   However, utilizing Asian suppliers impacted both the timeliness of Anixter's ability to procure materials and fulfill orders and the quality of the products compared to the more expensive European suppliers.   The timeliness and lower quality further aggravated the relationship between Anixter and JLR during the Class Period.

71.     According to CW2, JLR's pressure on Anixter became even more pronounced following the acquisition of JLR by Indian automobile manufacturer Tata Motors in March 2008 from Ford Motor Companies.   CW2 reported that after Tata Motors acquired JLR, and the dispute concerning JLR's rebate escalated, JLR's procurement orders to Anixter declined substantially throughout the remainder of 2008.   CW2 also reported that it was well known at Anixter's Spitfire Park Plant in Birmingham, UK (Anixter's main European operations) during the Class Period that Anixter was very likely going to have to pay JLR the disputed rebate amount.   A former Operations Manager for Anixter's UK operations ("CW3") corroborates these reports.   Additionally, according to CW2, defendant Eck visited the Spitfire Park Plant almost immediately after assuming the role as Anixter's CEO in July 2008.   JLR was a key customer in Anixter's OEM business.   As such, this rebate dispute was reported to the Company's U.S. operations.   Ultimately, on October 20, 2008, defendants admitted that Anixter was involved in this "pricing dispute" and was forced to pay the $3 million disputed amount during the Class Period, which had a material impact on the Company's earnings and gross margins.

72.     CW2 was a former Programme Buyer for Anixter's UK operations from 2005 to May 2009 whose responsibilities included working on Anixter's JLR account and, thus, was in a position to have such knowledge.

73.     While defendants' April 22, 2008 statements did not disclose the nature or magnitude of the effect of the worsening economic crises on Anixter's business, the partial disclosure resulted in Anixter's stock price dropping $10.31 between the closing price on April 21, 2008 and the closing

price on April 24, 2008, on heavy volume of nearly five million shares over three trading days.

Despite this drop, defendants' false and misleading statements and material omissions outlined in

¶¶61-67 continued to cause Anixter's stock to trade at artificially inflated prices.

74.     On July 22, 2008, Anixter issued a press release announcing its financial results for

2Q08, the period ended June 27, 2008.  For the quarter, the Company reported EPS of $1.71 and

organic sales growth of only **4%**.  Despite the continuing decline in Anixter's organic sales growth

and overall decline in economic conditions, defendant Eck continued to reassure investors that any

softening in sales was limited to specific customers and **was not the result of any "broad-based**

**negative trends**" in any of the Company's markets:

> "Given that the second quarter year-on-year comparisons were difficult because of
> the exceptional growth in the prior year, especially on larger projects, we are
> encouraged by the higher than historical trend line growth in consecutive quarter
> sales from the first to second quarter of this year as well as the growth we realized
> over the unusually strong second quarter of 2007.  **While we continue to see select**
> **customer situations where sales are softer, we have not observed any broad-based**
> **negative trends in the various end markets and geographical regions where we**
> **have a business presence.  We believe the overall market conditions, as they**
> **currently exist, should allow for consecutive quarter sales growth from the second**
> **to third quarter of this year**.  If we achieve a modest level of consecutive quarter
> growth **it will move our third quarter year-on-year growth rates closer to our**
> **longer-term target of 8 to 12 percent yearly growth**."
>
>          "Going forward through the next few quarters, we will remain focused on
> building on our strategic initiatives, which include growing our security and OEM
> Supply businesses, initiating a factory automation network sales effort, adding to our
> supply chain services offering, enlarging the geographic presence of our electrical
> wire & cable business, and expanding our product offering.  **We are confident that**
> **continued focus on these investments and successful execution on these strategies**
> **will help drive full-year and longer-term growth of the business**.  At the same time
> we believe the breadth of the end markets we serve, the diversity of the vertical
> markets our customers operate in and the broad geographical scope of our business
> will continue to provide excellent opportunities for growth."

75.     While defendant Eck admitted that Anixter was experiencing increased margin

pressures in its European OEM supply business, he assured investors that any negative effects were

"**offset**" by "**good sales growth and expense controls**" in Europe:

"We are pleased with the 10 percent increase in sales from the first to the second quarter of this year, which despite continuing macroeconomic uncertainty, exceeded longer-term seasonal trends.  Also, while the second quarter year-on-year sales growth was modest due to the difficult comparison to last year's exceptionally strong second quarter, it was, however, stronger than we anticipated.  *The multiple end markets we serve, the diversity of vertical end markets that our customers operate in and the breadth of geographies in which we conduct our business continue to support the company's ongoing revenue and earnings growth*."

*     *     *

"As compared to the second quarter of last year, *gross margins declined from 24.0 percent to 23.8 percent due to lower supplier volume growth incentives and continued pressure from rising steel and specialty metal prices in our OEM Supply business*.  At the same time, we have continued to invest in people to drive our initiatives of expanding our security business, the global reach of the electrical wire & cable business, our initial efforts in the factory automation market and expansion of our business in emerging markets.  *Despite the slight drop in gross margins and continued investment in growth initiatives, we were able achieve a modest improvement in operating margins due to the increased operating leverage coming from growth in sales and sound expense management*."

". . . In Europe, operating margins in the most recent quarter were 5.3 percent as compared to 4.6 percent in the year ago quarter.  This improvement in European operating margins reflects good sales growth and expense controls, *which offset the gross margin pressures in the OEM Supply business*."

76.     Following the press release, defendants held an earnings conference call with analysts and investors to discuss the Company's earnings and operations.  Despite having told investors on April 22, 2008 that Anixter's gross margin pressures in 1Q08 were just a "*short term anomaly*" that had *already improved* in 2Q08, defendants *again* reported a decline in OEM supply business gross margins and enterprise cabling business sales growth:

> Turning to gross margins.  We report second-quarter gross margins of 23.8% versus 24% in the year-ago quarter.  During the recent quarter, *we continued to experience some price pressure from rising steel prices in our OEM supply business and the effects of lower supplier volume incentives that resulted from lower year-on-year sales growth rates, particularly in the enterprise cabling market*. . . .

77.     Despite the decrease in gross margins and sales growth, however, defendant Eck continued to report to investors that Anixter was "*experienc[ing] very strong growth in Europe*,"

- 30 -

and that despite "*continuing concerns about weakness in our economy*," the Company was "*seeing good growth*" across all of its business lines and geographies.  In addition, having told investors on April 22, 2008 that gross margin pressures were "being mitigated through pricing actions," defendant Eck reassured investors that Anixter had indeed "*succeeded in negotiating price increases with [its] customers*":

> Turning now to OEM supply business, we continue to feel some margin pressure from steel price increases.  While *we have succeeded in negotiating price increases with our customers*, which will begin to impact margins in the third quarter, those increases tend to lag the continued run up in steel prices. . . .

> *At the same time, we experienced very strong growth in Europe from new customers as well as adding new products with existing customers*. . . .  We are very pleased with the confidence these customers have in us and are now doing business in multiple countries with several of these new customers.  We have believed all along that we can build a unique global partner for multi-national customers and we are beginning to see that strategy drive benefits for our customers and ourselves.

> \*       \*       \*

> *In closing, while there are continuing concerns about weakness in our economy, we are seeing good growth across our businesses and around the world*.  We have continued to invest in the initiatives that will carry us forward in the coming years while appropriately managing operating expenses, enabling us to continue to gain operating leverage in the business.  The drive toward globalization, new technologies, and relentless management of supply chain costs are all trends that we believe we are well-positioned to participate in with our customers.  *We expect the third quarter will again show sequential growth over the second quarter as well as over prior year*.

78.     Given the decrease in Anixter's organic sales growth and OEM gross margins in uncertain economic conditions, analysts questioned defendants about the Company's backlog demand and quote activity.  In response, defendants assured the analysts that they *were not seeing "downward trends anyplace" in their business*:

> [ANALYST:] . . . [I]s quote activity I guess it's holding kind of steady the way it's been for awhile?

> \*       \*       \*

- 31 -

BOB ECK:    *Yes, quote activity, what we see on our project boards are holding reasonably steady.  We have got a lot of strength in wire cable, particularly with the EPC companies, with energy-related projects, with resources and we are seeing good quote activity, continued steady quote activity in the enterprise business.  We are not seeing big downward trends anyplace.  So we are comfortable with the backlog and the project boards at this point*.

DENNIS LETHAM:   To repeat a point Bob made earlier, *we have seen good quote activity in the OEM supply business and some good realization with some significant new contract activity over the last several months*.

79.    Analysts also questioned defendants about the declining sales growth in the Company's European market.  Defendants, however, told the analysts that the Company was experiencing "*decent growth*" in European markets, and that any decline in sales growth was limited to certain "*individual customers*" and would be "*offset*" by strong sales growth from other customers and geographies:

[ANALYST:] I've got a couple of questions.  First, you are showing very good growth in Europe. Can you describe the growth from the economy in Europe versus Anixter's strong performance?  Are you seeing slowing end markets there?  It didn't sound like it from the commentary.  I was just curious if you could comment about the direction of the economy in Europe versus your high growth to start with.

BOB ECK:    Yes, I think it really crosses three business units and a lot of variables. If you looked at the OEM supply business first, what we have seen, and this has been typical of what we have seen in our OEM supply business around the world, *there are individual customers who may have slowing activity, and we have seen some of that in the European business.  On the other hand, we have other customers who, either because they are taking share in the markets or are in a more rapidly growing market, tend to pick up*.

So I think if you looked at OEM supply, there is the UK market is beginning to slow a touch because there tends to be some talk about some macroeconomic factors there. *It is being offset by growth with other customers and other geographies*.

\*      \*      \*

DENNIS LETHAM: I think on that point, Bob, it is important like in the second quarter we did see some softness in the UK market year-on-year on electrical wire and cable that our growth initiatives overall helped us overcome in electrical wire and cable in Europe.

BOB ECK: Absolutely. Again, we saw growth in the enterprise business, which came both from the security investment as well, again, as investment in continental Europe, where we have struggled in the past and *we've seen good pickup there*, which is offsetting slowness in the UK, which is trying to recover from big project spend last year.

DENNIS LETHAM: I think in general [if] you look at Europe we would probably mirror what you read in the press in that the UK has been softer for us this year than it was a year ago. *But the continent has held together pretty well which when combined with our specific growth initiatives has left us with decent growth coming out of Europe*.

80.     In response to further questioning, defendant Eck reiterated that any decline in Anixter's sales growth was "*customer specific*" and was *not* the result of broader economic trends:

[ANALYST:] . . . In the discussions you have right now with some of your largest cyclical companies let's say in your industrial markets, are they still indicating a reasonably good level of activity and optimism looking out past the next month, four to six weeks?

BOB ECK:     *I think that is a very customer specific question*. Some customers are challenged right now. Like I mentioned in the consumer discretionary space, some of those customers are challenged right now and are looking at tighter production runs and tighter spending. *Other customers are doing really quite well*. *I think there are specific customers in retail that are spending a lot of money, there are specific customers in energy that are spending a lot of money, there are customers alternative in energy that are spending money. So its hard to draw one broad answer. Again, we operate in so many geographies and across so many customer verticals that where one type of customer or segment is soft, other segments are strong*.

81.     In addition, defendant Letham used Anixter's share buyback program to tout the Company's prospects during the July 22, 2008 earnings conference call, stating that "[o]ur continued commitment to our buyback program *reflects our strong confidence in both the company's near and long-term prospects* and our belief that Anixter shares represent a compelling value at current prices. . . . The repurchase of 4.8% of our outstanding shares since the first of the year *reflects our confidence in both the near and long-term outlook for our business*."

82.     Analysts responded favorably to defendants positive reassurances. For example, on July 22, 2008, William Blair & Company reported that: "Management's business outlook was

encouraging. Anixter cited stronger-than-anticipated sequential sales growth in the second quarter and *healthy recent quoting activity*. *Looking to the third quarter, management expects slightly higher sequential sales growth to result in year-over-year organic growth closer to its longer-term target of 8%-12%*."

83.    On July 31, 2008, defendants signed and filed with the SEC Anixter's 2Q08 Form 10-Q, in which defendants continued to make positive but false statements and omissions about the Company:

> The Company's consecutive quarter sales growth from the first to second quarter of 2008 of 9.9% was generated *despite the macroeconomic uncertainty that existed during the quarter*. The 2007 consecutive quarter growth from the first to second quarter was 13.8% which was well above that historical trend line. *Importantly, the Company continued to make significant progress on its major initiatives during the quarter, which include growing the Company's security and OEM supply sales*, initiating a factory automation network sales effort, adding to the supply chain services offering, enlarging the geographic presence of the electrical wire and cable business, expanding the Company's product offering and continuing to expand business in the Emerging Markets.

> *        *        *

> *Gross Margins*: Gross margins decreased in the second quarter of 2008 to 23.8% from 24.0% in the corresponding period in 2007 mainly due to pricing pressure from rising steel and specialty metal prices in the Company's OEM supply business and the effects of lower supplier volume incentives that resulted from lower year-on-year sales growth rates.

> *        *        *

> In the OEM supply market, sales increased 4.8%, or $5.7 million, with strong sales growth to aerospace and defense customers offsetting continuing weakness with *certain customers* in the industrial portion of this market who have experienced production slowdowns that have negatively impacted the Company's sales.

> *        *        *

> *Europe Results of Operations* . . . Gross margins in the second quarter of 2008 were 25.7% compared to 26.1% in the corresponding period in 2007. The decline in gross margins is primarily due to lower gross margins in the OEM supply market versus the prior year due to pricing pressure from rising steel and specialty metal prices in the Company's OEM supply business.

- 34 -

\*   \*   \*

The improvement in European operating profit **reflects good sales growth and expense controls**, which offset gross margin pressure in the OEM supply market.

84.     Nowhere in Anixter's 2Q08 Form 10-Q did defendants disclose that the declining economic environment and credit market contraction were negatively impacting the Company's enterprise cabling and OEM businesses, or that Anixter was involved in a material "pricing dispute" with European OEM customer JLR, as more fully described in ¶¶86-93.

85.     Anixter's 2Q08 Form 10-Q also included the following certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendants Eck and Letham:

(2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

\*   \*   \*

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

86.     For the same reasons outlined in ¶¶57-60, 68-72, defendants' July 2008 positive statements, assurances and forecasts were materially false and misleading when made and failed to disclose material information concerning Anixter's business.  At the same time defendants were telling investors that Anixter was "experience[ing] very strong growth in Europe," defendants knew that Anixter's organic sales growth, particularly in its European OEM supply business, was being severely impacted by the economic downturn.  According to a former Operations Manager for Anixter's UK operations, CW3, it was clear by mid-2008 that Anixter's European OEM business had slowed dramatically as a result of the global economic crises and was unlikely to improve as the

global recession continued gathering momentum.  As a result, CW3 reported that Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008 – months before defendants' October 20, 2008 disclosures.  These sales trends were made known to Anixter's U.S. operations on at least a monthly basis, and were incorporated into regular monthly reports given to defendants to monitor Anixter's business health.  Indeed, defendant Letham later admitted on February 3, 2009 that Anixter had experienced a "***trend of decelerating growth rates . . . in the past few quarters*** [*i.e.* 2Q08, 3Q08 and 4Q08]."

87.     CW3 was a former Operations Manager for Anixter's UK operations from approximately January 2008 to November 2008 and, thus, was in a position to have such knowledge.

88.     Other witnesses corroborate these facts.  According to a former U.S.-based product Planner in Anixter's OEM division ("CW4"), by mid-2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling the orders entirely, in order to avoid taking delivery of new inventory.  CW4 reported that all pending vendor orders were tracked using a single spreadsheet program.  The orders were catalogued by part number, date of order, and desired delivery or fulfillment date, among other details.  The spreadsheet was also used to rank each order in terms of how critical it was for Anixter to timely receive the goods.  For instance, orders ranked 100 to 200 were the most critical to Anixter; orders ranked 300 meant the orders were close to becoming due and required monitoring; orders ranked 400 to 500 required less attention; orders ranked 600 to 700 indicated that the products should not have been ordered in the first place because the delivery times were far into the future; and orders ranked 900 indicated that the orders should be promptly cancelled or the delivery or fulfillment dates extended.

89.     According to CW4, by the summer of 2008, an increasing number of orders were ranked at 900.  Between August and September 2008 alone, CW4 cancelled or extended delivery on 15% to 20% of the orders he was responsible for managing – many of which were for parts destined

for customer Case New Holland, one of Anixter's largest fastener customers.  CW4 reported that these cancelled or extended orders were among Anixter's largest and were for the most profitable products Anixter supplied.  The directions to cancel or delay certain orders were made by upper management, with input from Anixter's Vice President of Procurement and Supply Chain, Director of Inventory and Inventory Manager, for whom CW4 worked.  By delaying or cancelling these orders, Anixter avoided having inventory on its books that it would be unable to sell due to the significant decline in business it was experiencing during the Class Period.

90.     CW4 was a former product Planner in Anixter's OEM fastener division at Anixter's corporate headquarters in Illinois and coordinated the vendor purchases and fulfillment of orders for the five or six buyers who ordered to parts needed to satisfy Anixter's customer orders.  CW4 was responsible for managing the orders pending with 15 to 20 vendor accounts, many of which serviced Anixter customer Case New Holland, one of Anixter's largest fastener customers.  Thus, CW4 was in a position to have such knowledge.

91.     The significant decline in Anixter's OEM supply business also continued to negatively impact the Company's operating margins.  As a result, Anixter's gross margins steadily declined year-over-year throughout the Class Period, falling from 24.0% in 1Q07 to 23.7% in 1Q08, from 24.0% in 2Q07 to 23.8% in 2Q08, and from 24.1% in 3Q07 to 23.4% in 3Q08, and were consistently below defendants' guidance to investors of 24% in 2008.

92.     In addition, and contrary to defendants' reassurances that Anixter had "***succeeded in negotiating price increases with [its] customers***," Anixter continued to be involved in a material pricing dispute with major OEM customer JLR, ultimately resulting in a $3 million payment to JLR during the Class Period, which materially affected Anixter's operating margins and financial results.  Anixter was also involved in a material pricing dispute with major OEM customer Lucent.  According to a former U.S.-based Product Manager at Anixter ("CW5"), the Company had been

involved in an ongoing and escalating tension over pricing with Lucent during the Class Period which resulted in decreased sales to Lucent and, ultimately, the loss of Lucent's business completely in 2009.

93.     CW5 was a former Product Manager for specialized telecommunications products at Anixter from approximately 1998 to April 2009 and was a member of the Company's AIS division, a division of its OEM business.  Thus, CW5 was in a position to have such knowledge.

94.     In response to defendants repeated reassurances made in the July 22, 2008 press release and conference call, shares of Anixter stock rose $7.21 per share, or approximately 12%, to close at $66.37 per share, on heavy trading volume.

95.     Defendants continued to reiterate their guidance and positive, but false, reassurances to analysts and investors throughout the Class Period.  For example, on September 17, 2008, The Buckingham Research Group reported:   "Following a meeting with investors and senior management, we remain confident Anixter can deliver solid EPS growth amid strong economic growth headwinds and that the company can deliver organic revenue growth in management's 8%-12% target range over the course of the economic cycle."

**Investors Begin to Learn the Truth**

96.     On October 21, 2008, Anixter issued a press release announcing its financial results for 3Q08, the period ended September 26, 2008.  For the quarter, the Company reported sales of $1.59 billion and net income of $61.7 million, or $1.58 per diluted share, and organic growth of only ***2%***.  In the press release, defendants admitted that the Company was being "***negatively impacted by macro economic trends***":

> "***While we experienced strength early in the third quarter, broader negative economic factors, especially in Europe, impacted sales activities late in the period***. Despite these headwinds we still generated ***2 percent organic growth***, primarily driven by our initiatives to expand the company's presence in the security solutions market and increase the geographic footprint of our electrical wire and cable business in Europe.  The progress realized, despite a challenging environment, demonstrates

- 38 -

the importance of focusing on growth initiatives and programs we can control to offset some of the *negative shorter-term macro economic factors*.  The long-term strategic initiatives and our sustained execution position us for even stronger growth when the economy improves."

\*     \*     \*

"*Our third quarter results were negatively impacted by macro economic trends, particularly in the last few weeks of the quarter*.  The quarter began very favorably, with July being the best four week month in the history of the company.  August, which is traditionally a softer month because of vacation schedules, produced slightly weaker results than historical patterns would have suggested.  While activity levels picked up in September, they did not come back with the strength that is typically seen following the summer vacation period."

97.     In addition, defendants admitted that the Company's decrease in margins was due to

*lower sales growth in Anixter's higher gross margin OEM supply business*:

"Third quarter operating margins were 7.4 percent compared to 7.8 percent in the year ago quarter. . . .  The slight sequential decline in sales in the third quarter, when historical patterns would normally suggest consecutive quarter growth, created some operating leverage compression. . . .  *Gross margins, however, continued to reflect pressure associated with lower supplier volume growth incentives as a result of lower sales growth, softening sales in our higher gross margin OEM supply business and some continued pressure from higher steel and specialty metal prices in our OEM supply business.  All of these factors combined to decrease margins in the quarter*."

"In North America, our operating margins were equal to the 8.6 percent reported in the year ago quarter as slower sales growth and slight downward pressure on gross margins offset good expense control.  *Operating margins in Europe exhibited the most significant decline in the recent quarter as softer sales, particularly in the higher gross margin OEM supply business, moved operating margins to 3.2 percent compared to 4.9 percent in the year ago quarter*."

\*     \*     \*

"European sales in the quarter rose 2 percent versus the year ago quarter. . . Adjusted for acquisitions and the effects of foreign exchange rates on sales, . . . European sales *declined 2 percent organically*."

\*     \*     \*

The European OEM supply business saw only modest growth, increasing 2 percent as sales grew from $146.8 million in the year ago quarter to $149.8 million in the current year period.  Contributing to the year-on-year growth were the acquisitions of Sofrasar and Gergen, which added $9.0 million to current period

- 39 -

sales.  At the same time, an unfavorable foreign exchange rate impact reduced sales by $2.3 million due primarily to the depreciation of the British pound.  ***Without these factors the company's OEM sales declined by 3 percent as the business experienced a number of customer production cutbacks in response to softening economic conditions in Europe***.

 ***The company's European enterprise cabling and security business experienced a sales decline of 6 percent*** to $112.7 million versus $119.7 million in the year ago quarter. . . .  The decline in core enterprise cabling sales reflects a broader-based slowdown in activity beyond the U.K.-based weakness seen earlier this year.

 98. With regard to the Company's outlook, defendant Eck stated, in pertinent part, as

follows:

 "***The later weeks of the third quarter signaled a more broad-based economic slowing than the company had experienced year to date***.  At this time it is difficult to ascertain exactly what this will mean to sales volumes in the coming months.  Historically in periods of economic softness the 15-to-20 percent of our enterprise cabling and security solutions business and our electrical wire and cable business that is project-based has shown the most variability.  On the other hand, the 80-to-85 percent of day-to-day business supporting maintenance and moves, adds and changes to existing infrastructure has remained comparatively steady.  Also, sales in the OEM supply business are driven by customer production slowdowns that vary from customer to customer and between customer vertical markets.  Overall, we believe our business mix has changed appreciably to a less volatile mix than we had in the recession earlier in this decade."

 99. Following the earnings announcement, defendants held an earnings conference call

with analysts and investors.  During the call, defendant Letham elaborated on the negative results:

 This year, the August slowdown was slightly more pronounced than historical patterns.  However, ***the real issue in the quarter was the normal bounce back in sales activity from August to September was much weaker than historical patterns would indicate.  While this was generally true throughout most of the business, it was most pronounced in Europe and within our OEM supply customers, where we saw either extended shutdowns or reduced production schedules, once business resumed after the August shutdowns***.

   *  *  *

Generally, the OEM supply business in Europe was negatively affected by extended vacation shutdowns and reduced customer production schedules.

 100. With regard to the Company's declining gross margins, defendant Letham stated:

- 40 -

Turning to gross margins, we reported second quarter gross margins of 23.4%, versus 24.1% in the year ago quarter. *Contributing to the decline between years, were the effects of lower supplier volume incentives resulting from lower year-on-year sales growth rates. A sales mix shift resulting from slower sales in our higher gross margin OEM supply business, and a resolution of a customer pricing dispute that reduced current quarter gross profit by $3 million or approximately 20 basis points of gross margin*.

101.    Defendant Eck further explained the negative results:

As Dennis has just described, after a solid start to the quarter in July, *we experienced a noticeable slowing of growth, which combined with the rapid strengthening of the US dollar and gross margin pressure, contributed to essentially flat operating earnings versus the prior year third quarter*.

*            *            *

*At this time, our view is that given deterioration in the credit markets and the economy as a whole, corporate spending has slowed or declined for discretionary items, including certain information technology projects*.   This conservative approach to IT spending appears to be in place in North America and Europe.

*            *            *

*I would expect that we will continue to see a difficult environment in North America and Europe, for larger IT projects for some period of time into the future*.

*            *            *

*Turning to the OEM supply business, as Dennis has mentioned, our results were negatively impacted by a customer pricing issue that impacted gross margin by $3 million*. . . .

. . . *At the same time, we experienced reduced manufacturing volumes at certain customers due to economic softness*.

*            *            *

As we look forward to the fourth quarter, continued economic difficulty particularly in North America and Europe will create an uncertain environment for growth.

102.    In addition, defendant Eck admitted that defendants saw the negative effects from the

market's slowdown "*pretty quickly*":

I think what happens, Ted, if you look back over the prior four years, we saw a really strong growth in that enterprise business and that was on the strength of good

- 41 -

corporate spending on projects in IT infrastructure, where we tend to do particularly well because of our business model. ***When the market slows, the chunk of the market that we do particularly well in ends up being a little bit smaller and so we see an effect from that pretty quickly in our business***.

103.    In response to this announcement, the price of Anixter common stock fell $18.76 per share, ***or approximately 40%***, over the next five trading days, to close at $29.06 per share, on October 27, 2008, on heavy trading volume of over nine million shares.

104.    The market for Anixter common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Anixter common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Anixter common stock relying upon the integrity of the market price of Anixter common stock and market information relating to Anixter, and have been damaged thereby.

## ADDITIONAL ALLEGATIONS OF SCIENTER

105.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly, or recklessly, substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Anixter, their control over, and/or receipt and/or modification of Anixter's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Anixter, participated in the fraudulent scheme alleged herein.

- 42 -

106.    Defendants knew, or recklessly disregarded, that the economic downturn was negatively affecting the Company since late 2007.  Defendants acknowledged that there was a "significant amount of economic uncertainty . . . particularly in the U.S. related to the credit markets" as early as October 2007.  Defendants also admitted in October 2007 that the "macroeconomic issues" were impacting Anixter's automotive OEM supply business, although defendants claimed at the time that only certain "luxury" products were being affected. Defendant Eck later admitted on October 21, 2008 that defendants saw the negative effects of the market slowdown "***pretty quickly***":

> *When the market slows, the chunk of the market that we do particularly well in ends up being a little bit smaller and so we see an effect from that pretty quickly in our business.*

107.    Defendant Eck has also admitted that "[defendants] have a very detailed view of what's happening in each of the end markets and each one of the geographies."  Moreover, defendant Letham admitted on February 3, 2009 that Anixter had experienced a ***"trend of decelerating growth rates . . . in the past few quarters*** [*i.e.* 2Q08, 3Q08 and 4Q08]."

108.    By the end of 2007, the deteriorating credit markets and global economic conditions were negatively impacting Anixter's sales activities and organic sales growth, such that defendants' positive reassurances on guidance of 8% to 12% organic growth for 2008 had no reasonable basis. As described in ¶¶58-60, 68-72, 86-93, 106-107, 109-113, defendants knew, or recklessly disregarded, that Anixter's business was being negatively impacted by the declining economic conditions throughout the Class Period.

109.    According to a former Senior Manager for Business Analysis and Standard Cost ("CW6") in Anixter's North America operations, Anixter generated monthly reports showing the sales and profits of its cabling products on a geographic basis.  The information for the reports was extracted from an Access database hosted on an AS-400 mainframe computer.  According to CW6,

defendant Eck received and reviewed the reports.  CW6's main role at Anixter was to analyze the year-over-year performance of the Company's standard cabling product lines in North America, including sales and margin analysis.  Thus, CW6 was in a position to have such knowledge.

110.    According to CW4, a former Planner at Anixter's Glenview, Illinois headquarters, by August and September 2008, Anixter was pushing out delivery dates for products previously ordered from vendors, or cancelling the orders entirely, in order to avoid taking delivery of new inventory before September 30, 2008.  CW4 was one of approximately 17 Planners in the Fastener division at Anixter's corporate headquarters.  CW4 was tasked with coordinating the vendor purchases and fulfillment of orders for the five or six Buyers who ordered the parts needed to satisfy Anixter's customer orders.  CW4 was responsible for managing the orders pending with 15-20 vendor accounts, many of which serviced Anixter customer Case New Holland, a manufacturer of tractors and engines for large trucks, one of Anixter's largest fastener customers.

111.    CW4 reported that all pending vendor orders were tracked using a single spreadsheet program.  The orders were catalogued by part number, date of order, desired delivery or fulfillment date, among other details.  The spreadsheet was also used to rank each order in terms of how critical it was for Anixter to received the goods timely, ranking orders from 100 (critical) to 900 (order should be cancelled).

112.    According to CW4, beginning in August 2008, an increasing number of orders were ranked at 900.  Between August and September 2008, CW4 cancelled or extended delivery of 15-20% of the orders he was responsible for managing – many of which were for parts destined for Case New Holland.  CW4 reported that these cancelled or extended orders were among Anixter's largest and were for the most profitable products Anixter supplied.  The direction to cancel or delay certain orders were made by upper management, with input from Anixter's Vice President of Procurement and Supply Chain, Director of Inventory and Inventory Manager, for whom CW4

worked.  By delaying or cancelling these orders, Anixter avoided having inventory on its books that it would be unable to push through because of the significant decline in business it was experiencing during the Class Period.

113.    According to CW2, it was well known at the Company's Spitfire Park Plant (the Company's main European OEM operations) during the Class Period that Anixter and JLR were disputing JLR's rebate and that Anixter was very likely going to have to pay JLR the disputed $3 million rebate amount.  CW2 reported that defendant Eck visited the Spitfire Park Plant in the midst of this pricing dispute almost immediately after he assumed the CEO position in July 2008.

**Insider Trading**

114.    Defendants were further motivated to engage in this course of conduct in order to allow Individual Defendants Eck, Grubbs and Letham and other Company insiders to sell 60,481 shares of their personally-held Anixter common stock for gross proceeds in excess of $3.9 million. The following chart sets forth the insider trading:

| Insider | Date | Shares | Price | Proceeds | % Sold | % Sold (incl. options) |
|---|---|---|---|---|---|---|
| JOHN DUL | 2/15/2008 | 735 | $68.09 | $50,046 | | |
| | 3/25/2008 | 1,058 | $63.46 | $67,141 | | |
| | 4/1/2008 | 530 | $65.00 | $34,450 | | |
| | 5/13/2008 | 530 | $65.00 | $34,450 | | |
| | 5/29/2008 | 530 | $65.00 | $34,450 | | |
| | 7/22/2008 | 530 | $65.00 | $34,450 | | |
| | 7/25/2008 | 530 | $67.26 | $35,648 | | |
| | 8/25/2008 | 530 | $66.91 | $35,462 | | |
| | | 4,973 | | $326,097 | 26.77% | 11.91% |
| | | | | | | |
| ROBERT ECK | 9/9/2008 | 1,045 | $70.50 | $73,673 | | |
| | | 1,045 | | $73,673 | 7.17% | 1.92% |
| | | | | | | |
| ROBERT GRUBBS | 1/29/2008 | 14,000 | $67.00 | $938,000 | | |
| | 9/2/2008 | 1,000 | $74.63 | $74,630 | | |
| | | 15,000 | | $1,012,630 | 9.29% | 3.70% |
| | | | | | | |
| DENNIS | 2/15/2008 | 200 | $67.45 | $13,490 | | |

| Insider | Date | Shares | Price | Proceeds | % Sold | % Sold (incl. options) |
|---|---|---|---|---|---|---|
| LETHAM | | | | | | |
| | 2/15/2008 | 200 | $67.47 | $13,494 | | |
| | 2/15/2008 | 200 | $67.50 | $13,500 | | |
| | 2/15/2008 | 200 | $68.13 | $13,626 | | |
| | 2/15/2008 | 168 | $67.78 | $11,387 | | |
| | 2/15/2008 | 100 | $68.22 | $6,822 | | |
| | 2/15/2008 | 100 | $68.23 | $6,823 | | |
| | 2/15/2008 | 100 | $68.29 | $6,829 | | |
| | 2/15/2008 | 100 | $66.91 | $6,691 | | |
| | 2/15/2008 | 100 | $66.93 | $6,693 | | |
| | 2/15/2008 | 100 | $66.96 | $6,696 | | |
| | 2/15/2008 | 100 | $67.18 | $6,718 | | |
| | 2/15/2008 | 100 | $67.41 | $6,741 | | |
| | 2/15/2008 | 100 | $67.43 | $6,743 | | |
| | 2/15/2008 | 100 | $67.46 | $6,746 | | |
| | 2/15/2008 | 100 | $67.49 | $6,749 | | |
| | 2/15/2008 | 100 | $67.53 | $6,753 | | |
| | 2/15/2008 | 100 | $67.54 | $6,754 | | |
| | 2/15/2008 | 100 | $67.57 | $6,757 | | |
| | 2/15/2008 | 100 | $67.58 | $6,758 | | |
| | 2/15/2008 | 100 | $67.59 | $6,759 | | |
| | 2/15/2008 | 100 | $67.60 | $6,760 | | |
| | 2/15/2008 | 100 | $67.63 | $6,763 | | |
| | 2/15/2008 | 100 | $67.65 | $6,765 | | |
| | 2/15/2008 | 100 | $67.69 | $6,769 | | |
| | 2/15/2008 | 100 | $67.73 | $6,773 | | |
| | 2/15/2008 | 100 | $67.88 | $6,788 | | |
| | 2/15/2008 | 100 | $67.90 | $6,790 | | |
| | 2/15/2008 | 100 | $68.10 | $6,810 | | |
| | 2/15/2008 | 100 | $68.14 | $6,814 | | |
| | 2/15/2008 | 100 | $68.17 | $6,817 | | |
| | 2/15/2008 | 100 | $68.21 | $6,821 | | |
| | 3/17/2008 | 400 | $59.50 | $23,800 | | |
| | 3/17/2008 | 300 | $59.52 | $17,856 | | |
| | 3/17/2008 | 200 | $59.13 | $11,826 | | |
| | 3/17/2008 | 200 | $59.36 | $11,872 | | |
| | 3/17/2008 | 200 | $59.46 | $11,892 | | |
| | 3/17/2008 | 200 | $59.61 | $11,922 | | |
| | 3/17/2008 | 100 | $58.65 | $5,865 | | |
| | 3/17/2008 | 100 | $58.93 | $5,893 | | |
| | 3/17/2008 | 100 | $59.01 | $5,901 | | |
| | 3/17/2008 | 100 | $59.05 | $5,905 | | |
| | 3/17/2008 | 100 | $59.06 | $5,906 | | |

| Insider | Date | Shares | Price | Proceeds | % Sold | % Sold (incl. options) |
|---|---|---|---|---|---|---|
| | 3/17/2008 | 100 | $59.10 | $5,910 | | |
| | 3/17/2008 | 100 | $59.11 | $5,911 | | |
| | 3/17/2008 | 100 | $59.19 | $5,919 | | |
| | 3/17/2008 | 100 | $59.20 | $5,920 | | |
| | 3/17/2008 | 100 | $59.22 | $5,922 | | |
| | 3/17/2008 | 100 | $59.27 | $5,927 | | |
| | 3/17/2008 | 100 | $59.28 | $5,928 | | |
| | 3/17/2008 | 100 | $59.35 | $5,935 | | |
| | 3/17/2008 | 100 | $59.38 | $5,938 | | |
| | 3/17/2008 | 100 | $59.43 | $5,943 | | |
| | 3/17/2008 | 100 | $59.44 | $5,944 | | |
| | 3/17/2008 | 100 | $59.48 | $5,948 | | |
| | 3/17/2008 | 100 | $59.53 | $5,953 | | |
| | 3/17/2008 | 100 | $59.69 | $5,969 | | |
| | 3/17/2008 | 100 | $59.76 | $5,976 | | |
| | 3/17/2008 | 100 | $59.86 | $5,986 | | |
| | 3/17/2008 | 68 | $58.61 | $3,985 | | |
| | 4/15/2008 | 400 | $63.00 | $25,200 | | |
| | 4/15/2008 | 300 | $61.57 | $18,471 | | |
| | 4/15/2008 | 200 | $61.89 | $12,378 | | |
| | 4/15/2008 | 200 | $62.09 | $12,418 | | |
| | 4/15/2008 | 200 | $62.10 | $12,420 | | |
| | 4/15/2008 | 200 | $62.50 | $12,500 | | |
| | 4/15/2008 | 168 | $62.76 | $10,544 | | |
| | 4/15/2008 | 100 | $61.44 | $6,144 | | |
| | 4/15/2008 | 100 | $61.45 | $6,145 | | |
| | 4/15/2008 | 100 | $61.46 | $6,146 | | |
| | 4/15/2008 | 100 | $61.48 | $6,148 | | |
| | 4/15/2008 | 100 | $61.84 | $6,184 | | |
| | 4/15/2008 | 100 | $61.86 | $6,186 | | |
| | 4/15/2008 | 100 | $61.93 | $6,193 | | |
| | 4/15/2008 | 100 | $61.99 | $6,199 | | |
| | 4/15/2008 | 100 | $62.23 | $6,223 | | |
| | 4/15/2008 | 100 | $62.25 | $6,225 | | |
| | 4/15/2008 | 100 | $62.27 | $6,227 | | |
| | 4/15/2008 | 100 | $62.34 | $6,234 | | |
| | 4/15/2008 | 100 | $62.97 | $6,297 | | |
| | 4/15/2008 | 100 | $62.99 | $6,299 | | |
| | 4/15/2008 | 100 | $63.02 | $6,302 | | |
| | 4/15/2008 | 100 | $63.06 | $6,306 | | |
| | 4/15/2008 | 100 | $63.25 | $6,325 | | |
| | 4/15/2008 | 100 | $63.37 | $6,337 | | |
| | 4/15/2008 | 100 | $63.43 | $6,343 | | |

| Insider | Date | Shares | Price | Proceeds | % Sold | % Sold (incl. options) |
|---------|------|--------|-------|----------|--------|------------------------|
| | 4/15/2008 | 100 | $63.62 | $6,362 | | |
| | 5/15/2008 | 1,100 | $65.00 | $71,500 | | |
| | 5/15/2008 | 600 | $64.99 | $38,994 | | |
| | 5/15/2008 | 200 | $64.58 | $12,916 | | |
| | 5/15/2008 | 200 | $64.85 | $12,970 | | |
| | 5/15/2008 | 200 | $64.90 | $12,980 | | |
| | 5/15/2008 | 200 | $64.92 | $12,984 | | |
| | 5/15/2008 | 200 | $64.93 | $12,986 | | |
| | 5/15/2008 | 200 | $65.03 | $13,006 | | |
| | 5/15/2008 | 168 | $64.97 | $10,915 | | |
| | 5/15/2008 | 100 | $64.51 | $6,451 | | |
| | 5/15/2008 | 100 | $64.76 | $6,476 | | |
| | 5/15/2008 | 100 | $64.86 | $6,486 | | |
| | 5/15/2008 | 100 | $64.91 | $6,491 | | |
| | 5/15/2008 | 100 | $64.99 | $6,499 | | |
| | 5/15/2008 | 100 | $65.02 | $6,502 | | |
| | 6/16/2008 | 300 | $62.86 | $18,858 | | |
| | 6/16/2008 | 300 | $62.87 | $18,861 | | |
| | 6/16/2008 | 300 | $62.93 | $18,879 | | |
| | 6/16/2008 | 300 | $63.05 | $18,915 | | |
| | 6/16/2008 | 200 | $62.83 | $12,566 | | |
| | 6/16/2008 | 200 | $62.96 | $12,592 | | |
| | 6/16/2008 | 200 | $63.06 | $12,612 | | |
| | 6/16/2008 | 200 | $63.07 | $12,614 | | |
| | 6/16/2008 | 200 | $63.08 | $12,616 | | |
| | 6/16/2008 | 168 | $63.70 | $10,702 | | |
| | 6/16/2008 | 100 | $62.84 | $6,284 | | |
| | 6/16/2008 | 100 | $62.85 | $6,285 | | |
| | 6/16/2008 | 100 | $62.90 | $6,290 | | |
| | 6/16/2008 | 100 | $62.94 | $6,294 | | |
| | 6/16/2008 | 100 | $62.97 | $6,297 | | |
| | 6/16/2008 | 100 | $63.03 | $6,303 | | |
| | 6/16/2008 | 100 | $63.09 | $6,309 | | |
| | 6/16/2008 | 100 | $63.15 | $6,315 | | |
| | 6/16/2008 | 100 | $63.22 | $6,322 | | |
| | 6/16/2008 | 100 | $63.31 | $6,331 | | |
| | 6/16/2008 | 100 | $63.34 | $6,334 | | |
| | 6/16/2008 | 100 | $63.42 | $6,342 | | |
| | 6/16/2008 | 100 | $63.52 | $6,352 | | |
| | 7/15/2008 | 2,768 | $55.94 | $154,842 | | |
| | 7/15/2008 | 900 | $56.97 | $51,273 | | |
| | 7/22/2008 | 2,700 | $65.00 | $175,500 | | |
| | 8/15/2008 | 3,668 | $70.12 | $257,200 | | |

| Insider | Date | Shares | Price | Proceeds | % Sold | % Sold (incl. options) |
|---------|------|--------|-------|----------|--------|------------------------|
|  | 8/15/2008 | 2,700 | $70.12 | $189,324 |  |  |
|  | 8/15/2008 | 2,700 | $65.20 | $176,040 |  |  |
|  | 9/15/2008 | 3,668 | $65.18 | $239,080 |  |  |
|  |  | 37,444 |  | $2,407,295 | 26.50% | 9.41% |
|  |  |  |  |  |  |  |
| PHILIP MENO | 3/17/2008 | 700 | $58.56 | $40,992 |  |  |
|  | 3/17/2008 | 5 | $58.97 | $295 |  |  |
|  | 7/29/2008 | 609 | $70.00 | $42,630 |  |  |
|  | 9/2/2008 | 705 | $75.01 | $52,882 |  |  |
|  |  | 2,019 |  | $136,799 | 15.50% |  |
|  |  |  |  |  |  |  |
|  | **Total:** | **60,481** |  | **$3,956,493** |  |  |

115.    Defendants' insider sales, as well as the sales of other Anixter insiders, were suspicious in timing and amount and provide additional indicia of scienter.  Defendant Letham sold 37,444 shares (***nearly 27%*** of his holdings) for proceeds of ***over $2.4 million***, defendant Grubbs sold 15,000 shares (***over 9%*** of his holdings) for proceeds of ***over $1 million***, and defendant Eck sold 1,045 shares (***over 7%*** of his holdings) for proceeds of ***over $73,000*** during the Class Period while Anixter's stock price was significantly inflated as a result of defendants' false and misleading statements and material omissions.  In addition, other Anixter executives sold significant amounts of stock at inflated prices.  For example, John Dul, Anixter's General Counsel and Vice President sold 13,603 shares (nearly 27% of his holdings) for proceeds of over $326,000, and Philip Meno, Anixter's Vice President and Tax Executive, sold 2,019 shares (nearly 16% of his holdings) for proceeds of nearly $137,000 during the Class Period.  While options are not stock holdings and should not be included in the insiders retained holdings, even including options, the percentages and amounts sold are highly suspicious, especially when considered with the highly suspicious timing of the sales.

116.    The timing of defendants' insider sales was highly suspicious, as they were timed to take maximum advantage of the artificial price inflation caused by defendants' misrepresentations

and while Anixter stock was trading at near record highs.  Indeed, defendant Grubbs sold 14,000 shares of his personally held Anixter stock on January 29, 2008, *the same day* Anixter reported its financial results for 4Q07 and defendants reassured investors that Anixter remained unaffected by the economic downturn, albeit *after* the stock price shot up approximately 18%.

117.     As described in ¶¶61-67, 74-81, 83, 85, defendants continued to inflate Anixter's stock price.  On April 22, 2008, defendants reassured investors that Anixter "continued[d] to generate very healthy growth" and would "sustain overall growth despite certain economic concerns."  Defendants also reassured the market that margin pressures in the Company's OEM supply business "[we]re being mitigated through pricing actions" and that margins were "up already."  Defendants continued these reassurances on July 22, 2008, telling investors that Anixter was "experienc[ing] very strong growth in Europe," was "seeing good growth across all [its] business," and had "succeeded in negotiating price increases with [its] customers."  At the same time defendants were making these optimistic statements, defendants Eck, Grubbs and Letham sold a total of 53,489 shares of their own Anixter stock between January 29, 2008 and September 15, 2008, at record prices as high as $74.63 – an *astounding $39.88* more than the closing price of $34.75 the day after defendants October 21, 2008 disclosures – for proceeds of nearly $3.5 million.  In addition, defendant Eck waited until September 9, 2008 to sell his stock, when the stock was trading above $70 and near its high, shortly before defendants disclosed on October 21, 2008 that the Company was being severely impacted by macro economic factors.

118.     Prior to the Class Period, on April 24, 2007, defendants Letham and Grubbs adopted trading plans pursuant to Rule 10b5-1 of the Exchange Act through which they sold their personally owned Anixter stock.  Defendants Letham and Grubbs were motivated to fraudulently and artificially inflate the price of Anixter stock in order to maximize the amounts received from their sales pursuant to these plans.

119.    During the Class Period, on July 24, 2008, defendant Grubbs entered into a new trading plan, pursuant to which some of his Class Period sales were made.  Defendant Eck also adopted a trading plan on July 24, 2008, pursuant to which *all* of his Class Period sales were made. As set forth in ¶¶57-60, 68-72, 86-93, defendants Eck and Grubbs had knowledge of numerous materially adverse, non-public facts at the time they entered into their July 24, 2008 trading plans. Thus, any trades made pursuant to these plans fall outside the protections of Rule 10b5-1.

## LOSS CAUSATION/ECONOMIC LOSS

120.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained Anixter's stock price and operated as a fraud or deceit on Class Period purchasers of the Company's publicly traded securities by misrepresenting and omitting material information including that the Company was experiencing severe, material, negative impact from the worsening global economic crises.  When defendants' misrepresentations and omissions were revealed, as detailed in ¶¶61-67, 96-102, Anixter's stock price fell precipitously as the prior artificial inflation came out of the price. As a result of their purchases of Anixter securities during the Class Period, plaintiff and other members of the Class suffered significant economic loss, *i.e.*, damages, under the federal securities laws.

121.    Defendants' false statements and omissions, identified herein at ¶¶46-52, 55-56, 61-67, 74-81, 83, 85, had the intended effect and caused Anixter's stock to trade at artificially inflated levels reaching a high of $73.81 per share on August 29, 2008.  As a direct result of the disclosures on April 22 and October 21, 2008, however, Anixter's stock price suffered material, statistically significant declines:



122.   On April 22, 2008, after it was disclosed that the Company's year over year growth

rate was 7%, that the Company was beginning to experience margin pressures in its electrical and

wire business and European OEM lines, and that Anixter was seeing "softer corporate spending," the

Company's stock price dropped $10.31 per share over the course of the following three trading days,

on unusually high trading volume of nearly five million shares.

123.   Then on October 21, 2008, the Company announced a year-over-year growth rate of

only 2% caused because the Company was being "negatively impacted by macro economic trends,"

which impacted sales, "especially in Europe."  The Company also announced that its gross margins

had dropped materially year-over-year in part due to "the resolution of a customer pricing dispute

that reduced current quarter gross profit by $3 million or approximately 20 basis points of gross

margin." This news caused the Company's stock price to fall 40%, or $18.76 per share between close of trading on October 21, 2008 and close of trading on October 27, 2008.

124.    Individually and collectively, the drops on April 22-24, 2008 and October 21-27, 2008 removed the inflation from Anixter's stock price, causing real economic loss of at least $29.07 per share to investors who had purchased the Company's publicly traded securities during the Class Period.

125.    The decline in the price of Anixter common stock after this disclosure came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Anixter common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Anixter common stock and the subsequent significant decline in the value of Anixter common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

126.    At all relevant times, the market for Anixter common stock was an efficient market for the following reasons, among others:

(a)    Anixter common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Anixter filed periodic public reports with the SEC and the NYSE;

(c)    Anixter regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

- 53 -

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Anixter was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

127.    As a result of the foregoing, the market for Anixter's publicly traded securities promptly digested current information regarding Anixter's from all publicly available sources and reflected such information in the prices of Anixter's publicly traded securities.  Without knowledge of the misrepresented and omitted material facts alleged herein, plaintiff and other members of the Class purchased Anixter's securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were revealed and suffered similar injury.  Thus, a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Anixter between January 29, 2008 and October 20, 2008, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

129.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Anixter common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands

of members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by Anixter or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

130.    Plaintiff's claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of federal law

complained of herein.

131.    Plaintiff will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class action and securities litigation.

132.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as

alleged herein;

(b)    whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business and operations of Anixter;

(c)    whether the price of Anixter common stock was artificially inflated during the

Class Period; and

(d)    to what extent the members of the Class have sustained damages and the

proper measure of damages.

133.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs

done to them.  There will be no difficulty in the management of this action as a class action.

- 55 -

**NO SAFE HARBOR**

134.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Anixter who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

135.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.     During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

137.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

138.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Anixter common stock.  Plaintiff and the Class would not have purchased Anixter common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements, and material omissions.

139.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Anixter common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

140.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141.    The Individual Defendants acted as controlling persons of Anixter within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Anixter, and their ownership of Anixter stock, the Individual Defendants had the power and authority to cause Anixter to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 6, 2010                    COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
                                             DEBRA J. WYMAN


                                             _____
                                                   s/ DEBRA J. WYMAN
                                                  DEBRA J. WYMAN

                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)

                                             COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
                                             SARAH R. HOLLOWAY
                                             100 Pine Street, Suite 2600
                                             San Francisco, CA  94111
                                             Telephone:  415/288-4545
                                             415/288-4534 (fax)

                                             Lead Counsel for Plaintiff

- 58 -

LASKY & RIFKIND, LTD.
LEIGH R. LASKY
NORMAN RIFKIND
AMELIA S. NEWTON
350 North LaSalle Street, Suite 1320
Chicago, IL  60610
Telephone:  312/634-0057
312/634-0059 (fax)

Liaison Counsel

S:\CasesSD\Anixter Int'l\secy\CPT00063701-amended.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 6, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 6, 2010.

s/ DEBRA J. WYMAN
DEBRA J. WYMAN

COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: debraw@csgrr.com

# Mailing Information for a Case 1:09-cv-05641

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David J. Bradford**
  dbradford@jenner.com,docketing@jenner.com
- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com
- **Sarah R. Holloway**
  sholloway@csgrr.com
- **Leigh R. Lasky**
  lasky@laskyrifkind.com
- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com
- **Amelia Susan Newton**
  newton@laskyrifkind.com
- **Norman Rifkind**
  rifkind@laskyrifkind.com
- **Marc David Sokol**
  msokol@jenner.com,docketing@jenner.com
- **Howard Steven Suskin**
  hsuskin@jenner.com,docketing@jenner.com
- **Matthew E Van Tine**
  mvantine@millerlawllc.com,mvt@vantine.us
- **Heidi E. VonderHeide**
  vonderheide@laskyrifkind.com
- **Daniel J. Weiss**
  dweiss@jenner.com,docketing@jenner.com
- **Debra J. Wyman**
  debraw@csgrr.com,nhorstman@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`