**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 09 CV 5641 |
| v. | ) ) | Hon. Robert M. Dow Jr. |
| ANIXTER INTERNATIONAL, INC., ROBERT J. ECK, DENNIS J. LETHAM and ROBERT GRUBBS, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

February 19, 2010

David J. Bradford (Illinois Bar #272094)
Howard S. Suskin (Illinois Bar #6185999)
Daniel J. Weiss (Illinois Bar #6256843)
Marc D. Sokol (Illinois Bar #6276263)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois  60654
(312) 222-9350

## **Table of Contents**

Introduction ........................................................................................................................1

Background .........................................................................................................................3

I.   Count I Should Be Dismissed. ......................................................................................7

   A.  Count I Is Not Pleaded With The Specificity Required By The PSLRA. ..........................8

   B.  No Falsity Is Alleged For Anixter's Pre-July 2008 Statements.........................................10

   C.  Anixter's July 2008 Statements Are Not Actionable.........................................................15

      1.   Plaintiff alleges no falsity with respect to Anixter's statements concerning its Q2 2008 results. ....................................................................................................15

      2.   Anixter's July 2008 forward-looking statements are not actionable. ...........................18

      3.   Anixter's forward-looking statements are protected by the PSLRA. ..........................19

      4.   Plaintiff's confidential witnesses do not establish falsity in Anixter's July 2008 statements.....................................................................................................23

   D.  Anixter's Later Statements Do Not Render Any Prior Statement False............................25

   E.  Count I Fails to Plead Scienter in Accordance with the PSLRA......................................27

      1.   Defendants' stock sales do not demonstrate scienter....................................................27

      2.   The CWs are inadequate to plead scienter. ..................................................................31

   F.  Plaintiff Has Failed to Plead Loss Causation....................................................................32

   G.  Several of the Challenged Statements Were Immaterial Puffery. .....................................33

II.  Count II Should Be Dismissed..........................................................................................33

   A.  Plaintiff Has Not Alleged An Underlying Violation Of Securities Law. ..........................33

   B.  Plaintiff Has Failed to Allege General or Specific Control. .............................................34

III. The Complaint Should Be Dismissed with Prejudice.............................................................35

## Table of Authorities

## FEDERAL CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ........................................................28, 29

*In re Allied Prods. Corp., Inc.*, 2000 WL 1738333
   (N.D. Ill. Mar. 13, 2000) ...............................................................14

*In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411
   (N.D. Ill. June 29, 2001) ................................................................34

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .........................................................7

*Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004)...............................................21, 23

*In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833
   (N.D. Cal. 2000).........................................................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................7

*Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008)...................................................9

*In re Buca Inc. Sec. Litig.*, 2006 WL 3030886
   (D. Minn. Oct. 16, 2006).................................................................33

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410
   (3d Cir. 1997).........................................................................30

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126, (3d Cir. 2004).........................................................24, 31

*In re Career Educ. Corp. Sec. Litig.*, 2007 WL 1029092
   (N.D. Ill. March 29, 2007) ..............................................................3

*Clark v. TRO Learning Inc.*, 1998 WL 292382
   (N.D. Ill. May 20, 1998) ...............................................................9

*In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857
   (N.D. Cal. 2004).......................................................................29

*In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662
   (E.D. Mich. 1999).....................................................................28, 29

*Damato v. Hermanson*, 153 F.3d 464 (7th Cir. 1998) .................................................34

*Davis v. Coopers & Lybrand*, 787 F. Supp. 787
    (N.D. Ill. 1992) ..................................................................................................34

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) .........................................................14

*Desai v. Gen. Growth Props., Inc.,* 654 F. Supp. 2d 836
    (N.D. Ill. 2009) ..................................................................................................20

*Donohoe v. Consol. Operating & Prod. Corp.*,
    30 F.3d 907 (7th Cir. 1994) .........................................................................34, 35

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................32

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    2010 WL 154519 (11th Cir. Jan. 19, 2010) .......................................................20

*Elam v. Neidorff*, 544 F.3d 921 (8th Cir. 2008) .......................................................28

*Fannon v. Guidant*, 583 F.3d 995 (7th Cir. 2009) ....................................................35

*In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871
    (W.D.N.C. 2001) ................................................................................................26

*In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261
    (S.D.N.Y. 2009) .................................................................................................28

*Glassman v. Computervision Corp.*, 90 F.3d 617
    (1st Cir. 1996) ...................................................................................................26

*Greebel v. FTP Software, Inc.*, 194 F.3d 185
    (1st Cir. 1999) ...................................................................................................30

*In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913
    (S.D. Ind. 2008) .................................................................................................28

*In re Harley-Davidson, Inc. Sec. Litig.,* 660 F. Supp. 2d 969
    (E.D. Wis. 2009) .............................................................................................8, 29

*Havenick v. Network Express, Inc.*, 981 F. Supp. 480
    (E.D. Mich. 1997) ..............................................................................................29

*Head v. NetManage, Inc.*, 1998 WL 917794
    (N.D. Cal. Dec. 30, 1998) ..................................................................................29

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ................................................3

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753
    (7th Cir. 2007)................................................................15, 26, 31

*Higginbotham v. Baxter Int'l., Inc.*, 2005 WL 1272271
    (N.D. Ill. May 25, 2005) ................................................................29

*In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952
    (8th Cir. 2008)................................................................24, 25, 31

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574
    (S.D.N.Y. 2007)................................................................28

*Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937
    (N.D. Ill. 2003)................................................................20, 23, 34

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008)................................................33

*In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152
    (N.D. Ill. 2004)................................................................20, 21, 33

*In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279
    (N.D. Ill. Nov. 14, 2000)................................................................14

*In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858
    (N.D. Cal. June 28, 2005) ................................................................28

*Parnes v. Gateway 2000, Inc.,* 122 F.3d 539 (8th Cir. 1997)................................26

*In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096 (N.D. Cal. 2006) ................................9

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008)................................................ *passim*

*Ray v. Citigroup Global Mkts.*, 482 F.3d 991
    (7th Cir. 2007)................................................................32

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001)................................................28

*Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791
    (N.D. Ill. 2007)................................................................27

*Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir. 1989)................................34

*Schultz v. Tomotherapy Inc.*, 2009 WL 2032372
    (W.D. Wis. July 9, 2009) ................................................................29

*In re Sina Corp. Sec. Litig.*, 2006 WL 2742048
   (S.D.N.Y. Sept. 26, 2006) ........................................................................................9

*Starr v. !Hey, Inc.*, 2003 WL 21212596
   (N.D. Ill. May 23, 2003) .........................................................................................34

*Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833
   (N.D. Ill. 2003).................................................................................3, 20, 21, 23

*Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438
   (S.D.N.Y. 2008) .......................................................................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..........................8, 27

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002)....................................................... 3

*Tricontinental Indus., Ltd. v. Pricewaterhousecoopers, LLP*,
   475 F.3d 824 (7th Cir. 2007) ..................................................................................32

*Waldock v. M.J. Select Global, Ltd.*, 2005 WL 3542527
   (N.D. Ill. Dec. 27, 2005) .........................................................................................34

*In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934
   (W.D. Wash. 2009) ............................................................................................24, 31

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(1) ...............................................................................................8

15 U.S.C. § 78u-4(b)(2) .............................................................................................27

15 U.S.C. § 78u-4(b)(3)(A)...........................................................................................8

15 U.S.C. § 78u-5(c) .............................................................................................19, 20

15 U.S.C. § 78u-5(i)(1) ...............................................................................................21

15 U.S.C. § 78u-5(c)(1)(A)(i) .....................................................................................20

## OTHER AUTHORITIES

H.R. Rep. No. 104-369 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730 ....................20

Defendants (collectively, "Anixter," except where specified), by their attorneys, Jenner & Block LLP, respectfully submit this memorandum in support of their motion to dismiss plaintiff's amended class action complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## Introduction

This is a classic case of "fraud by hindsight."  Despite plaintiff's charge of securities fraud, the typical hallmarks of a securities fraud case are completely absent from the complaint. Plaintiff does not allege any inaccuracy in Anixter's financial statements.  Instead, plaintiff faults Anixter for not predicting with perfect accuracy the unprecedented financial crisis during the third quarter of 2008 and the effects that crisis would have on Anixter's business in that quarter. Plaintiff's main tactic is to contrast relatively positive statements from Anixter during the first half of 2008 with less positive statements from the third quarter, and to argue that it was fraud— not an intervening global economic catastrophe—that explains the difference.  This tactic fails.

Plaintiff thus embellishes its complaint by misquoting Anixter's statements, taking snippets out of context, relying on low-level "confidential witnesses," and mischaracterizing routine stock sales.  When these distortions are accounted for, as they must be under the PSLRA and *Twombly*, plaintiff fails to allege that Anixter made statements that were *false when made* (not incorrect in retrospect), that Anixter *knew* or recklessly disregarded that the statements were false, and that the statements themselves were otherwise actionable.  The complaint therefore fails for multiple reasons, including:

**1.  Plaintiff does not adequately allege falsity in Anixter's pre-July 2008 statements.**

Plaintiff claims that Anixter made misrepresentations on five occasions, three of which occurred during the first half of 2008—in January, February, and April.  In most of the challenged

statements from this period, Anixter simply reported its results based upon financial figures that plaintiff does not challenge.  In the other challenged statements, Anixter projected its first and second quarter performance—projections that turned out to be *accurate*, as shown in the financial results that plaintiff (again) does not challenge.  Without any alleged misstatement of results, and without any "missed" projection, plaintiff fails to allege with the requisite plausibility *how* or *why* any of these early 2008 statements was false.

**2. Anixter's July 2008 statements are not actionable.**  The only other statements that plaintiff challenges are from two occasions in July 2008.  There, Anixter reported its second quarter results and made projections about anticipated performance in the third quarter.  Once again, plaintiff does not adequately allege any falsity with respect to the unchallenged second quarter results.   And even though Anixter's third quarter performance did not meet the company's July 2008 projections in all respects, plaintiff has failed to plead any "misstatement," let alone any that is not covered by the PSLRA's protections for forward-looking statements.

**3. Plaintiff fails adequately to allege scienter.**  The "insider sales" that plaintiff highlights were all previously scheduled pursuant to 10b5-1 plans and represent a small proportion (no more than 12%) of each executive's total holdings.  The "confidential witnesses" that plaintiff alleges do not identify with specificity any problem at Anixter extant before June 2008, and the alleged problems they do identify were concentrated in isolated business units or concerned individual customers.  These allegations do not establish scienter.

A company following the securities laws to the letter can suffer a "stock drop" because it appropriately and timely tells investors that the effects of an economic crisis have caused its business to suffer and the future looks more difficult.  Plaintiff's allegations are insufficient to assert a plausible claim that anything different than that happened at Anixter.  Plaintiff has failed

to allege claims that can pass the gate-keeper standards established by Congress and the Supreme Court.  The Court should dismiss with prejudice.

## Background[1]

**A.  Anixter's Business.**

Anixter is a global distributor of parts, wires, and cables.  (Amended Complaint ("Cmplt.") ¶ 2.)  Anixter has three main product lines.  (*Id.* ¶ 3.)  The "Enterprise Cabling and Security Solutions" ("ECS") line accounted for slightly more than half of Anixter's sales during the relevant period.  The "Electronic Wire and Cable" ("EWC") line accounted for about 28%.  The smallest line was "Original Equipment Manufacturer Supply" ("OEM"), accounting for about 18% of the company's business.  (*Id.* ¶ 39.)

Anixter "is a leader in the provision of advanced inventory management services," meaning that customers may rely on Anixter to deliver parts on a "just-in-time" basis rather than maintaining their own costly supplies.  (Ex. K, 2008 Form 10-K, at 1.)[2]  As Anixter told investors in its 2007 10-K, its backlog of orders typically represented only about "four weeks of sales" and each order would "ship to customers within 30 to 60 days from order date."  (*Id.* at 3.)

Anixter has experienced rapid growth.  Between 2003 and 2007, Anixter's revenues increased by 17% or more every year, more than doubling from $2.6 billion to $5.8 billion during that period.  (*Id.* at 9.)  Anixter told investors that its long-term goal was to continue this pattern of growth, albeit at a lower rate, as the company grew larger.  During the October 23,

---

[1] This section is based on the allegations of the amended complaint and the documents referenced therein.

[2] The Court may take judicial notice of Anixter's SEC filings (including its press releases, which were filed with the SEC) without converting the motion to dismiss into a motion for summary judgment. *See In re Career Educ. Corp. Sec. Litig.*, 2007 WL 1029092, at *1 n.5 (N.D. Ill. March 29, 2007); *Stavros*, 266 F. Supp. 2d , 844 n.8 (N.D. Ill. 2003).  The Court may also consider the transcripts of the earnings conference calls because they are referred to in the complaint and are central to plaintiff's claims.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

2007 conference call to discuss Q3 2007 results, an analyst asked about that goal: "Last year around this point, I think you expressed confidence in being able to achieve an 8% to 12% organic revenue growth number in 2007.  Does that remain a target in '08?"  Anixter's then-CEO, Mr. Robert Grubbs, responded:

> I think that still remains our target and we've never really assigned that, Noelle, to any given time period.  But [we] have looked at it kind of as an intermediate, you know, couple of year outlook for the business.  Any given quarter or any given time period might be a little above or below that.

(Ex. G, Oct. 23, 2007 Tr. at 9.)

Anixter has explained that "organic" revenue, as opposed to total or reported revenue, excludes the effects of acquisitions, foreign exchange, and copper price variations.  (*See, e.g.*, Ex. I, Jan. 29, 2008 P.R. at 2.)

**B.      Anixter's Performance Through The Second Quarter Of 2008.**

Anixter ended 2007 with revenue of approximately $5.8 billion, up 19% from the year prior, and $253.5 million in net income, up 21%.  (Ex. K, 2008 Form 10-K at 9.)  Both figures were records for Anixter.  The company cautioned that "2008 begins with a well publicized, less certain overall economic environment than 2007," but noted that "recent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year."  (Ex. I, Jan. 29, 2008 P.R. at 13.)

Growth, in fact, continued.  For the first quarter of 2008, Anixter reported $1.47 billion in revenue (up 11% over the same quarter in 2007) and $57.7 million in net income (up 8%).  (Ex. N, May 7, 2008 Form 10-Q at 1.)  Not all of the news was good, however.  The company warned that it was experiencing "slower project growth in Asia," and "a decline in operating margins" in the OEM line in Europe.  (Ex. L, Apr. 22, 2008 P.R. at 2.)  The company further warned that, in light of the global economic downturn, "[s]hort-term macro-economic conditions ***may slow our***

*organic sales growth from the rates of the past couple of years*, which when combined with the investment in [new] initiatives may limit near-term earnings growth." (*Id.* at 3, emphasis added.) The company forecast "consecutive quarter sales growth in the second quarter, [and] also year-on-year sales growth over the very strong second quarter of 2007." (*Id.*)

Anixter achieved those goals. Anixter's revenue in the second quarter of 2008 was $1.62 billion (7% higher than Q2 2007 and 10% higher than the Q1 2008), and Anixter's net income was $66.9 million (4% and 16% higher, respectively). (Ex. Q, July 31, 2008 Form 10-Q at 1.) As Anixter had predicted in April, organic revenue growth turned out lower than in previous quarters, at 4% as compared to Q2 2007. (Ex. O, July 22, 2008 P.R. at 2.) The company again warned of "gross margin pressures in the OEM Supply business" in Europe and also "select customer situations where sales are softer." (*Id.* at 3.) The company also forecast: "[w]e believe the overall market conditions, *as they currently exist*, should allow for consecutive quarter sales growth from the second to third quarter of this year." (*Id.*, emphasis added.)

On the conference call to discuss those results, an analyst asked Anixter about its ability to make forecasts with precision: "[h]ow long out ahead here do you have what you would call reasonable visibility? And even if it's a guess, do you think we'll see reasonably good growth across your markets in North America and Europe through the end of the year?" Anixter's CFO, Mr. Dennis Letham responded:

> Basically *we don't have a lot of hard visibility*. Backlog here at any point in time is typically in the range of about a month. We have pipelines on project-type activity, pipeline tools that give us project activity outlook that extend beyond that but projects are 15%, 20% or so of our enterprise and electrical wire and cable business. *The real issue here is you get your bulk of your business day-to-day, short order, so there is not a lot of long-term visibility.*

(Ex. P, July 22, 2008 Tr. at 13, emphasis added.)

C.    **Anixter's Third Quarter 2008 Results.**

Anixter announced its third quarter results on October 21, 2008.  Third quarter revenue was $1.59 billion, which was 4% higher than the same quarter in 2007, but about 1.7% lower than the second quarter in 2008, despite Anixter's earlier projection of "consecutive quarter sales growth" based on then-existing market conditions.  (Ex. T, Oct. 31, 2008 Form 10-Q at 1.)  Net income of $61.7 million was 5% lower than in the same quarter in 2007.  Anixter explained:

> Our third quarter results were negatively impacted by macro economic trends, particularly in the last few weeks of the quarter.  The quarter began very favorably, with July being the best four week month in the history of the company.  August, which is traditionally a softer month because of vacation schedules, produced slightly weaker results than historical patterns would have suggested.  While activity levels picked up in September, they did not come back with the strength that is typically seen following the summer vacation period.

(Ex. R, Oct. 21, 2008 P.R. at 2.)  Anixter also cautioned investors about the future:  the company had experienced a "broad-based economic slowing" and it was "difficult to ascertain exactly what this will mean to sales volumes in the coming months."  (*Id*. at 4.)

After that announcement, Anixter's stock price declined approximately 39% over the next five trading days.  (Ex. E, Stock Closing Price Chart and Accompanying Graph.)

Anixter finished 2008 with record sales of $6.14 billion, 4.85% higher than in 2007.  (Ex. V, Feb. 27, 2009 Form 10-K at 36.)  For each quarter of 2008 during the class period, including Q3, Anixter reported higher sales than in the same respective quarter of 2007.

D.    **Allegations Of The Amended Complaint.**

Plaintiff alleges that Anixter made false statements on five occasions: (1) on **January 29, 2008**, when Anixter announced its results for the fourth quarter and full year of 2007 (Cmplt. ¶¶ 46-52); (2) on **February 21, 2008**, in Anixter's 2007 Form 10-K (*id*. ¶¶ 55-56); (3) on **April 22, 2008**, when Anixter announced its results for the first quarter of 2008 (*id*. ¶¶ 61-67); (4) on

**July 22, 2008**, when Anixter announced its results for the second quarter of 2008 (*id*. ¶¶ 74-81); and (5) on **July 31, 2008**, in Anixter's Form 10-Q for the second quarter of 2008. (*Id*. ¶¶ 83-85.)

In Count I, plaintiff alleges that Anixter violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. In Count II, plaintiff alleges "control person" violations against each of the individual defendants under Section 20(a) of the Exchange Act.

<u>**Argument**</u>

The Court should dismiss the complaint with prejudice. A complaint's allegations "'must be enough to raise a right to relief above the speculative level.'" *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (FRCP 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"). In order to survive a motion to dismiss, a plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft*, 129 S. Ct. at 1949. A complaint that fails to meet this standard does not state a claim upon which relief may be granted. *See id*.; *Pugh*, 521 F.3d at 699.

**I.      Count I Should Be Dismissed.**

Count I should be dismissed for multiple reasons. The claim does not meet the pleading standards of the Private Securities Litigation Reform Act. (§ A, below.) Plaintiff does not adequately allege falsity in Anixter's early 2008 statements. (§ B.) Anixter's July 2008 statements are inactionable because no falsity is alleged and because the forward-looking statements are protected by the PSLRA's safe harbor. (§ C.) Anixter's post-class-period statements do not render any of its prior statements false. (§ D.) Plaintiff fails to plead scienter.

(§ E.)  Plaintiff fails to plead loss causation.  (§ F.)  Finally, many of the challenged statements were, at most, inactionable puffery.  (§ G.)

### A.        Count I Is Not Pleaded With The Specificity Required By The PSLRA.

To state a claim under Section 10(b), plaintiff must meet the "uniform pleading standard for § 10(b) actions" prescribed by the PSLRA.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007).  Congress enacted the PSLRA as a "check against abusive litigation by private parties."  *Id.* at 313.  "Exacting pleading requirements are among the control measures Congress included in the PSLRA."  *Id.*  A plaintiff must "specify *each statement* alleged to have been misleading [and] the *reason or reasons why* the statement is misleading."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  "[T]he court shall, on the motion of any defendant, dismiss the complaint" if this pleading requirement is not met.  *Id.* § 78u-4(b)(3)(A).

Plaintiff has failed to meet that requirement and the complaint should be dismissed for this reason alone.  "Lacking from the Complaint are fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made."  *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009).  In a complaint that is 59 pages long, plaintiff fails to allege specific, concrete alleged misstatements by Anixter, much less the precise reasons why any particular statement was misleading.  Instead, plaintiff carpets its complaint with long block-quotations sprinkled with bold and italicized font seemingly at random.  (*See, e.g.*, Cmplt. ¶¶ 46-52, 55-56, 61-67, 74-81, 83, 85).  This is unacceptable under the PSLRA.  *See, e.g., Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("Plaintiff['s] use of large block quotes

from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements.").[3]

As but one example, paragraphs 64 and 65 of the complaint contain no less than *eight* block paragraphs of statements alleged to have been made by Anixter or its executives. Defendants and the Court are left to guess which of these statements are alleged to have been misleading and why. And though plaintiff has applied bold text in places, the complaint does not indicate what significance the bolded text has or how the text was misleading.[4]

Plaintiff also engages in "group pleading"—attributing statements to all defendants collectively. (*See, e.g.*, Cmplt. ¶¶ 55, 83.) The Seventh Circuit has rejected this approach as inconsistent with the PSLRA. *Pugh*, 521 F.3d at 693-94.

In the remainder of this memorandum, Anixter attempts to address all of the principal statements that plaintiff appears to challenge. However, plaintiff's defective pleading style makes it impractical for Anixter to address in detail every sentence quoted in the pleading. Anixter has therefore attached as Exhibit A a table containing every statement quoted in the complaint and a brief explanation why each statement is not actionable.

---

[3] *See also Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1198 (N.D. Cal. 2008) ("because most of the [complaint] consists of block quotations taken from statements by Defendants and securities analysts, Plaintiffs have not plead falsity with the required particularity" under the PSLRA); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1100-01 (N.D. Cal. 2006) (dismissal where alleged misstatements were in block quotes and the court was "'unwilling . . . to search through' the Complaint in an effort to link the allegedly false statements to the reasons those statements purportedly are false") (internal citations omitted); *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *6 (S.D.N.Y. Sept. 26, 2006) (same, "the complaint sets forth large block quotes taken from public statements made by the Individual Defendants and from SEC filings, followed by generalized explanations of why the statements collectively misled the plaintiffs"); *Clark v. TRO Learning Inc.*, 1998 WL 292382, at *4 (N.D. Ill. May 20, 1998) (Plaintiff's "recitation of quotations without any explanation as to which allegations were false or material" failed to satisfy the specificity requirements of the PSLRA).

[4] *See Brodsky*, 592 F. Supp. 2d at 1198 (block quotes with "apparently random sentences bolded and italicized" not sufficient to satisfy PSLRA); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 841-42 (N.D. Cal. 2000) (highlighted portions of block quotes "presumably meant to indicate or to emphasize false or misleading statements" did not satisfy PSLRA where the complaint did not "indicate exactly what is false within [each] highlighted passage").

**B.      No Falsity Is Alleged For Anixter's Pre-July 2008 Statements.**

The Court should dismiss all portions of the complaint concerning statements before July 2008 because plaintiff does not adequately plead how or why any of those statements was supposedly false.  (*See* Cmplt. ¶¶ 46-52, 55-56, 61-67.)  Three of plaintiff's five supposed instances of false statements fall into this period: (i) Anixter's January 29 press release and conference call in connection with its Q4 and year-end 2007 results; (ii) Anixter's February 21 10-K for the year 2007; and (iii) Anixter's April 22 press release and conference call announcing its Q1 2008 results.  Plaintiff fails to state a claim on the basis of any of those statements.

**1.      January and February Statements.**      Plaintiff apparently challenges the following statements made by Anixter or its executives in January and February 2008:

- "[W]e have continued to experience strong growth from our strategic initiatives in the security and OEM markets."  (Ex. I, Jan. 29, 2008 P.R. at 2.)

- "We enter 2008 with a solid backlog of orders and a healthy pipeline of potential new projects."  (*Id.*)

- "[R]ecent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities."  (*Id.* at 3.)

- "Overall in market demand remain[s] healthy across all markets."  (Ex. J, Jan. 29, 2008 Tr. at 2.)

- "[B]usiness activity levels in Europe remain strong."  (*Id.* at 3.)

- "The Company also continues to experience strong growth in security and OEM supply sales."  (Ex. K, 2008 Form 10-K at 17.)

Remarkably, nothing in the complaint suggests with specificity or plausibility how or why any of those statements was false.  As discussed above, Anixter *did* experience growth during the time of these early 2008 statements and for months thereafter.  At the time Anixter made these statements, it was reporting Q4 2007 results that included record revenue and profit, both up about 20% as compared to 2006.  (Ex. I, Jan. 29, 2008 P.R. at 1.)  That growth continued

10

through Q1 (11%) and Anixter experienced both year-on-year and quarter-on-quarter growth in Q2 (7% and 9.8%, respectively).  (Ex. L, Apr. 22, 2008 P.R. at 1; Ex. O, July 22, 2008 P.R. at 1.)  Even during Q3 2008, Anixter's business continued to grow as measured against the same quarter in 2007.  (Ex. R, Oct. 21, 2008 P.R. at 1.)  Plaintiff nowhere alleges that Anixter misreported any of those results.

Plaintiff further does not allege that Anixter did not, in fact, possess a "solid backlog of orders" or experience "strong" markets and growth and "healthy" demand as of January and February 2008.  Plaintiff also does not allege in non-conclusory terms that Anixter possessed any undisclosed information in January or February that was material to the challenged statements.  While plaintiff flatly asserts that "defendants knew . . . that the deteriorating credit markets and global economic conditions were negatively impacting Anixter's business," (Cmplt. ¶ 57), plaintiff alleges no specific information from *January or February* showing that Anixter knew any more than what it disclosed.  The six "Confidential Witnesses" (or "CWs"), for example, provide no specific information about early 2008.  (*Id.* ¶¶ 69-72, 86-90, 92-93, 109-13.)

Plaintiff thus resorts to misstating Anixter's words.  During the January 29 conference call, an analyst asked the following question about sales in Europe:

> I was looking back at previous growth here and I think it's been running right around high single digits, low double-digits.  When you step back and look at the underlying growth, do you see that level of growth in that let's say nine to 11% range continuing ahead here in Europe[?]

(Ex. J, Jan. 29, 2008 Tr. at 11.)  The CFO, Mr. Letham, responded:  "[T]o answer your questions about Europe, we are still comfortable driving the kind of growth we have driven."  (*Id.*)

From that exchange, plaintiff twists Anixter's words and argues that Anixter "confirmed [its] expectation of 9% to 11% *organic* growth in Europe (within their previous Company-wide 8% to 12% guidance)."  (Cmplt. ¶ 6, emphasis added; *see also* Cmplt. ¶ 52.)  But Anixter never

announced an "expectation" of 9% to 11% *organic* growth in Europe, much less "confirmed" one. The word "organic" does not appear in the exchange that plaintiff quotes, and plaintiff points to no other alleged statement by Anixter about *any* organic growth target in Europe. Rather, plaintiff has conflated Anixter's previously announced long-term *company-wide* goal of 8% to 12% organic growth (a goal that came with caveats) with a discussion of Anixter's *total* sales growth in a *single market*, Europe. This is apples and oranges.

In all events, Anixter *achieved* total sales growth in Europe for months after the January statement—11% in Q1 2008 and 12% in Q2 2008 in results that plaintiff once more does not question. (Ex. L, Apr. 22, 2008 P.R. at 2; Ex. O, July 22, 2008 P.R. at 3.) Plaintiff fails to allege adequately anything false in the statements it challenges.

**2. April Statements.** The same goes for Anixter's April 2008 statements made in connection with its Q1 results. Here, plaintiff appears to challenge the following statements:

- "We are very pleased to report double digit increases in sales, operating profits and earnings per diluted share over the prior year quarter. The multiple end markets we serve, the diversity of industries in which our customers operate and the broad geographies over which our business is conducted have given us the ability to sustain overall growth despite certain economic concerns." (Ex. L, Apr. 22, 2008 P.R. at 1.)

- "While there were a number of customer-specific situations where spending was reduced in response to slower economic conditions, we do not believe this represents a broader trend." (*Id*. at 3.)

- "[W]e expect to report not only consecutive quarter sales growth in the second quarter, but also year-on-year sales growth over the very strong second quarter of 2007." (*Id*.)

- "Importantly, we continued to make significant progress on our major initiatives during the quarter, including growing in new markets." (*Id*. at 2.)

- "Some of the factors pressuring gross margins in the first quarter are being mitigated through pricing actions." (*Id*.)

- "[T]here is an improvement in conditions [between Q1 and the beginning of Q2]." (Ex. M, Apr. 22, 2008 Tr. at 9.)

Again, plaintiff nowhere alleges with specificity how or why any of these April 2008 statements was untrue.  Far from misleading anyone, Anixter's April 2008 statements correctly reported the company's Q1 2008 results and correctly anticipated that Q2 would be stronger in many respects.  As shown, Anixter *did* sustain overall growth in Q1 and *did* go on to report consecutive quarter and year-on-year growth months later at the conclusion of Q2.  Nor does plaintiff allege specific facts suggesting that Anixter did not, in fact, "continue[] to make significant progress on [its] major initiatives" in Q1, or that Anixter was not taking "pricing actions" to mitigate some margin pressure, or that Anixter had not experienced "an improvement in conditions" between Q1 and Q2.  Indeed, Anixter's Q2 revenue was *10% higher* than in Q1 and all of its profit margins were up substantially in reported results that plaintiff again does not challenge.  (Ex. O, July 22, 2008 P.R. at 1.)  And though organic revenue growth turned out slower in Q2 (4% growth versus Q2 2007) (*id.* at 2), Anixter expressly told investors in April that "short-term macro-economic conditions *may slow our organic sales growth*."  (Ex. L, Apr. 22, 2008 P.R. at 3, emphasis added.)

Plaintiff also fails to allege any undisclosed information at Anixter as of April 22, 2008 that rendered any of these statements false.  In this section of its complaint (Cmplt. ¶¶ 69-73), plaintiff appears to rely on the allegations associated with "CW1" and "CW2," but neither describes specific information known at Anixter *as of April 22* that was relevant to the statements challenged.  With respect to CW1, plaintiff merely alleges that "Anixter's UK [OEM] automotive business declined precipitously during 2008."  (*Id.* ¶ 69.)  Nothing about that allegation suggests that Anixter knew *in April* that results in that particular business line would (allegedly) trend downward for the rest of the year, or that such a trend in one business would not be offset by successes in other businesses.  Nor is the allegation inconsistent with the

13

statements and disclosures that Anixter *actually made* throughout 2008, *including* repeated disclosures of declining profit margins in Europe OEM. (*See, e.g.*, Ex. L, Apr. 22, 2008 P.R. at 2; Ex. O, July 22, 2008 P.R. at 3.)

With respect to CW2, plaintiff devotes several paragraphs to describing what amounted to a "$3 million disputed amount" associated with the customer JLR. (Cmplt. ¶¶ 70-72, 113.) Anixter paid JLR the $3 million during Q3 2008. (*Id.* ¶ 71.) Plaintiff does not plausibly explain how a $3 million amount could be material to a company with revenues over $6 billion.[5] But more importantly here, nothing in the complaint alleges that Anixter knew in *April* that it would have to pay $3 million to JLR months later in the third quarter. Plaintiff simply alleges without *any precise time period* that it was "known . . . during the Class Period" that Anixter was "likely going to have to pay JLR the disputed $3 million." (*Id.* ¶ 113.) Such generalized allegations do not pass muster under the PSLRA.[6]

What is plaintiff left with? As in the classic examples of fraud by hindsight, "plaintiff has simply seized upon disclosures made in later [statements] and alleged that they should have been made in earlier ones." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.). For example, Anixter disclosed in October that it had been "negatively impacted by macro economic trends" in Q3 and that that it had seen a downturn emerge "pretty quickly" in the market for "projects in IT infrastructure" during that quarter. (Ex. R, Oct. 21, 2008 P.R. at 2; Ex. S, Oct. 21, 2008 Tr. at 13.) Plaintiff seizes upon those October statements, assumes without any

---

[5] *See In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000) ("when it is clear that a particular financial misstatement could not possibly be significant to a reasonable investor due to its small magnitude, a court may properly determine on a motion to dismiss that the misstatement was immaterial as a matter of law"); *see also* n.14, below.

[6] *In re Allied Prods. Corp., Inc.*, 2000 WL 1738333, at *4 (N.D. Ill. Mar. 13, 2000) (allegation that it was "simply common knowledge throughout the organization of cost overruns and lack of capacity necessary to complete the projects on time" insufficient because "in order to meet PSLRA's pleading requirement with respect to each alleged misrepresentation or omission, it is crucial that the Complaint be particular about what the Defendants knew and *when*").

basis that they did not represent *new* developments that arose in Q3, and argues that the disclosures are an "admission" that Anixter's prior statements were false. This tactic fails as a matter of law because, as the Seventh Circuit has explained, "there is no fraud by hindsight." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759-61 (7th Cir. 2007); *Pugh*, 521 F.3d at 694-95 (same).

Although it should be unnecessary to reach for all of the above reasons, many of Anixter's early 2008 statements are also protected by the PSLRA's safe-harbor provisions, discussed in Section C.3, below. Those statements are identified in Exhibit A. The Court should dismiss all portions of the complaint concerning Anixter's January, February, and April 2008 statements.

## C. Anixter's July 2008 Statements Are Not Actionable.

Plaintiff alleges that Anixter made misstatements on only two other occasions: (i) in its July 22 press release and conference call announcing its Q2 2008 results, and (ii) in its July 31 Form 10-Q for Q2 2008. (Cmplt. ¶¶ 74-81, 83-85.) None of the challenged statements in those sources is actionable. As above, many of the statements plaintiff challenges are historical statements of the financial results Anixter achieved in Q2 2008, results that plaintiff again does not challenge. (§ 1, below.) The remaining statements about Anixter's projected results are not actionable on their own terms (§ 2) and are forward-looking statements protected under the PSLRA (§ 3). Plaintiff's "confidential witnesses" do not save the pleading. (§ 4.)

### 1. Plaintiff alleges no falsity with respect to Anixter's statements concerning its Q2 2008 results.

On July 22, 2008, Anixter announced its Q2 results, including that sales had increased by 10% from Q1 2008 to Q2 2008, that Q2 sales were 7% higher than the same quarter in 2007, and that profit margins were higher than in Q1 2008 and Q2 2007. (Ex. O, July 22, 2008 P.R. at 1.)

Plaintiff does not dispute those record results and nowhere contends that Anixter misstated its audited financials.[7]   Plaintiff nonetheless appears to challenge statements that Anixter and its executives made in describing the results to the public (Cmplt. ¶¶ 74-81, 83), including:

- "The Company's consecutive quarter sales growth from the first to the second quarter of 2008 of 9.9% was generated despite the macroeconomic uncertainty that existed during the quarter." (Ex. Q, July 31, 2008 Form 10-Q at 14.)  *Plaintiff, however, does not contend that the 9.9% figure was false or that there was not, in fact, a level of macroeconomic uncertainty during 2008.*

- "[T]he Company continued to make significant progress on its major initiatives during the quarter, which include growing the Company's security and OEM supply sales." (*Id.*)  *Plaintiff, however, does not contend that Anixter did not, in fact, experience growth in those business lines during Q2 2008, as it reported.*  (*See* Ex. P, July 22, 2008 Tr. at 2-3, reporting 22% growth in security business and 16% growth in OEM supply end markets.)

- "While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence." (Ex. O, July 22, 2008 P.R. at 3.)  *Plaintiff, however, does not contend that Anixter did not, in fact, experience Q2 sales growth in every product line and every geography, as it reported.*  (*Id.* at 2-3; Ex. P, July 22, 2008 Tr. at 2-4.)

- "Despite the slight drop in gross margins and continued investment in growth initiatives, we were able to achieve a modest improvement in operating margins due to the increased operating leverage coming from growth in sales and sound expense management." (Ex. O, July 22, 2008 P.R. at 3.)  *Plaintiff, however, does not contend that Anixter was not, in fact, able to achieve an improvement in operating margins in Q2, as Anixter reported.*  (*Id.*, reporting Q2 2008 operating margins of 7.8%, higher than Q1 2008 result of 6.9% and Q2 2007 result of 7.7%.)

Without any specific allegations as to how or why those statements were false, each challenged statement is inactionable.

Plaintiff thus again resorts to misquoting or misreading Anixter's statements.  There are at least three such serious instances in the complaint concerning Anixter's Q2 results.

---

[7] The financials from all of Anixter's 2008 10-Qs were repeated in the company's Feb. 2, 2009 10-K, which was audited by the company's independent accounting firm.  (Ex. V, Feb. 2, 2009 10-K at 35, 68.)

*First*, Anixter stated during the July 22 call that it had "experienced very strong growth in Europe." (Ex. P, July 22, 2008 Tr. at 6.) Plaintiff does not allege that Anixter misstated the 12% sales growth it reported for European sales in Q2. (Ex. O, July 22, 2008 P.R. at 3.) Instead, at least *four times* throughout the complaint, plaintiff alters the past-tense quotation about Q2, "we experienc*ed* strong very strong growth in Europe," and morphs it into a *present*-tense statement about July (*i.e.*, Q3): "defendant Eck continued to report to investors that Anixter was 'experience[*ing*] very strong growth in Europe.'" (Cmplt. ¶¶ 16, 20, 86, 117, alteration in pleading.) Anixter made no such statement.

*Second,* during the July 22 call, Anixter disclosed that increased steel prices were negatively impacting profits in its OEM business: "[W]e continue to feel some margin pressure from steel price increases." (Ex. P, July 22, 2008 Tr. at 6.) Anixter further disclosed that, while it was attempting to address that issue with price increases, it was having trouble keeping up: "[w]hile we have succeeded in negotiating price increases with our customers . . . *those increases tend to lag the continued run up in steel prices*." (*Id.*, emphasis added.) Plaintiff simply deletes the later portion of the sentence in most of its pleading. (*See, e.g.*, Cmplt. ¶¶ 16, 19, 92, 117.) Without alteration, however, it is plain that Anixter was *warning* investors about the limited effect of its price increases, *not* touting those increases. Further, though plaintiff attempts to link the "negotiating price increases" statement to the $3 million JLR pricing dispute and another alleged customer dispute with Lucent (Cmplt. ¶ 92), plaintiff's own allegations show that steel prices had nothing to do with those alleged disputes. (*Id.* ¶¶ 70-71, 92.)

*Third*, plaintiff takes out of context a statement by Anixter's CEO, Mr. Eck, during the July 22 call that Anixter was not "seeing big downward trends anyplace." (Ex. P, July 22, 2008 Tr. at 10.) Plaintiff reads that statement as a proclamation that Anixter had not seen any

difficulties in any aspect of its business—despite Anixter's express warnings to the contrary. (*See, e.g.*, Cmplt. ¶¶ 63, 75.)   But in fact, Mr. Eck was responding to a question specifically concerning a narrow portion of Anixter's business referred to as "*quote activity*," *i.e.*, future projects for which Anixter had been asked to provide a price quotation to a customer.  (Ex. P, July 22, 2008 Tr. at 10.)   Anixter explained on the very same call that such projects were "15%, 20% or so of our enterprise and electrical wire and cable business."  (*Id.* at 13.)   Plaintiff nowhere contends that Anixter was not, in fact, experiencing good quotation activity in that specific portion of its business as of July 22, 2008.   Having failed to identify any actual misstatement, plaintiff cannot create one by misreading Anixter's words.

## 2. Anixter's July 2008 forward-looking statements are not actionable.

Stripped of the unchallenged historical statements about Anixter's Q2 2008 results, plaintiff is left with a handful of forward-looking statements from July.  Namely:

- "We are confident that continued focus on these investments and successful execution on these strategies will help drive full-year and longer-term growth of the business."  (Ex. O, July 22, 2008 P.R. at 4.)

- "We believe the overall market conditions, *as they currently exist*, should allow for consecutive quarter sales growth from the second to third quarter of this year.  If we achieve a modest level of consecutive quarter growth it will move our third quarter year-on-year growth rates closer to our longer-term target of 8 to 12 percent yearly growth."  (*Id.* at 3, emphasis added.)

- "We expect the third quarter will again show sequential growth over the second quarter as well as over prior year."  (Ex. P, July 22, 2008 Tr. at 7.)

Even here, plaintiff fails to plead falsity with the required specificity.  The projection of "full-year and longer-term growth of the business" came true, as Anixter reported 4.8% full year sales growth for 2008 in unchallenged audited financials.  (*See* Ex. V, Feb. 27, 2009 Form 10-K at 21.)  Likewise, Anixter *did* achieve 3Q 2008 growth "over [the] prior year" and plaintiff does not contend otherwise.  (Ex. T, Oct. 31, 2008 Form 10-Q at 1.)  Only *one* of Anixter's

projections—that it would achieve consecutive quarter sales growth between Q2 and Q3 of 2008—did not come true, though Anixter did not miss by much.[8]  Plaintiff, however, nowhere alleges with the requisite specificity that Anixter *knew* it would not achieve that goal when it made these statements on July 22.

Plaintiff thus once again distorts what Anixter actually said.  Plaintiff claims that Anixter "reiterated [its] guidance of 8% to 12% organic growth for 2008" in its July statements.  (Cmplt. ¶ 15.)  But Anixter never issued any such "guidance" and certainly never "reiterated" it.  Entirely absent from plaintiff's complaint is *any* quoted statement from Anixter projecting 8% to 12% organic growth for 2008.  Rather, as discussed, Anixter told investors in 2007 that the target was a long-term goal that the company had not assigned "to any given time period," and that "[a]ny given quarter or any given time period might be a little above or below that."  (Ex. G, Oct. 23, 2007 Tr. at 9.)  Anixter amplified that caution in April 2008, telling investors that the economic downturn could "slow our organic sales growth."  (Ex. L, Apr. 22, 2008 P.R. at 3.)  And in July 2008, Anixter expressly stated that it was *not* on track to meet the goal.  Anixter's CFO, Mr. Letham, explained on the July 22 conference call that *if* Anixter could achieve sufficient growth in Q3 2008, it would "get[] us back *closer* to our targeted 8% to 12% growth rate."  (Ex. P, July 22, 2008 Tr. at 13, emphasis added; *see also* Ex. O, July 22, 2008 P.R. at 3.)  Plainly, by July, Anixter was saying that 8% to 12% was not in the cards for 2008, even *if* it achieved its Q3 projection.

### 3.    Anixter's forward-looking statements are protected by the PSLRA.

In all events, all of Anixter's forward-looking statements challenged in the complaint are protected by the PSLRA's statutory safe harbor for forward-looking statements.  15 U.S.C. §

---

[8] Anixter's sales in Q3 2008 were $1.59 billion as compared to Q2 2008 sales of $1.61 billion, a "miss" of less than 2%.  (Ex. O, July 22, 2008 P.R. at 1; Ex. R, Oct. 21, 2008 P.R. at 1.)

78u-5(c).  Under that rule, a defendant's statement is inactionable in a private securities fraud action so long as the statement (a) is identified as a forward-looking statement, and (b) the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).

Courts routinely dismiss cases on the pleadings under the safe harbor rule.  *See, e.g.*, *In re Midway Games,* 332 F. Supp. 2d 1152, 1167 (N.D. Ill. 2004) ("Numerous decisions in this district and elsewhere have dismissed Rule 10b-5 claims based on . . . cautionary language"); *Stavros*, 266 F. Supp. 2d at 852-53 (dismissing complaint with prejudice pursuant to safe harbor); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 954 (N.D. Ill. 2003) (dismissing complaint pursuant to safe harbor).

Further, despite plaintiff's erroneous contrary statement (Cmplt. ¶ 134), the safe harbor applies without regard to a particular defendant's alleged state of mind.  *See, e.g.*, *Desai v. Gen. Growth Props., Inc.,* 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009) ("[T]he author of any forward-looking statement—even though a deliberate falsehood—is insulated from liability so long as that statement is accompanied by some meaningful cautionary statement.").[9]

Each of the forward-looking statements plaintiff challenges meets the protections of the statutory safe harbor.

***The statements were forward-looking.***  The statutory safe harbor defines a forward-looking statement to include: "a statement containing a projection of revenues, income

---

[9] *See also Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 2010 WL 154519, *11 (11th Cir. Jan. 19, 2010) ("However we cast forward-looking statements accompanied by meaningful cautionary language, an allegation that the speaker knew the statements were false does not convert those statements, mitigated by adequate warnings of risks, into actionable frauds"); H.R. Rep. No. 104-369, at 44 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement.  Courts should not examine the state of mind of the person making the statement.").

(including income loss), earnings (including earnings loss) per share . . . or other financial items"; "a statement of the plans and objectives of management for future operations"; "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations"; and "any statement of the assumptions underlying or relating to any [of the foregoing]." 15 U.S.C. § 78u-5(i)(1)(A)-(D).

Each of Anixter's projections of its future growth and performance set forth above and identified in Ex. A meets those definitions and is a forward-looking statements for purposes of the statutory safe harbor.

***The statements were accompanied by meaningful cautionary language.*** Courts consider cautionary statements that accompanied the statements at issue, that were incorporated by reference, and that were publicly available. *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004).[10]

Here, each of the alleged misrepresentations was accompanied by meaningful cautionary language. Like all of Anixter's press releases during the Class Period, Anixter's July 22, 2008 press release contained the following "safe harbor statement":

> The statements in this news release that use such words as "believe," "expect," "intend," "anticipate," "contemplate," "estimate," "plan," "project," "should," "may," or similar expressions are forward-looking statements. They are subject to a number of factors that could cause the company's actual results to differ materially from what is indicated here. These factors include *general economic conditions*, technology changes, *changes in supplier or customer relationships*, commodity price fluctuations, exchange rate fluctuations, new or changed competitors and risks associated with integration of recently acquired companies. Please see the company's Securities and Exchange Commission filings for more information.

---

[10] *See also In re Midway Games,* 332 F. Supp. 2d at 1166-67; *Stavros,* 266 F. Supp. 2d at 844.

(Ex. O, July 22, 2008 P.R. at 4, emphasis added.)  Anixter's incorporated SEC filings—including

its Form 10-K filed on February 21, 2008—included multiple additional warnings, such as that

"an unexpected shift in market demand" could affect the realizable value of the Company's

inventory, and that the Company's "future performance could be subject to economic

downturns." (Ex. K, 2008 Form 10-K, at 4, 16.)  Anixter's May 7, 2008 Form 10-Q, also warned

that "future performance could be subject to economic downturns." (Ex. N, May 7, 2008 Form

10-Q at 13.)

The statements made during Anixter's July 22 conference call were also accompanied by

meaningful cautionary language.  At the beginning of the call, the company read a cautionary

statement similar to the one quoted above, making clear that "*general economic conditions*" were

a factor that could cause the company's future results to "differ materially from what is indicated

here." (Ex. P, July 22, 2008 Tr. at 1, emphasis added.)

Anixter's CFO, Mr. Letham, amplified those warnings and expressly cautioned investors

during the July 22 conference call that Anixter was limited in its ability to predict future results

because of the short-cycle nature of its business.  An analyst asked: "[h]ow long out ahead here

do you have what you would call reasonable visibility?  And even if it's a guess, do you think

we'll see reasonably good growth across your markets in North America and Europe through the

end of the year?" (Ex. P, July 22, 2008 Tr. at 13.)  Mr. Letham responded:

> Basically *we don't have a lot of hard visibility*.  Backlog here at any point in time
> is typically in the range of about a month.  We have pipelines on project-type
> activity, pipeline tools that give us project activity outlook that extend beyond that
> but projects are 15%, 20% or so of our enterprise and electrical wire and cable
> business. ***The real issue here is you get your bulk of your business day-to-day,***
> ***short order, so there is not a lot of long-term visibility***[.]

(*Id.*, emphasis added.)

The foregoing cautionary statements were "meaningful" under the PSLRA.  Meaningful cautionary language is "substantive and tailored to the specific predictions made in the allegedly misleading statement."  *Johnson*, 262 F. Supp. 2d at 952-53.  It is not necessary for the language to explicitly refer to the risk that ultimately caused the projection to differ from the results. *Asher*, 377 F.3d at 731 (stating that the PSLRA does not require "prescience"); *Stavros*, 266 F. Supp. 2d at 843.  It is only necessary to "'convey substantive information about factors that could cause results to differ materially from those projected in the forward-looking statements.'" *Stavros*, 266 F. Supp. 2d at 843 (internal citation omitted).  Anixter's warnings—which included statements about macroeconomic uncertainty and the company's limited ability to forecast future results—cautioned investors of the exact types of risk that plaintiff claims came to pass.

### 4.     Plaintiff's confidential witnesses do not establish falsity in Anixter's July 2008 statements.

Nor do plaintiff's "CWs" substantiate its allegations.  CWs 1 through 3 are each alleged to have worked in Anixter's United Kingdom OEM operations and each variously alleges that Anixter suffered downturns in U.K. OEM during 2008.  (Cmplt. ¶¶ 69-72, 86-87.)  Those allegations, however, are not inconsistent with Anixter's actual statements, which *disclosed weakness in U.K. OEM* but nonetheless reported actual and projected sales growth in Europe overall.  During its July conference call, Anixter told investors that it had achieved 12% sales growth in Europe overall in Q2 versus the same quarter in 2007, *notwithstanding* that the "UK has been softer for us this year than it was a year ago," and that "the UK market is beginning to slow a touch because there tends to be some talk about some macroeconomic factors there."  (Ex. P, July 22, 2008 Tr. at 3, 12.)  Anixter also warned in each of its April and July 2008 press releases that profit margins associated with Europe OEM had suffered.  (Ex. L, Apr. 22, 2008 P.R. at 2; Ex. O, July 22, 2008 P.R. at 3.)

Even ignoring those disclosures, the CW allegations about the U.K. OEM sub-market do not render false Anixter's statements about the company's broader European or global operations. As one court has explained, "[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard." *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008).[11] The statements that plaintiff challenges deal with Europe as a whole or even Anixter's full global business. Nothing in plaintiff's complaint plausibly suggests that those statements did not take into account any problems that existed in U.K. OEM along with any other offsetting factors in other countries and with other product lines.

Plaintiff's other CWs do not add more. According to plaintiff, CW4 and CW5 were placed within Anixter's U.S.-based OEM business (Cmplt. ¶¶ 88-90, 92-93, 110-12), but plaintiff does not contend that *any* statement concerning U.S. OEM was false. Both CW4 and CW5 also focus on single customers (Case New Holland and Lucent, respectively) and plaintiff again fails to connect observations about those customers to the statements about company-wide performance that they challenge. Indeed, Anixter expressly *disclosed* in July that it had experienced "select customer situations where sales are softer." (Ex. O, July 22, 2008 P.R. at 3.) The allegations therefore fail. *See, e.g.*, *Chubb Corp.*, 394 F.3d at 156 ("[A]necdotal examples of profitable customers lost or policies renewed at flat or slightly raised rates [do] not

---

[11] *See also California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 142, 155 (3d Cir. 2004) ("Plaintiffs have failed to plead the falsity of the Defendants' statements and accounting fraud with the particularity demanded by the PSLRA" where "[p]laintiffs repeatedly attribute specific nationwide information and statistics regarding Chubb's performance to former employees who worked in local branch offices."); *In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, *9 (W.D. Wash. 2009) (holding that anecdotal statements from confidential witnesses regarding the performance of their own stores "hardly raise an inference that the alleged problems were widespread throughout the Company").

demonstrate that the rate initiative was failing"); *In re Hutchinson Tech.,* 536 F.3d at 960 (problems with one customer are not enough to meet the PSLRA's heightened standard).[12]

### D.    Anixter's Later Statements Do Not Render Any Prior Statement False.

Plaintiff also points to three post-class-period statements that it contends show that Anixter's prior statements were misleading.  Plaintiff is wrong on each score.

*First*, plaintiff highlights Anixter's disclosures in its October 21, 2008 announcement of Q3 results that the company had suffered from "broader negative economic factors, especially in Europe."  (Cmplt. ¶ 96.)  On their face, though, these statements describe an impact that was felt at Anixter late in Q3.  The statement about "negative economic factors," for example, explains that those factors "impacted sales activities *late in the period* [*i.e.*, late Q3]."  (*Id.*)  Plaintiff also quotes Anixter—under the header "Investors Begin to Learn the *Truth*"—explaining that "[t]he *later weeks of the third quarter* signaled a more broad-based economic slowing than the company had experienced year to date."  (*Id.* ¶ 98, emphasis added.)  Except as fraud by hindsight, these October statements cannot impugn Anixter's months-earlier disclosures.

*Second*, plaintiff seizes on a snippet of a statement by Anixter's CEO Mr. Eck on the October 21 call that "[w]hen the market slows the chunk of the market that we do particularly well [in] ends up being a little bit smaller and so we see an[] effect from that pretty quickly in our business."  (Ex. S, Oct. 21, 2008 Tr. at 13.)  Plaintiff misreads that statement as an "admission" that Anixter saw the effects of a market slowdown early in 2008 but failed to make a disclosure until October.  The plain text, however, shows that Mr. Eck said nothing of the sort.

---

[12] In addition, both CW4 and CW5 appear to focus on alleged events that occurred *after* Anixter's July 2008 statements, including the extension of some delivery dates in "August and September 2008," and the alleged loss of the Lucent business "in 2009."  (Cmplt. ¶¶ 89, 92.)  There are no substantive allegations in connection with CW6.  (*Id.* ¶ 109.)

Mr. Eck was responding to a question about a specific part of Anixter's business, "projects in IT infrastructure," during a specific time period, "*in this fourth quarter and in the last month of the third quarter*." (*Id.* at 12-13, emphasis added.)[13] Mr. Eck explained that the market for that type of project had slowed and "[w]hen the market slows . . . we see an[] effect from that pretty quickly in our business." (*Id.* at 13.) Nothing in that statement is an "admission" that Anixter had suffered an undisclosed slowdown *earlier* in the year—to the contrary, the plain implication is that Anixter experienced a slowdown during the period specified in the question (late Q3 and Q4) and that the slowdown arose suddenly ("pretty quickly") such that it was *not* apparent earlier, consistent with the short-cycle nature of Anixter's business.

*Third*, plaintiff points to Anixter's disclosure on October 21, 2008 that it had paid $3 million to its customer JLR to resolve a dispute. (Cmplt. ¶ 71.) As noted, plaintiff does not plausibly allege how this $3 million one-time amount could be material at a company with over $6 billion in revenue in 2008.[14] The $3 million, if it had not been paid, would have represented an increase of less than 1% in Anixter's profit for 2008.[15] Further, as also discussed, plaintiff's "CWs" also do not establish in any non-conclusory manner that Anixter *knew* it would have to

---

[13] As Anixter had disclosed, this type of project constituted a 15-20% fraction of its ECS and EWC lines. (*See* Ex. P, July 22, 2008 Tr. at 13.)

[14] *See Higginbotham*, 495 F.3d at 759 ("[r]easonable executives need not see a 1.5% change as substantial"); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (alleged overstatement of assets by $6.8 million was immaterial as a matter of law where that amount represented only 2% of defendant's total assets); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir. 1996) (3% to 9% difference in backlog levels as a percent of revenue was immaterial) ; *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 895 (W.D.N.C. 2001) (as a matter of law, an alleged misstatement of $79 million cannot be material when that loss is "a mere 2.1 percent of operating earnings and 2.8 percent of earnings after such charges").

[15] The $3 million would represent additional income of $1.845 million on a net of tax basis, as compared to 2008 net income of $195.7 million (0.94%). (*See* Ex. V, Feb. 27, 2009, 10-K at 22-23.)

26

pay the $3 million before the last challenged statements on July 22, 2008.  None of Anixter's later 2008 statements casts doubt on its earlier disclosures.

**E.     Count I Fails to Plead Scienter in Accordance with the PSLRA.**

The complaint fails for the additional and independent reason that plaintiff has failed adequately to plead scienter.  Under the PSLRA, a securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The "required state of mind" is "scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs,* 551 U.S. at 319 (internal citation omitted).  The PSLRA requires a "strong" inference of scienter.  15 U.S.C. § 78u-4(b)(2).  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

Here, plaintiff has failed to allege a strong inference of scienter with regard to any of the defendants.[16]  In attempting to meet its burden, plaintiff primarily relies upon (1) supposed "insider stock sales," and (2) allegations from the CWs.  Neither supports the required inference.

**1.     Defendants' stock sales do not demonstrate scienter.**

Plaintiff points to stock sales by five Anixter executives in an effort to plead scienter.  (Cmplt. ¶¶ 114-17.)  But as the Seventh Circuit has explained, "[b]ecause executives sell stock all the time, stock sales must generally be *unusual* or *suspicious* to constitute circumstantial evidence of scienter."  *Pugh*, 521 F.3d at 695 (emphasis added).  Here, plaintiff's own

---

[16] Plaintiff's conclusory assertions throughout the complaint that Anixter "knew" about the Q3 2008 downturn before it occurred are flatly insufficient.  *Pugh*, 521 F.3d at 694-95 (unsupported allegations concerning a defendant's "knowledge" are "wholly conclusory" and insufficient to draw an inference of scienter); *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 800 (N.D. Ill. 2007) ("generalized and conclusory assertions" about knowledge are "not enough to prove that defendants had intent to deceive").

allegations and the incorporated public filings show nothing unusual or suspicious, for at least four reasons.

*First*, plaintiff acknowledges that *all* of the defendants' stock sales were undertaken pursuant to Rule 10b5-1 trading plans adopted before the sales.  (Cmplt. ¶¶118-19; *see also* Ex. D.)[17]  Stock sales made pursuant to 10b5-1 plans occur automatically, and are not evidence of scienter.  *See Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious"); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (sales "were made pursuant to a non-discretionary Rule 10b-5-1 trading plan, which undermines any allegation that the timing or amounts of the trades was unusual or suspicious"); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008) ("automatic, nondiscretionary sales made pursuant to 10b5-1 plans . . . do not give rise to a strong inference of scienter").[18]

*Second*, the amount of stock that each executive sold is insufficient to establish scienter.  Plaintiff does not allege that any executive sold more than 12% of his total holdings, including unexercised options, during the class period.[19]  (Cmplt. ¶ 114.)  Courts have repeatedly rejected an inference of scienter when examining sales of a similar or even larger size.[20]  The most senior

---

[17] Publicly filed Forms 4 also show that sales by the non-defendant executives (Mr. Dul and Mr. Meno) during the class period were likewise made pursuant to 10b5-1 plans.  (*See, e.g.*, Ex. D at 172, 186.)

[18] *See also In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) (because insider sales were made under a 10b5-1 plan, "the timing and amount of the sales do not raise a strong inference of scienter"); *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, *8 (N.D. Cal. June 28, 2005) (sales did not support a strong inference of scienter when "sales were pursuant to a Rule 10b-5(1) trading plan and were consistent with … prior trading histories").

[19] *See Ronconi v. Larkin*, 253 F.3d 423, 435 n.25 (9th Cir. 2001) ("Stock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them."); *In re Gildan Activewear*, 636 F. Supp. 2d at 271 n.5 ("weight of the authority . . . lends credence to the position that options are to be taken into account in comparing the volume of an insider's sales to his shareholdings"); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) ("The ownership of options must be considered in evaluating the Defendants stock sale activities").

[20] *Ronconi*, 253 F.3d at 435 (sales of less than 10% and 17% of holdings did not give rise to strong inference of scienter); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (same, 11% of stock

executives named—the former and current CEOs (Mr. Grubbs and Mr. Eck)—each sold less than 4%. (Cmplt. ¶ 114.)[21] Further, as multiple courts have recognized, there is no plausible inference of scienter where an executive alleged to have inflated the stock price retains a substantial stake in the company even while revealing the alleged fraud that sends the stock falling. *See Schultz v. Tomotherapy Inc.*, 2009 WL 2032372, *22 (W.D. Wis. July 9, 2009) ("An insider selling a quarter of his stock and taking a bath on the rest does not raise a strong inference of fraud."); *In re Credit Acceptance Corp.*, 50 F. Supp. 2d at 677 (where executive sold 9% of holdings, "[i]t seems unlikely that [defendant] would engage in a scheme to inflate the company's earnings . . . yet fail to sell any of his remaining shares at 'artificially inflated prices'"). The same is true here.

*Third*, two of the executives that plaintiff has identified, Mr. Dul (General Counsel) and Mr. Meno (Vice President-Tax), are not defendants and are not alleged to have been involved in any manner in the statements that plaintiff challenges. Sales by these individuals cannot establish scienter. *See, e.g., Higginbotham v. Baxter Int'l., Inc.*, 2005 WL 1272271, at *8 n.6 (N.D. Ill. May 25, 2005) (non-defendant's sales not relevant to scienter inquiry with no allegations that the executive "was in any way involved in the alleged fraudulent misconduct").

*Fourth*, plaintiff has failed to allege that there was anything unusual or suspicious about the timing of any executive's sales. Indeed, plaintiff has neglected to provide *any* information regarding stock sales *prior* to the alleged class period, an omission that, on its own, defeats any inference of scienter. *Pugh*, 521 F.3d at 695 ("the failure to provide any context showing that the

---

holdings); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1002-03 (E.D. Wis. 2009) (same, sales of 5.7%, 6.4% and 18.1% of holdings); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 875 (N.D. Cal. 2004) (same, sales between 17% and 21% of total holdings); *Havenick v. Network Express, Inc.*, 981 F. Supp. 480, 528 (E.D. Mich. 1997) (same, defendants retained from 68-85% of holdings).

[21] *See Head v. NetManage, Inc.*, 1998 WL 917794, *4 (N.D. Cal. Dec. 30, 1998) (no scienter where "alleged masterminds of the fraudulent scheme" sold 3% or less of their shares).

29

applicable time period was unusual undercuts a 'strong' demonstration of scienter");
*Higginbotham,* 495 F.3d at 759 (same).

In fact, the publicly filed Forms 4 for the years preceding the alleged class period show
that the executives' sales were not unusual at all (a table summarizing all executive sales from
January, 2006 through September, 2008 is attached with Ex. D). The executives received stock
options with expiration dates as part of their compensation. (*See, e.g.*, Ex. B, Apr. 11, 2007
Proxy at 18; Ex. C, Apr. 8, 2008 Proxy at 21.) These executives would exercise their options
before expiration and sell the resulting shares.[22] Mr. Letham, for example, regularly exercised
options and sold shares pursuant to a 10b5-1 plan every month from January 2006 until October
2008. (*See, e.g.*, Ex. D at 12, 84-85, 174-75.) Mr. Letham sold no more shares during the class
period than during the same months in each of the two prior years. (*See id.* at 3.) Mr. Grubbs
similarly exercised options and sold shares from January 2006 through January 2008 (*see, e.g.*, at
26, 102-03); his sales substantially *decreased* during the class period. (*Id.* at 2.) Mr. Meno
likewise sold many *fewer* shares during the alleged class period than in either of the prior years.
(*Id.* at 3.) Mr. Dul had options for 5,849 shares expiring March 1, 2009, (Ex. C, Apr. 8, 2008
Proxy at 21), and exercised those options and sold the shares in the months leading up to
expiration. (*See, e.g.*, Ex. D at 173, 179, 185.) The only other alleged seller, Mr. Eck, is alleged
to have made a single sale representing less than 2% of his holdings during the class period.
(Cmplt. ¶ 114.) The patterns of these sales are entirely inconsistent with the type of "unusual" or
"suspicious" trading necessary to support an inference of scienter.

---

[22] *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (rejecting scienter and finding that
executives "often have a limited period of time to exercise their company stock options"); *In re
Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) ("A large number of today's
corporate executives are compensated in terms of stock and stock options. It follows then that these
individuals will trade those securities in the normal course of events.").

## 2.      The CWs are inadequate to plead scienter.

Nor can plaintiff establish an inference of scienter with its CWs.  As an initial matter, the law of the Seventh Circuit is that "allegations from 'confidential witnesses' must be 'discounted'" and "[u]sually that discount will be steep."  *Higginbotham*, 495 F.3d at 757.  This is especially true with respect to scienter: "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist."  *Id*.

Plaintiff's CW allegations do not overcome that steep discount.  As discussed, **CWs 1 through 3** were each located at a single isolated business unit (U.K. OEM) and, by plaintiff's own allegations, did not have knowledge of the company's broader performance outside of that unit.  (Cmplt. ¶¶ 69-72, 86-87.)  Plaintiff itself alleges that OEM was Anixter's smallest product line, at only 18% of sales, and that only a little more than half of those sales were made in *all* of Europe—meaning that U.K. OEM represented less than 10% of total company sales.  (*Id.* ¶ 39.)  These witnesses cannot establish scienter with respect to Anixter's statements about its overall business performance.  *See In re Hutchinson Tech.*, 536 F.3d at 960; *Chubb Corp.*, 394 F.3d at 156; *In re Zumiez*, 2009 WL 901934, at *9.

Plaintiff's allegations about **CW2** and the $3 million payment to JLR in Q3 2008 are also insufficient.  As noted, the sum is immaterial on its face.  Further, plaintiff does not allege that anyone at Anixter knew that any particular statement was "false" in light of the $3 million issue.

Plaintiff's allegations concerning **CW4** similarly portray an individual at a single business unit (U.S. OEM, which is even smaller than U.K. OEM), who focused on a single customer (Case New Holland).  (Cmplt. ¶¶ 88-90, 110-12.)  That CW's alleged observation that

Anixter canceled orders from suppliers "[b]etween August and September 2008" cannot logically establish scienter with respect to statements made in July and before.  (*Id.* ¶ 112.)

Plaintiff's allegations concerning **CW5** are even further off-point, suggesting only that Anixter experienced a pricing dispute with a single customer (Lucent) that culminated in the loss of an unspecified amount of business "in 2009," months after the end of the alleged class period. (*Id*. ¶ 92.)   Plaintiff makes no substantive allegations about **CW6**.  (*Id*. ¶ 109.)   In sum, the confidential witnesses are insufficient to establish a "compelling" inference of scienter.

### F.       Plaintiff Has Failed to Plead Loss Causation.

The complaint fails for the independent reason that plaintiff has failed to plead adequately loss causation, a requirement of the PSLRA.   *Tricontinental Indus., Ltd. v. Pricewaterhousecoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007).   In order to plead loss causation, a plaintiff must first "'specify each misleading statement'" and then demonstrate "'a causal connection between the material misrepresentation and the loss.'"   *Id*. at 843 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 345 (2005)).   Specifically, "Plaintiff must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception."   *Ray v. Citigroup Global Mkts.*, 482 F.3d 991, 995 (7th Cir. 2007).

Plaintiff has failed to satisfy either test.  As shown, plaintiff has failed to specify each misleading statement.  Plaintiff also only alleges generally that "Defendants' false statements and omissions" caused its losses, without explaining how each misstatement inflated the price of Anixter's stock or subsequently caused the stock to fall once discovered.  (Cmplt. ¶ 121.)

Plaintiff further fails to account for the decline in Anixter's stock price during the alleged class period—well before the "truth" was supposedly revealed in Anixter's October 21, 2008 announcement of Q3 results.  From August 29, 2008 through October 15, 2008, Anixter's stock

price declined from $73.81 per share to $43 per share—a decline of 41% in approximately six weeks that is unconnected to any "fraud" alleged in the complaint.  (A stock price chart and accompanying graph are attached as Exhibit E.)   The continuation of a months-long stock decline is insufficient to allege a loss caused by anything that Anixter disclosed on October 21, 2008.  *See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (dismissing complaint with prejudice where it neither addressed ten-month price decline prior to disclosure nor explained how price decline following corrective disclosure was attributable to fraud); *see also In re Buca Inc. Sec. Litig.*, 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006) (no loss causation where share price was trending downward throughout class period).[23]  For each reason, plaintiff has failed to plead loss causation.

G.      **Several of the Challenged Statements Were Immaterial Puffery.**

Plaintiff's complaint fails for the additional reason that many of the challenged statements are no more than "puffery"—that is, "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."  *In re Midway Games*, 332 F. Supp. 2d at 1164.  Anixter has noted each such statement on attached Exhibit A.

II.    **Count II Should Be Dismissed.**

Plaintiff's Count II, against the individual defendants for control person liability under Section 20(a) of the Exchange Act, should also be dismissed.

A.      **Plaintiff Has Not Alleged An Underlying Violation Of Securities Law.**

Count II necessarily falls with the dismissal of Count I.  "[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities law--here, a violation of § 10(b) and Rule 10b-5."  *Pugh*, 521 F.3d at 693.  "If a Complaint does not adequately allege an

---

[23] The Court may take judicial notice of publicly reported stock prices.  *Pugh*, 521 F.3d at 691 n.2.

underlying violation of the securities laws . . . the district court must dismiss the section 20(a) claim." *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at \*12 (N.D. Ill. June 29, 2001). The Court should dismiss Count II on those grounds alone.

### B.     Plaintiff Has Failed to Allege General or Specific Control.

Plaintiff has also failed to plead a § 20 claim on its own terms. A plaintiff alleging a control person violation must adequately allege (1) that the alleged control person "*actually exercised general control over the operations of the wrongdoer*," and (2) that the alleged control person "had the power or ability-even if not exercised-to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994); *see also Schlifke v. Seafirst Corp.*, 866 F.2d 935, 949 (7th Cir. 1989). Both elements must be pleaded in accordance with Rule 9(b)'s particularity requirement. *Johnson*, 262 F. Supp. 2d at 958. Plaintiff has failed to plead either element.

With respect to general control, it is not sufficient for plaintiff merely to point to defendants' "positions as officers and/or directors of Anixter, and their ownership of Anixter stock." (Cmplt. ¶ 141.) *See Davis v. Coopers & Lybrand*, 787 F. Supp. 787 (N.D. Ill. 1992), *abrogated on other grounds by Damato v. Hermanson*, 153 F.3d 464, 469-70 (7th Cir. 1998). In *Davis*, for example, the court explained that neither the "Plaintiff's allegations that the various defendants were either 'principals,' officers or directors of S Funds or any of the other corporate entities," nor "their conclusory allegations about claimed controlling person status" sufficed to establish controlling person liability. *Id.* Many other courts have reached the same conclusion.[24]

---

[24] *See Waldock v. M.J. Select Global, Ltd.*, 2005 WL 3542527, at \*7 (N.D. Ill. Dec. 27, 2005) ("[p]laintiffs' conclusory allegation that the . . . Defendants were control persons within the meaning of Section 20(a)" is insufficient); *Starr v. !Hey, Inc.*, 2003 WL 21212596, at \*4 (N.D. Ill. May 23, 2003) (dismissing control person claim where the plaintiff "self-servingly pleaded[ed] a bare legal conclusion . . . [b]ut . . . allege[d] no facts, other than the Defendants' status as shareholders, senior managers, or directors to support his conclusion").

Plaintiff must also plead specific control—that the alleged control person "had the power or ability . . . to control the specific transaction or activity that is alleged to give rise to liability. *Donohoe*, 30 F.3d at 911-12. Plaintiff, however, fails to allege any facts that describe the individual defendants' alleged power to control any of the underlying allegations of securities fraud other than their own statements. Accordingly, with respect to each individual defendant, plaintiff's allegations of control person liability as to any statements not made by that particular defendant are deficient as a matter of law and should be dismissed.

## III.     The Complaint Should Be Dismissed with Prejudice.

The Court should not only dismiss Counts I and II for the reasons detailed above, it should dismiss with prejudice. As the Seventh Circuit has explained, "[Plaintiff does] not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA." *Pugh*, 521 F.3d at 698; *see also Fannon v. Guidant*, 583 F.3d 995, 1002 (7th Cir. 2009) (dismissing consolidated complaint with prejudice).

Plaintiff has had several months since the initiation of this case in September 2009, and months more since the end of the alleged class period in October 2008, to investigate and plead all relevant facts. The 141-paragraph amended complaint that plaintiff filed on January 6, 2010 demonstrates that plaintiff has had ample time to draw up the sharpest attack it could muster. In the end, however, even that effort is insufficient. The Court should dismiss with prejudice.

## <u>Conclusion</u>

WHEREFORE, for the reasons set forth above, the Court should dismiss plaintiff's amended class action complaint in its entirety, with prejudice.

35

Respectfully submitted,

Anixter International, Inc., Robert J. Eck, Dennis J. Letham and Robert Grubbs

By:  _/s/ David J. Bradford_____

Dated:  February 19, 2010

David J. Bradford (Illinois Bar #272094)
Howard S. Suskin (Illinois Bar #6185999)
Daniel J. Weiss (Illinois Bar #6256843)
Marc D. Sokol (Illinois Bar #6276263)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois  60654
(312) 222-9350