UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) | No. 1:09-cv-05641 |
| vs. | ) ) ) | Judge Robert M. Dow, Jr. |
| ANIXTER INTERNATIONAL INC., et al., | ) ) | CLASS ACTION |
| Defendants. | ) ) ) | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  Statement of Facts ...............................................................................................1

     A.   Background On Anixter's Business ...........................................................1

     B.   Growth By Acquisition Opportunities Dry Up In 2007 And The Global
          Economic Crisis Begins To Take Shape .....................................................2

     C.   Defendants Repeatedly Deny That Anixter's Business Was Being
          Negatively Effected By The Worsening World Economy ...........................4

     D.   By The Fall Of 2008, Defendants Could no Longer Maintain Their Façade
          Of Success .................................................................................................8

III. The Complaint In All Respects Meets the Rule 9 and PSLRA Pleading Standards............9

     A.   The Complaint Sets Forth The Falsity Of Defendants' Class Period
          Statements In Precise Detail ......................................................................9

          1.   January/February Statements ...........................................................11

          2.   April Statements...............................................................................12

          3.   July Statements ................................................................................14

     B.   Defendants' "Puffery" Argument Lacks Merit ..........................................16

     C.   The Safe Harbor Does Not Protect Defendants from Liability...............18

     D.   The Complaint Pleads A Strong, Cogent and Compelling Inference Of
          Scienter .....................................................................................................21

          1.   Defendants' Admissions Confirm That They Knew Their Class
               Period Statements Were False and Misleading...........................21

          2.   Defendants Undoubtedly Knew About Trouble With Sales Of
               Anixter's Most Profitable Product Lines ....................................23

          3.   The Confidential Witnesses Provide Reliable Information that
               Defendants Knew of Material Facts Rendering Their Public
               Statements False or Misleading ...............................................24

          4.   Defendants' Stock Sales Add to the Strong Inference of Scienter
               Alleged ...................................................................................26

**Page**

      5.      Anixter's Corporate Scienter Is Also Properly Alleged ............................29

E.      Plaintiff Adequately Pleads Loss Causation ..........................................................29

F.      Plaintiff Has Adequately Pled Control Person Liability........................................32

IV.      Conclusion ........................................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## CASES

*ABN AMRO, Inc. v. Capital Int'l., Ltd.*,
    595 F. Supp. 2d 805 (N.D. Ill. 2008) ........................................................................17, 30

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ...........................................................................................23

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ....................................................................................19, 20

*Caremark, Inc. v. Coram Healthcare Corp.*,
    113 F.3d 645 (7th Cir. 1997) ....................................................................................30, 32

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*,
    497 F.3d 546 (5th Cir. 2007) .........................................................................................28

*Central Laborers' Pension Fund v. SIRVA, Inc.*,
    No. 04 C 7644, 2006 WL 2787520
    (N.D. Ill. Sept. 22, 2006) ..............................................................................................33

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)............................................................................24

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) .........................................................................................22

*Danis v. USN Commc'ns, Inc.*,
    73 F. Supp. 2d 923 (N.D. Ill. 1999) ..............................................................................23

*Davis v. Coopers & Lybrand*,
    787 F. Supp. 787 (N.D. Ill. 1992) .................................................................................34

*Desai v. General Growth Props.*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009) ................................................................9, 24, 32

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ...........................................................................................9

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................29, 30, 31

*Foster v. DeLuca*,
    545 F.3d 582 (7th Cir. 2008) .........................................................................................35

- iii -

**Page**

*Gebhardt v. ConAgra Foods, Inc.,*
    335 F.3d 824 (8th Cir. 2003) ........................................................17

*Gosselin v. First Trust Advisors L.P.,*
    No. 08 C 5213, 2009 WL 5064295
    (N.D. Ill. Dec. 17, 2009) .............................................................33

*Greater PA Carpenters Pension Fund v. Whitehall Jewellers, Inc.,*
    No. 04 C 1107, 2005 WL 61480
    (N.D. Ill. Jan. 10, 2005) .............................................................31

*Harrison v. Dean Witter Reynolds, Inc.,*
    974 F.2d 873 (7th Cir. 1992) ......................................................32

*Hayley v. Parker,*
    No. SA CV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255
    (C.D. Cal. Aug. 31, 2001) ...........................................................27

*Higginbotham v. Baxter Int'l, Inc.,*
    495 F.3d 753 (7th Cir. 2007) ......................................................24

*Huddleston v. Herman & MacLean,*
    640 F.2d 534 (5th Cir. 1981),
    *aff'd in part and rev'd in part on other grounds,*
    459 U.S. 375 (1983)...................................................................21

*In re Able Labs. Sec. Litig.,*
    No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538
    (D.N.J. Mar. 24, 2008)...............................................................28

*In re Amgen Inc. Sec. Litig.,*
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ......................................25

*In re Bally Total Fitness Sec. Litig.,*
    No. 04 C 3530, 2006 WL 3714708
    (N.D. Ill. July 12, 2006)........................................................31, 32

*In re Biogen Idec, Inc.,*
    No. 05-10400-WGY, 2007 U.S. Dist. LEXIS 98076
    (D. Mass. Oct. 25, 2007)............................................................28

*In re Cardinal Health, Inc. Sec. Litig.,*
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ..................................28, 29

510829_1

**Page**

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...............................................................28

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993)...................................................................................19

*In re Evci Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006).................................................................27

*In re Fannie Mae Sec.*,
    503 F. Supp. 2d 25 (D.D.C. 2007) ...................................................................28

*In re Huffy Corp. Sec. Litig.*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008) ............................................................25

*In re Immucor Inc. Sec. Litig.*,
    No. 1:05-cv-2276-WSD, 2006 U.S. Dist. LEXIS 72335
    (N.D. Ga. Oct. 4, 2006).....................................................................................28

*In re InfoSonics Corp. Derivative Litig.*,
    No. 06cv1336 BTM(WMc), 2007 U.S. Dist. LEXIS 66043
    (S.D. Cal. Sept. 4, 2007) ...................................................................................28

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) ...............................................29, 30, 31

*In re Motorola Sec. Litig.*,
    No. 03 C 287, 2004 U.S. Dist. LEXIS 18250
    (N.D. Ill. Sept. 10, 2004) ..................................................................................22

*In re Northfield Labs., Inc. Sec. Litig.*,
    No. 06 C 1493, 2008 WL 4372743
    (N.D. Ill. Sept. 23, 2008) ..................................................................................17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .....................................................................27

*In re PXRE Group, Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)..............................................................24

*In re Sears Roebuck & Co. Sec. Litig.*,
    291 F. Supp. 2d 722 (N.D. Ill. 2003) ...............................................................33

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...........................................................27

510829_1

**Page**

*In re Sys. Software Assocs. Sec. Litig.*,
No. 97 C 177, 2000 U.S. Dist. LEXIS 3071
(N.D. Ill. Mar. 8, 2000) ....................................................................................26

*In re Tut Sys. Sec. Litig.*,
No. C 01-02659 CW, 2002 U.S. Dist. LEXIS 27092
(N.D. Cal. Aug. 15, 2002)..................................................................................26

*In re Ulta Salon, Cosmetics & Fragrance, Inc.*,
604 F. Supp. 2d 1188 (N.D. Ill. 2009) .......................................................22, 23

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ..............................................................28

*In re Westell Techs., Inc. Sec Litig.*,
No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867
(N.D. Ill. Oct. 26, 2001)....................................................................................26

*Institutional Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)...............................................................................24

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
No. 02 C 5893, 2004 WL 574665
(N.D. Ill. Mar. 22, 2004) ...................................................................................33

*Lindelow v. Hill*,
No. 00 C 3727, 2001 WL 830956
(N.D. Ill. July 20, 2001)........................................................................32, 33, 34

*Lormand v. U.S. Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .......................................................................21, 22

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ("*Tellabs I*") ............................................... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ("*Tellabs III*") ............................................ *passim*

*Marks v. CDW Computer Ctrs., Inc.*,
122 F.3d 363 (7th Cir. 1997) .............................................................................17

*Norfolk County Ret. Sys. v. Ustian*,
No. 07C7014, 2009 WL 2386156
(N.D. Ill. July 28, 2009)........................................................................30, 31, 32

**Page**

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000)............................................................22

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
380 F.3d 1226 (9th Cir. 2004) ........................................................22

*Ong v. Sears, Roebuck & Co.,*
459 F. Supp. 2d 729 (N.D. Ill. 2006) ...............................................30, 31, 32

*Schlagel v. Learning Tree Int'l,*
No. CV 98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306
(C.D. Cal. Dec. 23, 1998) ................................................................26

*Schleicher v. Wendt,*
529 F. Supp. 2d 959 (S.D. Ind. 2007) ..............................................24, 25, 32

*Schultz v. Tomotherapy Inc.,*
No. 08-CV-314-SLC, 2009 WL 2032372
(W.D. Wis. July 9, 2009) .................................................................17

*Selbst v. McDonald's Corp.,*
No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093
(N.D. Ill. Sept. 21, 2005) ................................................................19

*Silverman v. Motorola, Inc.,*
No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799
(N.D. Ill. Sept. 23, 2008) ................................................................24, 25, 32, 33

*Starr v. AHey, Inc.,*
No. 01 C 6087, 2003 WL 21212596
(N.D. Ill. May 23, 2003) .................................................................34

*Stavros v. Exelon Corp.,*
266 F. Supp. 2d 833 (N.D. Ill. 2003) ...............................................23

*Stocke v. Shuffle Master, Inc.,*
615 F. Supp. 2d 1180 (D. Nev. 2009) ..............................................28

*Sundstrand Corp. v. Sun Chem. Corp.,*
553 F.2d 1033 (7th Cir. 1977) .........................................................21

*Takara Trust v. Molex Inc.,*
429 F. Supp. 2d 960 (N.D. Ill. 2006) ...................................... *passim*

- vii -

Page

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*,
     __F. Supp. 2d __, No. CIV 06-2674-PHX-RCB, 2010 WL 653440
     (D. Ariz. Feb. 22, 2010) .........................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
     551 U.S. 308 (2007) ("*Tellabs II*") ...................................................9, 21, 26

*Triad Assocs. v. Chicago Hous. Auth.*,
     892 F.2d 583 (7th Cir. 1989) ..............................................................16

*Tricontinental Indus. v. PricewaterhouseCoopers, LLP*,
     475 F.3d 824 (7th Cir. 2007) ..............................................................30

*United States v. Morris*,
     80 F.3d 1151 (7th Cir. 1996) ..............................................................19

*Waldock v. M.J. Select Global, Ltd.*,
     No. 03 C 5293, 2005 WL 3542527
     (N.D. Ill. Dec. 27, 2005) ....................................................................34

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
     §78t(a) ................................................................................32, 33, 34
     §78u-4(b)(1)(B).........................................................................10

Federal Rules of Civil Procedure
     Rule 8 ...............................................................................................30
     Rule 9 .................................................................................................9
     Rule 9(b) .......................................................................................9, 33

17 C.F.R.
     Rule 10b5-1.......................................................................................27

## I.      Introduction

Defendants Anixter International Inc. ("Anixter" or "the Company"), Robert J. Eck ("Eck"),

Dennis J. Letham ("Letham") and Robert Grubbs ("Grubbs") urge the Court to dismiss this action.

Their arguments, however, depend on a wholesale disregard of the detailed allegations within the

Amended Class Action Complaint for Violations of Federal Securities Laws (the "Complaint").

Indeed, defendants urge this Court to resolve issues of fact, particularly asking the Court to accept

their explanation for certain statements and accept their version of the facts, as opposed to the

version set forth in the Complaint.  As the Seventh Circuit has many times held, these types of

factual resolutions cannot be made on a motion to dismiss – which only resolves matters of law.

The Complaint sets forth in a clear manner how defendants omitted material, negative

information from investors between January 29, 2008 and October 20, 2008 (the "Class Period").

Plaintiff also details what that information was, when defendants received it, and from whom.  The

Complaint meets, and indeed exceeds, the pleading requirements outlined by the Private Securities

Litigation Reform Act of 1995 ("PSLRA") .  Defendants' motion should be denied.

## II.     Statement of Facts

### A.      Background on Anixter's Business

Anixter describes itself as a "leading global distributor of communication products, electrical

and electronic wire & cable, fasteners and other small parts." ¶2.[1]  The Company is a global supplier

of communications products used to connect voice, video, data and security systems. It provides

electrical and electronic wire and cable, fasteners, and other small components to build, repair and

maintain a variety of systems and equipment.  *Id.*

---

[1]      Paragraph references ("¶__" or "¶¶__") are to the Complaint.

Anixter operates through three main lines of business. The Company's Enterprise Cabling and Security Solutions business group makes up the largest component of the Company's total revenue, approximately 54% in 2007 and 52% in 2008. This group focuses on the supply of cabling, connectivity, wireless devices, cameras, recorders, power and other items and IT projects for enterprise networks, factory automation, security networks and data centers. ¶36.

Electric Wire and Cable is Anixter's second largest business group, accounting for approximately 28% of the Company's total revenue in 2007 and 29% in 2008. This group provides electrical and electronic wire and cable to the contractor, integrator, architectural and engineering, utilities, broadcast and industrial markets. Specific products in this group include power cable, flexible cable, coaxial cable, armored cable, building wire, fiber optic cable, mining cable, control cable, accessories and portable cord. ¶37.

Operating End Markets ("OEM") Supply is Anixter's third largest business group. OEM supply represented approximately 18% of the Company's total revenue in 2007 and 19% in 2008. This group delivers "C" class components, such as fasteners, nuts and bolts, directly to the production line of its OEM customers, which include aerospace, industrial and automotive companies. The majority of Anixter's OEM supply business (56%) is based in Europe. ¶38.[2]

**B.     Growth by Acquisition Opportunities Dry Up in 2007 and the Global Economic Crisis Begins to Take Shape**

Historically, Anixter had grown its sales base through both strategic acquisitions and organic sales growth. ¶40. However, acquisition opportunities dried up during 2007 leaving defendants dependant on organic sales growth to generate Anixter's future growth. *Id.* Defendants confirmed

---

[2]     In addition to its multiple lines of business, Anixter operates in multiple regions. In 2007, the Company generated approximately 70% of its total sales from North America (U.S. and Canada), 22% from Europe and 8% from its emerging markets (Asia Pacific and Latin America). ¶39.

- 2 -

this situation in Anixter's 2007 Annual Report, stating that "[f]uture growth will continue to be primarily driven organically." ¶41.

As early as mid-2007, defendants also began telling investors that, despite declining economic conditions in the U.S. and abroad, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008. ¶42. However by late 2007, the U.S. and global economies were declining and the credit markets were contracting. Indeed, defendants themselves admitted in October 2007 that there was a "significant amount of economic uncertainty . . . particularly in the U.S. related to the credit markets" and knew that despite the strong growth guidance defendants continued to reiterate, investors remained cautious about Anixter's prospects. *Id.* Thus, Anixter's stock price remained depressed.

Defendants knew that these concerns were justified. By the end of 2007, Anixter's sales and profits were under pressure due to slower global demand, including lower capital, non-residential construction and technology spending. Moreover, Anixter's organic growth rate, which defendants were relying on to drive 2008 sales growth, had declined significantly throughout 2007, falling from 22% at the end of 2006 to 9% by 3Q07. ¶43. In an attempt to allay investors' concerns (and prevent a corresponding stock price decline), in November 2007, defendants began aggressively repurchasing the Company's stock. ¶44. This maneuver was met with approval in the market. *Id.*

The share repurchases alone, however, were not enough. Defendants knew that they needed to convince the market that Anixter was not being affected by the credit market contraction or declining global economies in order to protect Anixter's stock price, and, as a result, protect their ability to cash in on the substantial stock options they received as part of their compensation packages. ¶45.

- 3 -

**C.      Defendants Repeatedly Deny that Anixter's Business Was Being Negatively Effected by the Worsening World Economy**

Beginning on January 29, 2008 and continuing throughout the Class Period, defendants repeatedly disclaimed that Anixter was suffering any negative effects associated with deteriorating credit markets and global economic conditions.  In fact, on January 29, 2008, defendants reiterated that Anixter continued to experience "strong growth . . . in the security and OEM markets" and a "solid backlog and healthy pipeline of potential new projects and customers."  ¶47.  In addition, Grubbs assured investors that Anixter would continue to achieve "solid earnings and growth" in 2008 despite deteriorating market conditions:

> While 2008 begins with a well publicized, less certain overall economic environment than 2007, recent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year.

¶¶5, 48.  *See also* ¶51.  Defendants forcefully insisted that the Company's market demand "remained robust" and was "healthy across all markets," and that despite a sales decrease in Europe, "business activity levels in Europe remain strong."  ¶¶49-50, 52.

Defendants' earnest representations concerning Anixter's continued health and growth in spite of troubling global economic conditions paid off.  In response to these statements, Anixter's stock price surged 18%, or $10.55 per share in a single day.  ¶¶7, 53.  Taking advantage of this run up of Anixter's stock price, ***that same day***, Grubbs sold 14,000 Anixter shares realizing a nearly $1 million profit.  ¶¶7, 53, 114.  Letham followed suit on February 15, 2008, selling 3,668 shares and reaping a profit of nearly $250,000.  *Id.*

On April 22, 2008 when defendants announced the Company's 1Q08 financial results, defendants again flatly denied that the global economic slowdown was negatively effecting Anixter, or would negatively effect Anixter in the future.  Even though Anixter posted lower organic year-

over-year growth of 7%, Grubbs told investors that the first quarter's "divergent growth rates" were

nothing more than an "unfavorable impact from holidays."  ¶61.  In fact, Grubbs proclaimed:

> The multiple end markets we serve, the diversity of industries in which our
> customers operate and the broad geographies over which our business is conducted
> have given is the ability to sustain overall growth despite certain economic concerns.
> We believe that the diversity and depth of our business will continue to work to our
> shareholders' benefit regardless of broader economic conditions.

*Id.  See also* ¶¶63-64.

Given the uncertain credit markets, however, analysts questioned defendants on these

disappointing results and any potential negative effects going forward.  But defendants reassured the

analysts that it was "more of a seasonal pattern impact . . . [t]han it is anything about the credit

market issue," and that conditions were actually "improv[ing]" for Anixter.  ¶67.  This was the

opposite of what defendants had previously told investors in Anixter's 2007 Annual Report, namely

that "[t]he operating results of the Company are not significantly affected by seasonal fluctuations."

¶11.

Defendants also reassured investors that while Anixter had seen some "reduced spending . . .

due in part to softer corporate spending," this was limited to "specific project plans of individual

customers" and did not "represent[] a broader trend" associated with "slower economic conditions."

¶¶62, 65.  Moreover, they assured investors that Anixter "continue[d] to generate very healthy

growth," that "backlogs remain[ed] healthy," and that "what we're really trying to say is there [is] an

improvement in conditions.  That's exactly [what] we're saying."  ¶¶65, 67.

While defendants' April 22, 2008 statements did not disclose the nature or magnitude of the

effect of the worsening economic crises on Anixter's business, the partial disclosure that Anixter's

growth rates had suffered resulted in Anixter's stock price dropping $10.31 between the closing

price on April 21, 2008 and the closing price on April 24, 2008, on heavy volume of nearly five

million shares over three trading days.  ¶¶73, 122.

- 5 -

Defendants were determined to regain the lost value in Anixter's stock price.  On July 22, 2008, when they released and discussed the Company's 2Q08 financial results, they continued to fervently deny that the global economic slowdown was negatively effecting Anixter's results and insisted that the diversity of their customer base would protect Anixter from the downturn. ¶¶78-80. While defendants that day announced that the Company's 2Q08 organic growth was only 4%, defendants maintained that the growth figure was not the result of any "broad-based negative trends" but instead was the victim of a comparison to the prior years 2Q "exceptional growth." ¶74.  In fact, defendants told the market that the Company was "seeing good growth across our businesses and around the world" despite "continuing concerns about weakness in our economy." ¶77.

Defendants succeeded in persuading the market that Anixter was not suffering at the hands of a weakening economy.  In response to defendants' statements, Anixter's stock price rose $7.21 per share, or 12%, in one day.  ¶94.

While defendants represented to Anixter's investors that the Company was not being negatively effected by the slowing global economy and contracting credit markets, that Anixter enjoyed a diverse customer base that crossed many industries insulating the Company from damage as a result of a slowing economy and that they continued to see strong growth "across our business and around the world," defendants knew that Anixter's business was experiencing a very different fate.  ¶77.

Defendants knew that Anixter's organic sales growth, particularly in its European OEM supply business, was being severely impacted by the economic downturn.  Anixter's European market – chiefly the Company's OEM supply sales in the industrial and automotive industries – constituted the third largest reporting group for Anixter in 2008 – nearly 20% of total revenue. ¶38. But by 2008, these industries were slowing dramatically as a result of the economic downturn – in particular, the European and U.S. automotive industries. ¶59.  In addition, the decline in Anixter's

OEM supply sales was also negatively impacting the Company's operating margins, as OEM supply sales traditionally produced the Company's highest operating margins.  ¶60.  In fact, by 1Q08, organic growth for Europe had fallen to a paltry *2%*.  According to a former Credit Manager for Anixter's European markets ("CW1"), Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008.  ¶69.

Additionally, according to a former Operations Manager for Anixter's UK operations, ("CW3"), it was clear by mid-2008 that Anixter's European OEM business had slowed dramatically as a result of the global economic crises and was unlikely to improve as the global recession continued gathering momentum.  As a result, CW3 reported that Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008.  These sales trends were made known to Anixter's U.S. operations on at least a monthly basis, and were incorporated into regular monthly reports given to defendants to monitor Anixter's business health.  Indeed, Letham later admitted on February 3, 2009 that Anixter had experienced a "trend of decelerating growth rates . . . in the past few quarters [*i.e.* 2Q08, 3Q08 and 4Q08]."  ¶86.

Moreover, by mid-2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling the orders entirely, in order to avoid taking delivery of new inventory.  According to a former U.S.-based product Planner in Anixter's OEM division ("CW4"), by the summer of 2008, an increasing number of orders were ranked at the 900 level – internally indicating that the order was to be immediately cancelled or delivery extended.  Between August and September 2008 alone, CW4 cancelled or extended delivery on 15% to 20% of the orders he was responsible for managing – many of which were for parts destined for customer Case New Holland, one of Anixter's largest fastener customers.  CW4 reported that these cancelled or extended orders were among Anixter's largest and were for the most profitable products Anixter supplied.  The directions to cancel or delay certain orders were made by upper management, with

- 7 -

input from Anixter's Vice President of Procurement and Supply Chain, Director of Inventory and Inventory Manager, for whom CW4 worked.  By delaying or cancelling these orders, Anixter avoided having inventory on its books that it would be unable to sell due to the significant decline in business it was experiencing during the Class Period.  ¶¶88-90.

The significant decline in Anixter's OEM supply business also continued to negatively impact the Company's operating margins.  As a result, Anixter's gross margins steadily declined year-over-year throughout the Class Period, falling from 24.0% in 1Q07 to 23.4% by 3Q08, and were consistently below defendants' guidance to investors of 24% in 2008 throughout the Class Period.  ¶91.  Defendants received monthly reports that analyzed Anixter's margins and were aware of the steady decline being experienced.  ¶109.  Defendants were also aware of, and closely monitoring, a $3 million pricing dispute with one of Anixter's major European OEM customers, Jaguar Land Rover ("JLR"), which potentially constitute a material hit to the Company's gross margins .  ¶¶70-71.  JLR and Anixter were locked into a disagreement concerning Anixter's payment to JLR of a rebate based upon the amount of material purchased by JLR in 2007.  As a direct result of this on-going dispute, JLR's purchases from Anixter substantially declined in 2008 further depressing Anixter's sales figures and growth rates.  *Id.*

### D.     By the Fall of 2008, Defendants Could No Longer Maintain Their Façade of Success

By October 2008, defendants could no longer mask the reality of the situation at Anixter.  On October 21, 2008, when they announced Anixter's 3Q08 financial results, defendants finally admitted that the falling organic growth rates – only 2% for 3Q08 – were the result of the Company being "negatively impacted by macro economic trends" especially in Europe.  ¶¶96-97, 101.  Furthermore, defendants admitted that the Company's gross margins were suffering as a result of lower sales in Anixter's higher gross margin OEM supply business, and that the settlement of the $3

- 8 -

million pricing dispute with JLR alone impacted gross margins by 20 basis points. ¶¶97, 99. On this news, Anixter's stock price plummeted 40% over five trading days, dropping $18.76 per share. ¶¶103, 123.

Plaintiff and the class suffered hundreds of millions of dollars in damages as a result of defendants' false and misleading statements, and omissions of material information. However, by the time defendants came clean to the market, they had already profited handsomely by selling a substantial part of their personal Anixter holdings for proceeds exceeding $3.9 million.

## III.   The Complaint in All Respects Meets the Rule 9 and PSLRA Pleading Standards[3]

### A.   The Complaint Sets Forth the Falsity of Defendants' Class Period Statements in Precise Detail

Plaintiff is required to set forth the allegedly false and misleading statements, and the reasons they are false, in satisfaction of Fed. R. Civ. P. 9(b) and the PSLRA. To satisfy Rule 9(b), plaintiff must plead the "'circumstances constituting fraud'" with particularity, *i.e.* "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 971 (N.D. Ill. 2006). In addition to these requirements, the PSLRA also demands that plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall

---

[3]      In evaluating defendants' motion, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*") (all citations are omitted and emphasis is added throughout unless otherwise stated); *Desai v. General Growth Props.*, 654 F. Supp. 2d 836, 842 (N.D. Ill. 2009). Additionally, the "court must consider the complaint in its entirety" to determine if the claims are properly stated. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs II*").

- 9 -

state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1)(B). The Complaint in every respect meets these standards.

Contrary to defendants' protests, plaintiff plainly identifies what false information defendants gave to the market. For instance, plaintiff alleges that,

> At the same time defendants were reassuring investors that market demand "remained robust" and was "healthy across all markets," defendants knew, as described in ¶¶58-60, 106-107, 109, 113, that the deteriorating credit markets and global economic conditions were negatively impacting Anixter's business, such that defendants' guidance of 8% to 12% organic growth for 2008 had no reasonable basis.

¶57. Plaintiff then details over several paragraphs exactly what information defendants knew that made their guidance lack a reasonable basis. ¶¶58-60, 106-107, 109, 113.[4] Similar allegations are found throughout the Complaint. *See* ¶¶68, 70, 86, 92.[5] Defendants' complaint that they are left to "guess" which statements in the Complaint are alleged to be false (MTD at 9), falls flat given their 35 pages of argument attacking the Complaint (and particular statements within it) and their improper Exhibit A in which they somehow manage to identify and extract false statements from the Complaint and include what amounts to 22 additional pages of argument outlining the problems with plaintiff's pleading concerning these allegations.[6]

---

[4]   The plaintiffs in the cases relied upon by defendants to support their argument (Memorandum in Support of Defendants' Motion to Dismiss Amended Class Action Complaint ("MTD") at 9 n.3-4), did not utilize this method of pleading. These cases are thus distinguishable.

[5]   Equally unavailing is defendants' contention that plaintiff engages in "group pleading." MTD at 9. A cursory review of the Complaint dispels this notion. Each paragraph in which false and misleading statements are quoted attributes the particular statement(s) to a particular defendant. *See, e.g.*, ¶46 (attributing statements to Grubbs), ¶49 (attributing statements to Letham), ¶62 (attributing statements to Eck), ¶¶74-77 (same).

[6]   Plaintiff has moved to strike defendants' Exhibit A. However, should the Court decide it is properly considered, plaintiff has prepared a response to it, attached as Exhibit 1 to this opposition.

### 1.      January/February Statements

Defendants' argument that plaintiff has failed to plead the falsity of their January and February 2008 statements ignores the Complaint's plain allegations to the contrary.  MTD at 10-12. Instead, defendants push their premature and improper fact-finding agenda in an attempt to divert the Court's attention from the well-pleaded allegations against them.  The only issue the Court can decide on this motion is whether the Complaint meets the applicable pleading requirements – it does. Defendants' desire to disprove the allegations must wait.

Plaintiff alleges that on January 29, 2008 defendants told Anixter's investors that the Company continued to successfully execute its previously described 2008 growth strategy, (¶46-Grubbs); that despite reporting lower sales in Europe, the OEM business had a solid backlog of orders and a strong pipeline of new projects, that business activity levels in Europe were strong and expected to grow, (¶47-Grubbs, ¶50-Letham)[7]; that despite an uncertain economic environment, Anixter's end markets were not being affected and the recent solid trends in sales and growth would continue into 2008, (¶48-Grubbs, ¶49-Letham); and, defendants saw nothing in its European business that would derail the 9-11% growth for that segment they expected, (¶52-Letham).[8] Anixter's stock price surged more than $10 per share in response to defendants' statements.  ¶53.

---

[7]      This information was repeated in the Form 10-K signed by Letham and Grubbs and filed on February 21, 2008.  ¶55.

[8]      Defendants take issue with plaintiff's allegation that they "reiterated" a 9-11% growth projection for Europe in their January remarks.  MTD at 11-12.  As defendants' own motion indicates, Letham answered in the affirmative a direct question from an analyst asking if the Company expected a European growth rate of 9-11% for 2008.  *Id.* at 11.  Whether this was a "reiteration" or not is irrelevant.  Plaintiff has alleged that this forecast was made without a reasonable basis on January 29, 2008 when Letham answered this question and in so doing primed the market's expectation concerning Anixter's European growth.  ¶52.  Furthermore, defendants had made clear in the 2007 Annual Report, as plaintiff alleges, that growth in 2008 would be "organic[]" and not as a result of acquisitions.  ¶41.  Defendants' accusation that plaintiff improperly refers to the 9-11% European growth projection as "organic" growth (MTD at 11-12), is thus nonsense.

However, plaintiff alleges that when Letham and Grubbs made these statements, they knew that a slowdown in the OEM market – particularly in the U.S. and European automotive industries – had begun to take hold in late 2007 and was already negatively effecting that segment of Anixter's business.  ¶¶59, 106.  This slowdown did not escape defendants' attention as the OEM market represented roughly 20% of Anixter's 2008 revenues, and is where the Company's sold its products with the higher gross margins.  ¶¶38, 60.  Plaintiff alleges that defendants also knew that corporate spending, specifically for IT projects, was declining in both North America and Europe by the beginning of 2008 as a result of the burgeoning financial crisis.  These cutbacks had already begun to directly effect Anixter's enterprise cabling business which depended largely on IT projects for its sales growth.  ¶58.

Plaintiff has thus alleged everything that the PSLRA requires, 1) who made the statements, 2) what the statements were, 3) when, 4) where the statements were made, and 5) why those statements were false.  No more is required of plaintiff at this point in time.  *Takara Trust*, 429 F. Supp. 2d at 971.[9]

### 2.    April Statements

The same can be said for defendants' statements made on April 22, 2008.  In each instance plaintiff alleges which defendant made the challenged statement, what the defendant represented, when the statement was made, where it was made, and why it was false.  *See* ¶¶61-72.  Again, however, defendants' arguments center on whether or not the statements were true by arguing that their version of the facts – which plaintiff is statutorily barred at the present time from seeking

---

[9]    Defendants' arguments that these statements could not have been false because Anixter reported growth in the European business in subsequent quarters misses the mark.  MTD at 12.  Plaintiff alleges that *at the time* defendants made these statements concerning Anixter's European business that they knew that growth rate would likely not be achieved for the whole of 2008 because of the rapidly slowing of orders, customer disputes and worsening global economy.  ¶¶58-60, 106.

- 12 -

discovery to confirm – should be accepted by the Court.  MTD at 13-14.  The Seventh Circuit does not give defendants this presumption.  *Tellabs III*, 513 F.3d at 705.

Plaintiff alleges that Anixter reported lower Company-wide growth of 7% in 1Q08, and merely 2% growth in its European segment during this same timeframe.  ¶61.  This performance missed defendants' growth forecasts to the market by a wide margin.[10]  Understandably, investors and analysts were concerned that the strengthening global economic slow down was negatively effecting Anixter's business.  As a result, defendants provided numerous explanations for why those concerns were not justified and specifically why Anixter was insulated from any negative effects from the slowing economy.  However, defendants knew information at the time these explanations were offered that rendered them false and misleading.

For example, Grubbs told investors that "[t]he multiple end markets" Anixter serves, it's customers' "diversity of industries," and the "broad geographies over which [Anixter's] business is conducted have given us the ability to sustain overall growth despite certain economic concerns." ¶61.  Letham echoed this sentiment when he told investors "[t]he geographic diversity of our business model and various company driven initiatives as factors mitigating some of the effects of a slowing economy."  ¶64.  For his part, Eck told investors that the lower growth reported by Anixter was really the result of "customer-specific situations where spending was reduced in response to slower economic conditions" but that this did not represent a "broader trend."  ¶62.  Defendants also told investors that the lower OEM results were really just a "short term anomaly," that the pricing increases implemented by Anixter were already resulting in higher margins and that the situation was "very quickly fixing itself."  ¶66.

---

[10]     Defendants' argument that because Anixter reported growth quarter to quarter, defendants growth forecasts were true, ignores this key fact.  MTD at 13.

However, at the time that defendants provided these explanations and denials of larger problems looming at Anixter, they knew otherwise.  Beginning in 1Q08, Anixter's European OEM business began to nose dive – eventually falling a total of 50% during 2008 – due in part to the slowdown in the automotive industry but also due to an escalating dispute with one of Anixter's major European customers, JLR.  ¶¶70-72.  Plaintiff alleges that once a year Anixter paid JLR a rebate based upon the amount of product that JLR purchased from Anixter during the prior year. ¶70.  In addition to the receipt of this annual rebate, JLR also enjoyed lower prices from Anixter as a result of its exertion of pressure on the Company to give JLR the best deal, and its threats to take its substantial business elsewhere.  *Id*.  Because JLR was a key account, Anixter relented and gave JLR the price breaks, in addition to the rebate, it demanded.  *Id*.  Plaintiff alleges that this dispute grew more pronounced in March 2008 when JLR was acquired by Tata Motors.  ¶71.  During March 2008 and continuing throughout the remainder of the Class Period, JLR drastically reduced its purchases from Anixter in an effort to pressure the Company into paying the $3 million rebate JLR contended was due.  *Id*.  Defendants knew on April 22, 2008 that the dramatic reduction of JLR purchases, coupled with the effects of the slowing economy, resulted in Anixter posting a paltry 2% organic growth in its European business in 1Q08.

Again, plaintiff has pled all that is required to meet the PSLRA's expectations.  *Takara Trust*, 429 F. Supp. 2d at 971.

### 3.    July Statements

Instead of focusing on the allegations in the Complaint concerning their July statements, defendants attempt to re-write the Complaint to further the factual arguments they continue to improperly make.  MTD at 15-18.  In doing so, defendants conveniently ignore the core of plaintiff's claims against them, *i.e.*, that the organic growth projection of 8-12% they gave to the market was without a reasonable basis (and achieving it was becoming more remote as the economy soured), and

- 14 -

that defendants' fervent and repeated denials that Anixter was being negatively effected by the slowing economy were false and misleading.

Despite their attempts to change the allegations against them, defendants, however, do not deny that they reported a mere 4% organic growth in 2Q08. *Id.*; ¶74. Nor do defendants deny that they continued to assure the market that Anixter was not seeing "any broad-based negative trends in the various end markets and geographical regions where we have a business presence," (¶74), and that "while there are continuing concerns about the weakness in our economy, we are seeing good growth across our businesses and around the world." ¶77.[11]

Even while defendants were providing these assurances to the market, they knew that by mid-2008 Anixter's European OEM business had slowed dramatically. ¶86. Plaintiff alleges that according to a former operations manager in Anixter's UK operations, by June 2008, OEM supply sales had taken a significant hit and were trending toward a continued downward spiral for the rest of 2008. *Id.* This information was passed along to the U.S. operations at least monthly and, as defendants have admitted, incorporated into defendants' "detailed view of what's happening in each of the end markets and each one of the geographies." ¶¶86, 107. Furthermore, plaintiff alleges that the U.S. based OEM division was also suffering. ¶88. Plaintiff alleges that by mid-2008 orders were being delayed or cancelled in order to avoid taking delivery of new inventory that was not going to be passed through to Anixter's end users. *Id.* Indeed, within one month's time, by August 2008, 15-20% of the orders destined for one of Anixter's largest customers – Case New Holland – were being cancelled. *Id.* In addition, the rebate dispute with JLR continued negatively affecting

---

[11]     These assurances worked. Anixter's stock price climbed 12% on July 22, 2008 in response to defendants' statements. ¶94.

Anixter's sales in OEM supply as a result of the significant cut-back in JLR purchases from Anixter. ¶¶70-72.

Instead of dealing with the facts alleged, defendants quibble with grammar and urge the Court to accept their interpretation of the meaning of certain statements.  MTD at 17-18.[12]  What defendants meant when they made certain statements is not a matter that can be decided on a motion to dismiss.  *Triad Assocs. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989) ("The purpose of a motion to dismiss is . . . not to decide the merits.").  The only question before the Court is whether plaintiff's allegations satisfy the PSLRA.  Once again plaintiff has alleged who made the statement, what was stated, where and when the statement was made and why it was false.  No more is required now.

### B.     Defendants' "Puffery" Argument Lacks Merit

While defendants claim that "many" of the statements plaintiff alleges are immaterial "puffery," they fail to identify a *single immaterial statement*.  MTD at 33.  Instead, defendants make arguments *outside* the pleadings in an effort to support their blanket claim.  *See* MTD, Ex. A.  Exhibit A labels certain statements as "puffery," then cites to defendants' brief without further explanation or support.  Such use of extrinsic materials is improper and should not be considered because "[i]n considering a motion to dismiss, a court may *not* consider matters outside the

---

[12]     Defendants accuse plaintiff of "misquoting" Eck's July 22, 2008 statement, "we experienced strong very strong growth in Europe" MTD at 17.  Not so.  *See* ¶77 (which quotes Eck as telling investors: "At the same time, we experienced very strong growth in Europe from new customers as well as adding new products with existing customers. . . .").

pleadings." *In re Northfield Labs., Inc. Sec. Litig.*, No. 06 C 1493, 2008 WL 4372743, at \*3 (N.D. Ill. Sept. 23, 2008).[13]

Immateriality can only be demonstrated at the pleading stage if defendants establish that the omitted information is "***so insignificant***, in relation to the total mix of data available, that it would not have mattered to a reasonable investor." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*"). Hence, "the Seventh Circuit [has] caution[ed] against determining materiality on a motion to dismiss":

> The determination of materiality requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments ***are peculiarly ones for the trier of fact***; thus a materiality determination is ***rarely*** appropriate at the summary judgment stage, ***let alone on a motion to dismiss.***

*Schultz v. Tomotherapy Inc.*, No. 08-CV-314-SLC, 2009 WL 2032372, at \*16 (W.D. Wis. July 9, 2009) (quoting *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997)); *ABN AMRO, Inc. v. Capital Int'l., Ltd.*, 595 F. Supp. 2d 805, 839 (N.D. Ill. 2008) (Dow, J.) ("[B]ecause materiality is a fact-based determination, resolution of this issue is inappropriate at the motion to dismiss stage.").

Defendants do not attempt to meet this burden – nor can they, because any reasonable investor would consider it important that Anixter (i) was ***not*** experiencing "strong" growth and demand in its OEM supply business, which accounted for nearly 20% of its revenues in 2008 (¶¶3, 47, 50, 55, 77); (ii) did ***not*** have a "healthy" pipeline of new customers or "robust" market demand (¶¶47, 49, 65); and (iii) ***was*** being negatively impacted by the economic environment (¶¶48-49, 51,

---

[13]    *See also* Plaintiff's Memorandum of Law in Support of Motion to Strike Defendants' Extrinsic Evidence Attached to Their Motion to Dismiss or, in the Alternative, to Convert Defendants' Motion to Dismiss into a Motion for Summary Judgment at 5-6.

61-62, 67, 74, 77-78).  "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Tellabs I*, 437 F.3d at 596.  Here, a reasonable investor would deem statements regarding the health of the Company "consequential," in light of the global economic slowdown that was then occurring.

### C.    The Safe Harbor Does Not Protect Defendants from Liability

Plaintiff has no quarrel with defendants' assertion that growth forecasts are forward-looking statements within the meaning of the PSLRA.  MTD at 21.  However, defendants' assertion that they did not give an organic growth projection of 8-12% for 2008 (*id*. at 18) is belied by their own statements during the Class Period.  On April 22, 2008, while discussing Anixter's 1Q08s organic growth of 7%, Letham noted that when this rate was "adjusted for holidays," it brought it up to "8% which is in line with the lower end of our 8% to 12% organic growth target range."  ¶64.  Defendants again reiterated this organic growth range on July 22, 2008 when Eck commented that a "modest level of consecutive growth" will move the 3Q08 "growth rates closer to our longer-term target of 8 to 12 percent yearly growth."  ¶74.  While the growth targets defendants gave the market fall within the meaning of the safe harbor, these statements are not protected as defendants contend because none of them were accompanied by the meaningful cautionary language required for statutory protections to apply.[14]

The PSLRA's safe harbor does not apply to forward-looking statements unless those statements were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those [identified] in the forward-looking statement."  *Tellabs I*, 437 F.3d at 598-99. As an initial matter, it is clear that the issue of whether

---

[14]      As discussed in §III.D., the safe harbor is also inapplicable because plaintiff has alleged that defendants made and reiterated the forecasts with actual knowledge they lacked a reasonable basis.

- 18 -

cautionary language is sufficient is an intensive fact issue that is not resolvable on a motion to dismiss. "Exactly what constitutes 'meaningful cautionary language' is 'difficult if not impossible' to decipher, particularly 'at the pleading stage, before plaintiffs have access to discovery.'" *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093, at *50 (N.D. Ill. Sept. 21, 2005) (quoting *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729, 734 (7th Cir. 2004)).

In any event, the cautionary language cited by defendants is not sufficient to invoke the protection that they seek. Cautionary language accompanying forward-looking statements must be **meaningful** in nature, *i.e.*, "'substantive and tailored to the specific future projections, estimates or opinions' that are alleged to be misleading." *United States v. Morris*, 80 F.3d 1151, 1167 (7th Cir. 1996) (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 372 (3d Cir. 1993)). In other words, it must "mention[] 'those sources of variance that (at the time of the projection) were the principal or important risks.'" *Tellabs I*, 437 F.3d at 599.

Defendants' cautionary language did none of the above. In fact, defendants' "cautionary language" consisted of warning against "general economic conditions" and that "future performance could be subject to economic downturns" – general factors that would affect *any* company. MTD at 21-22. These "warnings" are also strikingly similar to the language found lacking in *Asher* and *Tellabs I*. The general, broad approach employed by Anixter was specifically rejected by the Seventh Circuit in *Asher*:

> For its part, Baxter says that mentioning these business segments demonstrates that the caution is sufficient; but this also is wrong, because then any issuer could list its lines of business, say "we could have problems in any of these," and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight.

377 F.3d at 733.  This approach was again rejected by the Seventh Circuit in *Tellabs I*, when the court considered risk disclosures similar to those relied upon by defendants here.[15]  *See* 437 F.3d at 599.  Noting that the risk factors' "generalized statements" encompassed the problems relating to the products at issue, the *Tellabs I* court held that the factors "also encompass a whole world of other possible contingencies" which rendered them too broad to address the specific risks that the company faced.  *Id.* (holding that "that Tellabs's warnings were not particularized enough for it to claim shelter under the PSLRA's safe harbor provision").

Critically, even humoring defendants that their generalized statements about "economic conditions" impart any meaningful information, defendants repeatedly and fervently denied throughout the Class Period that "economic conditions" were negatively effecting Anixter's business results such that the organic growth projections they continued to give during the Class Period were in jeopardy of being missed.  ¶¶48-49, 61-67, 74-80.  Indeed, defendants' motion fails to even mention these statements and cites no authority applying the protections of the safe harbor when a defendant repeatedly tells investors that the risks the "warnings" cautioned about were not coming to pass when in fact the conditions were already being experienced.

The safe harbor is not a game of gotcha and *is not a shield for the defendants to use when they know the negative factors they warn of were already occurring*.  Defendants flat denials that Anixter was experiencing the consequences of the risks they "warned" investors about, renders meaningless any minimal cautionary effect that could be gleaned from their vague, generalized "warnings."  *Asher*, 377 F.3d at 733 (safe harbor does not allow a defendant to "avoid liability for

---

[15]      In *Tellabs I*, the court considered the following cautionary language: "Factors that might cause such a difference include, but are not limited to, risks associated with introducing new products, entering new markets, availability of resources, competitive response, and a downturn in the telecommunications industry." 437 F.3d at 599.  The "cautionary" language at issue here is similar.  *See* MTD at 21-22 citing "warnings" that there could be an "unexpected shift in market demand" or "changes in supplier or customer relationships."

statements implying that no such problems were on the horizon even if a precipice was in sight"); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) ("[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983).

### D.   The Complaint Pleads a Strong, Cogent and Compelling Inference of Scienter

In the Seventh Circuit, a plaintiff may plead scienter by alleging facts which demonstrate that a defendant knowingly made a false statement (if that statement is forward-looking) or recklessly disregarded "a substantial risk that it was false," (if the statement if not forward-looking). *Tellabs III*, 513 F.3d at 704. In this context, recklessness is defined as "'an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Tellabs I*, 437 F.3d at 600 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (alteration in original)); *see also Tellabs III*, 513 F.3d at 704 (same). A court must consider the totality of the facts alleged to determine whether they give rise to "an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs II*, 551 U.S. 328 (emphasis in original).

### 1.   Defendants' Admissions Confirm that They Knew Their Class Period Statements Were False and Misleading

Defendants' post-Class Period admissions constitute powerful evidence of their scienter. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009). Defendants' attempts to explain away these admissions and again lure this Court toward resolving factual issues are improper. MTD at 25-26.

Here, defendants *admitted* on February 3, 2009 when the fiscal year 2008 financial results were announced that Anixter experienced a "trend of decelerating growth rates . . . in the past few

- 21 -

quarters [*i.e.* 2Q08, 3Q08 and 4Q08]." ¶107.  This admission is in direct conflict with the numerous

representations defendants made throughout the Class Period that no negative trends were being

experienced by Anixter's business.  *See* ¶¶48-49, 61-67, 74-80.  In addition, defendants admitted that

they "have a very detailed view of what's happening in each of the end markets and each one of the

geographies," (¶107), and that "[w]hen the market slows, the chunk of the market that we do

particularly well in ends up being a little bit smaller and so we see an effect from that pretty quickly

in our business." ¶106.  Thus, defendants knew during the Class Period, by their own admission, that

the slow down in the end markets they served – for example the U.S. and European automotive

industries where Anixter's highest margin products were sold – had "quickly" affected Anixter's

business.  Defendants knew of this effect from their "detailed views" of the "end markets" and

"geographies" they admitted to possess and that these negative trends had been apparent to them

during the Class Period.  These admissions further corroborate that the information described by the

confidential witnesses was known or available to defendants at the time they were speaking to the

market.[16]

     "Here, the admissions by the individual defendants, as alleged in the complaint, directly and

cogently tend to prove their state-of-mind at the time of their misleading statements and omissions,

*i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn

out badly."  *Lormand*, 565 F.3d at 254; *see also Nursing Home Pension Fund, Local 144 v. Oracle*

---

[16]    *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684 (6th Cir. 2005)
(crediting scienter inference from negative data that was "known *or available* to" defendants); *In re Motorola
Sec. Litig.*, No. 03 C 287, 2004 U.S. Dist. LEXIS 18250, at *92 (N.D. Ill. Sept. 10, 2004) (holding that
defendants' "access to information contradicting their public statements" supports a finding that they "'knew
or, more importantly, should have known that they were misrepresenting material facts related to the
corporation'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *In re Ulta Salon, Cosmetics &
Fragrance, Inc.*, 604 F. Supp. 2d 1188, 1196-97 (N.D. Ill. 2009) (holding that allegations that defendants had
access to crucial information about a company's troubles was more cogent and compelling than an inference
that they were "essentially clueless as to major problems existing within the company").

*Corp.*, 380 F.3d 1226, 1232-33 (9th Cir. 2004) (holding that post-class period admissions were relevant to reasonably infer that the company knew that it would not make its projections due to internal company problems); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 76-83 (1st Cir. 2002) (holding that subsequent public statements supported "an extremely reasonable inference" that the company had previously engaged in improper conduct). Defendants' admissions provide compelling support for a strong inference of actual knowledge.

### 2.      Defendants Undoubtedly Knew About Trouble with Sales of Anixter's Most Profitable Product Lines

"Facts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributed to the company and its key officers." *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 938-39 (N.D. Ill. 1999); *see also Ulta Salon*, 604 F. Supp. 2d at 1196-97; *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003) (holding that a strong inference of scienter can be inferred by pleading "key officers knew of facts critical to a business's core operations").

Defendants cannot reasonably dispute that the allegations in the Complaint directly relate to problems with the sales of Anixter's most profitable product lines. Plaintiff alleges, and defendants admit, that declining economic conditions hit Anixter's OEM business hard. This business unit – the majority of which was based in Europe – made up nearly 20% of Anixter's total revenue in 2008. ¶59. Not only did the slumping OEM sales negatively impact Anixter's growth rate, but materially and negatively impacted Anixter's operating margins, *i.e.* profitability, as OEM supply sales traditionally produced the Company's highest profit margins. ¶60. In fact by the end of 1Q08, organic growth in the European business had fallen precipitously to a mere 2% which caused defendants spent a lot of time reassuring the market that margin pressure in this business was a "short term" condition that was already correcting itself. ¶¶64-66, 69. However, defendants

continued to receive information that indicated otherwise.  ¶¶106-107.  Indeed, defendants later

admitted that Anixter's decline in gross margins during the Class Period was due, at least in part, to

"slower sales in [Anixter's] higher gross margin OEM supply business."  ¶60.

That defendants did not know of the peril befalling the source of 20% of the Company's

overall revenues is hard to credit.  As the Seventh Circuit asked in *Tellabs III*: "Is it conceivable that

[the CEO] was unaware of the problems of his company's two major products and merely repeating

lies fed to him by other executives of the company? It is conceivable, yes, **but it is exceedingly**

**unlikely**."  513 F.3d at 711; *see also Desai*, 654 F. Supp. 2d at 860 (noting that a strong inference of

scienter may be credited "where 'it is almost inconceivable'" that an individual defendant would be

unaware of the matter at issue). The same conclusion can be drawn here.

### 3. The Confidential Witnesses Provide Reliable Information that Defendants Knew of Material Facts Rendering Their Public Statements False or Misleading

Allegations based upon confidential witnesses support a strong inference of scienter where

the complaint sets forth: (i) when the sources were employed by the defendant; (ii) when the sources

acquired the relevant information; and (iii) how the sources had access to the information.  *Tellabs*

*III*, 513 F.3d at 710-12.[17]

---

[17]    Defendants' reliance upon *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) is in error. *Tellabs III* "circumscribes *Higginbotham*'s broad pronouncement that confidential witness allegations will 'usually' be steeply discounted, clarifying that the weight accorded to anonymous sources will depend in large part on the level of detail with which they are described." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 262 (3d Cir. 2009).  Courts in this Circuit have recognized this important limitation, holding that "confidential witnesses could help generate a strong inference of scienter where they were sufficiently described, and had first-hand knowledge of the information about which they would testify." *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799, at *42 (N.D. Ill. Sept. 23, 2008); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007).  Other courts have continued "to consider allegations based on information provided by confidential sources without discounting those allegations due *solely* to the anonymity of the information's source." *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 526 n.18 (S.D.N.Y. 2009) (emphasis in original); *City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464,

- 24 -

The confidential witnesses provide an adequate basis for concluding that the defendants had knowledge or recklessly disregarded adverse facts in making their false and misleading statements. Many of the witnesses described worsening conditions, particularly within the OEM supply business, throughout 2008. For example, CW1 described how Anixter's UK automotive business declined by 50% during 2008. ¶69. Likewise CW2 described a serious dispute between the Company and one of its largest OEM supply customers, JLR, over Anixter's refusal to pay JLR a $3 million rebate. ¶70. As a result of this dispute, JLR's procurement orders from Anixter declined substantially beginning in March 2008. ¶71. Anixter finally paid the $3 million which defendants acknowledged reduced the Company's overall 3Q08 gross margins by 20 basis points. ¶100. Indeed, defendants' admit that they had detailed information during the Class Period about "what's happening in each of the end markets and each one of the geographies." ¶107.[18]

Here, the Complaint describes with particularity information (¶¶69-72, 86-90, 92-93, 109-113) provided to defendants demonstrating that both their projections and their statements about Anixter's business conditions were false or misleading when made. Plaintiff also described when the witnesses were employed at Anixter, their titles, positions and responsibilities, and the basis for their knowledge. *Id.* Nothing more is required. *Tellabs III*, 513 F.3d at 712; *Schleicher*, 529 F. Supp. 2d at 972; *Silverman*, 2008 U.S. Dist. LEXIS 76799, at *13-*18, *41-*42.

---

474 (S.D.N.Y. 2008); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1032-33 (C.D. Cal. 2008); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 991-93 (S.D. Ohio 2008).

[18]    This admission most directly corroborates the information provided by CW6 who described the detailed reports he/she prepared monthly, which were reviewed by Eck, showing the sales and profits on a geographic basis for Anixter's North American cabling product lines. ¶109. These product lines provided the majority of Anixter's revenue – 71% in 2007. ¶39.

- 25 -

**4.      Defendants' Stock Sales Add to the Strong Inference of Scienter Alleged**

Defendants' insider sales – and those of other Anixter insiders – are additional indicia of scienter.  The Supreme Court has held that "personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs II*, 551 U.S. at 325.  "Allegations that a corporate insider delayed disclosing materially adverse information in order to sell personally-held stock at a huge profit can supply the requisite motive for a scienter allegation."  *In re Westell Techs., Inc. Sec Litig.*, No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867, at *34-*35 (N.D. Ill. Oct. 26, 2001).

Here, defendants' sales were suspicious in both timing and amount.  Both Grubbs and Letham sold stock on the same day that they made false representations to the market that caused Anixter's stock price to rise substantially.  On January 29, 2008, Grubbs made nearly $1 million in profits on sales he made after his misrepresentations resulted in an 18% increase in Anixter's stock price.  ¶¶53, 114  Likewise, Letham sold 2700 shares of his stock on July 22, 2008 after misrepresentations he gave to the market caused the Company's price to climb 12%.  ¶¶94, 114. "[W]here stock sales occur[] on the heels of optimistic statements, this constitutes circumstantial evidence that statements were fraudulent when made."  *Schlagel v. Learning Tree Int'l*, No. CV 98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306, at *32 (C.D. Cal. Dec. 23, 1998).  Moreover,  each of the defendants sold at prices exceeding $70 per share – near the stock's peak price.  ¶114; *see In re Tut Sys. Sec. Litig.*, No. C 01-02659 CW, 2002 U.S. Dist. LEXIS 27092, at *39 (N.D. Cal. Aug. 15, 2002) (allegations that defendants sold substantial portions of their holdings while "stock was trading at all-time highs, give rise to a strong inference of scienter").[19]

---

[19]      The inference of scienter drawn from defendants' stock sales is reinforced by the sales of two other Anixter insiders, who sold 26.77%  and 15.5% of their personally held stock during the Class Period.  *See In re Sys. Software Assocs. Sec. Litig.*, No. 97 C 177, 2000 U.S. Dist. LEXIS 3071, at *43 (N.D. Ill. Mar. 8,

Never mentioning the suspect timing of these sales and not denying that they realized the nearly $4 million in profits alleged, defendants argue, in essence, that no inference of scienter can arise from their trading activities because they could have sold more stock.  MTD at 28-29.  However, in the Seventh Circuit, there is no bright-line test – even a sale of one percent of holdings may be deemed suspicious.  *Takara Trust*, 429 F. Supp. 2d at 978 n.10 (holding that "with regard to stock sales as evidence of scienter, the Seventh Circuit refused to hold that one percent of a defendant's stock was *per se* too little") (citing *Tellabs I*, 437 F.3d at 604).[20]  It is far more plausible that an insider trading on non-public information would not sell too much of his stock, let alone every possible share, in order to avoid drawing attention to those sales from the market, or worse, the SEC.

Reaching, defendants argue that because the sales were made pursuant to Rule 10b5-1 trading plans, no scienter can be inferred from the sales.  MTD at 28.  However, Eck entered into his trading plan, and Grubbs entered into a new plan, ***during the Class Period*** and while in possession of numerous materially adverse, non-public facts.  ¶119.  Both sold stock, allegedly pursuant to those plans in September 2008 when the price was peaking, walking away with over $1.2 million

---

2000) (holding that "the inference is obviously strongest when examined collectively – *e.g.*, where the [insiders] bought or sold shares in a common pattern").

[20]  *See, e.g.*, *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (holding that stock sales that amounted to 7.6% of personal holdings added to a finding of a strong inference of scienter); *Hayley v. Parker*, No. SA CV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255, at *1, *16-*17 (C.D. Cal. Aug. 31, 2001) (holding that stock sales amounting to 11% of holdings supported a strong inference of scienter).  Additionally, defendants cite no authority in this Circuit for the proposition that courts must consider vested stock options when determining whether stock sales support an inference of scienter.  MTD at 28 n.19.  Vested stock options do not carry the same economic risk as actual stock ownership.  If a stock price declines, the actual owner of the stock suffers a real economic loss of the money paid for the stock.  The holder of a vested stock option, however, does not lose any invested money; rather, at worst, the holder suffers a reduced expectancy of profit in the future.  Thus, "vested [stock] options are not shares."  *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999); *In re Evci Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).  Even considering vested stock options, however, the sales are suspicious.  ¶114.

between them. ¶114.  Several courts have held that  trading plans entered into during a period when

it is alleged that the defendant was making false and misleading representations to the market, can

not be used to negate an inference of scienter.  *See Cent. Laborers' Pension Fund v. Integrated Elec.*

*Servs.*, 497 F.3d 546, 554 (5th Cir. 2007) ("the attempt to use the 10b5-1 Plan as a non-suspicious

explanation is flawed because, *inter alia*, Reynolds entered into the Plan during the Class Period");

*In re Biogen Idec, Inc.*, No. 05-10400-WGY, 2007 U.S. Dist. LEXIS 98076, at *40 (D. Mass. Oct.

25, 2007) ("The attempt to use such trading plans as a non-suspicious explanation is undermined,

however, when such plans are entered into during the Class Period.").[21]  Moreover, the existence of a

10b5-1 trading plan is an affirmative defense not properly considered at the pleading stage.  *In re*

*UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[E]vidence of the

nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative

defense at a later stage of the litigation."); *In re Able Labs. Sec. Litig.*, No. 05-2681 (JAG), 2008

U.S. Dist. LEXIS 23538, at *103 n.40 (D.N.J. Mar. 24, 2008) (holding that a 10b5-1 trading plan

"requires an additional factual finding of good faith" that courts cannot make when considering a

motion to dismiss).[22]

---

[21]     Indeed, "a clever insider might 'maximize' their gain from knowledge of an impending price drop
over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan." *In re Immucor Inc.
Sec. Litig.*, No. 1:05-cv-2276-WSD, 2006 U.S. Dist. LEXIS 72335, at *53 n.8 (N.D. Ga. Oct. 4, 2006); *see
also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) (holding
that an insider's amendments to a 10b5-1 trading plan can be probative of scienter); *In re InfoSonics Corp.
Derivative Litig.*, No. 06cv1336 BTM(WMc), 2007 U.S. Dist. LEXIS 66043, at *24-*25 (S.D. Cal. Sept. 4,
2007) ("However, whether these trading plans were legitimately adopted or were put in place after learning of
material, nonpublic information that could affect the price of stock, can not be resolved at the pleading
stage.").

[22]     *See also Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009);  *In re Fannie
Mae Sec.*, 503 F. Supp. 2d 25, 48 (D.D.C. 2007); *InfoSonics*, 2007 U.S. Dist. LEXIS 66043, at *24-*25; *In re
Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006).

- 28 -

While Letham, unlike Eck and Grubbs, did not enter into a new trading plan during the Class Period, he appears to have made at least one trade outside that plan.  On July 22, 2008 – the same day he fed false information to the market which caused Anixter's stock price to rise 12% – he sold 2,700 shares of his stock.  ¶114.  Each of the other trades he made during the Class Period occurred on the fifteenth of the month, including sales made a week earlier on July 15 – at prices roughly $10 per share lower than the July 22 sales. *Id.*

Defendants realized millions of dollars in profits from their improper sales of stock, selling between 7 and 26% of their stock, much of it as Anixter's stock reached its peak price.  ¶114.  These sales are suspicious both in timing and amount, and support the strong inference of scienter alleged.

### 5.    Anixter's Corporate Scienter Is Also Properly Alleged

Because the totality of the Complaint's allegations sufficiently plead the scienter of Grubbs, Telham and Eck, Anixter's scienter is also sufficiently stated.  *Takara Trust*, 429 F. Supp. 2d at 980 (holding that "where a corporate agent is acting within the scope of his position, such as CEO, his alleged knowledge of the falsity of his statements can be imputed to the corporation") (citing *Tellabs I*, 437 F.3d at 603).  Thus, defendants' charge that plaintiff only generally alleges Anixter's scienter is without merit.  MTD at 27 n.16.

### E.    Plaintiff Adequately Pleads Loss Causation

A plaintiff must allege "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  "To satisfy loss causation, a plaintiff must show a causal connection between a decline in the price of a security, and the revelation of the truth that the defendant's misrepresentation or omission concealed."  *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 535-36 (N.D. Ill. 2007).  "In other words, the plaintiff must have suffered a loss when the defendant's 'material misrepresentation

- 29 -

"became generally known."'" *Id.* at 536 (quoting *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007)).

In pleading loss causation, a "[p]laintiff need not plead causation with specificity" – a short and plain statement under Fed. R. Civ. P. 8 will suffice. *ABN AMRO*, 595 F. Supp. 2d at 846 (Dow, J.). A plaintiff need only "provide a defendant with ***some indication*** of the . . . causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. This requirement "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997); *Dura*, 544 U.S. at 347 (pleading loss causation was "not meant to impose a great burden upon a plaintiff").

Here, plaintiff has adequately pled loss causation. First, plaintiff alleges that defendants issued numerous false and misleading statements to deceive the investing public into believing that Anixter's organic sales growth and business prospects, particularly in its OEM supply business, were stronger than they were and that Anixter was not being negatively affected by the declining economic environment. ¶¶46-52, 55, 57-60, 61-67, 68-71, 74-81, 83, 86, 88-89, 91-92; *see Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 750 (N.D. Ill. 2006). Plaintiff also alleges that defendants' misrepresentations caused Anixter's stock to trade at artificially inflated prices during the Class Period (¶¶53, 94, 120-121), and that plaintiff purchased its Anixter holdings at those artificially inflated prices (¶¶29, 127). Next, plaintiff pleads a specific causal connection between defendants' April 22, 2008 and October 21, 2008 disclosures of the truth about Anixter's business and the corresponding steep declines in the value of its stock. *See Norfolk County Ret. Sys. v. Ustian*, No. 07C7014, 2009 WL 2386156, at *6 (N.D. Ill. July 28, 2009) ("Loss causation may be pled on a theory of partial disclosures."). Specifically, plaintiff alleges that after defendants' April 22, 2008 partial disclosures of a decline in organic sales growth, gross margin pressures in Anixter's OEM supply business and reduced corporate spending of certain customers, the price of Anixter

- 30 -

stock fell $10.31, *or approximately 16%*, over the following three trading days.  ¶¶73, 122, 124; *see Ustian*, 2009 WL 2386156, at *2-*3, *6 (crediting stock price declines over the course of several days following defendants' disclosures); *Greater PA Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, No. 04 C 1107, 2005 WL 61480, at *5 (N.D. Ill. Jan. 10, 2005) (same).   After defendants' October 21, 2008 disclosures that Anixter was experiencing slower sales, a decrease in margins due to lower sales growth in its OEM business and was being negatively impacted by macro economic trends, plaintiff alleges that the price of Anixter stock fell another $18.76, *or approximately 40%*, over the following five trading days.  ¶¶103, 123, 124.

"Plaintiff[] ha[s] thus adequately alleged that [d]efendants' misrepresentations not only inflated the price of the stock, but caused the steep drop in price when the truth was revealed." *Ong*, 459 F. Supp. 2d at 750.  At this stage, nothing more is required.  *Id; see also Motorola*, 505 F. Supp. 2d at 538 ("Since *Dura*, courts in this district and elsewhere, including this court, have found loss causation satisfied, at least at the pleading stage, by allegations that the plaintiff bought securities at a price artificially inflated by a defendant's misrepresentations, and that the price dropped once the truth was revealed.").

Undeterred, defendants argue that these allegations are inadequate because they "fail[] to account for the decline in Anixter's stock price during the alleged class period."  MTD at 32.  Judge Grady rejected this same argument in *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006).  As Judge Grady explained:

> Defendants also argue that the price of Bally stock had already greatly declined over the course of the class period and thus the announcement was not the cause of plaintiff's loss.  Defendants frame their position as a *Dura* argument, but in reality it goes to the merits of plaintiffs' case.  The essence of defendants' argument is that plaintiffs cannot ***prove*** loss causation.  But that is not an appropriate consideration on a motion to dismiss.  It is axiomatic that on a motion to dismiss, we accept as true all factual allegations in the complaint. . . .  Plaintiffs have sufficiently alleged loss causation in accord with *Dura*, and that is all that is required of them at this juncture.

- 31 -

*Id.* at \*14 (emphasis in original).   Indeed, while defendants suggest otherwise, "there is no requirement at the pleading stage that a plaintiff 'affirmatively rule out . . . other factors in its complaint; rather that burden arises at trial.'" *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at \*15 (N.D. Ill. Sept. 23, 2008); *Caremark*, 113 F.3d at 649 (Pleading loss causation "does not require . . . that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant. . . .  Nor does [it] require that the plaintiff allege that it could not have suffered the same damage under other circumstances.").[23]

## F.   Plaintiff Has Adequately Pled Control Person Liability

Section 20(a) of the Exchange Act "imposes liability not only on the person who actually commits the securities law violation, but also on the persons who 'directly or indirectly' control the violator." *Takara Trust*, 429 F. Supp. 2d at 983 (quoting 15 U.S.C. §78t(a)).   "The Seventh Circuit views section 20(a) 'as remedial, to be construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a control person liable.'" *Schleicher*, 529 F. Supp. 2d at 981 (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992)).   A plaintiff need only allege that "(1) the defendant actually exercised general control over the operations of the entity; and (2) that the defendant had the power or ability to control the specific acts constituting the primary violation." *Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at \*9 (N.D. Ill. July 20, 2001).

---

[23]     *See also Ustian*, 2009 WL 2386156, at \*5 (loss causation "does not require that the plaintiff plead that all of its losses can be attributed to the false statement of the defendant"); *Ong*, 459 F. Supp. 2d at 747 ("A plaintiff need not prove that all its loss can be attributed to the defendant's misrepresentation, and a complaint is not rendered infirm because the loss could have been caused by other . . . factors that influenced the price of the plaintiff's securities."); *Desai v. General Growth Props.*, 654 F. Supp. 2d 836, 857 (N.D. Ill. 2009) (same).

While the Seventh Circuit has yet to speak directly on whether control must be pled with particularity, courts in this circuit and others have held that it does not. *See, e.g., Silverman*, 2008 WL 4360648, at *16 ("we are ***not*** convinced that the allegations of control are also subject to the heightened standards"); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 WL 574665, at *10 (N.D. Ill. Mar. 22, 2004) ("§20(a) does not have a scienter requirement ***or a heightened pleading standard***. Accordingly, liberal pleading requirements apply.").[24] In addition, "[w]hether a defendant is a 'controlling person under §20(a) is a question of fact that cannot be determined at the pleading stage." *Lindelow*, 2001 WL 830956, at *9.

Here, plaintiff has adequately alleged control person liability. Plaintiff alleges that the Individual Defendants (i) were the CEOs and CFO of Anixter; (ii) directly participated in and exercised general control over the management of Anixter; (iii) were directly involved in the day-to-day operations of Anixter; (iv) had access to adverse undisclosed information about Anixter's business; (v) held themselves out to the public as spokespeople of the Company; (vi) made the false and misleading statements that form the basis of plaintiff's primary violation allegations; and (vii) had the ability to control the specific acts constituting the primary violation. ¶¶31, 32, 46-52, 55-56, 61-67, 74-81, 83, 85, 141. At this stage, no more is required. *See Gosselin v. First Trust Advisors L.P.*, No. 08 C 5213, 2009 WL 5064295, at *10 (N.D. Ill. Dec. 17, 2009) (plaintiff adequately alleged that defendants were control persons "based on their management positions, access to information, and ability to prevent issuance of misleading statements"); *Silverman*, 2008 WL

---

[24]    *See also In re Sears Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("§ 20(a) has neither a scienter requirement ***nor a heightened pleading requirement***."); *Central Laborers' Pension Fund v. SIRVA, Inc.*, No. 04 C 7644, 2006 WL 2787520, at *25 (N.D. Ill. Sept. 22, 2006) (same); *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, ___ F. Supp. 2d ___, No. CIV 06-2674-PHX-RCB, 2010 WL 653440, at *9 (D. Ariz. Feb. 22, 2010) ("[T]he court will ***not*** require a section 20(a) claim to be pled in accordance with either the PSLRA or Rule 9(b). Indeed, adopting a heightened pleading standard for section 20(a) claims would run afoul of the PSLRA.").

4360648, at *16 ("The complaint alleges that the individual defendants exercised control over Motorola by virtue of their position as senior executives in the company. That for now is enough."); *Lindelow*, 2001 WL 830956, at *9 (plaintiff adequately alleged that defendants were control persons based on "their status as top-ranking company officials whose high level positions necessarily involve general oversight and direction").

*Davis v. Coopers & Lybrand*, 787 F. Supp. 787 (N.D. Ill. 1992), cited by defendants, does not hold otherwise, and, indeed, does not even discuss §20(a). There, the court found the plaintiffs' "conclusory allegations" insufficient to establish respondeat superior liability under the Commodity Exchange Act §2(a)(1)(A). *Id.* at 797. The court also found that the plaintiffs failed to allege "who the primary violators [we]re" – *i.e.*, "whom the defendants were allegedly 'controlling'" – for liability under §15 of the Securities Act of 1933. *Id.* at 801. Such is not the case here.[25]

As the CEOs, CFO and the primary spokespeople for Anixter, there can be no serious debate about whether Eck, Letham and Grubbs controlled the Company. As discussed above, plaintiff has more than adequately alleged each defendant's primary violation of the federal securities laws. Accordingly, each defendant's control person liability has also been sufficiently alleged.

---

[25] The other cases cited by defendants are similarly distinguishable. *See* MTD at 34 n.24. In *Starr v. AHey, Inc.*, No. 01 C 6087, 2003 WL 21212596 (N.D. Ill. May 23, 2003), the court found that the plaintiffs failed to allege that the defendants exercised control as control persons under §15 of the Securities Act of 1933. *Id.* at *4. The court noted, however, that allegations that "the defendant . . . caused the corporation to disseminate to its minority shareholders information containing false and misleading statements" or that "directors had day-to-day control over the operations of the corporation and the power to control the particular transaction in question" ***would suffice***. *Id*. Similarly, in *Waldock v. M.J. Select Global, Ltd.*, No. 03 C 5293, 2005 WL 3542527 (N.D. Ill. Dec. 27, 2005), the court found allegations insufficient because the plaintiffs alleged only that the defendants "provided information to M.J. Select and had control over [its] investments," but failed to allege that the defendants "participated in or exercised general control over M.J. Select." *Id.* at *7.

## IV.      Conclusion

For the above reasons, the Complaint in every respect meets the PSLRA pleading requirements, thus defendants' motion should be denied.  Moreover, defendants' argument that the Complaint should be dismissed with prejudice should be rejected if the Court determines any allegations wanting.  *Foster v. DeLuca*, 545 F.3d 582, 583-85 (7th Cir. 2008).

DATED:  March 22, 2010                      Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DEBRA J. WYMAN


                                            s/ Debra J. Wyman
                                  _____
                                            DEBRA J. WYMAN

                                  655 West Broadway, Suite 1900
                                  San Diego, CA  92101
                                  Telephone:  619/231-1058
                                  619/231-7423 (fax)

                                  COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP
                                  SARAH R. HOLLOWAY
                                  100 Pine Street, Suite 2600
                                  San Francisco, CA  94111
                                  Telephone:  415/288-4545
                                  415/288-4534 (fax)

                                  Lead Counsel for Plaintiff

                                  LASKY & RIFKIND, LTD.
                                  LEIGH R. LASKY
                                  NORMAN RIFKIND
                                  AMELIA S. NEWTON
                                  350 North LaSalle Street, Suite 1320
                                  Chicago, IL  60610
                                  Telephone:  312/634-0057
                                  312/634-0059 (fax)

                                  Liaison Counsel

- 35 -

510829_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2010, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on March 22, 2010.

s/ Debra J. Wyman
DEBRA J. WYMAN

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:debraw@csgrr.com

# Mailing Information for a Case 1:09-cv-05641

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David J. Bradford**
  dbradford@jenner.com,docketing@jenner.com
- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com
- **Sarah R. Holloway**
  sholloway@csgrr.com
- **Leigh R. Lasky**
  lasky@laskyrifkind.com
- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com
- **Amelia Susan Newton**
  newton@laskyrifkind.com
- **Norman Rifkind**
  rifkind@laskyrifkind.com
- **Marc David Sokol**
  msokol@jenner.com,whughes@jenner.com,docketing@jenner.com
- **Howard Steven Suskin**
  hsuskin@jenner.com,docketing@jenner.com
- **Matthew E Van Tine**
  mvantine@millerlawllc.com,mvt@vantine.us
- **Heidi E. VonderHeide**
  vonderheide@laskyrifkind.com
- **Daniel J. Weiss**
  dweiss@jenner.com,docketing@jenner.com
- **Debra J. Wyman**
  debraw@csgrr.com,nhorstman@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`