# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 09 CV 5641 |
| v. | ) ) | Hon. Robert M. Dow Jr. |
| ANIXTER INTERNATIONAL, INC., ROBERT J. ECK, DENNIS J. LETHAM and ROBERT GRUBBS, | ) ) ) ) | |
| Defendants. | ) ) | |

**FILED**

**APRIL 26, 2010**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## CORRECTED REPLY IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

April 22, 2010

David J. Bradford (Illinois Bar #272094)
Howard S. Suskin (Illinois Bar #6185999)
Daniel J. Weiss (Illinois Bar #6256843)
Marc D. Sokol (Illinois Bar #6276263)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350

## **Table of Contents**

Introduction.............................................................................................................................1

I.   Count I Should Be Dismissed. ..........................................................................................2

    A.   No Misrepresentation Is Alleged At The "Core" Of Plaintiff's Complaint. .......................2

        1.   The alleged "8%-12% organic growth" statements are not actionable.........................2

        2.   Anixter did not deny it was "being negatively [a]ffected by the slowing
             economy." ........................................................................................................4

    B.   Plaintiff Does Not Allege Any Other Actionable Misrepresentation. ................................7

    C.   Anixter's Forward-Looking Statements Are Protected by the PSLRA. .............................8

    D.   Count I Fails to Plead Scienter in Accordance with the PSLRA. ....................................10

        1.   The post-class period statements do not establish scienter.........................................10

        2.   The Europe OEM allegations do not establish scienter. .............................................11

        3.   The confidential witnesses do not raise a strong inference of scienter.......................11

        4.   Defendants' stock sales do not raise an inference of scienter.....................................12

    E.   Plaintiff Has Failed to Plead Loss Causation.....................................................................14

    F.   Several of the Challenged Statements Were Immaterial Puffery. .....................................14

    G.   Plaintiff Engages in Impermissible Group Pleading..........................................................14

II.  Count II Should Be Dismissed............................................................................................15

III. The Complaint Should Be Dismissed with Prejudice.........................................................15

**Table of Authorities**

**FEDERAL CASES**

*In re Able Labs. Sec. Litig.*,
    2008 WL 1967509 (D.N.J. Mar. 24, 2008) .......................................................12

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004) ...........................................................................7

*Baron v. Smith*,
    380 F.3d 49 (1st Cir. 2004) ............................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................5

*Cal. Public Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ...........................................................................6

*In re Credit Acceptance Corp. Sec. Litig.*,
    50 F. Supp. 2d 662 (E.D. Mich. 1999).........................................................13

*Cutsforth v. Renschler*,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002) ......................................................11

*Desai v. Gen. Growth Props., Inc.*,
    654 F. Supp. 2d 836  (N.D. Ill. 2009) ...........................................................9

*In re Donald J. Trump Casino Sec. Litig. - Taj Mahal Litig.*,
    7 F.3d 357 (3d Cir. 1993)  ..............................................................................7

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ........................................................................12

*In re The First Union Sec. Litig.*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ........................................................11

*Foster v. DeLuca*,
    545 F.3d 582 (7th Cir. 2008) ........................................................................15

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)......................................................12, 13

*In re Harley-Davidson, Inc. Sec., Litig.*,
    660 F. Supp. 2d 969 (E.D. Wis. 2009).............................................................2

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ................................................13

*Higginbotham v. Baxter Int'l, Inc.*,
    2005 WL 1272271 (N.D. Ill. May 25, 2005)................................... 13-14

*In re Hutchinson Tech., Inc. Sec. Litig.*,
    536 F.3d 952 (8th Cir. 2008) ................................................6

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
    2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) ................................1, 13

*J & R Mktg., SEP v. Gen. Motors Corp.*,
    549 F.3d 384 (6th Cir. 2008) ................................................14

*Johnson v. Tellabs, Inc.*,
    262 F. Supp. 2d 937 (N.D. Ill. 2003) ................................................15

*Krim v. BancTexas Group, Inc.*,
    989 F.2d 1435 (5th Cir. 1993) ................................................3

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ................................................13

*In re Midway Games, Inc. Sec. Litig.*,
    332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................9, 14

*In re Netflix, Inc. Sec. Litig.*,
    2005 WL 1562858 (N.D. Cal. June 28, 2005) ................................................12

*Ottmann v. Hanger Orthopedic Group, Inc.*,
    353 F.3d 338 (4th Cir. 2003) ................................................11

*In re Oxford Health Plans*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ................................................13

*Panasuk v. Steel Dynamics, Inc.*
    2009 WL 5176193(N.D. Ind. Dec. 21, 2009) ................................................9

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ................................................12, 13

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ................................................3

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...................................................13

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) .................................................11

*Schulz v. Tomotherapy, Inc.*,
   2009 WL 2032372 (W.D. Wis. July 9, 2009) ........................14

*Starr v. !Hey, Inc.*,
   2003 WL 21212596 (N.D. Ill. May 23, 2003).........................15

*Takara Trust v. Molex, Inc.*,
   429 F. Supp. 2d 960 (N.D. Ill. 2006) ...................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................10, 13

*Thornton v. Micrografx, Inc.*,
   878 F. Supp. 931 (N.D. Tex. 1995) .........................................3

*In re Trex Co. Sec. Litig.*,
   454 F. Supp. 2d 560 (W.D. Va. 2006) .....................................3

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................12

*In re Visual Networks, Inc. Sec. Litig.*,
   217 F. Supp. 2d 662 (D. Md. 2002) ........................................3

*W. Pa. Elec. Employees Pension Trust v. Plexus Corp.*,
   2009 WL 604276 (E.D. Wis. Mar. 6, 2009) ............................9

*Waldock v. M.J. Select Global, Ltd.*,
   2005 WL 3542527 (N.D. Ill. Dec. 27, 2005).........................15

*Wielgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir. 1989) ..................................................9

*In re Zumiez Inc. Sec. Litig.*,
   2009 WL 901934 (W.D. Wash. Mar. 30, 2009) .......................6

## FEDERAL STATUTES

15 U.S.C. § 78(u)-4(b)............................................................2, 3

15 U.S.C. § 78(u)-5(e) ..................................................................................................................9

**Introduction**

In its complaint, plaintiff challenged as "fraud" 43 block-quoted statements made by defendants (collectively "Anixter"). Anixter demonstrated in its motion to dismiss that most of the pleading simply contrasts relatively positive statements from the first half of 2008 with less positive statements after the steep economic downturn of later 2008—in other words, "fraud by hindsight." As another court in this Circuit recently observed, courts "would have to conclude that almost every company in the fall of 2008 was run by fraudsters because their predictions would have been knocked down by the dramatic recession that ensued." *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, 2010 WL 1287058, at *17 (E.D. Wis. Mar. 30, 2010).

In response, plaintiff jettisons nearly all of its complaint. Most of the block-quotations make no appearance in plaintiff's response. Rather, plaintiff now focuses on:

> *[T]he core of plaintiff's claims against [Anixter]*, *i.e.,* that the organic growth projection of 8-12% [Anixter] gave to the market was without a reasonable basis (and achieving it was becoming more remote as the economy soured), and that defendants' fervent and repeated denials that Anixter was being negatively [a]ffected by the slowing economy were false and misleading.

(Dkt. No. 46, Pltf.'s Opposition ("Opp.") at 14-15.) This new focus does not save the pleading.

Plaintiff nowhere identifies *any* "organic growth projection of 8-12%" made by Anixter for the year 2008. In fact, the very statements plaintiff references show that Anixter *did not* make such a prediction, but rather told investors that "8-12% organic growth" was a *long term goal* and that "[a]ny given quarter or any given time period might be a little above or below that." (Ex. G, Oct. 23, 2007 Tr. at 9.) That generalized goal—a protected forward-looking statement—was not a guarantee of performance in particular quarters of 2008.

The remaining "core of plaintiff's claims" is likewise hollow. The very statements plaintiff challenges show that Anixter disclosed *throughout* 2008 that it was "negatively affected by the slowing economy" in some respects, particularly in the Europe OEM business that is plaintiff's focus. That Anixter did not paint a completely negative picture does not establish "fraud." As already shown, plaintiff does not allege that Anixter misreported its results showing some successes throughout the first half of 2008, in addition to some offsetting challenges.

Nor does plaintiff's narrowed focus help it establish the required "strong inference" of scienter. Even assuming that plaintiff has sufficiently alleged a misstatement, nothing in the complaint establishes that Anixter *knew* or *had reason to know* that any statement it made was

false.   Plaintiff's "confidential witnesses," at most, suggest that Anixter encountered softer performance at a single business unit, Europe OEM, which comprised only 10% of the company's sales.   The statements plaintiff challenges, however, concern Anixter's *entire business.*  There is no compelling inference that Anixter knew that its statements about its future performance as a whole were misleading, or that slower sales in one of its lines would not be offset in the broader mix of its businesses.   Plaintiff's allegations of insider stock sales are insufficient under established Seventh Circuit law.   The Court should dismiss with prejudice.

<u>Argument</u>

I.      **Count I Should Be Dismissed.**

   A.      **No Misrepresentation Is Alleged At The "Core" Of Plaintiff's Complaint.**

      1.      **The alleged "8%-12% organic growth" statements are not actionable.**

   Under the PSLRA, the plaintiff must "specify *each* statement alleged to have been misleading [and] the reason or reasons *why* the statement is misleading."  15 U.S.C. § 78(u)-4(b) (emphasis added); *see also In re Harley-Davidson, Inc., Sec. Litig.*, 660 F. Supp. 2d 969, 983 (E.D. Wis. 2009) (plaintiff must "identify *each* false or misleading statement") (emphasis added).   Plaintiff, therefore, may not *plead generally* that Anixter provided "guidance of 8% to 12% organic growth for 2008," as it does throughout its complaint (*e.g.*, ¶¶ 4, 6, 15, 57, 108), but must identify the *specific* statements it challenges.   The complaint identifies only *four* alleged statements about "8% to 12% organic growth for 2008."  None establishes a misrepresentation:

   **2007.**   Plaintiff alleges that "[a]s early as mid-2007, defendants began telling investors that, despite declining economic conditions, Anixter expected to achieve organic growth of 8% to 12% and gross margins of 24% in 2008."  (Cmplt. ¶ 42; *see also id.* ¶ 108.)   Plaintiff nowhere *quotes* such a statement or identifies more specifically *when* or *where* it was made.  It cannot.  As Anixter demonstrated in its motion to dismiss, the statement that plaintiff references (and thus incorporates) disclosed that Anixter ***did not*** provide "guidance of 8% to 12% organic growth for 2008."   To the contrary, an analyst asked whether Anixter was providing 8%-12% organic growth guidance for 2008 and Anixter's CEO responded:

> I think that still remains our *target and we've never really assigned that, Noelle, to any given time period.*  But [we] have looked at it kind of as an intermediate, you know, *couple of year outlook for the business.  Any given quarter or any given time period might be a little above or below that.*

(Ex. G, Oct. 23, 2007 Tr. at 9, emphasis added.)

Thus, Anixter expressly advised that it was *not* making a firm projection for 2008 or for any other period, that the 8%-12% figure was only a *multi-year target*, and that actual results could vary.  Precisely these types of "soft" targets or "vague statements predicting growth" have been held inactionable in a multitude of cases.  *See, e.g.*, *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (statement projecting "expected annual growth rate of 10% to 30% over the next several years" was not actionable "because the market price of a share is not inflated by vague statements predicting growth").[1]

Recognizing that the 2007 statement dooms its claims, plaintiff has moved to prevent the Court from considering it.  (Dkt. No. 49.)  But if the notion that Anixter made a firm projection of "8% to 12% organic growth" is at the "core" of the complaint, plaintiff must identify the statement and the Court must consider it.  15 U.S.C. § 78(u)-4(b).  Otherwise, the Court must disregard the allegation entirely, leaving no foundation for the claim that Anixter projected "8% to 12% organic growth for 2008" or "reiterated" such an expectation during the year.

**January 2008.**  Plaintiff next quotes a portion of a January 29, 2008 conference call in which an analyst asked whether the company believed it would continue to see "growth in that let's say nine to 11% range continuing ahead here in Europe."  (*Id.* ¶ 52.)  Anixter's CFO responded "we are still comfortable driving the kind of growth we have driven."  (*Id.*)  Three observations are immediately apparent:  (i) the quoted statement concerns only *Europe*, not the alleged company-wide projection that plaintiff actually challenges; (ii) the statement does not concern *organic* growth at all, but only growth generally—there is no reason to assume that every mention of "growth" is "organic," especially since Anixter discloses both "organic" and "reported" revenue figures (*see* Dkt. No. 44, Def. Mem. ("Mem.") at 4); and (iii) the exchange is indefinite and does not specify any time period.  Plaintiff's allegation that this statement "confirmed" a previous *company-wide* 8-12% *organic* growth projection for *2008* is unsupported by the pleading.

---

[1] *See also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws."); *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 935 (N.D. Tex. 1995) (statement that defendant was "comfortable with Wall Street estimates of 35% to 40% revenue growth" for the year not actionable); *In re Trex Co. Sec. Litig.*, 454 F. Supp. 2d 560, 577 (W.D. Va. 2006) (statement of "expect[ed] 20-25% revenue and earnings growth" not actionable); *In re Visual Networks, Inc. Sec. Litig.*, 217 F. Supp. 2d 662, 667 (D. Md. 2002) ("prediction that revenues would grow by 50% in 2000 and 2001" not actionable).

**April 2008.**  On April 22, 2008, Anixter announced its Q1 results, including organic revenue growth of 7%.  (Ex. L, Apr. 22, 2008 P.R. at 1; Cmplt. ¶ 61.)  Anixter stated:  "Adjusted for holidays, the organic growth was 8% which is in line with the lower end of our 8% to 12% organic growth target range."  (Ex. M, Apr. 22, 2008 Tr. at 2; Cmplt. ¶ 64.)  Plaintiff does not contend that Anixter misstated the reported result.  The only question, therefore, is whether the disclosure represented a *prediction* that Anixter would continue to achieve the same result on a quarterly or full-year 2008 basis, as plaintiff contends.  Nothing in the statement so indicates.  In fact, on the very same day, Anixter warned that "[s]hort-term macro-economic conditions ***may slow our organic sales growth from the rates of the past couple of years***."  (Ex. L, P.R. at 3; (emphasis added).)  Thus, rather than "reiterating" any prior projection, Anixter expressly warned that it foresaw potential *slowing* in its organic growth.

**July 2008.**  The final alleged "organic growth" statement was on July 22, 2008, when Anixter announced its Q2 results.  Consistent with its April warning, Anixter reported that it had achieved 4% organic growth in the quarter.  (Cmplt. ¶ 74.)  Turning to the next quarter, *Anixter told investors that it did **not** expect to achieve 8% to 12% organic growth, but only that "[i]f we achieve a modest level of consecutive quarter growth it will move our third quarter year-on-year growth rates **closer to our longer-term target** of 8 to 12 percent yearly growth."  (Ex. O, July 22, 2008 P.R. at 3) (emphasis added).)  The plain implication of that statement is that Anixter did *not* expect to reach its long-term target, but only get "closer" to it, and then only "*if*" it first achieved other goals.[2]  In sum, plaintiff's allegations and the statements it references nowhere establish that Anixter ever told investors that it expected to achieve "8% to 12% organic growth for 2008."

### 2.  Anixter did not deny it was "being negatively [a]ffected by the slowing economy."

Plaintiff's remaining "core" allegation—that Anixter made false "fervent and repeated denials that [it] was being negatively [a]ffected by the slowing economy"—is likewise contradicted by plaintiff's own allegations and the statements it incorporates.

In its brief, plaintiff makes clear that its only claim of poor performance concerns Anixter's "Europe OEM" business.  Plaintiff's allegation is that Anixter knew that its Europe OEM line was encountering slower performance, but failed to disclose that fact, rendering false

---

[2] Plaintiff quotes from contemporaneous analyst reports that make the same point.  According to plaintiff, one analyst described 8%-12% organic growth as a "longer-term target," not guidance for 2008 results, and another described the same goal as a "target range over the economic cycle."  (Cmplt. ¶¶ 82, 95.)

positive statements that it made about its business as a whole during the first half of 2008. (*E.g.*, Opp. at 14-15.)  There are at least two fatal flaws rendering this theory "implausible" under the standards of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and the PSLRA.

*First*, Anixter *affirmatively disclosed* throughout 2008 that it was encountering difficulties in both Europe and in its OEM line:

> January 29:  Anixter discloses that Q4 2007 ***organic revenue growth in Europe was "flat"*** as compared to the same quarter in 2006.  (Ex. I, Jan. 29, 2008 P.R. at 2; Cmplt. ¶ 47.)

> April 22:  Anixter discloses a "***decline in gross [profit] margins***" stemming from the "OEM Supply business in Europe."  (Ex. M, Apr. 22, 2008 Tr. at 3; Cmplt. ¶ 64.)
>
> Also discloses that a ***decline in European "operating margins"*** is "largely ***within the OEM supply business***."  (Ex. L, Apr. 22, 2008 P.R. at 2; Cmplt. ¶ 63.)

> July 22:  Anixter discloses that in the "***OEM supply business, we continue to feel some margin pressure from steel price increases***.  While we have succeeded in negotiating price increases with our customers . . . those increases tend to lag the continued run up in steel prices."  (Ex. P, July 22, 2008 Tr. at 6; Cmplt. ¶ 77.)
>
> Also discloses, ***in "OEM supply," the "UK market is beginning to slow*** a touch because there tends to be some talk about some macroeconomic factors there."  (Ex. P, July 22, 2008 Tr. at 12; Cmplt. ¶ 79.)

*Second*, the fact that Anixter reported some positive results and trends at the *company as a whole* in the first half of 2008 does not mean that Anixter claimed that *every* business line and location was "unaffected by the slowing economy."  Plaintiff's own allegations establish that the Europe OEM line it focuses upon represented no more than 10% of Anixter's sales.  (Cmplt. ¶ 39.)[3]  Plaintiff does not claim that the slowing economy negatively affected all of Anixter's *other* business units uniformly, or that Anixter misreported the positive *company-wide* results that it posted in Q1 and Q2.  Simply put, it does not establish "fraud" to contrast an alleged

---

[3] Plaintiff sometimes uses a figure of 20% in its brief, but paragraph 39 of the complaint establishes that *all* of Anixter's worldwide OEM business represented 18% of company revenue, and 56% of that OEM business was in Europe, meaning that Europe OEM represented about 10% of all company revenue (56% of 18% is 10.08%).  Plaintiff's 20% figure appears to refer to *all* OEM sales worldwide (18%) or perhaps *all* Europe sales in all product lines (22%).

problem in a smaller unit with positive statements about company-wide performance or the performance of other business units.[4]  Plaintiff, however, does just that.

For example, plaintiff challenges Anixter's January 29 statement that "early indications" from 2008 suggested "solid trends for our business despite the economic uncertainties in other parts of the economy."  (Cmplt. ¶ 49.)  The complaint does not allege with the requisite specificity *how* or *why* that *full company* statement was false, even assuming that growth in Europe OEM was slower (as was disclosed).  Nor does the complaint allege any falsity with regard to Anixter's statement that there had been a "disconnect between the broader markets negative economic news and the fact that [Anixter] performed so strongly in [Q407]" and that the "disconnect continues into 2008."  (*Id.*)  The complaint does not allege, for example, that Anixter had not, in fact, experienced a "disconnect" between broader economic conditions and its *overall* earnings results through January 29, 2008.

Likewise, Anixter was plainly speaking about its *company-wide* performance in its April 22 statement that "[t]he multiple end markets we serve, the diversity of industries in which our customers operate, and the broad geographies over which our business is conducted have given us the ability to sustain overall growth despite certain economic concerns."  (Cmplt. ¶ 61.)  Far from claiming that it was immune from an economic downturn, Anixter disclosed that its varied businesses only helped it "*mitigate* the effects of the current economic slowdown."  (*Id.* ¶ 64.)  The complaint does not allege that Anixter could not, in fact, "sustain overall growth" because of its varied businesses, nor does it challenge the audited financial results showing that Anixter in fact *achieved* growth throughout 2008.  (*See* Mem. at 13.)

Similarly, on July 22, Anixter's statement that it had not then "observed any *broad-based* negative trends" expressly applied to the *entire company's* "business outlook."  When it came to the specific Europe OEM business line, Anixter expressly disclosed that it was experiencing "margin pressure from steel price increases," that it was trying to counteract that issue, but that

---

[4] *See, e.g., In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) ("[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard."); *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) ("Plaintiffs have failed to plead the falsity of the Defendants' statements and accounting fraud with the particularity demanded by the PSLRA" where "[p]laintiffs repeatedly attribute specific nationwide information and statistics regarding Chubb's performance to former employees who worked in local branch offices."); *In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, *9 (W.D. Wash. Mar. 30, 2009) (holding that anecdotal statements from confidential witnesses regarding the performance of their own stores "hardly raise an inference that the alleged problems were widespread throughout the Company").

its efforts "tend to lag" economic circumstances, and that "macroeconomic factors" were affecting its UK OEM sales.  (Ex. P, July 22, 2008 Tr. at 6, 12; Cmplt. ¶ 77, 79.)

Thus, Anixter never claimed that *no part* of its business was "being negatively [a]ffected by the slowing economy."  To the contrary, Anixter disclosed that the parts of its business singled-out by plaintiff were, in fact, suffering those effects.  No misstatement is alleged.

### B.    Plaintiff Does Not Allege Any Other Actionable Misrepresentation.

Anixter established in its opening brief that plaintiff has failed to allege an actionable misrepresentation with respect to any other statement it challenges.  (Mem. at 10-27.)  Plaintiff has no convincing response.

**January and February 2008.**  (Opp. at 11-12)  Plaintiff points to some generalized and relatively positive statements from Anixter in this period, but nowhere alleges with particularity why those statements were *false*.  Plaintiff does not contend that Anixter lacked a "strong pipeline" or a "solid backlog" of orders *as of January and February 2008*, or that Anixter did not, in fact, expect growth to continue in Europe at that time.  Plaintiff's confidential witnesses have nothing to say about January and February 2008.  (Cmplt. ¶¶ 69-71.)

Plaintiff responds that Anixter supposedly "knew that a slowdown in the OEM market—particularly in the U.S. and European automotive industries—had begun to take hold in late 2007."  (Opp. at 12.)  But of course, Anixter disclosed "flat" organic revenue growth in Europe in January.  (Cmplt. ¶ 47.)  And, in all events, the allegations that plaintiff relies upon to support this argument (*id.* ¶¶ 59 & 106) are plainly insufficient.  Paragraph 59 alleges in a conclusory fashion that *everyone* knew that the automotive industry was slowing in early 2008.  This is plainly insufficient.[5]  Paragraph 106 says even less, alleging that Anixter made disclosure about "economic uncertainty . . . related to the credit markets" in *October 2007*.  A disclosure in October 2007 cannot show that Anixter was hiding the same facts in January 2008.  No actionable misstatement from this period is alleged.

---

[5] *See, e.g., In re Donald J. Trump Casino Sec. Litig. - Taj Mahal Litig.*, 7 F.3d 357, 377 (3d Cir. 1993) ("defendants did not violate the securities fraud laws merely by failing to alert investors to the obvious implications of the already weakened economic conditions in the Northeast"); *see also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (defendant "was not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain"); *Baron v. Smith*, 380 F.3d 49, 57 (1st Cir. 2004) ("It is not a material omission to fail to point out information of which the market is already aware.").

**April 2008.**   (Opp. at 12-13.)   Here plaintiff focuses (at 13) on the company-wide performance statements discussed above, such as that some business unit successes were "mitigating some of the effects of a slowing economy." (Cmplt. ¶ 64.)   As discussed, plaintiff's allegations focused on issues at Europe OEM do not render false statements about mitigation efforts.   Plaintiff also claims (at 13) that Anixter represented that the OEM "situation was 'quickly fixing itself,'" but plaintiff has (once again) distorted Anixter's actual statement.   The comment plaintiff references expressly concerned copper prices and the "the industrial wiring and cable side" of Anixter's business, *not OEM*.   (Ex. M, Apr. 22, 2008 Tr. at 7-8.)[6]   Plaintiff alleges no misstatement concerning copper prices or the wiring and cable business.

Plaintiff also focuses here on its "JLR" allegations, but, as established in the motion to dismiss (Mem. 13-14), nothing in those allegations (linked to CW1 and CW2) describes information known to Anixter *as of April 22* that was inconsistent with the disclosures the company *actually made*, including disclosures of pricing pressure in the Europe OEM line.   That Anixter allegedly paid JLR $3 million (less than 1% of its 2008 profits after tax) in Q3 2008 does not support a material misstatement.

**July 2008.**   (Opp. 14-16.)   For Anixter's July statements, plaintiff merely references (at 14) its "core" allegations, addressed in detail above.   Plaintiff does not even attempt to argue that any other statement in July supports its action.   Plaintiff leaves largely unaddressed the serious misreadings and misquotations of Anixter's July statements established in the motion to dismiss, complaining that Anixter "quibble[s] with grammar."   But Anixter made no "quibble"—the PSLRA requires a close examination of Anixter's *actual words*, not plaintiff's misconstructions. The complaint fails that test.

### C.      Anixter's Forward-Looking Statements Are Protected by the PSLRA.

Plaintiff fails to plead that Anixter made any false projection.   But even if it had, any such projection, along with every other forward-looking statement alleged in the complaint, would be protected by the PSLRA's statutory safe harbor.   (*See* Mem. at 19-23.)

---

[6] During the April 22, 2008 earnings call, analyst David Mathney asked Mr. Eck whether Anixter was taking "pricing actions" on the "data cabling side" and "industrial wire cable" of its business.   (Ex. M, Apr. 22, 2008, Tr. at 7.)   Mr. Eck responded that the "pricing actions" were "primarily with respect to our OEM supply business." (*Id.*)   Mathney then asked *again* about the "*industrial wiring and cable* side," asking whether Anixter anticipated that the price of *copper* would drive up prices in that business. (*Id.*) Mr. Eck replied that Anixter was seeing those higher copper prices "pass through," and it was only "a short term anomaly" that Anixter did not see that effect earlier.   (*Id*. at 8.)

As an initial matter, plaintiff incorrectly argues that whether cautionary language is sufficient "is not resolvable on a motion to dismiss."  (Opp. at 18-19.)  To the contrary, the PSLRA expressly provides otherwise.  *See* 15 U.S.C. § 78u-5(e).  Following the PSLRA, numerous courts in this district and elsewhere have decided this issue on motions to dismiss.  *See, e.g.*, *Panasuk v. Steel Dynamics, Inc.*, 2009 WL 5176193, at *8-9 (N.D. Ind. Dec. 21, 2009) (holding that cautionary statements made by defendants were meaningful).[7]

Moreover, Anixter's cautionary language was specifically tailored to not only the particular forward-looking statements alleged in the complaint, but also to the very risks that plaintiff alleges came to pass—namely that the deteriorating overall economic environment negatively impacted Anixter's earnings results.  As plaintiff itself concedes, Anixter warned repeatedly that "future performance could be subject to economic downturns."  (Opp. at 19.)  Anixter also continually warned investors throughout 2008 that Europe OEM was encountering difficulties.  (*See supra*, Part I-A-2.)  Anixter additionally warned throughout 2008 that it was being affected by the economic slowdown:  in April it said it had to that point been able to "mitigate" those economic effects to a "degree" and in July it acknowledged that "there are continuing concerns about weakness in our economy," economic effects that were negatively impacting the company's enterprise cabling and OEM businesses.  (*See supra* Part I-A-2; *see also* Mem. at 21-22.)

Plaintiff argues in response that Anixter's warnings were too "generalized."  (Opp. at 19-20.)  This is not so, as shown above.  In any event, the very basis of plaintiff's complaint is a "generalized" economic downturn and Anixter's supposed failure to warn that it would be affected.  The flaw is not in Anixter's cautionary statements (which disclose substantial detail about company-specific matters, *e.g.*, Ex. F, 2007 10-K at 4-5), but rather in the very premise of plaintiff's complaint.[8]

---

[7] *See also Desai v. Gen. Growth Props., Inc.,* 654 F. Supp. 2d 836, 847 (N.D. Ill. 2009) (holding on a motion to dismiss that certain forward-looking statements "were accompanied by meaningful cautionary language and . . . thus protected by the PSLRA's safe harbor"); *W. Pa. Elec. Employees Pension Trust v. Plexus Corp.*, 2009 WL 604276, at *8-9 (E.D. Wis. Mar. 6, 2009) (on motion to dismiss, "defendants' cautionary statements are not boilerplate or generic but, rather, tailored to the risks involved in Plexus's business"); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1167 (N.D. Ill. 2004) ("Numerous decisions in this district and elsewhere have dismissed Rule 10b-5 claims based on . . . cautionary language.").

[8] *E.g.*, *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989) ("Securities laws require issuers to disclose *firm-specific* information . . . .").

9

**D.** **Count I Fails to Plead Scienter in Accordance with the PSLRA.**

Anixter established in its opening memorandum (at 27-32) that plaintiff has failed to satisfy the PSLRA's requirement that it plead facts demonstrating a "strong" and "cogent" inference that Anixter made any statement that it knew or had reason to know was false. Indeed, because plaintiff has failed to plead that Anixter said anything actionably false at all, it can hardly plead that Anixter did so knowingly. Rather, plaintiff simply assumes that because Anixter's Q3 2008 showed slower growth, Anixter must have *known in advance* it would perform that way. This is fraud by hindsight and inadequate under the PSLRA. Plaintiff's four arguments to the contrary are incorrect.

**1.** **The post-class period statements do not establish scienter.**

Plaintiff first turns to alleged "admissions" made by Anixter after the class period. (Opp. at 21-23.) Anixter explained in its motion to dismiss (Mem. at 25-26) that none of these statements, on their face, actually "admits" that Anixter failed to disclose anything—a demonstration that plaintiff simply ignores.

Undaunted, plaintiff focuses on a statement by Anixter in February 2009 that it had "experienced a trend of decelerating growth rates . . . in the past few quarters [i.e., 2Q08, 3Q08 and 4Q08]." (Opp. at 21-22.) But there is nothing "fraudulent" about "experience[ing] a trend." The missing ingredient is a suggestion that Anixter *failed to disclose* what it was experiencing on a timely basis. Even if Anixter could recognize a "trend" from the vantage point of February 2009, it does not imply that any such trend was visible from July 2008, when the last alleged misstatement was made. Indeed, under plaintiff's own interpretation, the *first* data point of this "trend" emerged in Q2 2008, meaning that Anixter could not have, by definition, observed a "trend" during the class period.

Nor can a strong inference of scienter be inferred from the complaint's allegation that Anixter admitted it had a "detailed view" of what was happening in its businesses and saw the effects of a slowing market "pretty quickly." (Opp. at 22.) As discussed in detail in Anixter's opening brief (Mem. at 25-26), nothing in these statements suggests that Anixter learned information *and failed to disclose it* in a timely manner. To the contrary, the "pretty quickly" statement expressly refers to a slowdown that occurred *after* the last alleged misstatement in July 2008—in the "fourth quarter [Q4 2008] and in the last month of the third quarter [September

2008].” (Ex. S, Oct. 21, 2008 Tr. at 12-13.) These statements are *consistent* with an unforeseen worsening slowdown in late 2008, the *opposite* of a “cogent” inference of scienter.

### 2. The Europe OEM allegations do not establish scienter.

Plaintiff next erroneously argues that scienter is established by Anixter’s alleged knowledge of slower growth in its Europe OEM business. This argument fails. In the first place, Anixter *disclosed* difficulties in its Europe OEM business in *every* communication it made during the class period. (*See supra*, Part I-A-2.) Plaintiff cannot establish that Anixter had an “intent to deceive” based on facts that it expressly disclosed.[9]

Moreover, simply knowing about difficulties in one business in one region does not establish a free-floating inference of scienter—plaintiff must *connect* the alleged knowledge to a *false statement* with detailed and plausible allegations. *E.g.*, *In re The First Union Sec. Litig.*, 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) (“Plaintiffs must plead facts giving rise to a strong inference that a particular defendant made *a specific statement* with knowledge of its falsity.”) (emphasis added). As noted, however, most of the statements that plaintiff challenges as “fraud” concerned *company-wide* results and expectations; the complaint provides no adequate basis to infer that *those* statements were knowingly false when made merely because Anixter allegedly knew of (disclosed) difficulties at Europe OEM.

### 3. The confidential witnesses do not raise a strong inference of scienter.

Anixter explained in detail in its motion to dismiss why plaintiff’s six “CWs” do not establish a strong inference of scienter. (Mem. at 31-32.) Plaintiff ignores that showing (Opp. at 24-25), merely repeating the insufficient allegations of its complaint. Indeed, plaintiff apparently abandons four of its CWs, discussing only CW1 and CW2 in its scienter argument. But as shown, the CW1 allegations merely establish that “Anixter’s UK automotive business [OEM] declined precipitously during 2008.” (Cmplt. ¶ 69.) There is no basis to infer from that generalized statement—which does not even specify a particular month or quarter—that Anixter knew more than it disclosed as 2008 unfolded. The CW2 allegations concern the JLR issue.

---

[9] *See, e.g., Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 348 (4th Cir. 2003) (disclosure of negative information “militates against a finding that [defendants] acted with a culpable state of mind”); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1261 (M.D. Fla. 2002) (disclosure of negative information “is inconsistent with the contention that . . . defendants were acting with scienter”); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (“It is difficult to form a ‘strong inference’ of scienter from the alleged undercapitalization of a company when plaintiffs appear to concede that the company accurately disclosed its capital structure and financial obligations in its prospectus.”).

Again without any specific dates, plaintiff alleges that "it was well known . . . during the Class Period that Anixter was very likely going to have to pay" the $3 million JLR amount. (*Id.* ¶ 71.) That vague allegation cannot raise a strong inference of scienter—especially because plaintiff nowhere alleges that this $3 million issue rendered any specific statement materially false.

### 4. Defendants' stock sales do not raise an inference of scienter.

Plaintiff's last scienter argument is based on stock sales. A plaintiff *must* allege "facts that would allow an assessment of whether the trading during the class period was unusual or suspicious," in other words, "*context* showing that the applicable time period was unusual." *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (emphasis added). Here, the required context *contradicts* any claimed inference of scienter, for at least four reasons.

*First*, plaintiff does not dispute that *all* of defendants' stock sales were made pursuant to Rule 10b5-1 trading plans, and that these sales were prescheduled and automatic.[10] Plaintiff's main response (Opp. at 27) is to argue that two defendants (Mr. Eck and Mr. Grubbs) entered into new plans on July 24, 2008, during the alleged class period. (Cmplt. ¶ 119.) But the January 29, 2008 sale by Mr. Grubbs that plaintiff focuses on as the main "suspicious" sales came *before* that new trading plan, and was covered by a prior April 2007 plan expressly alleged in the complaint. (*Id.* ¶ 118.) The sales for Mr. Grubbs and Mr. Eck under the "new" 10b5-1 plans after July 22 were comparatively small in size. (*Id.*) Moreover, plaintiff concedes that the sales of the three other executives (Mr. Dul, Mr. Letham, and Mr. Meno) *were* appropriately made pursuant to Rule 10b5-1 plans entered into before any alleged "non-public facts." Plaintiff's fall-back argument that the Court should not consider the Rule 10b5-1 plans at this stage is contrary to the weight of the authorities.[11]

---

[10] Plaintiff speculates that Letham may have made one sale outside of a 10b5-1 plan on July 22, 2008, but the publicly filed Form 4 concerning this sale shows the opposite. (Ex. D, at 184 n.1.)

[11] *E.g.*, *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) (affirming dismissal, "sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious"); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (dismissing complaint, sales "were made pursuant to a non-discretionary Rule 10b-5-1 trading plan, which undermines any allegation that the timing or amounts of the trades was unusual or suspicious"); *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, *8 (N.D. Cal. June 28, 2005) (same holding). The cases cited by plaintiff do not support its position. *See e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (court did not hold that it was improper to consider 10b5-1 trading plans on a motion to dismiss); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *27 (D.N.J. Mar. 24, 2008) (inapposite because court was considering the significance of 10b5-1 trading plans as an affirmative defense to claims of insider trading under 15 U.S.C. § 78t-l).

*Second*, plaintiff has failed to allege that any executive sold a suspicious amount of stock during the class period. As demonstrated in the motion to dismiss, no executive sold more than 12% of his total holdings, and the highest-ranking executives sold less than 4% each. (Mem. at 28-29.) As shown (*id.* at 28 n.20), courts routinely reject an inference of scienter based on even larger proportions of sales; plaintiff ignores those cases. Indeed, just last month a court in the Seventh Circuit rejected on the pleadings an inference of scienter based upon a sale of 13% of holdings. *Oshkosh*, 2010 WL 1287058 at *20. Plaintiff instead argues that there is "no bright line test" in the Seventh Circuit, but plaintiff cites no case from a court in this Circuit finding an inference of scienter based on similar sales as in this case.[12] Plaintiff's footnoted argument, that the Court should not consider the defendants' vested options in considering the proportion sold, is supported by a single outlier case that pre-dates the weight of cases holding the opposite.[13]

*Third*, plaintiff has not alleged any facts showing that defendants' stock sales were out of line with ordinary pre-class period trading, an omission that, on its own, defeats any inference of scienter. *See Pugh*, 521 F.3d at 695 ("the failure to provide any context showing that the applicable time period was unusual undercuts a 'strong' demonstration of scienter"); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (same). Public SEC records show that the sales were not unusual as compared to earlier periods. (Mem. at 29-30.) Plaintiff says nothing about the pre-class period sales in its response.

*Fourth*, although plaintiff erroneously attempts to supports its scienter argument by pointing to sales by two non-defendant executives, Dul and Meno (Opp. at 26, n.19), such allegations fail because plaintiff does not allege that either executive "was in any way involved in the alleged fraudulent misconduct." *Higginbotham v. Baxter Int'l, Inc.*, 2005 WL 1272271, at

---

[12] *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960 (N.D. Ill. 2006), cited by plaintiff, in inapposite because scienter was established on the basis of intentional accounting misstatements. *Id.* at 980-81. Plaintiff makes no similar allegation here. *Takara* also cites *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 604 (7th Cir. 2006), but that case *rejected* scienter for the selling defendant, and, in all events, was vacated by the Supreme Court because the scienter standard it applied was not strict enough. *See* 551 U.S. 308 (2007).

[13] Plaintiff cites *In re Oxford Health Plans*, 187 F.R.D. 133 (S.D.N.Y. 1999). The vast majority of courts have since disagreed. *E.g.*, *Ronconi v. Larkin*, 253 F.3d 423, 435 n.25 (9th Cir. 2001) ("Stock options should be considered in calculating the percentage of shares sold"); *In re Gildan Activewear,* 636 F. Supp. 2d at 271 n.5 ("weight of the authority . . . lends credence to the position that options are to be taken into account"); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) ("options must be considered in evaluating the Defendants stock sale activities").

*8 n.6 (N.D. Ill. May 25, 2005).  Plaintiff also does not address this point in its response.  In sum, the stock sale allegations do not support an inference of scienter.

E.    **Plaintiff Has Failed to Plead Loss Causation.**

As defendants pointed out in their opening memorandum, plaintiff has failed to plead loss causation because the complaint does not specify how each misleading statement supposedly inflated the price of Anixter's stock or subsequently caused the stock to fall once discovered. (Mem. at 32.)  In its response, plaintiff points to declines in Anixter's stock after the April 22 and October 21 press release, but plaintiff has merely conflated the disclosure of *new* information (some of which was negative) with the issuance of a *corrective* disclosure rectifying a prior "fraud."  For example, it should not be surprising that Anixter's October 2008 disclosure of "slower sales" results in Q3 2008 led to a drop in Anixter's stock price.  Fatally missing from the complaint, however, is any alleged *prior* misrepresentation that would have been contradicted by the news of slower sales.  The same is true with respect to each of the other factors that plaintiff alleges led to the declines in Anixter's stock price in April and October 2008.  Plaintiff also fails to account for a substantial decline in Anixter's stock price *prior* to the time of the alleged corrective disclosures, as detailed in the motion to dismiss.  (Mem. at 32-33.)

F.    **Several of the Challenged Statements Were Immaterial Puffery.**

As defendants demonstrated in their opening memorandum, several of the alleged misrepresentations amount to no more than immaterial puffery.  (Mem. at 33; *see also* Ex. A.)  In its response, plaintiff incorrectly argues that the Court cannot determine at the pleading stage whether statements to the effect that Anixter was experiencing "strong" or "healthy" growth amount to immaterial puffery.  (Opp. at 17.)  That is incorrect, as courts routinely dismiss similar allegations.[14]

G.    **Plaintiff Engages in Impermissible Group Pleading.**

As defendants demonstrated in their opening memorandum, the complaint erroneously relies on impermissible group pleading in paragraphs 55 and 83 in order to allege liability in

---

[14] *See, e.g., In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill.  2004) (rejecting argument that puffery cannot be decided at motion to dismiss stage and citing "several appellate decisions" in support); *see also J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 395-396 (6th Cir. 2008) (affirming dismissal where representation that progress was "significant" was immaterial as a matter of law); *Schultz v. Tomotherapy Inc.*, 2009 WL 2032372, at *22 (W.D. Wis. July 9, 2009) (dismissing claim where statements such as "we expect another strong year" were non-actionable puffery).

connection with Anixter's February 21, 2008 Form 10-K and July 31, 2008 Form 10-Q.  (Mem. at 9.)  Plaintiff makes no defense of those paragraphs in its response.  (*See* Opp. at 10 n.5.)

## II.     Count II Should Be Dismissed.

As demonstrated, Count II should be dismissed for three reasons.  *First*, plaintiff has failed to allege an underlying securities law violation.  (Mem. at 33-34.)  As Count II requires such a violation, it must fail with the dismissal of Count I.  *Second*, plaintiff has failed to plead adequately that the individual defendants actually exercised general control over Anixter's operations.[15]  Rule 9(b) applies to the allegations of general control where the underlying claim sounds in fraud.[16]  Plaintiff does not even attempt to argue that it has pleaded control person liability in accordance with Rule 9(b).  *Third*, plaintiff has failed to plead that any of the defendants had specific control over any of the alleged misrepresentations other than their own statements.  For each reason, Count II should be dismissed.

## III.     The Complaint Should Be Dismissed with Prejudice.

As defendants demonstrated in their opening memorandum, if the Court dismisses the complaint, it should do so with prejudice.  (Mem. at 35.)  The sole case that plaintiff cites in opposition, *Foster v. DeLuca*, 545 F.3d 582 (7th Cir. 2008), is inapposite because it concerned a district court's decision, *without explanation*, to deny leave to amend, not a decision to dismiss with prejudice.  *See id.* at 583-585.  Because plaintiff has had ample opportunity to put forth its best allegations, but has failed to meet its burden, no further pleading should be allowed.

## Conclusion

The Court should dismiss plaintiff's amended class action complaint with prejudice.

Respectfully submitted,

Anixter International, Inc., Robert J. Eck, Dennis J. Letham and Robert Grubbs

Dated:  April 22, 2010                    By:  _/s/ David J. Bradford_____

---

[15] *See, e.g., Waldock v. M.J. Select Global, Ltd.*, 2005 WL 3542527, at *7 (N.D. Ill. Dec. 27, 2005) ("conclusory allegation that the . . . Defendants were control persons within the meaning of Section 20(a)" is insufficient); *Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) (dismissing where plaintiff "allege[d] no facts, other than the Defendants' status as shareholders, senior managers, or directors to support his conclusion").

[16] *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 958-59 (N.D. Ill. 2003) ("Because Plaintiffs' Section 20(a) claim is one of fraud, Plaintiffs must meet the heightened pleading requirements of [Rule] 9(b)."); *See also Waldock*, 2005 WL 3542527, at *6, *7.