**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GARDEN CITY EMPLOYEES' | ) | |
| RETIREMENT SYSTEM, and | ) | |
| INDIANA LABORERS PENSION FUND, | ) | |
| Individually and on Behalf of | ) | |
| All Others Similarly Situated, | ) | CASE NO.: 09-CV-5641 |
| | ) | |
| Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| ANIXTER INTERNATIONAL, INC., | ) | |
| ROBERT J. ECK, DENNIS J. LETHAM and | ) | |
| ROBERT GRUBBS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Garden City Employees' Retirement System and Indiana Laborers Pension Fund ("Plaintiffs") bring this putative class action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), on behalf of themselves and all persons other than Defendants who purchased or otherwise acquired the common stock of Anixter International Inc. ("Anixter" or the "Company") between January 29, 2008 and October 20, 2008, inclusive. On November 17, 2009, this Court appointed Indiana Laborers Pension Fund as Lead Plaintiff [36], and on January 6, 2010, Plaintiffs filed an amended complaint [39]. Before the Court is Defendants' motion to dismiss that complaint [43]. Also before the Court is Plaintiffs' motion to strike certain materials Defendants attached to their motion to dismiss [47]. For the following reasons, Defendants' motion [43] is granted and Plaintiffs' complaint is dismissed without prejudice. Plaintiffs' motion to strike [47] is granted in part and denied in part.

## I.     Allegations in Plaintiffs' Complaint[1]

Plaintiffs allege that beginning on January 29, 2008 and continuing throughout the class period, Defendants engaged in a scheme to deceive and defraud investors of the true value of Anixter's stock in violation of federal securities law.  The "core of plaintiff's claims" is that "the organic growth projection of 8-12% [Defendants] gave to the market was without a reasonable basis (and achieving it was becoming more remote as the economy soured), and that defendants' fervent and repeated denials that Anixter was being negatively affected by the slowing economy were false and misleading."  (Pl. Resp. Mot. Dismiss [46] at 14-15).  Plaintiffs contend that while Anixter's stock was artificially inflated, Individual Defendants sold off some of their own holdings for handsome gains.

Defendant Anixter is a publicly-traded Delaware corporation with its headquarters in Glenview, Illinois.  ¶ 30.  The Individual Defendants were officers of Anixter during some or all of the class period:  Defendant Robert J. Eck is President and CEO of Anixter; prior to that he was the Company's chief operating officer and executive vice president. ¶ 31.  Defendant Dennis J. Letham is Anixter's executive vice president of finance and chief financial officer, and Defendant Robert Grubbs was president and CEO of Anixter from February 1998 to June 2008, *Id*.

---

[1]  Unless indicated otherwise, all citations in this section correspond to Plaintiffs' amended complaint [39].  For present purposes, the Court accepts the allegations in the complaint as true, as precedent instructs.  See, *e.g.*, *Singer v. Pierce & Assocs.*, *P.C.*, 383 F.3d 596, 597 (7th Cir. 2004).  At this juncture, the Court takes no position on whether any of the allegations are, in fact, well-founded.  The complaint is nearly 60 pages long and includes 141 numbered paragraphs; many paragraphs are more than a page long and have numerous subparagraphs.  Furthermore, the complaint is replete with long blocks of text, quoted from press releases and scripts of conference calls.  The Court has done its best to summarize the operative facts and language that Plaintiffs consider most important.  However, the parties should give no weight to whether the Court has chosen not to include a particular quote or fact in this section of its opinion—as precedent instructs, the Court has based its analysis on its reading of the complaint in its entirety.

Anixter is a global supplier of communication products, electrical and electronic wire and cable, fasteners and other small parts used to connect voice, video, data and security systems. ¶ 2. Anixter operates through three main lines of business: (1) the Enterprise Cabling and Security Solutions ("ECS") group; (2) the Electric Wire and Cable ("EWC") group, and (3) the Operating End Markets ("OEM") group. ¶ 36. The ECS group represented approximately 54% of the Company's total revenue in 2007 and 52% in 2008. *Id*. The EWC group represented approximately 28% of revenue in 2007 and 29% in 2008. ¶ 37. The OEM group—the smallest division—represented approximately 18% of revenue in 2007 and 19% in 2008. ¶ 37. In 2007, 70% of the Company's sales were from North America, 22% were from Europe, and 8% were from other emerging markets (Latin America and Asia Pacific). ¶ 39. The majority of the OEM business (56%) is based in Europe. ¶ 37. Accordingly, simple math applied to Plaintiffs' allegations shows that about 10 percent of Anixter's sales come from its European OEM business.

### A.     Pre-Class Period Allegations

Historically, Anixter had grown its sales base through both strategic acquisitions and organic sales growth. ¶ 40. However, acquisition opportunities dried up during 2007 leaving the Company dependant on organic sales to drive its overall sales growth. ¶¶ 40, 41. But during the first parts of 2007, the Company's organic growth rate also had been in decline, falling from 22% to 19% in the first quarter of 2007 and to 17% in the second quarter. ¶ 43.

Plaintiffs allege that "as early as mid-2007, Defendants began telling investors that, despite declining economic conditions in the U.S. and abroad, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008." ¶ 42.

By late 2007, Plaintiffs allege that the U.S. and global economies were declining and credit markets were contracting. ¶ 42. In fact, in October 2007, the Company reported that there was a "significant amount of economic uncertainty * * * particularly in the U.S. related to the credit markets." *Id*. Plaintiffs allege that by the end of 2007 Anixter's sales and profits were under pressure due to slower global demand, including lower levels of non-residential construction and technology spending. ¶ 43. Moreover, Anixter's organic growth rate had continued to fall, to 9% in the third and fourth quarters of 2007. ¶ 43. In an attempt to allay investors' persistent concerns about the Company, in November 2007, the Company began aggressively repurchasing its stock. ¶ 44. This maneuver was met with some approval in the market. *Id*.

**B.      January and February 2008 Statements**

On January 29, 2008 (the first day of the class period), Anixter issued a press release announcing its financial results for the fourth quarter and fiscal year 2007. ¶ 46. The Company reported year-over-year organic sales growth of 9%.[2] *Id*. In the press release, Defendant Grubbs reported that Anixter had continued to experience "strong growth * * * from our strategic initiatives in the security and OEM markets." ¶ 47. Grubbs also reported that the Company had a "solid backlog and healthy pipeline of potential new projects and customers" both in Europe and North America. *Id*. However, Grubbs also recognized that "sales in Europe were flat as compared to unusually strong sales in the year ago quarter." *Id*. Overall, Grubbs told investors that Anixter would continue to achieve "solid sales and earnings growth" in 2008 despite deteriorating market conditions. For example, Grubbs stated:

> While 2008 begins with a well publicized, less certain overall economic environment than 2007, recent activity levels suggest the end markets we serve have remained strong and we are comfortable they will continue to present

---

[2] Plaintiffs do not challenge the accuracy of this figure or in fact any of Anixter's reported financials.

opportunities for growth in the coming year.

¶ 48.

The same day, the Company held an earnings conference call with analysts and investors to discuss the Company's earnings and operations. ¶ 49. Describing the Company's performance in 2007, Defendant Letham stated that "[o]verall end market demand remain [sic] healthy across all markets. Larger project demand generally remained robust and we continue to have good success with our strategic initiatives." *Id*. Defendant Letham stated that despite "economic uncertainty in other parts of the economy," the Company had "performed so strongly" during the last quarter of 2007. Letham stated that "early indications" suggested that the trend would continue into 2008. *Id*.; see also ¶ 51.

During the call, Defendant Letham recognized that as compared to 2006, the 2007 "year on year sales in Europe were flat" and that growth in Europe had slowed compared to prior years. ¶ 50. However, Letham said that the Company's "business activity levels in Europe remain strong" and that the Company was "optimistic" about "growth in Europe in the coming quarters." *Id*. In response to a question from an analyst about whether the Company could sustain "that level of growth in that let's say nine to 11% range continuing ahead here in Europe," Letham responded that "to answer your questions about Europe, we are still comfortable driving the kind of growth we have driven." ¶ 52.

After the call ended, the Company's stock price rose 18%, or $10.55 per share in a single day, to close at $68.85 per share. ¶ 53. That same day, Grubbs sold 14,000 Anixter shares for proceeds of $938,000. *Id*. On February 15, 2008, when the stock was between $66.91 and $68.29 per share, Defendant Letham sold 3,668 shares for proceeds of $248,199. *Id*.[3]

---

[3] The Individual Defendants sold Anixter stock at other points during the class period. In all, Plaintiffs allege that during the class period, Defendant Letham sold 37,444 shares (26.5% of his holdings, or

On February 21, 2008, the Company filed its 2007 Form 10-K for the period ending December 28, 2007, which Defendants Letham and Grubbs signed. The Form 10-K reported that the Company had experienced "strong organic growth" in 2007 and, describing 2007 as compared to 2006, reported that the Company "continues to experience strong growth in security and OEM supply sales." ¶ 55; see also Ex. K to Def. Mem., at 17.

### C. April 2008 Statements

On April 22, 2008 the Company issued a press release announcing its financial results for the first quarter of 2008. The Company reported year-over-year organic sales growth of 7%. ¶ 61. The Company also announced that its organic growth rate for Europe had fallen to only 2%. ¶ 69. However, other numbers for the quarter were positive, including a rise in sales, operating profits, and earnings per diluted share over the prior year quarter. ¶ 61.

In the press release, Defendant Grubbs discussed the Company's positive results and reported that he believed the Company would continue to succeed despite the worsening economic conditions:

> The multiple end markets we serve, the diversity of industries in which our customers operate and the broad geographies over which our business is conducted have given is the ability to sustain overall growth despite certain economic concerns. We believe that the diversity and depth of our business will continue to work to our shareholders' benefit regardless of broader economic conditions.

¶ 61. Defendant Eck echoed Defendant's Grubbs' optimism about future prospects, yet Eck

---

9.41% including stock options) for proceeds of over $2.4M, Defendant Grubbs sold 15,000 shares (9.29% of his holdings, or 3.70% including options) for proceeds of over $1M, and Defendant Eck sold 1,045 shares (7.17% of his holdings, 1.92% including options) for proceeds of over $73,000. See ¶¶ 114-115. All of the Individual Defendants' stock sales were made under trading plans adopted pursuant to Rule 10b5-1 of the Exchange Act. ¶¶ 118-119. Defendant Letham's sales were made pursuant to a plan that he adopted on April 24, 2007. Defendant Grubbs's sales were made pursuant to plans that he adopted on April 24, 2007 and July 24, 2008. Defendant Eck's sales were made pursuant to a plan that he adopted on July 24, 2008. *Id.*

warned that the Company's growth could be affected by macro-economic conditions generally and in the European OEM market specifically. "Short-term macro-economic conditions may slow our organic sales growth from the rates of the past couple of years, which when combined with the investment in these initiatives may limit near-term earnings growth. We believe, however, that continued focus, investment and successful execution on these strategies will drive full-year and longer-term growth and profitability of the business." ¶ 62. Eck reported that the Company had seen a "number of customer-specific situations where spending was reduced in response to slower economic conditions, [but] we do not believe this represents a broader trend." *Id*. Regarding growth from the European OEM market, Defendant Eck identified "some pressure in the electrical wire & cable market on a global basis and in the OEM supply market in Europe." ¶ 63. Eck predicted that seasonal upticks in sales and "pricing actions" in the coming months would mitigate these issues. *Id*. Defendant Eck also blamed the first quarter's "divergent growth rates" in part on an unfavorable impact from the timing of New Year's and Easter, not on the global economic slowdown. *Id*.

Following the press release, the Company held an earnings conference call with analysts and investors wherein the Individual Defendants expanded on these themes. Defendant Letham explained that the "geographic diversity of our business model and various company driven initiates" allowed the Company to "mitigate the effects of the current economic slowdown." ¶ 64. While there was "concern about the condition of the U.S. economy," Eck explained that the Company's performance remained "healthy" and growing. ¶ 65. Letham stated that the first quarter's "healthy 7% organic sales growth," adjusted for the holidays was "in line with the lower end of our 8% to 12% organic growth target range." ¶ 64. Eck stated that the Company had noticed "softer corporate spending" but that much of the spending decrease was "relate[d] to

specific project plans of individual customers." ¶ 65. "While some customers have reduced their production schedules, this was offset by growth with other customers and added products." *Id*. Similarly, Defendant Letham blamed a recent decline in daily booking activity in one of its product lines as "more of a seasonal pattern impact here" rather than "anything about the credit market issue" or "some broader economic issue." ¶ 67.[4]

And while Letham again recognized the problems in the North American electrical wire & cable market and the European OEM market, Letham reported that "we've experienced recent improvements in both situations over the last several weeks." ¶ 64.

Following the Defendants' April 22, 2008 statements and the disclosure of slowed growth rates, Anixter's stock price dropped $10.31 between the closing price on April 21, 2008 and the closing price on April 24, 2008. ¶ 73.

### D.    July 2008 Statements

On July 22, 2008, the Company released its financial results for the second quarter of 2008. ¶ 74. Some numbers were indicative of solid performance, for example the Company reported a 10 percent increase in sales from the first to the second quarter of 2008. ¶ 75. However, the Company reported organic sales growth of only 4% for the quarter. ¶ 74. (Overall growth, including sales growth from recently completed acquisitions, was 7% for the quarter). The Company also reported a slight decline in gross margins from the same quarter a year ago, from 24% to 23.8%. ¶ 75.

Discussing the slower organic sales growth rates, Defendant Eck said that the lower growth figure was not the result of any "broad-based negative trends." ¶ 74.

"While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and

---

[4] Plaintiffs note that Anixter's 2007 Annual Report stated that "[t]he operating results of the Company are not significantly affected by seasonal fluctuations." ¶ 11.

geographical regions where we have a business presence. We believe the overall market conditions, as they currently exist, should allow for consecutive quarter sales growth from the second to third quarter of this year. If we achieve a modest level of consecutive quarter growth, it will move our third quarter year-on-year growth rates closer to our longer-term target of 8 to 12 percent yearly growth."

*Id*.

Eck reported that he was "pleased with the 10 percent increase in sales from the first to the second quarter of this year, which despite continuing macroeconomic uncertainty, exceeded longer-term seasonal trends." ¶ 75. Eck explained that the lower sales growth rates were "modest due to the difficult comparison to last year's exceptionally strong second quarter." *Id*. While Defendant Eck reported that Anixter had experienced a slight decline in gross margins and "continued pressure from rising steel and specialty metal prices in our OEM Supply business," he told investors that operating margins had continued to improve due to increased sales and sound expense controls. *Id*. In fact, Eck reported that rising operating margins in Europe were sufficient to offset "gross margin pressures in the [European] OEM Supply business." *Id*.

In the subsequent conference call, Defendant Eck told listeners that "while there are continuing concerns about weaknesses in our economy, we are seeing good growth across our businesses and around the world." ¶ 77. According to Eck, "quote activity" was "holding reasonably steady" and the Company had not seen "big downward trends [in quote activity] anyplace." ¶ 78; see also *id*. ("Letham: * * * we have seen good quote activity in the OEM supply business * * *"). Defendant Eck closed his presentation with the words "[w]e expect the third quarter will again show sequential growth over the second quarter as well as over prior year." ¶ 77.

Defendants Eck and Letham explained that while the UK OEM supply business was being affected by "individual customers who may have slowing activity" these customers were being "offset by growth with other customers and other geographies." ¶¶ 78-79. Defendant Eck

recognized that the OEM supply market in the UK was "beginning to slow a touch" because of "macroeconomic factors" but that despite this, growth out of Europe had been "decent" overall. *Id*. Addressing the issue of continued "margin pressure from steel price increases," ¶ 77, Eck explained that "[w]hile we have succeeded in negotiating price increases with our customers * * * those increases tend to lag the continued run up in steel prices." *Id*.

During the question and answer session, one analyst asked about Anixter's ability to make forecasts about its sales and growth with precision. Defendant Letham responded:

> Basically, we don't have a lot of hard visibility. Backlog here at any point in time is typically in the range of about a month. We have pipelines on project-type activity, pipeline tools that give us project activity outlook that extend beyond that but projects are 10%, 20% or so of our enterprise and electrical wire and cable business. The real issue here is you get your bulk of your business day-to-day, short order, so there is not a lot of long term visibility.

On July 31, 2008, the Company filed its Form 10-Q for the second quarter of 2008, in which the Company recognized that its major initiatives appeared to be succeeding despite "macroeconomic uncertainty that existed during the quarter." ¶ 83.

On the morning of July 22, Anixter's stock opened at $61.50 per share. On the morning of August 1, the stock opened at $68.29 per share, an increase of 11%.

### E. Post-Class Period Allegations

The class period ends on October 20, 2008. On October 21, Anixter issued a press release announcing its financial results for the third quarter of 2008, which ended September 26, 2008. ¶ 96. The Company reported organic growth of only 2%. *Id*. Gross margins had declined further, to 23.4% (versus 24.1% in the year ago quarter). ¶¶ 91, 100.

In the accompanying press release, the Company stated: "[w]hile we experienced strength early in the third quarter, broader negative economic factors, especially in Europe, impacted sales activities late in the period." *Id*. While the quarter began favorably (July was the best

month in the history of the Company), the Company admitted that its third quarter results had been affected by "macro economic trends." *Id*. The Company explained that it had been affected by lower operating margins in Europe and a decline in sales in their OEM supply business. ¶ 97.

Following the press release, the Defendants held a conference call where they further discussed how the Company's third quarter results had been affected by the slowing global economy. ¶¶ 99-102. During the call, the following exchange took place:

> **Analyst:** Hi, good morning. Just following up on that idea, if you look at the Enterprise Ts here, where would you the project activity level is in this fourth quarter and in the last month of the third quarter? As a percentage I guess you talked about a 15 to 20% range but that's slightly more than average, what do you think it is right now?
>
> **Letham:** It's probably in the mid to low teens right now.
>
> **Analyst:** And…
>
> **Letham:** It definitely pulled in the last couple of quarters, we were probably pursing that 20% number late last year, early part of this year and I think we've definitely probably given up at least five percentage points in the mix shift there.
>
> **Eck:** I think what happens *** if you look back over the prior four years we saw a really strong growth in the enterprise business and that was in the strength of good corporate spending on projects in IT infrastructure where we tend to do particularly well because of our business model. So when the market slows the chunk of the market that we do particularly well ends up being a little bit smaller and so we see an effect from that pretty quickly in our business.

The Company attributed the decline in its gross margins to "lower year-on-year sales growth rates," "a sales mix shift resulting from slower sales in our higher gross margin OEM supply business," and the "resolution of a customer pricing dispute that reduced current quarter gross profit by $3 million or approximately 20 basis points of gross margin." ¶ 100.

Over the next five trading days, Anixter's stock fell $18.76 per share, approximately 40%, to close at $29.07 per share on October 27, 2008.

According to Plaintiffs, Eck's statement above that "we see an effect from that pretty quickly" was an admission that the Individual Defendants knew their business had been being affected by the slowing global economy months earlier. ¶ 106. Similarly, Plaintiffs allege that on February 3, 2009, Defendant Letham stated that "Anixter had experienced a 'trend of decelerating growth rates * * * in the past few quarters." ¶ 107. Because Defendant Eck had earlier stated that Anixter has a "very detailed view of what's happening in each of the end markets and each one of the geographies" it serves (*id*), according to Plaintiffs, Defendant Letham's February 3, 2009 statement was an "admission" that Defendants knew about yet failed to disclose Anixter's "decelerating growth rates."[5]

### F. Defendants' Contemporaneous Knowledge Rendering the Class-Period Statements False

Plaintiffs plead the following to support their allegations that the Defendants' had contemporaneous knowledge that their statements in January, February, April and July 2008 were false when made, and that "defendant's guidance of 8% to 12% organic growth for 2008 had no reasonable basis." ¶ 57.

First, Plaintiffs make the general allegation that the Defendants knew "[b]y 2008" that economic conditions were deteriorating and that Anixter's business was being and would be affected. Plaintiffs allege that "[b]y 2008, corporate spending, particularly for IT projects, was declining in North America and Europe. As a result, Anixter was experiencing a slowdown in sales in its enterprise cabling business, which depended largely on IT projects for sales growth." ¶ 58; 68.

---

[5] To counter Plaintiffs' allegations that after the class period, Defendants "admitted" that they had a good view of what was happening regarding Anixter's growth and prospects, Defendants rely on the above-described statement from the July 22, 2008 conference call wherein Defendant Letham said that Anixter does not "have a lot of hard visibility" going past a month in the future regarding their ability to make sales forecasts.

Plaintiffs also allege that "[t]he declining economic conditions were also impacting Anixter's OEM supply business, the majority of which was based in Europe" which depended on sales to the industrial and automotive industries. ¶ 59. "[B]y 2008, these industries were slowing dramatically as a result of the economic downturn. * * * Indeed, in January 2008, Moody's Global Corporate Finance predicted that demand in the major Western European markets for European OEMs would "stagnate" in 2008." ¶ 59; see also ¶ 68. The complaint alleges that according to "Confidential Witness" ("CW") 4, a "U.S.-based Product Planner in Anixter's OEM division," by "mid-2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling orders entirely, in order to avoid taking delivery of new inventory." ¶ 88; see also ¶ 112 (delaying of orders took place "beginning in August 2008" and continuing to September 2008). Many of the canceled or delayed orders involved one customer—Case New Holland. ¶¶ 89-90; 110. The complaint alleges that these actions were evidence of Anixter's slowing European OEM business. ¶ 89. The directions to cancel or delay certain orders were made by upper management, with input from Anixter's Vice President of Procurement and Supply Chain, Director of Inventory and Inventory Manager, for whom CW4 worked. *Id.* The alleged purpose of delaying or cancelling these orders was so that Anixter could avoid "having inventory on its books that it would be unable to push through because of the significant decline in business it was experiencing during the Class Period." ¶ 112.

In addition to the above, Plaintiffs allege that the Individual Defendants were aware of problems in Anixter's *European* OEM business specifically. Plaintiffs put forth CW1, who was a "former Credit Manager for Anixter's European Markets." According to CW1, "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110

million by the end of 2008." ¶ 69.  Similarly, Plaintiffs also allege that, according to CW3 (a "former Operations Manager for Anixter's UK operations"), "Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008.  * * * These sales trends were made known to Anixter's U.S. operations on at least a monthly basis." ¶ 86.

Furthermore, Plaintiffs allege that "[D]efendants knew, and failed to disclose that Anixter was involved in a significant pricing dispute with major European OEM customer JLR."  ¶ 70; see also ¶ 113.  According to CW2 a "former Programme Buyer for Anixter's UK operations" the dispute involved the amount of a rebate Anixter owed to JLR.  According to CW2 and CW3 it was "well known at Anixter's Spitfire Park Plat in Birmingham, UK (Anixter's main European operations) during the Class Period that Anixter was very likely going to have to pay JLR the disputed rebate amount." ¶ 71.  Ultimately, on October 20, 2008, Anixter "was forced to pay the $3M disputed amount * * * which had a material impact on the Company's earnings and gross margins." [6]  *Id*.

## II.    Additional Materials Submitted by Defendant and Plaintiffs' Motion to Strike

Along with their motion to dismiss, Defendants have filed an appendix containing 22 separate exhibits.  Defendants have relied on and referenced the bulk of these exhibits in their motion.  Plaintiffs have moved to strike or limit the Court's consideration of a number of these materials.  Before the Court can analyze the merits of Defendants' motion to dismiss, the Court must first determine what materials the Court may consider in doing so.

---

[6]  Plaintiffs also allege that "Anixter was also involved in a material pricing dispute with major OEM customer Lucent" which "resulted in decreased sales to Lucent and, ultimately, the loss of Lucent's business completely in 2009." ¶ 92.  Plaintiffs do not identify whether (and when) this dispute was taking place during the class period, or whether and when the individual defendants knew of the dispute.

A court considering a motion to dismiss in a securities fraud action must consider "the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, *Inc*. *v*. *Makor Issues & Rights*, *Ltd*., 551 U.S. 308, 322 (2007) (citing 5B C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004 and Supp. 2007)). Documents attached to a motion to dismiss fit into the first category if they are "'referred to in the plaintiff's complaint and are central to her claim.'" *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F. 3d 969, 971 (7th Cir. 2002) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp*., 987 F.2d 429, 431 (7th Cir. 1993)). Matters subject to judicial notice are those that are both "'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F. 3d 1074, 1081 (7th Cir. 1997) (quoting Fed. R. Evid. 201(b)).

Federal Rule of Civil Procedure 12(f) permits a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are generally disfavored, because they potentially serve only to delay litigation. *ABN AMRO, Inc. v. Capital Intern. Ltd.*, 2007 WL 845046, at *3 (N.D. Ill. March 16, 2007) (citing *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989)). A district court has broad discretion to grant or deny a motion to strike. *Id.* (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664-65 (7th Cir. 1992)).

### A.    Defendants' Chart of Responses to Plaintiff's Allegations

First, attached to Defendants' motion as Exhibit A is a 22-page chart titled "Reasons Why Alleged Misrepresentations in Amended Complaint Are Not Actionable." The chart

compiles each of the statements that Plaintiffs consider misleading together with a reference to the relevant portion of Anixter's motion to dismiss. The first column of the chart sets forth the alleged misrepresentation (copied from the complaint); the second column lists the corresponding paragraph number in the complaint; and the third column contains a short description of why the statement is inactionable (for example, "Immaterial puffery") along with a reference to the relevant portion of Defendants' memorandum. Plaintiffs have moved to strike the chart. In the event that the Court declines to strike the chart, Plaintiffs have submitted their own chart which adds a fourth column to Defendants' chart, indicating Plaintiffs' response to each entry.

Plaintiffs first argue that the chart should be stricken because it is not a document subject to judicial notice or referred to in the complaint and central to Plaintiffs' claims. (Pl. Mot. Strike [47] at 5). These arguments are misplaced because the chart does not purport to introduce any facts or evidence extrinsic to the complaint. Instead, the chart merely reproduces portions of Plaintiffs' complaint and references portions of Defendants' memorandum in support of their motion to dismiss.

The only ground on which Plaintiffs could challenge the exhibit is that it allows defendants "22 pages of additional argument" above the Court-ordered page limit extension. (Pl. Reply Mot. Strike [55] at 6; see also Order granting Defendants leave to file an oversized memorandum of law of up to 35 pages [42]). In response, Defendants argue that the chart is "simply a summary document intended to assist the Court in evaluating the scores of statements quoted and challenged in the complaint." (Def. Resp. Mot. Strike [54] at 3). Because Plaintiffs have submitted a response to the chart, Defendants argue that Plaintiffs would suffer no prejudice if the Court considered both the chart and Plaintiffs' response thereto.

In *K&R Ltd. P'ship. v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 52-53 (D.D.C. 2006), a district court judge was faced with a motion to strike a nearly identical document. The district court noted that for the most part, the chart at issue there "does not present any information or argument that is not contained in [defendant's filing]; it is simply the same argument from the reply presented in a different manner." *Id.* Further, the district court found that the chart "is organizational work that the Court would otherwise have to take upon itself, and it does not appear to have been an attempt by [the defendant] to evade any of this Court's rules" regarding page limits. *Id.*; *cf. King v. Enterprise Rent-A-Car Co.*, 231 F.R.D. 255, 265 (E.D. Mich. 2004) (seventeen page memorandum summarizing numerous cases cited by opposing party plaintiffs was "legal argument" that "effectively, added an additional seventeen pages to [d]efendants' brief."). While not controlling, the Court finds the reasoning in *K&K Ltd. P'Ship* to be persuasive. Furthermore, because Plaintiffs have submitted a response to Defendants' chart, any unfairness to Plaintiffs resulting from extra pages allotted to Defendants is greatly reduced. Accordingly, the Court has considered Defendants' Exhibit A and Plaintiffs' response thereto to the extent that they were helpful to the Court in deciding the instant motion to dismiss.

### B.     Forms 4 and Defendants' Chart of Stock Sales

Next, Plaintiffs take issue with Defendants' Exhibit D, which includes a three-page chart created by Defendants that shows the number of Anixter shares sold by Individual Defendants from January 2006 to September 2008. The chart is populated with information taken from Forms 4 filed by Individual Defendants during that time period. The Forms 4 themselves (191 pages of them) are attached behind the chart. According to Defendants, the Forms 4 show that Individual Defendants' stock sales during the class period were not unusual, therefore rebutting

the allegations of scienter raised in Plaintiffs' complaint.[7]

Plaintiffs argue that the Court should not consider the Forms 4 at this stage of the litigation because the complaint did not cite to any of the forms and the Forms 4 from outside the class period are not central to Plaintiff's claims. Plaintiffs argue that even if the Court were to judicially notice the existence of the Forms 4, the Court could not consider the facts reported in the Forms 4 (*i.e.*, the dates of the sales, number of shares sold, and the sale price) for their truth. Plaintiffs also argue that Forms 4 from outside the class period are irrelevant, and the Court cannot consider them for any purpose. Plaintiffs further argue that the Court cannot consider the chart summarizing the information from the Forms 4.

As an initial matter, the Forms 4 from *within* the class period do not appear to be at issue in Plaintiffs' motion to strike. The complaint includes a table, at ¶ 114, which purports to show all of the insider trades made by Individual Defendants during the class period. The complaint does not explicitly disclose the source of the information in Plaintiffs' chart. However, the entries in the chart (including the dates of sales, number of shares sold, and share price) are identical to the information found in the relevant Forms 4 from Defendants' Exhibit D. Because the information in the chart and the information in the Forms 4 from within the class period is identical, and because "the only source" of insider trading data available to plaintiffs when drafting complaints "is the Forms 3, 4, and 5 filed with the SEC," *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 133 (D. Conn. 2007), the Court can safely assume that the Forms 4 filed by the

---

[7] Plaintiffs rely on Individual Defendants' stock sales within the class period as evidence of "scienter," which is an element of a securities fraud claim. See *infra* Sec. III. The required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). One method that securities fraud plaintiffs use to demonstrate the required scienter is through insider trades made by corporate executives. As discussed in detail below, "stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008).

Individual Defendants during the class period were the source of the entries in the chart at paragraph 114 of the complaint.  Accordingly, the Forms 4 from that period are incorporated into the complaint by reference.  See, *e.g. In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1991) (discussed *infra* pp. 27-29).  Further, in their motion to strike, Plaintiffs recognize that the "Form 4s during the class period may be relevant to plaintiff's insider trading allegations" and do not direct their arguments at these forms.  (See Pl. Mot. Strike at 7; Pl. Reply Mot. Strike at 8).  Accordingly, the Court will consider the Forms 4 in Defendants' Exhibit D that show Individual Defendants' trades from within the class period.

However, Plaintiffs do move to strike the Forms 4 from *outside* the class period. Plaintiffs first argue that the forms from outside the class period are not referenced in and central to the allegations of the complaint such that they may be considered regardless of whether they are attached to the complaint.  See *Albany Bank & Trust Co.*, 310 F. 3d at 971.  The complaint does not cite to any Forms 4 from 2006 or 2007 and does not discuss any stock sales from those years.  Yet, it is clear that because they are public documents, "[j]udicial notice may be taken of publicly filed [Securities and Exchange Commission ("SEC")] documents, including Forms 3 and 4."  *In re Spyglass, Inc., Securities Litigation*, 1999 WL 543197, at *5 (N.D. Ill. 1999).  But what is "not at all clear" is whether the Court may take judicial notice not only of the existence of the Forms 4, but also of the truth of the information reported within them.  See *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1025 n.3 (N.D. Ill. 2010).

Judicial notice is premised on the concept that certain facts exist which a court may accept as true without requiring additional proof from the opposing party or parties.  "It is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence."  *General Electric Capital Corp. v. Lease Resolution Corp.*,

128 F.3d 1074, 1081 (7th Cir. 1997) (citing *York v. American Tel. & Tel. Co.*, 95 F.3d 948, 958

(10th Cir. 1996); and *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d

862, 865 (7th Cir. 1983)). Accordingly, judicial notice "'merits the traditional caution it is given,

and courts should strictly adhere to the criteria by the Federal Rules of Evidence before taking

judicial notice of pertinent facts.'" *Doss v. Clearwater Title Co.*, 551 F.3d 634, 640 (7th Cir.

2008) (quoting *General Electric Capital Corporation*, 128 F.3d at 1081).

In *General Electric Capital Corp.*, 128 F.3d at 1082 n.6, the Seventh Circuit considered

when and for what purposes a court could take judicial notice of facts from prior proceedings—

an issue very similar to one presented in the instant motion. The Seventh Circuit noted that

"some appellate decisions have refused to allow a court to take judicial notice of any

adjudicative fact in a court record for the truth of the matter asserted." *Id.* (citing *United States*

*v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (concluding that a court "may take notice of

another court's order only for the limited purpose of recognizing the 'judicial act' that the order

represents or the subject matter of the litigation"); *Liberty Mut. Ins. Co. v. Rotches Pork Packers,*

*Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (holding that a "court may take judicial notice of a

document filed in another court 'not for the truth of the matters asserted in the other litigation,

but rather to establish the fact of such litigation and related filings'"). The Seventh Circuit

agreed that "courts generally cannot take notice of findings of fact from other proceedings for the

truth asserted therein because these findings are disputable and usually are disputed." *Id.*

However, the Seventh Circuit did not impose an outright ban on judicial notice of these types of

facts, and instead concluded that "it is conceivable that a finding of fact may satisfy the

indisputability requirement of Fed. R. Evid. 201(b)." *Id.*; see also *ABN AMRO, Inc. v. Capital*

*Int'l Ltd.*, 2007 WL 845046, at *9 (N.D. Ill. March 16, 2007) ("Typically, * * * because of the

indisputability requirement, the notice of a court order is limited to the purpose of recognizing the judicial act or litigation filing; judicial notice is generally not for the truth of the matters asserted in a court document."); *Collins v. Cook County*, 2008 WL 4925009, at *7 (N.D. Ill. Nov. 14, 2008).

In *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639-640 (7th Cir. 2008), the Seventh Circuit had occasion to apply the rule from *General Electric Capital Corp.* There, the defendants had attached a publicly-filed deed to their motion to dismiss, and had used the deed to show that the plaintiff's suit was subject to dismissal because he had sold the property that was the subject of the lawsuit. *Id.* at 637-38. In response to the motion to dismiss, the plaintiff argued that he had not sold his property and that the deed attached to the defendants' motion was a forgery. *Id.* The district court took judicial notice of the deed and dismissed the complaint. *Id.* at 637. On appeal, the Seventh Circuit reversed the district court, reasoning that because the authenticity of the deed was in dispute, the court could not properly take judicial notice of it. *Id.* at 693-94. An earlier case, *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995), also illustrates the rule. In *Hennessy*, an employment discrimination case, the district court was attempting to determine the size of the defendant corporation so as to assess the applicability of a punitive damages cap under the 1991 Civil Rights Act. *Id.* at 1354. The district court had received conflicting testimony at trial, but declined to take judicial notice of an SEC filing that pegged the number on the higher end. *Id.* The *Hennessy* court affirmed this decision not to take judicial notice because the parties disputed the relevance of the SEC filings (which covered more units of the defendant corporation than the one unit specifically involved in the suit). *Id.* at 1355. [8]

---

[8] Courts from other circuits apply the same test as the one articulated in *General Electric Capital Corp.* and other Seventh Circuit cases. See, *e.g. Lustgraaf v. Behrens*, 619 F.3d 867, 885-886 (8th Cir. 2010)

On the other hand, courts have concluded that judicial notice may be taken of the contents of public record disclosure documents filed with the SEC if the facts sought to be noticed are not subject to dispute. See, *e.g. Hernandez v. Midland Credit Mgmt., Inc.*, 2006 WL 695451, at *4 (N.D. Ill. March 14, 2006) (taking judicial notice of excerpted portion of Form 10-K where no dispute existed); *Sharbaugh v. First Amendment Title Ins. Co.*, 2007 WL 3307019, at *3 (N.D. Ill. Nov. 2, 2007) (taking judicial notice of statements in form 10-K that were not in dispute); see also *In re FedEx Ground Package System, Inc., Employment Practices Litigation*, 2010 WL 1253891, at *4-6 (N.D. Ind. Mar. 29, 2010).

On the basis of the foregoing discussion, there is a strong argument for concluding that the amount of stock Individual Defendants sold in 2006 and 2007, along with the date of each sale and the price at which the stock was sold, are judicially noticeable because the Forms 4 that contain these facts are publicly-filed documents, the contents of which are not in dispute. First, neither in their motion to strike nor in their reply in support of the motion do Plaintiffs challenge the authenticity of the forms or the accuracy of the financial reporting contained in them. Instead, Plaintiffs only assert that the Forms 4 are not properly considered at this stage of the litigation. The fact that Plaintiffs apparently relied on the Forms 4 from <u>within</u> the class period as the source of their allegations regarding Individual Defendants' allegedly-improper insider trades is further evidence that the Forms 4 from <u>outside</u> the class period are accurate and trustworthy. Having relied on the Forms 4 filed in 2008 (a period during which Plaintiffs allege that Defendants were committing securities fraud), it would be passing strange for Plaintiffs to argue that similar Forms 4 from 2006 and 2007 (filed during a period in which no securities

---

(court should not have noticed fact in corporation's state regulatory filings for their truth as fact was in dispute).

fraud is alleged) are untrustworthy.[9]

However, the Court is also cognizant of the recent decision, *Jones v. Corus Bankshares, Inc.*, in which Judge Bucklo denied a defendant's request to judicially notice the fact that the defendant did not sell company stock during the period in question. 701 F. Supp. 2d 1014, 1025 n.3 (N.D. Ill. 2010) (citing *Riggs Partners, LLC. v. Hub Group, Inc.*, 2002 WL 31415721 (N.D. Ill. Oct. 25, 2002)). The court in *Jones* did not discuss the cases in which courts in this circuit have taken judicial notice of undisputed portions of SEC filings and did not categorically rule that such information is not susceptible to judicial notice. 701 F. Supp. 2d at 1025 n.3 ("Corus believes that I may take judicial notice of the fact that Glickman did not sell Corus stock during the period in question. *It is not at all clear* that this is so.") (emphasis added). In addition, it is not clear from the opinion in *Riggs Partners* whether the defendants' stock purchases were

---

[9] In their reply, Plaintiffs assert that the Forms 4 (and other documents) are "subject to reasonable dispute" and therefore not judicially noticeable because Defendants use the documents "to make extrinsic factual assertions to support competing inferences." (Pl. Reply Mot. Strike at 3-4; 6-7). Of course Plaintiffs and Defendants each urge the Court to accept a competing conclusion to which the Forms are relevant—whether or not Plaintiffs have adequately alleged scienter. While this ultimate question is disputed, the authenticity and accuracy of the Forms 4 themselves is not. Plaintiffs seem to argue that on a motion to dismiss, courts cannot judicially notice any fact that contradicts an inference alleged in a plaintiff's complaint. This of course is not the law. A fact is judicially noticeable and properly considered on a motion to dismiss if it meets the requirements of Fed. R. Evid. 201 (as well as the other requirements of the Rules of Evidence), regardless of which party's position the fact supports. By way of analogy: Take a case arising out of an early morning car accident where the plaintiff alleged that the defendant driver "could not see." On a motion to dismiss, a court could judicially notice the fact that the sun rose an hour before the crash, even though this fact goes toward contradicting the ultimate allegation in the complaint. By noticing the hour of the sunrise, the court would not necessarily be accepting the competing inference that the driver *could* see; for example, the complaint could have alleged the presence of heavy fog. But when the court decides the motion to dismiss, it takes all the facts properly before it (including those alleged and those properly noticed), accepts them all as true, and then decides if the plaintiff has stated a claim. Plaintiffs are fond of quoting the following line from *Tellabs*: "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw *from the facts alleged*." 551 U.S. at 314 (Plaintiffs' emphasis). But this quote is misleading when taken in a vacuum. In fact, the Supreme Court in *Tellabs* made clear that courts considering complaints alleging securities fraud are to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." 551 U.S. at 322.

undisputed.  See 2002 WL 31415721, at *5 n.7.  That said, *Jones* and *Riggs* represent instances in which courts in this district have considered the precise question posed in Plaintiffs' motion to strike and decided not to accept the facts reported in the Forms 4 as true.

At the end of the day, the Court concludes that it can resolve the motion to dismiss without any need to consider the Forms 4 outside the class period for the truth of the information contained in them.  As explained in detail below, the complaint is subject to dismissal for failure to adequately allege scienter irrespective of the content of the disputed Forms 4.  Thus, the Court need not express at this time a definitive view on what aspects of the Forms 4 may be judicially noticed.

However, the Court writes further to address another of Plaintiffs' arguments against consideration of the truth of the content of the Forms 4 from outside the class period.  Plaintiffs argue that these Forms 4 are "irrelevant" to determining whether Plaintiffs have stated a claim for securities fraud—presumably because Plaintiffs' allegations concern Defendants' actions during 2008 only.  (Pl. Reply Mot. Strike at 7-8); see also *Gas Tech. Inst. v. Rehmat*, 2006 WL 3743576, at * 15 (N.D. Ill. Dec. 15, 2006) (refusing to take judicial notice of information that was "irrelevant" to determining whether plaintiffs had adequately alleged a cause of action).  Because "facts subject to judicial notice are not exempt from analysis under the other rules of evidence," *Sunstar, Inc. v. Alberto-Culver Co.*, 2006 WL 6505615, at *3 (N.D. Ill. Nov. 16, 2006), Plaintiffs are correct that truly irrelevant facts are not properly considered on a motion to dismiss.  However, Plaintiffs are incorrect that Individual Defendants' trades from outside the class period would be "irrelevant" to determining the presence of scienter.  The opposite is true.  The Seventh Circuit has held that, in order to establish an inference of scienter, a plaintiff must allege "facts that would allow an assessment of whether the trading during the class period was

unusual or suspicious," in other words, "context showing that the applicable time period was unusual." *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008); *see also Higginbotham v. Baxter Int'l.,Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) ("Managers sell stock all the time * * * [if] managers sell blocs during the average month, plaintiffs can't get any mileage out of what happened in April."). For those reasons, Forms 4 showing trades made *outside* of the alleged class period would be relevant to assess whether trading during the class period is suspicious or unusual within context. See, *e.g. In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006) ("stock sales during the class period must be considered in light of his trading history"); *Malin*, 499 F. Supp. 2d at 151.[10]

---

[10] Another interesting question (not addressed by the parties) is whether the Court should decline to consider the statements in the Forms 4 for their truth because they are inadmissible hearsay. Because courts must "strictly adhere to the [ ] Federal Rules of Evidence before taking judicial notice of pertinent facts," *General Electric Capital Corporation*, 128 F.3d at 1081, inadmissible hearsay is not noticeable. It does not appear to the Court that the statements in the Forms 4 would be hearsay. Instead, the Forms 4—which Individual Defendants signed and submitted to the government under penalty of perjury—would likely qualify as either government or business records within the Evid. R. 803(6) and 803(8) hearsay exceptions, if a proper foundation were laid. See *McGhee v. Joutras*, 1996 WL 706919, at *3 (N.D. Ill. Dec. 5, 1996) (SEC forms 4 subject to Rule 803(6) hearsay exception); *In re Silicon Graphics Securities Litigation*, 970 F. Supp. 746, 759 n.6 (N.D. Cal. 1997) (SEC forms 3 and 4 "may be admissible under the business and/or government records exceptions to the hearsay rule") (citing *United States v. Bland*, 961 F.2d 123, 127 (9th Cir. 1992) (holding that gun shop records kept pursuant to government requirements are admissible business records); *United States v. Central Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984) (holding that shipping reports prepared by private citizen and submitted to the government pursuant to law fell within government records exception to hearsay rule)). But in any event, the exhibits would be offered not only for their truth, but also to demonstrate the state of mind of the Individual Defendants. As such, they may well fall within the exception to the hearsay rule in Rule 803(3). See *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1246 (D. Utah 1999) (citing *In re Silicon Graphics Securities Litigation*, 970 F. Supp. at 759 n. 6 ("Alternatively, [the SEC forms] may be admissible not to prove the truth of the information contained in them, but to show the lack of scienter on the part of the defendants."). If the Court had considered the disputed Forms 4 filed by Defendants, the Court also could have considered the three-page chart that summarizes the information in those forms. Fed. R. Evid. 1006; *Amsted Industries, Inc. v. National Castings, Inc.*, 1990 WL 106548, at *22 (N.D. Ill. July 11, 1990) (collecting cases) (under Evidence Rule 1006, "charts and graphs summarizing data culled from the financial records of the parties have often been admitted in the recognition that such summaries are a reasonable and efficient means of presenting the relevant information").

### C.     Defendants' Stock Price Graph

Both Plaintiffs and Defendants have submitted their own graphs of Anixter's stock price. Defendants' Exhibit E contains an eight-page chart taken from Yahoo! Finance that shows Anixter's stock price from Jan. 2, 2008 to December 31, 2008.  The last page of Defendants' Exhibit E is a graphical representation of the data contained in the previous eight pages. Plaintiffs concede that the Court may consider the stock price *data* set out in the first eight pages of Defendants' exhibit, *Pugh*, 521 F.3d at 691, n.2 (taking judicial notice of stock prices), but contend that the Court may not consider the graphical representation of that *same data* on page nine of the exhibit.  Plaintiffs do not argue that the graph is inaccurate or misleading in any way, or explain how they will be prejudiced by the Court's consideration of the graph.  The Court will consider the entirety of Exhibit E.  *Amsted Industries, Inc.*, 1990 WL 106548, at *22.

### D.     October 23, 2007 Conference Call Transcript

Attached to Defendants' motion as Exhibit G is a transcript of an October 23, 2007 Anixter earnings conference call.  Defendants do not argue that the Court can take judicial notice of the transcript.  See *In re Neopharm, Inc. Securities Litigation*, 2003 WL 262369, at *2-3 (N.D. Ill. Feb. 7, 2003) (quoting *Abrams v. Van Kampen Funds, Inc.*, 2002 WL 1160171, at *2 (N.D. Ill. May 30, 2002) ("[earnings call] transcripts are not subject to judicial notice, as they are not 'historical documents, documents contained in public record, or reports, decisions, and regulations of administrative bodies'")).  Furthermore, neither the transcript nor the conference call that it memorializes was referred to in Plaintiffs' complaint.

Nevertheless, Defendants argue that the Court may consider the October 23, 2007 transcript.  Defendants want the Court to consider the transcript to support their position that Anixter did not, in fact, set a firm organic growth projection of 8-12% for the 2008 year.  The

October 23, 2007 transcript reflects the following exchange.

> [Analyst]: Hi. Last year around this point, I think you expressed confidence in being able to achieve an 8% to 12% organic revenue growth number in 2007. Does that remain a target in '08? Or are you kind of reevaluating that?

> [Grubbs]: I think that still remains our target and we've never really assigned that, Noelle, to any given time period. But we have looked at it kind of as an intermediate, you know, couple of year outlook for the business. Any given quarter or any given time period might be a little above or below that. That still would be our objective would be 8% to 12% organic growth.

Defendants argue that Plaintiffs have admitted that the "core" of their claims is that "the organic growth projection of 8-12% [Defendants] gave to the market was without a reasonable basis." (Pl. Resp. Mot. Dismiss at 5). However, Defendants note that Plaintiffs "nowhere *quote*[ ] and nowhere *identify*[ ] the specific statement made by Anixter in 2007 supposedly communicating" that projection. (Def. Resp. Mot. Strike at 9) (emphasis in original); see also Cmplt. at ¶ 42 ("As early as mid-2007, Defendants began telling investors that, despite declining economic conditions in the U.S. and abroad, Anixter expected to achieve organic revenue growth of 8% to 12% and gross margins of 24% in 2008."). Defendants argue that failing to specifically cite to or incorporate the October 23, 2007 conference call transcript was "artful pleading" that deprives the Court of the opportunity of evaluating the statement that forms the basis of Plaintiff's complaint in "the context in which it was made." *Id.*

In support of their argument, Defendants cite a number of federal cases that stand for the proposition that plaintiffs cannot deliberately omit reference to a key document in their complaints and then later complain when defendants introduce the document on a motion to dismiss. See, *e.g. In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1991) (Alito, J.) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."); *Weitschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003) (citing *Parrino v. FHP, Inc.*, 146 F.3d 699,

706 (9th Cir. 1998) ("On a motion to dismiss, documents crucial to the plaintiff's claims but not explicitly incorporated in a complaint can be noticed in order to prevent a plaintiff from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based."). While the Seventh Circuit only permits consideration of documents that are "referred to in the plaintiff's complaint and are central to her claim," *Albany Bank & Trust Co*, 310 F. 3d at 971, Defendants have identified two cases that appear to slightly relax the first of those requirements in the presence of certain circumstances.

In *Rosenblum v. Travelbyus.com Ltd.*, 233 F.3d 657, 661-62 (7th Cir. 2002), the Seventh Circuit considered an employment agreement to which the plaintiff's complaint had not explicitly referred. The Seventh Circuit found that consideration of the agreement was appropriate, because the plaintiff had only attached part of the contract that formed the basis of the dispute.

> "From Travelbyus' point of view, the contract under review is the combination of the Acquisition Agreement and the Employment Agreement. In moving to dismiss on the ground that the contract, read in this matter, requires that the parties resort to arbitration, Travelbyus is entitled to take the position that Mr. Rosenblum has appended only a part of the relevant instrument and to append what it contends is the remainder. It would have been impossible for the district court or for this court to evaluate the disagreement between the parties without having all of the documentation."

*Id.* Similarly, in *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009), the Seventh Circuit upheld a district court's consideration of two supplemental summary plan descriptions ("SPDs") that were "not mentioned separately in the Complaint." There, the Seventh Circuit stressed that the supplemental SPDs "serve much the same purpose as the originals," which were themselves explicitly referred to in the complaint and "central to plaintiffs' case." *Id.* The Seventh Circuit further stressed that "[t]aking into account the limited purpose to which the prospectuses were put," the district court had not abused its discretion in considering the

supplemental SPDs on a motion to dismiss. *Id.*

With those principles in mind, the Court respectfully declines to consider the October 23, 2007 earnings call transcript. Unlike the documents at issue in *Rosenblum*, *Hecker*, and *Burlington*, Plaintiffs' claims do not appear to be based—either in whole or in part—on the October 23, 2007 transcript. In their reply in support of the motion to strike, Plaintiffs clarify that the complaint "does *not*, implicitly or explicitly, reply on the October 23, 2007 conference call transcript." (Pl. Reply Mot. Strike [55] at 9) (emphasis in original). Plaintiffs point out that the complaint, at ¶ 42, alleges that Defendants first began promising 8% to 12% growth in 2008 "[a]s early as mid-2007"—months before the conference call at issue.

The case on which Defendants most heavily rely is the Third Circuit's opinion in *Burlington*. 114 F.3d at 1426. In *Burlington*, the plaintiff claimed that the district court below had erred in using cost data contained in defendant's 1994 Annual Report as a basis for its materiality analysis because the 1994 Annual Report was neither attached to, nor referred to, in the complaint. The Third Circuit examined the complaint and agreed that the complaint did not explicitly refer to or cite the report. However, the complaint did include certain cost data, but did not provide a citation or source for that data. Third Circuit found that it was "unambiguous" that the source of the cost data was the 1994 Annual Report, and therefore it was proper for the district court to consider the document. *Id*. Where it was "unambiguous" that the 1994 Annual Report was the source of the cost data in *Burlington*, here, for the reasons explained above, it is not at all clear that the October 23, 2007 conference call transcript was the initial source of Plaintiffs' allegation that Defendants' projected 8 to 12% organic growth in 2008. As the transcript is neither "referred to" in Plaintiffs' complaint nor "central" to the claims, the Court will not consider it.

### E. Anixter's SEC Filings Not Referenced in the Complaint—Exhibits B, C, F, H, N, T, U and V

Next, Plaintiffs ask the Court to strike eight SEC filings (Exhibits B, C, F, H, N, T, U and V) that are "not referred to in the Complaint nor central to Plaintiffs' claims." (Pl. Mot. Strike at 9). The Court will not strike these documents, as SEC filings are publicly filed documents subject to judicial notice whether or not they are referred to in Plaintiffs' complaint.[11] *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *1 n.4 (N.D. Ill. Sept. 21, 2005) (citing *Stavros v. Exelon*, 2003 WL 21372468, at *8 n.8 (N.D. Ill. June 13, 2003) ("The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment.")).

Plaintiffs further argue that the Court may not consider any of the statements in the eight filings for their truth. For example, Defendants cite Exhibits B and C for the proposition that "[t]he executives received stock options with expiration dates as part of their compensation." The Court did not find it necessary to accept as true any of the facts reported in Exhibits B, C, N, T, or V in order to resolve any of the issues presented in Defendants' motion to dismiss.

### F. Anixter's SEC Filings Referenced in the Complaint—Exhibits I, J, K, L, M, O, P, Q, R, and S

Exhibits I, J, K, L, M, O, P, Q, R, and S are SEC filings which admittedly form the basis of the complaint and to which Plaintiffs referred in their complaint. Plaintiffs admit that the "Court may consider the full text of these documents to prove the appropriate context" of Defendants' statements. (Pl. Reply Mot. Strike at 3).

---

[11] Initially, Plaintiffs note that because Defendants do not cite to Exhibits F and U in their motion to dismiss, they should be excluded. Plaintiffs cite no case that stands for the proposition that failing to make use of an attachment to a motion is sufficient grounds for a court to strike that document. The Court declines to strike Exhibits F and U for the reason that Defendants did not specifically discuss them; however the Court has not considered either exhibit in deciding the motion to dismiss. From the Court's own review of the motion, it appears that Defendants also do not cite Exhibit H. The Court has not considered that document either.

Plaintiffs further argue that even if the "existence, date, and contents of the SEC filings might be public record" and therefore subject to judicial notice, "any facts, calculations, and inference defendants seek to have this Court draw from them are inappropriate." (Mot. Strike at 11). Again, the Court did not find it necessary to accept as true any of the facts reported in Exhibits I, J, K, L, M, O, P, Q, R, and S in order to resolve any of the issues presented in Defendants' motion to dismiss.

Finally, because the Court has not considered any materials not properly subject to judicial notice that are extraneous to the complaint, it need not convert Defendants' motion from a motion to dismiss to one for summary judgment. See *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993); *Gas Technology Inst. V. Rehmat*, 2006 WL 3743576, at *14 (N.D. Ill. Dec. 15, 2006) (citing *E.E.O.C v. Park Ridge Pub. Library*, 856 F.Supp. 477, 480 (N.D. Ill. 1994) ("the court is not required to convert a motion to dismiss to a motion for summary judgment if it excludes the extrinsic evidence from consideration")).

## III. Legal Standards

The complaint alleges two causes of action against Defendants. Count I of the complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b-5. "Section 10(b) * * * forbids the 'use or employ, in connection with the purchase or sale of any security * * * [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Tellabs*, *Inc*. *v*. *Makor Issues & Rights*, *Ltd*., 551 U.S. 308, 318 (2007) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 also forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Stoneridge Inc. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)).

Count II of the complaint is directed against the Individual Defendants only and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). That provision provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." "Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws- here, a violation of § 10(b) and Rule 10b-5." *Pugh*, 521 F.3d at 693.

Defendants move to dismiss the amended complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). A motion to dismiss tests the sufficiency of the complaint, not its merits. See, *e.g.*, *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion in securities fraud actions, courts must, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 569 n.14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic*, 550 U.S. at 563.

Allegations of fraud, such as the allegations made in support of Plaintiffs' securities fraud claim, are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280-81 (7th Cir. 1996). Plaintiffs must plead the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). They must identify the person who made the misrepresentation; the time, place, and content of the misrepresentation; and the method by which the misrepresentation was communicated. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (fraud must be pled with particularity by providing the who, what, when, where, and how).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), further raises the pleading standard for securities fraud claims. See *Teamsters Affiliates Pension Plan v. Walgreen Co.*, 2010 WL 3894149, at *2 (N.D. Ill. Sept. 29, 2010) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs I)*, 437 F.3d 588, 596 (7th Cir. 2006) ("[T]he PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading-one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b).")). Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties," *Tellabs*, 551 U.S.

at 313—it was intended "to screen out frivolous suits, while allowing meritorious actions to move forward." *Id.* at 324. "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* at 313. In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Further, in claiming scienter under the PSLRA, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir.2007). A complaint will survive a motion to dismiss only if a reasonable person would deem the inference of scienter cogent and at least as compelling as an opposing inference that could be drawn from the facts alleged. *Tellabs*, 551 U.S. at 324. The Supreme Court has emphasized that "[t]he inquiry * * * is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (original emphasis). As the Court explained, "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* at 323. Although the inference of scienter must be more than merely "reasonable," it need not be irrefutable, or even the "most plausible of competing inferences." *Id.* at 324. It must, however, be "cogent and compelling."

*Id.* The Seventh Circuit has rejected the "'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh*, 521 F.3d at 693.

As is common with similar securities actions, some of Plaintiffs' contentions are made on information obtained from confidential sources. "While the PSLRA does not require [plaintiffs] to name their confidential source, they must nevertheless describe the source 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Selbst v. McDonald's Corp.*, 432 F.Supp.2d 777, 782-83 (N.D. Ill. 2006) (quoting *Tellabs I*, 437 F.3d at 596); see also *Makor Issues & Rights, Ltd v. Tellabs Inc. ("Tellabs III")*, 513 F.3d 702, 712 (7th Cir. 2008) (permitting reliance on the assertions of unnamed confidential sources who were "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify"). While the Seventh Circuit does allow information from confidential witnesses to help generate a strong inference of scienter, see *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (citing *Tellabs III*, 513 F.3d at 712), it has expressed a healthy skepticism regarding information obtained from confidential sources. See *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007) (stating that information from confidential sources should be discounted as unreliable and is of limited value in establishing scienter).

IV.     **Analysis of Motion to Dismiss**

      A.     **Count I**

            1.     **Failure to Adequately Plead Falsity**

The first argument that Defendants direct at the complaint is that Plaintiffs have failed to specify each statement alleged to have been false or misleading and the reasons why the statement is false or misleading, as required by the PSLRA. § 78u-4(b)(1)(B). As stated above, the PSLRA's heightened pleading instructions require Plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Claiming that a particular statement was untrue is not enough— Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue. See *Premier Capital Management, L.L.C. v. Cohen*, 2003 WL 21960357, at *2 (N.D. Ill. Aug. 15, 2003) (citing *Clark v. TRO Learning, Inc.*, 1998 WL 292382, at *4 (N.D. Ill. May 20, 1998)); see also *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) (complaint deficient because it lacked "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made"). The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Tellabs I*, 437 F.3d at 595 (quoting *Novak v. Kasaks* 216 F.3d 300, 314 n. 1 (2d Cir. 2000)).

Defendants correctly emphasize that Plaintiffs must allege facts that show with sufficient particularity that Anixter made statements that were "false when made (not incorrect in retrospect)." (Def. Mem. Mot. Dismiss [44] at 7); see also *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1332 (7th Cir. 1995) ("[T]he securities laws typically do not act as a Monday Morning Quarterback. The securities laws approach matters from an *ex ante* perspective.") (internal citation and quotation omitted); *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *7 (N.D. Ill. Oct. 19, 2009) (plaintiffs required to plead facts known to Defendants

"contemporaneous to the [allegedly-false] statements"). To this point, the Seventh Circuit has specifically and repeatedly held that "there is no 'fraud by hindsight.'" *Higginbotham*, 495 F.3d at 759-60 (quoting *Tellabs*, 551 U.S. at 320 and *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)); see also *Pugh*, 521 F.3d at 694-95; *Sutton v. Bernard*, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001) ("statements made at or after the end of the class period cannot be used to show that what was said earlier was false or misleading"). As Defendants aptly phrased it, Plaintiffs cannot merely "contrast relatively positive statements from Anixter during the first half of 2008 with less positive statements from the third quarter, and argue that it was fraud—not an intervening global economic catastrophe—that explains the difference." (Def. Mem. Mot. Dismiss at 7).

As described above, Plaintiffs allege that Defendants made false or misleading statements on five occasions: (1) on January 29, 2008, when Anixter announced its results for the fourth quarter and full year of 2007; (2) on February 21, 2008, in Anixter's 2007 Form 10-K; (3) on April 22, 2008, when Anixter announced its results for the first quarter of 2008; (4) on July 22, 2008, when Anixter announced its results for the second quarter of 2008; and (5) on July 31, 2008, in Anixter's Form 10-Q for the second quarter of 2008. The Court will consider each of these instances in turn.

*January and February 2008 Statements*

As noted above, Plaintiffs' complaint is nearly 60 pages long and is replete with long blocks of text, quoted from press releases and scripts of conference calls. Accordingly, it was not an easy task for the Court to determine precisely which statements Plaintiffs consider to be fraudulent.[12] However, in their response to Defendants' motion to dismiss [46 at 11-12],

---

[12] Some courts have found complaints to be subject to dismissal under the PSLRA solely for utilizing a pleading style similar to Plaintiffs'. See, *e.g. Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453

Plaintiffs have helpfully focused the Court on those statements that they consider to be actionable. Plaintiffs allege that the following statements made on January 29, 2008 were false:

(1) that the Company continued to successfully execute its 2008 growth strategy;

(2) that the OEM business had a solid backlog of orders and a strong pipeline of new projects;

(3) that business activity levels in Europe were strong and expected to grow;

(4) that despite an uncertain economic environment, Anixter's end markets were not being affected and the recent solid trends in sales and growth would continue into 2008; and

(5) that Defendants saw nothing in its European business that would derail the 9-11% growth for that segment they expected.

Plaintiffs do not plead facts sufficient to suggest that any of the statements cited above were false or misleading when made.[13] For example, Plaintiffs do not identify any information known to Defendant Grubbs on January 29, 2008 that suggests that he knew that his statement that Anixter had a "solid backlog and healthy pipeline of potential new projects and customers" was untrue at the time that he made it. Plaintiffs allege no inaccuracy or fraud in any of Anixter's financial reporting.[14] None of Plaintiffs' six confidential witnesses offers any allegations that pertain to the January or February 2008 timeframe. See ¶¶ 69-72, 86-90, 92-93,

---

(S.D.N.Y. 2008) ("Plaintiff['s] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements."); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1198 (N.D. Cal. 2008) ("because most of the [complaint] consists of block quotations taken from statements by Defendants and securities analysts, Plaintiffs have not plead falsity with the required particularity" under the PSLRA); see also *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1244 (N.D. Cal. 1998) ("In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims.").

[13] In addition to the statements identified in Plaintiffs' response, the Court has scrutinized each of the allegations in the complaint and has concluded that Plaintiffs have failed to properly allege that any of Defendants' statements from January/February 2008 were false or misleading.

[14] For example, Plaintiffs could properly allege the falsity of Anixter's statement that "business levels in Europe were strong" if they could identify undisclosed financial information in Defendants' possession at the time that the statement was made that showed the opposite.

109-13.

Plaintiffs argue that the January 29 statements were false because Defendants knew that business in two of the market segments that Anixter served (the "OEM Market—particularly in the U.S. and European automotive industries" and the market for corporate IT projects) had begun to slow in late 2007 and already was negatively affecting Anixter's business. (Pl. Resp. Mot. Dismiss at 12). In support of this argument, Plaintiffs point the Court to allegations that generally demonstrate that these sectors of the global economy were slowing.

For example, Plaintiffs rely on their allegations in paragraph 58, which states that "[b]y 2008, corporate spending, particularly for IT projects, was declining in North America and Europe." As an initial matter, Defendants were not required to publicly disclose to the markets statements about the general condition of the global economy. See *Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (citing *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) ("The securities laws do not require firms to 'disclose' information that is already in the public domain.")). But more to the point, even if Grubbs knew that corporate spending on IT projects was beginning to decline in January of 2008, that knowledge is not sufficient to support a reasonable belief that Grubbs' statement that Anixter had a "solid backlog" of new projects and customers was false. Perhaps Anixter, at that time, did have a solid backlog of new projects despite the worsening economic conditions. Contrasting Defendants' specific statements about Anixter's business with generalized, well-known allegations about the state of the economy is insufficient to establish falsity under the strict pleading requirements of the PSLRA. *Premier Capital Management, L.L.C.*, 2003 WL 21960357, at *2.

Paragraph 58 also alleges that Defendants knew (but failed to disclose) that by January 2008, Anixter was suffering a "slowdown in sales in its enterprise cabling business."  The next sentence of Paragraph 58 is intended to provide support for this statement: "Indeed, defendant Eck later admitted after the Class Period that 'IT projects spending . . . that drives [Anixter's] cabling business tends to slow down, very obviously slows down, in difficult times.'"  It is not apparent to the Court that Eck's later statement is an "admission" that Anixter was aware (yet failed to disclose) that its IT projects business actually was slowing in January of 2008. Regardless, post-class period allegations are no substitute for facts showing contemporaneous knowledge of a statement's falsity.  *Higginbotham*, 495 F.3d at 759-60; *Sutton*, 2001 WL 897593, at *4.[15]

Regarding Anixter's OEM business, Plaintiffs allege that by 2008 the "industrial and automotive industries * * * were slowing dramatically as a result of the global economic crisis." ¶ 59.  Again, Defendants do not commit securities fraud by failing to specifically alert investors to the general condition of certain segments of the market.  *Higginbotham*, 495 F.3d at 759; see also *In re Donald J. Trump Casino Sec. Litig. - Taj Mahal Litig.*, 7 F.3d 357, 377 (3d Cir. 1993) ("[W]e hold that the defendants did not violate the securities fraud laws merely by failing to alert investors to the obvious implications of the already weakened economic conditions in the Northeast.  As the reasonable investor should have known of the economic downturn in the Northeast at that time, the inclusion of this information would not have substantively altered the total mix of information the prospectus provided to investors.  The federal securities laws, in a word, do not compel the Partnership to state the obvious."); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (defendant "was not duty-bound to disclose general industry-

---

[15] See discussion of post-class statements, *infra* Sec. IV. 2.

wide trends easily discernable from information already available in the public domain"); *Baron v. Smith*, 380 F.3d 49, 57 (1st Cir. 2004) ("It is not a material omission to fail to point out information of which the market is already aware.").[16]

The Court now turns to one of the key components of Plaintiffs' claims—namely, that the "organic growth projection of 8-12% [Defendants] gave to the market was without a reasonable basis." (Pl. Resp. Mot. Dismiss at 14). Plaintiffs' complaint does not identify with the particularity required by the PSLRA (or Rule 9(b)) the source for their allegation that by January and February of 2008, Defendants were promising 8-12% organic growth for the entire company for 2008. Instead, paragraph 42 generally pleads that by "mid-2007, defendants began telling investors that * * * Anixter expected to achieve organic revenue growth of 8% to 12% * * * in 2008." However, that allegation fails to identify which Anixter executive or executives made the statement or statements, when they were made, and the particulars of each statement. Accordingly, the Court disregards the allegation in paragraph 42. Plaintiffs may not plead generally that Anixter provided "guidance of 8% to 12% organic growth for 2008," as they do throughout the complaint. See ¶¶ 4, 6, 15, 57, 108.

The closest that Plaintiffs come for support for their "8-12%" allegation in early 2008 is from Defendant Letham's response (during the January 29th earnings call) to a question about whether he expected the "nine to 11% [growth] range continuing ahead here in Europe and then Asia Pacific, Latin America" to continue. See ¶ 52. Accepting all reasonable inferences in favor of Plaintiffs, the exchange can be read as Defendant Letham reporting that he expected to see that level of growth continuing for Europe "as we go into the next year." However, the statement cannot be stretched as far as Plaintiffs would like. Letham never said that he expected

---

[16] Plaintiffs also direct the Court to ¶¶ 60 and 106 of their Complaint. The allegations in ¶ 106 are not actionable for the same reasons as those in ¶¶ 58 and 59.

9-11% *organic* growth (as opposed to growth including acquisitions), or that he expected 9-11% growth for the *entire company*, as opposed to the regions that he identified. Further, the time period in the statement is indefinite—nowhere does Letham promise 9-11% over 2008 in its entirety.[17]

Plaintiffs' other central allegation is that Defendants "repeatedly disclaimed that Anixter was suffering any negative effects associated with deteriorating credit markets and global economic conditions." (Pl. Resp. Mot. Dismiss at 4; see also id. at 14-15). Contrary to Plaintiffs' allegations, Defendants never told investors in early 2008 that Anixter was categorically immune to the effects of a global economic slowdown. For example, in January of 2008, Defendant Letham recognized the "negative economic news" in the "broader markets," and stated that "*early indications* of our business activity continue to support a continuation of solid trends for our business despite the economic uncertainties in other parts of the economy." ¶ 49 (emphasis added). Letham's statement was a measured one; the statement itself reflects the fact that it was based only on the preliminary data then available. The complaint does not

---

[17] Defendants argue that even if they had explicitly promised "8-12% organic growth for 2008," such a statement would not be actionable under the securities laws. In support of their position, Defendants cite a number of cases that have held "vague statements predicting growth" to be nonactionable. *Raab v. Gen. Physics Corp*., 4 F.3d 286, 289-90 (4th Cir. 1993) (statement projecting "expected annual growth rate of 10% to 30% over the next several years" was not actionable "because the market price of a share is not inflated by vague statements predicting growth"); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws."). The Seventh Circuit has commented favorably on both *Raab* and *Krim*, but has not adopted a *per se* rule that predictions of future growth are immaterial and therefore not actionable. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1332-33 & n.6 (7th Cir. 1995) ("While it often may be the case that predictions of growth are not material, we hesitate to impose a *per se* rule to this effect. The Supreme Court has cautioned that materiality is typically an issue to be resolved by the finder of fact. A blanket rule that forward-looking statements are not material does not allow for the contextual, fact-specific nature of the inquiry and would potentially allow companies to engage in conjecture with impunity.") (citations omitted). Accordingly, in the Seventh Circuit it appears that forward looking statements that are false when made or made without a reasonable basis can give rise to § 10(b) and Rule 10b-5 liability, if they are material. *Id.*; *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995); see also *Iles v. Swank*, 2006 WL 1806365, at *3 (N.D. Ill. June 28, 2006); *Weiner v. Quaker Oats Co.*, 2000 WL 1700136, at *11 (N.D. Ill. Nov. 13, 2000).

identify information in Defendants' possession as of January 2008 that would render fraudulent Letham's generally positive statements about the business as a whole.[18]

Furthermore, Plaintiffs' response makes clear that its main claim of poor performance concerns Anixter's European OEM business. But that emphasis falls short for at least a couple of reasons. First, Defendant Grubbs disclosed on January 29th that organic revenue growth in Europe was "flat" (¶ 47), undermining Plaintiffs' allegation that Defendants painted an improperly rosy picture of their prospects in that market. Second, even if Defendants had failed to sufficiently account for weaknesses in Anixter's European OEM business, that division represents only 10% of Anixter's sales. Weaknesses in one (relatively small) part of Anixter's business would not necessarily render untrue positive statements about the company as a whole. See, *e.g. In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) (citing *In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542, 549-50 (8th Cir. 2004)) ("[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard."). Plaintiffs do not explain with the particularity required by the PSLRA why Anixter's European OEM business was so important to Anixter's overall financial health that declining sales there would necessarily have a material impact on the Company's bottom line. Similarly, Plaintiffs do not explain why Anixter's positive statements about its business did not take into account any problems that existed in its European OEM businesses along with other offsetting factors in other countries and with other products.

---

[18] Similarly, Defendant Grubbs stated that in spite of "a well publicized less certain overall economic environment than 2007, *recent activity levels* suggest the end markets we serve have remained strong and we are comfortable they will continue to present opportunities for growth in the coming year." ¶ 48 (emphasis added). Plaintiffs do not identify any information known to Defendant Grubbs that undercuts the proposition that then-recent activity levels suggested that 2008 would present "opportunities for growth."

*April 2008 Statements*

Similarly, Plaintiffs have not properly alleged that any of Defendants' statements from April 2008 were false or misleading. Plaintiffs challenge as fraudulent statements that Defendants made on April 22, 2008 indicating that Anixter's business *as a whole* was succeeding and would continue to succeed in the face of an economic slowdown. For example, on April 22, 2008, Defendant Grubbs reported that the "diversity and depth of our business will continue to work to our shareholders' benefit regardless of broader economic conditions." ¶ 61. During the same call, Defendant Eck reported that "any effect from the declining economic environment on Anixter was limited to specific customers and did not represent a 'broader trend' for the Company's businesses." ¶ 62. Plaintiffs' explanation as to why these and similar statements were untrue at the time they were made is insufficient.

Here again, Plaintiffs' tactic is to contrast positive statements (which again, pertained to the business as a whole) with increasingly poor performance from Anixter's European OEM business. As an initial matter, Defendants do not deny that they were aware of the increasing weakness in this segment of Anixter's business. In fact, on April 22, 2008, the Company announced that its organic growth rate for Europe had fallen to only 2%.[19] ¶ 61. Defendants discussed lower gross margins and operating margins in the European OEM supply business in the April 22, 2008 earnings call and the press release that accompanied it. See ¶ 64. Further, Defendant Eck was specifically discussing Anixter's "OEM supply businesses" when he warned that "[s]hort-term macro-economic conditions may slow our organic sales growth from the rates

---

[19] By way of contrast, the complaint reflects that many of the company-wide results Anixter reported for 1Q08 were positive. See ¶ 61 (reporting rise in sales, operating profits, and earnings per diluted share over the prior year quarter).

of the past couple of years."[20] ¶ 62. Despite these caveats and warnings regarding Anixter's OEM and European businesses, Plaintiffs hew to their argument that Defendants' positive statements about Anixter as a whole were misleading in light of the poor performance in the European OEM segment. Here again, Plaintiffs cannot explain how weakness in one relatively small segment of Anixter's business renders false generally positive statements about the business as a whole (especially when the weaknesses in the European OEM business were disclosed).[21]

The only other allegation to which Plaintiffs point to establish the falsity of Defendants' April 22, 2008 statements involves Anixter's pricing dispute with JLR, a major European OEM customer. See ¶¶ 70, 71, 113. Defendants did not disclose this dispute to shareholders until after the end of the class period. As an initial matter, the Complaint does not allege with adequate particularity that the Individual Defendants knew of the dispute at any time during the class period. The Complaint does not identify precisely when the dispute between JLR and Anixter

---

[20] CW1 reports that "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. The information provided by this witness is of little value to Plaintiffs—Defendants do not deny that they were aware of problems in their European OEM business, which they timely disclosed. CW1 does not allege that Individual Defendants knew, as of April 22, 2008, that results in that particular business line would trend downward for the rest of the year, or that such a downward trend would not be offset by successes in other businesses. The complaint also reflects the fact that Defendant Eck described a slowdown in Anixter's OEM business as a "[s]hort term anomaly" attributable in part to cycles in the commodities markets. Plaintiffs offer no allegations sufficient to suggest that this statement was false when it was made. Additionally, Defendant Eck identified "some pressure in the electrical wire & cable market on a global basis and in the OEM supply market in Europe," but predicted that seasonal upticks in sales and "pricing actions" in the coming months would mitigate these issues. ¶ 63. Defendants offer no facts that would suggest that Eck knew that seasonal upticks in sales and pricing actions would not, in fact, mitigate the "pressure" in those markets.

[21] As with the challenged January/February statements, the Court has carefully scrutinized each of the allegations in the complaint and has concluded that Plaintiffs have failed to properly allege that any of Defendants' statements from April 2008 were false or misleading. For example, Plaintiffs have failed to plead specific facts suggesting that Anixter did not, in fact "continue[ ] to make significant progress on [its] major initiatives" in Q108 (¶ 63), or that Anixter had not experienced "an improvement in conditions" between Q1 and Q2 (¶ 67).

began and when Individual Defendants became aware of it. See *id.* Instead, the complaint alleges that "JLR's pressure on Anixter [to lower prices] became even more pronounced * * * in March 2008." The complaint alleges that it was "well known at Anixter's Spitfire Park Plant in Birmingham, UK (Anixter's main European operations) during the Class Period that Anixter was very likely going to have to pay JLR the disputed amount." ¶ 71. However, Plaintiffs do not allege how or when any of Individual Defendants learned of the dispute (although Plaintiffs do allege that Eck visited the Spitfire Park plant in July 2008). *Id.* Assuming for the sake of argument that Plaintiffs have properly alleged that Individual Defendants knew of the JLR dispute on April 22, 2008, the complaint fails to properly allege facts suggesting that Defendants knew that they would lose the dispute and would have to pay JLR.

Assuming further that the complaint alleged that Defendants knew about the dispute and knew on April 22, 2008 that Anixter would have to pony up, the complaint does not adequately allege that the dispute was "material" such that Anixter was required to disclose it. Rule 10b-5 forbids a company or an individual "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The complaint alleges that "[u]ltimately, on October 20, 2008, defendants admitted that Anixter was involved in this 'pricing dispute' and was forced to pay the $3 million disputed amount during the class period, which had a material impact on the Company's earnings and gross margins." ¶ 71. The allegation that $3 million had a "material impact" on Anixter's financials (and thus the dispute was a "material fact" that should have been disclosed) is a legal conclusion which the Court is not bound to accept. See *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); see also *Twombly*, 550 U.S. at

555 (while a court must take all of the factual allegations in the complaint as true for purposes of a motion to dismiss, it is "not bound to accept as true a legal conclusion couched as a factual allegation"). Plaintiffs have not included allegations in their complaint that are sufficient to plausibly suggest that $3 million is an amount material to Anixter and the Court cannot assume that it is. For example, Plaintiffs do not identify how much revenue Anixter took in during 2008. Three million dollars almost certainly would be a material amount to a mom-and-pop grocery store, but it would not be material to an international giant like Microsoft. Where Anixter lies on the continuum of corporate financial resources should be a fact ascertainable by Plaintiffs from available, publicly-filed documents.[22] Apart from the allegations involving the JLR pricing dispute, Plaintiffs offer no other undisclosed information at Anixter as of April 22, 2008 that suggests that any of the executives' statements were false.

The Court now returns to the "core" of Plaintiffs' complaint—that Defendants were promising 8-12% organic growth for 2008 at a time when they knew that they could not possibly deliver on that goal. The April statement that Plaintiff challenges is Defendant Letham's statement that "the first quarter's "healthy 7% organic sales growth," adjusted for the holidays was "in line with the lower end of our 8% to 12% organic growth target range." ¶ 64. Nothing in the statement can be read as a projection or promise of performance for the 2008 year— instead, reading all inferences in favor of Plaintiffs, Letham here reports that Anixter had a "target range" of 8-12% organic growth, not limited to a specific time frame or division of the company. As explained above, Plaintiffs identify no facts then known to Letham that suggest

---

[22] As discussed above, Defendants attempted to cite to their SEC filings to establish that Anixter had more than $6 billion in revenue in 2008, and that the $3 million disputed amount, if it had not been paid, would have represented an increase of less than 1% in Anixter's profit for 2008. See *Higginbotham*, 495 F.3d at 759 ("securities lawyers often use a 5% change as a rule-of-thumb approach to what is 'material'"). The Court has not considered this argument, as the Court has not judicially noticed the SEC filings which establish Anixter's size for the truth of their contents. See *infra* Sec. II.

that a general organic growth projection of 8-12% (not limited to a certain time frame or division

of the company) made on April 22, 2008 would have been in bereft of a reasonable basis or in

bad faith.

<u>July 2008 Statements</u>

Like the challenged statements from the first half of 2008, the Court has considered

Plaintiffs' allegations pertaining to the statements Defendants made in July of 2008 and

concludes that none are actionable. Because Plaintiffs' discussion of the July statements in their

response focuses on their twin "core" allegations (Pl. Resp. Mot. Dismiss at 14-15), the Court

will begin there.

First, Plaintiffs essentially argue that by July of 2008, the economy had soured to such a

state that "the organic growth projection of 8-12% [Defendants] gave to the market was without

a reasonable basis." *Id*. The problem with Plaintiffs' argument is the same for the July

statements as it was for the statements from the early parts of 2008—Anixter simply did not

promise "8-12% organic growth for 2008" either in its July SEC filings, press releases, or during

the July 22, 2008 earnings call with analysts.

On July 22, Anixter reported some positive numbers, but reported organic sales growth of

only 4% for the quarter. ¶ 74. Discussing the slower organic sales growth rates, Defendant Eck

said the following:

> "While we continue to see select customer situations where sales are softer, we
> have not observed any broad-based negative trends in the various end markets and
> geographical regions where we have a business presence. We believe the overall
> market conditions, as they currently exist, should allow for consecutive quarter
> sales growth from the second to third quarter of this year. *If we achieve a modest*
> *level of consecutive quarter growth, it will move our third quarter year-on-year*
> *growth rates closer to our longer-term target of 8 to 12 percent yearly growth*."

¶ 74 (emphasis added). The plain implication of the statement is that Anixter was then not on

track to hit its "longer-term target" of 8 to 12 percent yearly growth, and assuming a "modest

48

level of consecutive quarter growth," Anixter's growth rates would move "closer" to the 8-12% range.

Plaintiffs' second "core" argument is that in July, Defendants continued to falsely deny "that Anixter was being negatively effected [sic] by the slowing economy." (Pl. Resp. Mot. Dismiss at 15). When Anixter reported its 2Q08 results, Defendants recognized that organic growth had slowed to 4% (see ¶ 74), but also reported some positive results for the quarter (see ¶ 75). With these results in mind, Anixter's executives did recognize the "continuing concerns about weaknesses in our economy." ¶ 77; see also ¶ 75 (acknowledging "continuing macroeconomic uncertainty"). However, many of Individual Defendants' July statements about Anixter's business prospects as a whole were of a positive nature. Individual Defendants opined that Anixter's business as a whole would continue to succeed in the face of the economic downturn. See, *e.g.* ¶ 74 ("While we continue to see select customer situations where sales are softer, we have not observed any broad-based negative trends in the various end markets and geographical regions where we have a business presence"); ¶ 77 ("while there are continuing concerns about weaknesses in our economy, we are seeing good growth across our businesses and around the world"). Plaintiffs have not properly alleged that these statements were false or misleading because they have failed to identify "specific, contradictory information presumably known" to Individual Defendants in July that contradicted these statements about Anixter's business as a whole. *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d at 1000. As explained below, to the extent Plaintiffs' confidential witnesses offer undisclosed information known to Defendants in July of 2008, the information regards only Anixter's European OEM business and one customer of Anixter's U.S.-based OEM business.

Individual Defendants also spoke about Anixter's OEM business and its business

prospects in Europe. The statements regarding these aspects of Anixter's business can best be described as "mixed." Defendants Eck and Letham explained that while the UK OEM supply business was being affected by "individual customers who may have slowing activity," these developments were "offset by growth with other customers and other geographies." ¶¶ 78-79. Defendant Eck recognized that the OEM supply market in the UK was "beginning to slow a touch" because of "macroeconomic factors" but that despite this, growth out of Europe had been "decent" overall. *Id.* While Defendant Eck reported that Anixter had experienced a slight decline in gross margins and "continued pressure from rising steel and specialty metal prices in our OEM Supply business," he told investors that operating margins had continued to improve due to increased sales and sound expense controls. ¶ 75. In fact, Eck reported that rising operating margins in Europe were sufficient to offset "gross margin pressures in the [European] OEM Supply business." *Id.* However, addressing the issue of continued "margin pressure from steel price increases," ¶ 77, Eck explained that "[w]hile we have succeeded in negotiating price increases with our customers * * * those increases tend to lag the continued run up in steel prices." *Id.* Defendant Letham reported "good quote activity in the OEM supply business." ¶ 78.

These statements (which again, reflect a rather mixed outlook) would be misleading only if (1) Plaintiffs could point to specific statements that were untrue or misleading; or (2) Plaintiffs could identify information known to Individual Defendants at that time that was of such a negative nature as to preclude Anixter from saying nearly anything positive about Anixter's OEM business or its prospects in Europe. The complaint fails to do either. First, Plaintiffs offer nothing to contradict any *specific* statement made by Individual Defendants in July. For example, Plaintiffs do not offer facts to suggest that Anixter was not seeing "good quote activity"

50

in its company-wide OEM supply business. (¶ 78). Again, Plaintiffs take no issue with any of Anixter's reported financials.

Instead, Plaintiffs essentially argue that Anixter's OEM supply business (especially in the U.S. and Europe) was doing so poorly that the positive statements Defendants made in July were misleading. (Pl. Resp. Mot. Dismiss at 15). Plaintiffs fail to offer "specific, contradictory information," *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d at 1000, presumably known to Individual Defendants in July that is sufficient to establish this proposition. Instead, the allegations they do offer (from "confidential witnesses") fail to establish much of anything.

According to CW1, a "former Credit Manager for Anixter's European Markets," "Anixter's UK automotive business declined precipitously during 2008 from £200 million in 2007 to £110 million by the end of 2008." ¶ 69. CW1 reports that Anixter's UK OEM business had fallen nearly by half "by the end of 2008," but does not offer information as to that division's performance as of July 22, 2008. As noted above, Defendants did report that Anixter's UK OEM business was "beginning to slow a touch" because of "macroeconomic factors." ¶ 79. Nothing that CW1 reports concerning Anixter's performance at year end is inconsistent with any of Individual Defendants' statements to the markets on July 22. The information provided by CW3 is more temporally specific but less specific in regard to the level of decline of Anixter's sales. CW3 reports that "Anixter's UK operations (its largest European market) saw a significant decline in OEM supply sales by June 2008." ¶ 86. The Court is left to guess what a "significant decline" in sales is. Considering the fact that in July, Defendants did acknowledge slowed sales from this division, CW3 does not provide information sufficient to suggest that Defendants' July statements were false or misleading.

Finally, the allegations from CW4—a "U.S.-based Product Planner in Anixter's OEM

division"—are insufficient to suggest that any of Defendants' July statements were false or misleading. CW4 reports that by "mid-2008, Anixter was pushing out delivery dates for OEM products previously ordered from vendors, or cancelling orders entirely, in order to avoid taking delivery of new inventory." ¶ 88. The Court is left to guess what "mid-2008" means. It is unclear whether the events described by CW4 began prior to Defendants' July 22, 2008 statements. In the next paragraph, Plaintiffs' are more specific, alleging that "by the summer of 2008, an increasing number of orders were ranked at 900" (meaning they were slated to be cancelled or delayed). ¶ 89. However, later in the complaint, Plaintiffs cite CW4 for the proposition that "*beginning in August 2008*, an increasing number of orders were ranked at 900." ¶ 112 (emphasis added); see also ¶ 111 ("According to CW4 * * * by *August and September 2008*, Anixter was pushing out delivery dates for products previously ordered from vendors, or cancelling the orders entirely, in order to avoid taking delivery of new inventory * * *") (emphasis added). The internal inconsistencies in the complaint make it impossible for the Court to assess whether the events described by CW4 began before or after Individual Defendants spoke to the market on July 22, 2008.

Furthermore, CW4's information is of limited value, because "many of" the orders that were delayed or cancelled involved one customer—Case New Holland. ¶¶ 89-90; 110-112. See, *e.g. In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) (citing *In re Amdocs Ltd. Sec. Litig.*,390 F.3d 542, 549-50 (8th Cir. 2004)) ("[e]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard."); *California Pub. Employees' Ret. Sys. V. Chubb Corp.*, 394 F.3d 126, 156 (3d Cir. 2004) ("[A]nectdotal examples of profitable customers lost of policies renewed at flat or slightly raised raises [do] not demonstrate that the rate initiative was failing"). The complaint says that "many

of" the delayed or cancelled orders involved Case New Holland, leading to the inference that there were some delayed or cancelled orders that involved other customers. However, Plaintiffs have not identified any of these other orders or customers.

Because Plaintiffs have failed to specify any statements alleged to have been false or misleading and the reasons why the statements are false or misleading, as required by the PSLRA. § 78u-4(b)(1)(B), dismissal of Count I is appropriate.

### 2. Failure to Plead Scienter in Accordance with the PSLRA

Count I also is subject to dismissal for a second, independent reason. As discussed above, the PSLRA provides that the complaint in a securities-fraud action must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). That "required state of mind" is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc*., 495 F.3d 753, 756 (7th Cir. 2007). In many ways, the analysis the Court has undertaken in Section IV.A.1. above overlaps with the scienter analysis; for if Plaintiffs have failed to properly plead that any of Anixter's statements were false or misleading, Planitiffs could hardly allege that Defendants made false statements with the required state of mind. For example, the information provided by Plaintiffs' confidential witnesses does not give rise to an inference that Defendants were acting with scienter, as the information provided by the CWs is not inconsistent with Defendants' disclosures.[23]

---

[23] Similarly, Defendants' statements regarding Anixter's European OEM business do not add to an inference of scienter. As discussed above, Defendants disclosed difficulties in this area of its business during the class period. See, *e.g. Cutsforth v. Renschler*, 253 F. Supp. 2d 1216, 1261 (M.D. Fla. 2002) (disclosure of negative information "is inconsistent with the contention that * * * defendants were acting with scienter").

With that said, the Court writes further to elaborate on why Plaintiffs complaint fails to adequately allege the required "strong" and "cogent" inference of scienter. *Tellabs*, 551 U.S. at 322-24. The two grounds on which Plaintiffs base their allegations of scienter not previously discussed by the Court are (1) Defendants' post-class period statements, and (2) Individual Defendants' stock sales during the class period.[24] The Court will discuss each of these issues in turn.[25]

First, at various places in the complaint, Plaintiffs attempt to cite to Defendants' post-class period statements as evidence that Anixter's executives knew that their statements during the class period were false or misleading. See, *e.g.* ¶¶ 86, 96-102; 106-107. For example, Plaintiffs argue that on February 3, 2009 (when the fiscal year 2008 financial results were announced), Defendants "admitted" that Anixter had experienced a "trend of decelerating growth rates * * * in the past few quarters." (Pl. Resp. Mot. to Dismiss at 21-22 (citing ¶ 107)). Similarly, after the end of the class period, Defendants allegedly "admitted" that they "have a very detailed view of what's happening in each of the end markets and each one of the geographies," and that "when the market slows, the chunk of the market that we do particularly well in ends up being a little bit smaller and so we see an effect from that pretty quickly in our business." (*Id.* (citing ¶¶ 106-107)). Plaintiffs use these "admissions" in an to attempt to show

---

[24] Additionally, throughout the complaint, Plaintiffs allege that Defendants "acted with scienter" (*e.g.* ¶ 105) or "knew" that the economic downturn was affecting the Company or that the Company would not meet its growth goals (*e.g.* ¶ 106). These sorts of "generalized and conclusory assertions do not satisfy the heightened pleading standard imposed on securities actions by the PSLRA," *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 800 (N.D. Ill. 2007), and the Court need not discuss them further.

[25] Although the Court discusses each of these issues separately, the Court wishes to make clear that it has not "scrutinize[d] each allegation [regarding scienter] in isolation" but instead has assess[ed] all the allegations holistically" to determine whether Plaintiffs properly alleged scienter. *Tellabs*, 551 U.S. at 326.

that Defendants knew during the class period that Anixter's business was being affected by the economic downturn, yet failed to disclose that fact. (*Id.*).

As explained above, the Seventh Circuit has specifically and repeatedly held that "there is no 'fraud by hindsight.'" *Higginbotham*, 495 F.3d at 759-60. Post-class period statements by Defendants recognizing that their business has experienced a downturn do nothing to suggest that Defendants had contemporaneous knowledge (yet failed to disclose) that their company was earlier experiencing a downturn. That said, it is not the case that post-class period statements are never relevant in a securities fraud action. For example, in *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009), cited by Plaintiffs, the plaintiff had provided "admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails)." The Fifth Circuit held that these "admissions" did support an inference of scienter. *Id.* ("The contemporaneous documents and post-period admissions both consistently tell the same story: the defendants privately knew, at the time of the representations, that the no-deposit programs and Type II affiliation conversion would be disastrous for the company but continued to tout their benefits publicly."). The Fifth Circuit further explained that "the plaintiff's partial reliance on alleged facts dating from the post-class period does not amount to 'fraud by hindsight'" because "the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.,* they are evidence that the defendants actually knew earlier that the course of action would turn out badly." *Id.*

Here, the Court has carefully considered all of the post-class period statements identified by Plaintiffs. Unlike the "admissions" used by the plaintiffs in *Lormand*, the later statements

seized on by Plaintiffs here are not akin to "admissions" by Individual Defendants that they had engaged in securities fraud. Many of the statements (*e.g.*, the statement Anixter had experienced a "trend of decelerating growth rates") amount to nothing more than *ex-post* descriptions of Anixter's financial performance in 2008. The statements do not establish that Defendants knew—from an *ex ante* perspective—that Anixter's growth rates would trend downward over the year. *Higginbotham*, 495 F.3d at 759-60. The statements that Defendants "have a very detailed view" of Anixter's financial performance and that Defendants would notice the effect of a slowed market "pretty quickly" are not admissions that Defendants foresaw (yet failed to disclose) the fact that Anixter's growth rates would continue to decline over the course of 2008 to the extent that they did. If Plaintiffs could identify contemporaneous information known to Defendants that showed that Anixter's current financial health or future prospects was poorer than what Defendants disclosed to the market, such post-class period statements may be relevant to corroborate and build on the inference of scienter raised by the possession of that contemporaneous information. See *Lormand*, 565 F.3d at 254. But on their own, the post-class period statements identified by Plaintiffs do not help to establish a "strong" or "cogent" inference of scienter.

Individual Defendants' sales of Anixter stock during the class period likewise do not raise an inference of scienter. Most importantly, Plaintiffs' complaint fails to establish a strong inference of scienter because Plaintiffs have only provided information about Defendants' stock sales from *within* the class period. Without contextual information about Defendants' stock sales outside the class period, the Court cannot determine if the class period sales were "unusual or suspicious." *Pugh v. Tribune Co*., 521 F.3d 686, 695 (7th Cir. 2008). In *Pugh*, the Seventh Circuit held that the plaintiffs' discussion of the defendants' sales of stock in the complaint had

failed to create a strong inference of scienter. There, the "complaint merely set[ ] forth the aggregate amount of shares sold during the class period and the value of those shares," *id.*— which is precisely what Plaintiffs here have done. "[T]he failure to provide any context showing that the applicable time period was unusual undercuts a 'strong' demonstration of scienter." *Id*. (citing *Higginbotham*, 495 F.3d at 759 ("Managers sell stock all the time * * * [if] managers sell blocs during the average month, plaintiffs can't get any mileage out of what happened in April.")). Plaintiffs do not even attempt to distinguish *Pugh*, despite the fact that Defendants repeatedly cited it throughout their opening memorandum.[26] Instead, Plaintiffs argue that Defendants' sales were "suspicious in both timing and amount"—suspicious in timing because Defendants Grubbs sold stock on January 29, 2008 (the same day they spoke to the market),[27] and suspicious in amount because of the allegedly large amount of stock sold and the price at which the sales were made. (Pl. Resp. Mot. Dismiss at 26). But without contextual information about Defendants' stock sales outside the class period, the Court cannot properly evaluate these arguments. *Pugh* is directly on point, and in light of that controlling authority, Plaintiffs' reliance on Defendants' class period stock sales to establish scienter fails.

As discussed above, Defendants have attached Forms 4 showing Defendants' sales from 2006 and 2007. Because the Court has determined that Plaintiffs' complaint is subject to dismissal for the reasons stated above, the Court need not rule definitively on the difficult question (discussed at length above) of whether it may consider at this stage of the case the Forms 4 for the truth of what is discussed in them. Nevertheless, looking ahead to the possibility of an amended complaint – and further down the road to a possible motion for summary

---

[26] Plaintiffs also ignore *Higginbotham's* discussion of the same issue.

[27] Defendant Letham sold a block of stock two weeks later, on February 15. 2008.

judgment – it would appear that the Forms 4 provide the "context" that Plaintiffs thus far have omitted. A review of those Forms and the chart at Exhibit D which summarizes them, seems to undermine any notion that a strong inference of scienter can be drawn from Defendants' stock sales. In fact, Defendant Letham sold no more shares during the class period than during the same months in each of the two prior years.[28] Defendant Grubbs sold substantially less stock during the class period than in prior years.[29] Interestingly, Defendant Grubbs sold more stock in January of 2008 than he sold in any other single month in 2006, 2007, and 2008 (29,000 shares). However, Plaintiffs do not mention that Defendant Grubbs sold 14,000 of those shares on January 2, 2008—just weeks *before* he allegedly began to engage in securities fraud. If anything, a large sale of stock just before a defendant is alleged to have begun engaging in securities fraud undercuts an allegation of scienter. The *only* sale that Defendant Eck made in 2006, 2007, and 2008 was a sale of 1,045 shares in September of 2008.[30] As this sale represented only 7.17% of his holdings at the time (1.92% including options), it is difficult to infer much of anything from it.[31]

---

[28] For example, Defendant Letham sold 3,668 shares per month in January through June of 2008, 3,668 shares per month in January through June of 2007, and 3,332 shares per month in January through June of 2006.

[29] Defendant Grubbs sold 15,000 shares during the class period. He sold 30,000 shares during the months of January-October 2008, 196,125 shares during that same period in 2007, and 91,550 shares during that same period in 2006.

[30] In their complaint, Plaintiffs mention sales by other Anixter executives who are not Defendants in this case. These sales "need not be considered" as "[t]here are no allegations that th[ese] officer[s] * * * [were] in any way involved in the alleged fraudulent misconduct." *Higginbotham v. Baxter Inter., Inc.*, 2005 WL 1272271, at *8 n.6 (N.D. Ill. May 25, 2005).

[31] Because the Court has found Count I to be subject to dismissal on two independent grounds, it need not address the other arguments Defendants raise regarding Count I – namely, that their forward-looking statements are protected by the PSLRA's statutory safe harbor (19 U.S.C. § 78u-5(c)), that some of Defendants' statements were immaterial puffery, or that Plaintiffs have failed to plead loss causation.

## B.      Count II

As discussed above, Count II of the complaint is directed against the Individual Defendants and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).  "[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh*, 521 F.3d at 693.  Because Plaintiffs have failed to do this, Count II is dismissed as well.[32]

## V.      Conclusion

For the foregoing reasons, Defendants' motion [43] is granted and Plaintiffs' complaint is dismissed without prejudice.[33]  Plaintiffs are given 28 days to replead if they believe that they can cure the deficiencies identified above.  Plaintiffs' motion to strike [47] is granted in part and denied in part.

Dated:  March 31, 2011

_____
Robert M. Dow, Jr.
United States District Judge

---

[32] The Court need not address the other argument Defendants have raised in opposition to Count II; namely, that Plaintiffs have failed to properly allege that Individual Defendants had general or specific control over Anixter.  See *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994).

[33] In *Fannon v. Guidant Corp.*, 583 F.3d 995, 1001-02 (7th Cir. 2009), the Seventh Circuit discussed whether a district court had abused its discretion in dismissing a securities fraud complaint with prejudice. The court cited a number of cases in which courts of appeals have found that it is best to use a dismissal without prejudice for a PSLRA complaint, given the demanding nature of PSLRA pleading standards.  *Id.* at 1002.  However, the Seventh Circuit declined to adopt a *per se* rule regarding when such complaints should be dismissed without prejudice, finding instead that "each [case] must be evaluated on its own merit, in light of its own procedural history."  *Id.*  In affirming the district court's dismissal with prejudice, the Seventh Circuit noted that there, plaintiffs had had "a number of opportunities to craft a complaint that complied with the standards of the PSLRA."  This is the first time that the Court has dismissed Plaintiffs' complaint and the Court does not see why Plaintiffs should not have at least one opportunity to correct the pleading deficiencies identified in this opinion, if they can do so.