**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GARDEN CITY EMPLOYEES' | ) | |
| RETIREMENT SYSTEM, and | ) | |
| INDIANA LABORERS PENSION FUND, | ) | |
| Individually and on Behalf of | ) | |
| All Others Similarly Situated, | ) | CASE NO.:  09-CV-5641 |
| | ) | |
| Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| ANIXTER INTERNATIONAL, INC., | ) | |
| ROBERT J. ECK, DENNIS J. LETHAM and | ) | |
| ROBERT GRUBBS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' motion to dismiss [73] Plaintiff's Second Amended Complaint ("SAC").  Plaintiffs filed their SAC [65] after the Court granted Defendants' motion to dismiss the First Amended Complaint ("FAC") in its March 31, 2011 Order [63].  Defendants now argue that Plaintiffs SAC again fails to state a claim on which relief can be granted.  For the reasons below, the Court grants Defendants' motion [73].

**I.      Background**

Garden City Employees' Retirement System and Indiana Laborers Pension Fund ("Plaintiffs") bring this putative class action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), on behalf of themselves and all persons other than Defendants who purchased or otherwise acquired the common stock of Anixter International Inc. ("Anixter" or the "Company") between January 29, 2008 and October 20, 2008, inclusive.

On March 31, 2011, the Court granted Defendants motion to dismiss Plaintiffs' FAC without prejudice. The Court's March 31, 2011 Opinion held that Plaintiff failed to plead facts sufficient to suggest that: (1) any of the statements made by Defendants were false or misleading when they were made ([63 at 38]); (2) Defendants were promising 8%-12% organic growth for the entire company for 2008 (*Id*. at 41); and (3) Defendants claimed Anixter was not being affected of the global economic slowdown (*Id*. at 42). In other words, Plaintiffs failed to point to any specific statements that were untrue or misleading or identified information known to Defendants at that time that was of such a negative nature as to preclude Anixter from saying nearly anything positive. *Id*. at 50. Moreover, Plaintiffs failed to plead a "strong" or "cogent" inference of scienter. *Id*. at 53. Plaintiffs filed a SAC on April 28, 2011 [65]. On May 26, 2011, Defendants filed a motion to dismiss the SAC [73].

Because the Court provided detailed background in its March 31, 2011 Order ("March 31 Order"), it will not do so again. In their motion to dismiss, Defendants argue that Plaintiffs SAC suffers from the same failures that resulted in the dismissal of the FAC. The Court agrees.

## II.     Legal Standard

The complaint alleges two causes of action against Defendants. Count I of the complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b-5. "Section 10(b) * * * forbids the 'use or employ, in connection with the purchase or sale of any security * * * [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Tellabs*, *Inc*. *v*. *Makor Issues & Rights*, *Ltd*., 551 U.S. 308, 318 (2007) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 also forbids a company or an individual "to make any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Stoneridge Inc. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)).

Count II of the complaint is directed against the Individual Defendants only and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). That provision provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." "Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws- here, a violation of § 10(b) and Rule 10b-5." *Pugh*, 521 F.3d at 693.

Defendants move to dismiss the amended complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). A motion to dismiss tests the sufficiency of the complaint, not its merits. See, *e.g.*, *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). In considering a Rule 12(b)(6) motion in securities fraud actions, courts must, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the

defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 569 n.14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic*, 550 U.S. at 563.

Allegations of fraud, such as the allegations made in support of Plaintiffs' securities fraud claim, are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280-81 (7th Cir. 1996). Plaintiffs must plead the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). They must identify the person who made the misrepresentation; the time, place, and content of the misrepresentation; and the method by which the misrepresentation was communicated. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (fraud must be pled with particularity by providing the who, what, when, where, and how).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), further raises the pleading standard for securities fraud claims. See *Teamsters Affiliates Pension Plan v. Walgreen Co.*, 2010 WL 3894149, at *2 (N.D. Ill. Sept. 29, 2010) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs I)*, 437 F.3d 588, 596 (7th Cir. 2006) ("[T]he PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading-one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b).")). Congress

enacted the PSLRA "[a]s a check against abusive litigation by private parties," *Tellabs*, 551 U.S. at 313—it was intended "to screen out frivolous suits, while allowing meritorious actions to move forward." *Id.* at 324. "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* at 313. In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Further, in claiming scienter under the PSLRA, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir.2007). A complaint will survive a motion to dismiss only if a reasonable person would deem the inference of scienter cogent and at least as compelling as an opposing inference that could be drawn from the facts alleged. *Tellabs*, 551 U.S. at 324. The Supreme Court has emphasized that "[t]he inquiry * * * is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (original emphasis). As the Court explained, "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* at 323. Although the inference of scienter must be more than merely "reasonable," it need not be irrefutable, or even the "most

plausible of competing inferences." *Id.* at 324. It must, however, be "cogent and compelling." *Id.* The Seventh Circuit has rejected the "'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh*, 521 F.3d at 693.

As is common with similar securities actions, some of Plaintiffs' contentions are made on information obtained from confidential sources. "While the PSLRA does not require [plaintiffs] to name their confidential source, they must nevertheless describe the source 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 782-83 (N.D. Ill. 2006) (quoting *Tellabs I*, 437 F.3d at 596); see also *Makor Issues & Rights, Ltd v. Tellabs Inc. ("Tellabs III")*, 513 F.3d 702, 712 (7th Cir. 2008) (permitting reliance on the assertions of unnamed confidential sources who were "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify"). While the Seventh Circuit does allow information from confidential witnesses to help generate a strong inference of scienter, see *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (citing *Tellabs III*, 513 F.3d at 712), it has expressed a healthy skepticism regarding information obtained from confidential sources. See *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007) (discounting allegations from confidential sources as unreliable and of limited value in establishing scienter, adding that "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

### III.    Analysis of Motion to Dismiss

In the SAC, Plaintiffs argue that Defendants engaged in a scheme to deceive and defraud investors of the true value of Anixter's stock in violation of federal securities law.  To prove their claim, Plaintiffs' sixty-three page complaint focuses on Defendants' January, April, and July 2008 statements (including press releases and earnings conference calls), the statements of analysts in January, April, July and September 2008, and the testimony of confidential witnesses.

Defendants argue that the SAC fails because: (1) Plaintiffs have again failed to plead that Defendants made any false or materially misleading statements; (2) Plaintiffs fail to adequately plead scienter; (3) Defendants' forward-looking statements are protected by the PSLRA's safe harbor; (4) several challenged statements were immaterial puffer; and (5) Plaintiffs have failed to plead loss causation.

### A.    Count I

#### 1.    Failure to Adequately Plead Falsity or Materially Misleading

The first argument that Defendants direct at the complaint is that Plaintiffs have again failed to specify each statement alleged to have been false or misleading and the reasons why the statement is false or misleading, as required by the PSLRA.  § 78u-4(b)(1)(B).  As stated above, the PSLRA's heightened pleading instructions require Plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  Claiming that a particular statement was untrue is not enough— Plaintiffs must explain, with particularity, the factual basis for their assertion that the statement was untrue.  See *Premier Capital Management, L.L.C. v. Cohen*, 2003 WL 21960357, at *2 (N.D. Ill. Aug. 15, 2003) (citing *Clark v. TRO Learning, Inc.*, 1998 WL 292382, at *4 (N.D. Ill. May 20, 1998)); see also *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000

(E.D. Wis. 2009) (complaint deficient because it lacked "fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made"). The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Tellabs I*, 437 F.3d at 595 (quoting *Novak v. Kasaks* 216 F.3d 300, 314 n. 1 (2d Cir. 2000)).

Defendants correctly emphasize, as the Court did in its March 31 Order, that Plaintiffs must allege facts that show with sufficient particularity that Anixter made statements that were "false when made (not incorrect in retrospect)." [63 at 36]; see also *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1332 (7th Cir. 1995) ("[T]he securities laws typically do not act as a Monday Morning Quarterback. The securities laws approach matters from an *ex ante* perspective.") (internal citation and quotation omitted); *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *7 (N.D. Ill. Oct. 19, 2009) (plaintiffs required to plead facts known to Defendants "contemporaneous to the [allegedly-false] statements"). To this point, the Seventh Circuit has specifically and repeatedly held that "there is no 'fraud by hindsight.'" *Higginbotham*, 495 F.3d at 759-60 (quoting *Tellabs*, 551 U.S. at 320 and *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)); see also *Pugh*, 521 F.3d at 694-95; *Sutton v. Bernard*, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001) ("statements made at or after the end of the class period cannot be used to show that what was said earlier was false or misleading").

In the SAC, Plaintiffs claim that Defendants misled investors about negative economic trends affecting Anixter's business in statements that Defendants made during the class period. Specifically, Plaintiffs argue that Anixter misled investors concerning (1) corporate spending and IT projects, (2) non-residential construction, (3) pricing pressures and day-to-day sales, (4)

Anixter's European segment and OEM supply business, (5) projected organic growth in 2008, and (6) Anixter's exposure to the economy.

In order to adequately plead that Defendants misled investors, "plaintiffs must point to a specific statement that is made misleading by [an] omission," (*Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001)), and offer "specific, contradictory information" known to Anixter sufficient to establish that Anixter made any misleading statements.[1]  *In re Harley-Davidson. Sec. Litig*, 600 F. Supp. 2d at 1000.  Defendants argue that Plaintiffs have failed to plead that Anixter misled investors about negative economic trends affecting its business because (1) "Defendants were not required to publicly disclose to the markets statements about the general condition of the global economy" ([63] at 39), (2) Anixter never stated that it was insulated from the general economy, and (3) Anixter disclosed both positive and negative developments over the course of the class period.

Corporate Spending and IT Projects

Plaintiffs first contend that Anixter failed to disclose that by 2008 corporate spending—particularly for IT projects—was declining in North America and Europe.  As an initial matter, the Court reminds Plaintiffs that Defendants do not commit securities fraud by failing to specifically alert investors to the general conditions of certain segments of the market. [63 at 40]; *Higginbotham*, 495 F.3d at 759.  Plaintiffs' evidence of the general state of the market during the class period thus does not prove fraud.

Moreover, looking at Anixter's press releases and earnings conference call transcripts during the class period, Defendants disclosed that it was experiencing a slowdown.  See Def. Ex. G, 4/22/08 P.R. at 2 ("Sales in the enterprise cabling and security market [in Europe] fell by 7 percent primarily due [to] timing of holidays and lower project volumes, particularly in the U.K.

---

[1] Plaintiffs rely on Defendants' press releases and conference calls in January, April and July 2008.

market"); Def. Ex. H, 4/22/08 Tr. at 2 ("slower growth in the enterprise cabling and security market", "reducing spending is due, in part, to softer corporate spending"); Def. Ex. J, 7/22/08 P.R. at 2 ("lower volumes of large projects in the overall enterprise cabling market," including "lower year-on-year growth rates [that] were most pronounced in the North American enterprise cabling and security solutions end market"); Def. Ex. K, 7/22/08 Tr. at 3 ("we experienced slow growth in the North American enterprise business"). The SAC focuses only on Defendants' statements that were positive during the class period. But as discussed in the March 31 Opinion, Plaintiffs have failed to plead that those statements were false, and in light of the disclosures noted above during the class period, the Court does not find that Defendants disclosures misled investors. [63 at 39]. Rather, looking at all the disclosures, Defendants disclosed both the positive and negative news throughout the class period. Accordingly, Plaintiffs failed to plead with the required level of specificity that Defendants made false or misleading statements with respect to corporate spending and IT projects during the class period.

Non-Residential Construction

Plaintiffs next contend that based on a billings index published by the American Institute of Architects ("AIA") in April 2008, Defendants knew by April 2008 that non-residential construction would begin to decline during the second half of 2008, and thus Anixter's July 2008 statement that there were "good sales to contractors" was misleading. According to the complaint, 15-20% of Anixter's Enterprise business was tied to non-residential construction. Again, Defendants do not commit securities fraud by failing to specifically alert investors of the general condition of certain segments of the market. [63 at 40]; *Higginbotham*, 495 F.3d at 759. Contrasting Defendants' specific statements about Anixter's business with generalized, well-known allegations about the state of the economy is insufficient to establish falsity under the

strict pleading requirements of the PSLRA. *Premier Capital Management, L.L.C.*, 2003 WL 21960357, at *2. The index published by the AIA in April 2008 is exactly the type of general and public information the Court found was not evidence in its March 31 Order. See [63 at 39-40].

Furthermore, as Defendants note, the SAC does not plead that Defendants were not seeing good sales to contractors at the time the relevant statements were made. See [63 at 50] ("These statements . . . would be misleading only if [] Plaintiffs could point to specific statements that were untrue or misleading"). In fact, the complaint contains no information concerning the actual level of Anixter's sales to contractors at any time throughout the period. Nor does the complaint allege that Defendants had any non-public information that would render the statements misleading during the class period. Thus, the mere existence of the AIA report—which is public information—has no bearing on whether Defendants statements were false or misleading at the time they were made, and Plaintiffs have alleged nothing else to suggest that Defendants' statement in July 2008 that they had "good sales to contractors" was indeed untrue or misleading.

Pricing Pressures and Day-to-Day Sales

Third, Plaintiffs allege that Anixter mislead investors in January, April, and July 2008 when it represented that it was seeing "strong day-to-day sales" during a time that broad economic issues were negatively affecting Anixter's sales. Plaintiffs rely on evidence of concerns with four of Anixter's customers—JLR, Alcatel-Lucent, Siemens, and Netversant—during the class period to allege that Anixter's statements were misleading.[2]

---

[2] Plaintiffs rely on the statements of several confidential witnesses to support their allegations. CWs 2-5 are the same CWs on whom Plaintiffs relied in the FAC. As it did in the FAC, the Court has considered all of the statements of the CWs in reaching its determination here.

With regard to JLR, in its March 31 Order, the Court noted that Plaintiffs failed to allege that (1) the defendants knew of the dispute during the class period, (2) when the dispute began and when the individual Defendants knew of it, (3) that Defendants knew they would lose the dispute and have to pay JLR, and (4) that Plaintiff did not adequately allege that the dispute was material such that Anixter was required to disclose it under Rule 10b-5. [63 at 46]. The SAC and Plaintiffs brief failed to address the first three of these deficiencies. Thus, the Court stands on its previous analysis.

As for Alcatel-Lucent, the complaint alleges that Alcatel-Lucent, one of Anixter's largest and most important customers, was pressuring Anixter during 2007 and early 2008 to renegotiate and reduce its pricing terms. But as Defendants note, these allegations fail for the same reasons that the JLR allegation failed in the FAC and in this complaint. Plaintiffs do not allege that Alcatel-Lucent was successful in renegotiating its prices during the class period, that Defendants knew during the class period what the result of the negotiations would be, or any facts showing that any price changes during the class period were material such that Anixter was required to disclose them—especially since, according to the SAC, by the end of 2007 Alcatel-Lucent had already "negotiated its prices to such lows that Anixter was in danger of not making a profit on Alcatel-Lucent's business." [65 ¶ 109]. And—as the Court said with regard to JLR in its March 31 Order—"the Court cannot assume" that the pricing negotiations were material and "is not bound to accept" Plaintiffs' legal conclusion that they were. [63 at 47].

The same is true of the allegations concerning Siemens and Netversant. While Plaintiffs allege that there was a report on July 11, 2008 that Siemens was reducing its workforce, they do not allege that Anixter knew this information before it went public or that it would materially affect Anixter's relationship with Siemens. Netversant filed for bankruptcy in November 2008,

but the complaint does not allege how Anixter would have known about it before that time or anytime during the class period.

Ultimately, Plaintiffs argue that the "collection of these troubles with Anixter's major customers demonstrate the falsity of defendant's denials that any 'broad based economic trends' and assurances that 'some' customers were picking up their business." [76 at 12].  However, looking at the whole of Anixter's disclosures, Anixter continually noted that some of its customers were experiencing difficulties and that those difficulties were impacting Anixter.  See Ex. E. 1/29/08 Tr. at 2 ("certain customers . . . experienced production slow downs that negatively impacted our year on year sales"); Ex. G 4/22/08 P.R. at 3 ("there were a number of customer-specific situations where spending was reduced in response to slower economic conditions"); Ex K 7/22/08 Tr. at 3 ("continuing weakness with certain customers . . .who experienced production slowdowns . . . negatively impacted our year-on-year sales").  Accordingly, Plaintiffs have failed to demonstrate with the requisite particularity how the omissions of Defendants' relationships with JLR, Alcatel-Lucent, Siemens, and Netversant resulted in any specific statement Anixter made during the class period misleading investors, especially in light of the negative disclosures that Defendants did make throughout the class period.  See *In re Guidant Corp. Sec. Litig*., 536 F. Supp. 2d 913, 928 (S.D. Ind. 2008) ("Plaintiffs have not demonstrated with the requisite particularity how [the alleged] omission . . . rendered any specific affirmative statements misleading.")

Anixter's European Segment and OEM Supply Business

Plaintiffs next allege that Defendants misled investors about the declining trends in the European segment and OEM supply business.  Specifically, Plaintiffs allege that by January 2008 the European automotive industry was slowing dramatically, directly affecting Anixter's

European OEM supply business. [76 at 13]. Plaintiffs further contend that by June 2008, European OEM Supply sales had taken a significant hit and were trending downward, resulting in organic growth in Europe falling from 4% in Q2 to negative 2% in Q3. According to the complaint, despite these trends Anixter continued to tell investors it was experiences "very strong growth in Europe." Plaintiffs also allege that Anixter's US OEM Supply business was suffering, and by August 2008 Anixter was delaying and canceling orders. But again, the Plaintiffs have not properly alleged that these statements were false or misleading because they have failed to identify "specific, contradictory information presumably known" to Defendants that contradicted the positive statements about Anixter's business as a whole. [63 at 49]; *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d at 1000.

First, looking at all the disclosures during the class period, Anixter repeatedly disclosed its concerns in the European Supply business. See Ex. E 1/29/08 Tr. at 2 ("year on year sales in Europe were flat"); Ex. G, 4/22/08 P.R. at 2 ("gross margins experienced some pressure . . . in the OEM supply market in Europe"); Ex. H 4/22/08 Tr. at 3 ("The decline in gross margins was based in two areas, the Electric[al] Wire business in North America, and OEM supply business in Europe."); *Id*. at 6 ("some customers have reduced their production schedule"); Ex. J 7/22/08 P.R. at 3 ("gross margins declined . . . due to    . . . continued pressure from rising steel and specialty metal prices in our OEM supply business"); Ex. K, 7/22/08 Tr. at 6 ("So I think if you looked at OEM supply, there in the UK market is beginning to slow a touch because there tends to be some talk about some macroeconomic factors there.")

Second, Defendants argue that Plaintiffs distort Anixter's July 22, 2008 statement that there was "very strong growth in Europe." According to Defendants, the statement actually reads that it experienced "very strong growth in Europe *from new customers*" in the OEM market in

Q2. Ex. K, 7/22/08 Tr. at 6 (emphasis added). Plaintiffs do not contend that Anixter did not have strong growth in Europe from new customers in that period or even that Anixter's OEM business did not experience strong growth in Europe in the Second Quarter generally. And in fact, in the second quarter Anixter reported "a 16 percent year-on-year increase" in OEM sales in Europe "as a result of adding business with existing customers and the addition of new accounts." (Ex. J, 7/22/08 P.R. at 3). Plaintiffs again have failed to explain why Anixter's positive statements about its business did not take into account any problems that existed in its European OEM business along with other offsetting factors in other countries and with other products. [63 at 43].

Finally, with regard to Plaintiffs' claim that Defendants mislead investors when they were canceling orders in August and September 2008, the Court agrees with Defendants. This action at the very end of the period, suggests not that Defendants were misleading investors, but rather that they did not know that there was going to be a large scale slowdown until this point, well after statements were made in January, April, and July 2008. Plaintiffs thus also have failed to allege with the required specificity how Defendants misled investors with regards to the European OEM supply business.

Projected 8%-12% Organic Growth of 2008

In its March 31 Order, the Court made clear that Plaintiffs "may not plead generally that Anixter provided 'guidance of 8% to 12% organic growth for 2008", ([63 at 41]), and that to support their claims they must plead a specific statement made by Anixter containing such a projection. *Id.* at 41-42. In Plaintiffs' SAC, they included numerous statements that they

contend contain a projection of 8%-12% growth in 2008.  But looking at all of the allegations, the SAC suffers from the exact same flaw as the first amended complaint—absent from all of the allegations is a statement from Anixter in which is promises 8%-12% organic growth for 2008. See [63] at 48.  The 8%-12% growth rate was a "couple of year outlook for the business." Ex. C 10/23/07 Tr. at 9.  When asked on January 29, 2008 to look out over the "next few quarters" and "talking about how you get to organic growth of eight to 12%," Defendants responded that Anixter was "seeing good market growth in a number of the industries we serve," and that "it is hard to say where we see the market growing." Ex. E, 1/29/08 Tr. at 5-6.  Absent from this statement is a projection of 8%-12% organic growth in 2008.

In April 2008, Defendants stated that "[a]fter adjusting for acquisitions and exchange rate differences, we still achieved a healthy 7% organic sales growth as compared to the year-ago first quarter.  Adjusted for holidays, the organic growth was 8% which is in line with the lower end of our 8% to 12% organic growth target range." Ex. H, 4/22/08 Tr. at 2.  The plain language of this statement discusses the growth rate for the previous quarter, which Plaintiffs do not dispute; it does not promise an organic growth rate of 8%-12% for 2008.

In the July press release, Anixter noted that "[i]f we achieve a modest level of consecutive quarter growth it will move our third quarter year-on-year growth rates closer to our longer-term target of 8 to 12 percent yearly growth." Ex. J, 7/22/08 P.R. at 3.  When the Court dealt with this statement in its March 31 Opinion, it noted that "[t]he plain implication of the statement is that Anixter was then not on track to hit its 'long-term target' of 8 to 12 percent yearly growth, and assuming a 'modest level of consecutive quarter growth,' Anixter's growth rates would move 'closer' to the 8-12% range." Plaintiffs plead nothing new to alter the Court's previous conclusion that "[t]he problem with Plaintiffs' argument is the same for the July

statement as it is for the statements from the early parts of 2008—Anixter simply did not promise '8%-12% organic growth for 2008' either in its July SEC filings, press release, or during the July 22, 2008 earnings call with analysts." [63] at 48.[3]

Plaintiffs SAC—like the FAC—fails to plead with the required level of specificity that Defendants projected an 8%-12% organic revenue growth in 2008 at any time during the class period. Nothing in any of the statements to which Plaintiffs point can be read as a projected promise of performance for the 2008 year. Defendants simply did not promise 8%-12% organic growth for 2008 at any point during the class period.

Exposure to the Economy

Plaintiffs also claim that Defendants made false and misleading statements about Anixter's exposure to the declining economy. According to Plaintiffs, Defendants misled investors throughout the class period to believe that Anixter was disconnected from the current declining economic conditions and made specific statements in January, April, and July 2008 confirming their immunity. [76 at 18-20].

For example, Plaintiffs allege that in January 2008 Defendants stated that the fourth quarter of 2007 "was an interesting quarter in terms of the disconnect between the broader markets negative economic news" and Anixter's performance, and that "early indications of

---

[3] Plaintiffs also attempt to attribute statements by third-party analysts to Defendants to support their argument. But "securities issuers are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions attributable to [the issuers.]" *Teamsters Affiliates Pension Plan v. Walgreen Co.*, 2010 WL 3894149, at *3 (N.D. Ill. Sept. 29, 2010); see also *In re ATI Techs. Inc. sec. Litig.*, 2007 WL 2301151, at *8 (E.D. Pa. Aug. 8, 2007) ("a company cannot be liable for a third party's statements unless it expressly adopts or endorses that statement."). Thus, the Court will not consider the analysts statements because none of the statements are alleged to have been adopted or endorsed by Anixter. See also *In re Pinnacle Sys., Inc.*, 2002 WL 31655187, at *3 (N.D. Cal. Nov. 18, 2002) ("Even assuming that one reasonable inference is that the analyst did nothing but repeat what [defendant's] managers told him, such an inference does not suffice to defeat the [motion to dismiss] because it is equally reasonable to infer that the analyst spoke to [defendant's] management, and perhaps others, and then formed and stated his own opinions.").

[Anixter's] 2008 business activity" showed the same disconnect. Ex E. 1/29/08 Tr. at 2. Plaintiffs argue that this statement misleads investors to believe that Anixter was disconnected from broader economic trends throughout the class period. But looking at the plain language of the statement, it reads that the fourth quarter of 2007 showed a disconnect, and that early indications of the first quarter of 2008 continued to show that disconnect. This statement was not a forward-looking projection as to whether Anixter would remain disconnected from outside economic conditions during the class period.

Plaintiffs claim that on April 22, 2008, Anixter said that its "geographic diversity" would "mitigate the effects of the current economic slowdown." But the actual statement reads: "Details of our first quarter results highlight how the diversity of the business and the success of our growth initiatives did, in fact, mitigate the effects of the current economic slowdown to a sufficient degree to once again allow us to report double-digit growth in sales, operating income and diluted earnings per share as well as improved opening margins versus the year-ago quarter." Ex. H, 4/22/08 Tr. at 1. The plain language of this statement described the past quarter ("did, in fact") and was a not a projection of Anixter's future.

Finally, Plaintiffs submit that on July 22, 2008, when asked whether Anixter would take action similar to what it took during the 2001 recession, Defendant Letham told analysts that Anixter did not have "any particular . . . exposure today that would suggest that [it] would be taking similar type action." Defendants argue that this, too, is taken out of context. According to Defendants, Letham was discussing the "similar type action" of "pulling down expenses" from a "clearly identifying set of costs" in the "telecom market" in which Anixter had "heavy exposure" in 2001. Ex K., 7/22/08 Tr. at 16. Again, Defendants did not say they were not exposed, and in fact, in the same call Defendants stated that they had "continued concerns about

weakness in our economy." *Id*. at 6.  Accordingly, Plaintiffs failed to plead with the required specificity that Defendants statements about Anixter's exposure to the economy during the class period were materially misleading.

Ultimately, what Plaintiffs really allege in the SAC is that Anixter was too bullish about its quarterly predictions during the class period.  But if, as Plaintiffs do, citing disappointing figures from the future as evidence of fraud in the past was enough, courts "would have to conclude that almost every company in the fall of 2008 was run by fraudsters because their predictions would have been knocked down by the dramatic recession that ensued." *Iron Workers Local No. 25 Pension Fund et al. v. Oshkosh Corp.*, 2010 WL 1287058, at *17 (E.D. Wis. Mar. 30, 2010); see also, *DiLeo v. Ernst & Young*, 901 F. 2d 624, 626 (7th Cir. 1990) ("For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off.  No matter when a bank does this, someone may say that it should have acted sooner. If all this is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.")  In sum, because Plaintiffs have failed to specify any statements to have been false or misleading and the reasons why the statements are false or misleading, as required by PSLRA § 78u-4(b)(1)(B), dismissal of Count I is appropriate.


### 2.    Plaintiff Fails to Plead Scienter

In its March 31 Order, the Court found that Count I was subject to dismissal for a second reason—Plaintiffs failed to properly plead that any of Anixter's allegedly false or misleading statements were made with the required state of mind.  The PSLRA provides that the complaint in a securities-fraud action must, "with respect to each act or omission alleged to violate this

chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). That "required state of mind" is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

In many ways, the analysis the Court has undertaken in Section III.A.1. above overlaps with the scienter analysis; for if Plaintiffs have failed to properly plead that any of Anixter's statements were false or misleading, Plaintiffs could hardly allege that Defendants made false statements with the required state of mind. But, as it did in its March 31 Order, the Court writes further to elaborate on why Plaintiffs complaint fails to adequately allege the required "strong" and "cogent" inference of scienter. *Tellabs*, 551 U.S. at 322-24.

The four grounds on which Plaintiffs base their allegations of scienter not discussed above are (1) Defendants' post-class period statements, (2) Individual Defendants' positions in the firm, (3) the testimony of confidential witnesses, and (4) Individual Defendants' stock sales during the class period. The Court will discuss each of these issues in turn. However, in discussing each of these issues separately, the Court wishes to make clear that—as it did in the March 31 Order—it has not "scrutinize[d] each allegation [regarding scienter] in isolation," but instead has "assess[ed] all the allegations holistically" to determine whether Plaintiffs properly alleged scienter. *Tellabs*, 551 U.S. at 326; *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct 1309, 1324 (2011).

Plaintiffs, as they did in the FAC, point to alleged admissions made by Defendants after the close of the class period in an attempt to establish scienter. As an initial matter, the Court reiterates that there is no "fraud by hindsight." *Higginbotham*, 495 F.3d at 759-60. Post-class

period statements by Defendants recognizing that their business has experienced a downturn do nothing to suggest that Defendants had contemporaneous knowledge (yet failed to disclose) that their company was earlier experiencing a downturn.

Plaintiffs argue, however, that these statements take on new significance when viewed in the context of Anixter's experiences during the 2001 recession. According to Plaintiffs, Defendants knowledge and experience with the 2001 recession is the "canvas upon which the tableau of fraud is painted," because Defendants knew that Anixter was highly susceptible to the declining economy and was particularly exposed to spending cuts and cancellations by its customers. *Hughes*, 733 F. Supp. 2d at 949. But none of these statements "identify contemporaneous information known to Defendants that showed that Anixter's current financial health or future prospects were poorer than what Defendants disclosed to the market." [63 at 56]; see *Lormand*, 565 F.3d at 254. Again, the Court has carefully considered all of the post-class period statements and reaches the same conclusion; nothing in Defendants post-class statements raise an inference that because Defendants had previously dealt with a recession in 2001, they knew during the class period how the economy would affect their overall sales in 2008. As the Court noted in its March 31 Order, the *ex-post* descriptions of Anixter's financial performance in 2008 do not establish that Defendants knew—from an *ex ante* perspective—that Anixter's growth rates would trend downward over the year. *Higginbotham*, 495 F.3d at 759-60. This remains true, even in light of Anixter's experiences in 2001. In other words, juxtaposing Anixter's experience in 2001 with statements made by Defendants during and after the class period does not establish a "strong" or "cogent" inference of scienter. See *Tarico v. McDermott Int'l, Inc*., 2000 WL 1346895, at *7 (E.D. La. Sept.19, 2000) ("Plaintiffs fail to allege any facts

that suggest when these third quarter increases became recognizable as a trend and when defendants first discerned that a trend existed.").

Plaintiffs also attempt to establish scienter for the individual Defendants by arguing that they must have had knowledge because of their executive positions at Anixter. While Plaintiffs are correct that the Court can assume that corporate officers know facts critical to a business's core operations,[4] the Seventh Circuit has made clear that merely attributing statements made in group-published documents does not amount to scienter to individual officers. See *Pugh v. Tribute Co.,* 521 F.3d 686, 693 (7th Cir. 2008) (rejecting the group pleading doctrine); *Robin v. Arthur Young & Co.*, 915 1120, 1127 (7th Cir. 1990) (rejecting attempt to leverage allegation regarding what defendant "should have known" into scienter); see also *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc*., 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009) ("respective positions within the company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the PSLRA").

Plaintiffs also contend that the statements of their confidential witnesses ("CWs") contribute to finding a strong inference of scienter. As noted in the Court's March 31 Order, while the Seventh Circuit does allow information from CWs to help generate a strong inference of scienter, see *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (citing *Tellabs III*, 513 F.3d at 712), it has expressed a healthy skepticism regarding information obtained from confidential sources. See *Higginbotham*, 495 F.3d at 756-57. Thus, the Court found that the information provided by Plaintiff's CWs does not give rise to an inference that Defendants were acting with scienter, as the information provided by the CWs is not inconsistent

---

[4] *Tellabs III*, 513 F.3d at 709; *Sears*, 291 F. Supp. 2d at 727; *Danis v. USN Commc'ns, Inc*., 73 F. Supp. 2d 923, 938 (N.D. Ill. 1999).

with Defendants' disclosures. [63 at 53]. The Court reaches the same conclusion with regards to Plaintiffs' CWs in the SAC; nothing said by the CWs makes Defendants' positive statements fraudulent nor does it give rise to an inference of scienter.

Finally, Plaintiffs argue that Defendants' stock sales during the class period add to the strong inference of scienter. The Court dealt with the stock sales at length in the March 31 Order and found that Defendants' sales of Anixter stock during the class period likewise did not raise an inference of scienter. [63 at 56-58]. Nothing that Plaintiffs plead in the SAC alters the Court's previous decision. First, all of the individual Defendants' stock sales were made pursuant to a 10b-5 trading plan, adopted before the sale, which negates an inference of scienter. See *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious"); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (sales "were made pursuant to a non-discretionary Rule 10b-5-1 trading plan, which undermines any allegation that the timing or amounts of the trades was unusual or suspicious"); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 931 (S.D. Ind. 2008) ("automatic, nondiscretionary sales made pursuant to 10b-5-1 plans . . . do not give rise to a strong inference of scienter").

Defendants' stock sales also were not unusual or suspicious. As noted in the March 31 Order, Defendant Latham sold no more shares during the class period than during the same months in each of the two prior years. Defendant Grubbs sold substantially less stock during the class period than during the prior year. And while he did sell more stock (29,000 shares) in January of 2008 than in any other month in 2006, 2007 and 2008, he sold 14,000 of those shares on January 2, 2008— just weeks before he allegedly began to engage in securities fraud. As the Court previously noted, if anything, a large sale of stock just before a defendant is alleged to

have begun engaging in securities fraud undercuts an allegation of scienter. [63 at 58]. Defendants note that Plaintiffs also do not allege that Grubbs sold any stock after his January 29, 2008 sale and argue that such a lapse between the sale and the negative disclosures that occurred in late October 2008 further undermines any possible inference of scienter. See *Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*, 2010 WL 3749459, at *9 (E.D. Pa. Sept. 27, 2010) ("When analyzing the timing of stock sales, a longer delay between the sale and the negative disclosure will weigh against an inference of scienter.").

Finally, as Defendants note, Plaintiffs failed to allege whether Eck and Grubbs made a net profit from either of their sales and instead focus only on the gross proceeds from their sales. Pleading only gross proceeds, however, is insufficient to support a strong inference of scienter. See *Glaser v. The9, Ltd.*, 2011 WL 1106713, at *11 (S.D.N.Y. Mar. 28, 2011) ("Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' *net profits* as opposed to *gross proceeds*.")(emphasis in original); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 275 (S.D.N.Y. 2008) ("finding of motive . . . cannot be predicated solely upon the gross proceeds of alleged insider stock sales"). Accordingly, because Plaintiffs have also failed to plead any facts that create a strong inference of scienter as in a § 10(b) action, dismissal of Count I is appropriate.[5]

---

[5] Because the Court has found Count I to be subject to dismissal on two independent grounds, it need not address the other arguments Defendants raise regarding Count I – namely, that their forward-looking statements are protected by the PSLRA's statutory safe harbor (19 U.S.C. § 78u-5(c)), that some of Defendants' statements were immaterial puffery, or that Plaintiffs have failed to plead loss causation.

### B.      Count II

As discussed above, Count II of the complaint is directed against the Individual Defendants and alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). "[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh*, 521 F.3d at 693. Because Plaintiffs have failed to do this, Count II is dismissed as well.[6]

## V.      Conclusion

For the foregoing reasons, Defendants' motion [73] is granted and Plaintiffs' Second Amended Complaint is dismissed with prejudice.[7]

_____

Dated: March 29, 2012                              Robert M. Dow, Jr.
                                                   United States District Judge

---

[6] The Court need not address the other argument Defendants have raised in opposition to Count II – namely, that Plaintiffs have failed to properly allege that Individual Defendants had general or specific control over Anixter. See *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994).

[7] In *Fannon v. Guidant Corp.*, 583 F.3d 995, 1001-02 (7th Cir. 2009), the Seventh Circuit discussed whether a district court had abused its discretion in dismissing a securities fraud complaint with prejudice. The court cited a number of cases in which courts of appeals have urged district courts to consider whether dismissal without prejudice is appropriate for a PSLRA complaint given the demanding nature of PSLRA pleading standards. *Id.* at 1002. However, the Seventh Circuit declined to adopt a *per se* rule regarding when such complaints should be dismissed without prejudice, finding instead that "each [case] must be evaluated on its own merit, in light of its own procedural history." *Id.* (affirming the district court's dismissal with prejudice and observing that plaintiffs in that case had "a number of opportunities to craft a complaint that complied with the standards of the PSLRA"). Here, too, Plaintiffs have had multiple opportunities to craft a complaint, the most recent of which was after the Court spelled out in a detailed, 59-page opinion the pertinent law and what Plaintiffs would need to plead to state a claim under that law. In these circumstances, the Court does not believe that yet another attempt to plead is warranted. See *id.* at 1002; see also *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1033 (E.D. Wis. 2010) (dismissing with prejudice plaintiff's complaint where plaintiff filed an amended and second amended complaint and was given ample time to construct a proper claim).